IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL,
LLC d/b/a FONTAINEBLEAU MIAMI
BEACH, *a foreign limited liability*
*company*,

       *Plaintiff*,

v.

JACOB SHMUEL BOTACH a/k/a
"SHMULEY BOTEACH," *an individual*,
and John Doe,

       *Defendants*.

_____/

CASE NO. 1:25-cv-20251-KMM

**<u>FIRST AMENDED COMPLAINT</u>**

**BURSTYN LAW PLLC**

Sean A. Burstyn
Florida Bar No. 1028778
1101 Brickell Avenue, Suite S700
Miami, FL 33131

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*
*d/b/a Fontainebleau Miami Beach*

## INTRODUCTION

1.  In every context imaginable, reasonable people would call the actions of Defendant Jacob Shmuel Botach a/k/a "Shmuley Boteach" a "shakedown."

2.  The social media influencer and rabbi has been on a multi-week assault on the Fontainebleau Miami Beach,[1] its personnel, and representatives—creating AI videos purporting to show them celebrating antisemitism, comparing them to Nazi collaborators, falsely accusing them of banning Jews from the property, and fabricating statements that they embraced a policy of Judenrein, *i.e.*, the extermination of six million Jews.

3.  In addition to these defamatory and harassing statements made by Defendant Boteach, Defendant Boteach has also explicitly threatened the Hotel, and its personnel and representatives, with violence and harm. He has threatened to "uproot" them as "traitors" to their people, vowed to "fight" them "completely," and warned they have "no idea what's in store for them." In a video about the Hotel's outside counsel, he spoke of the "lessons" of a historical figure who "went after" traitorous Jews and killed them.

4.  This is not the Hotel's first such experience with Defendant Boteach. Two years ago, Defendant Boteach again recorded a verbal altercation in the lobby of the Hotel, then approached Hotel management seeking compensation to calm the outrage that would follow a social media campaign amplifying the video recording.

5.  While Defendant Boteach publicly claims that in 2023 he proposed aligning with the Hotel in exchange for a commitment to retrain security (which was already provided by the Hotel), Defendant Boteach omits that he also demanded personal lifetime access to the swimming pool and gym at the Hotel (the same place he says is unsafe). Ultimately, Defendant Boteach accepted some hotel perks and moved on.

---

[1] Plaintiff Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach ("Fontainebleau" or "Hotel").

6.   Now he's back again, with a promise to "de-escalate" his campaign of harassment in exchange for a $1 million "donation" to his organization, World Values Network.

7.   After the Hotel declined to cower to his extortion, Defendant Boteach intensified his calls for the public to boycott the Hotel on the basis of his categorically false statements that the Hotel obstructed a police investigation into heinous statements hurled at him by a third party unaffiliated with the Hotel on December 2, 2024.[2] Defendant Boteach's targeted harassment of innocent Hotel personnel is a harmful and misdirected response to the serious scourge of antisemitism, which the Hotel *again* condemns in no uncertain terms.

8.   Defendant Boteach's conduct is malicious, illegal, intentional, and wildly out of control. In fact, he went through 3 law firms in the first 10 days since the Incident—a law firm attrition rate of approximately 1 firm every 3 days.

9.   Defendant Boteach has posted information about the Hotel's financial transactions in connection with a demand that the Hotel pay him *$100 million*, which is outrageous on its face and designed to interfere with the Hotel's business relationships. Defendant Boteach's continued false statements that the Hotel affirmatively supports antisemitism are unrelenting and have forced the Hotel to commence litigation to end Defendant Boteach's extortion and remedy the damages caused by his misconduct.

10. Following the Incident and the Hotel's decision not to agree to his demand for $100 million, Defendant Boteach made multiple statements that were false, damaging, or otherwise displayed his malice towards the Hotel, including by way of example:

   a.   Defendant Boteach deliberately distorted a statement of the Hotel, deleting a portion that made clear it declined entry to persons threatening litigation against the Hotel, so

---

[2] What transpired on December 2, 2024 is described herein as the "Incident," the same word Defendant Boteach used to describe it.

as to create the false appearance that he was told that the Hotel enacted a policy to ban Jews.

b. Defendant Boteach falsely stated that the Hotel "denie[d]" he was subject to antisemitism and that he could not go to the Hotel because he is "too Jewish."

c. Defendant Boteach falsely claimed that the Hotel stated that he was "equally responsible" for the attack upon him.

d. Defendant Boteach posted a video falsely accusing the Hotel of unqualifiedly refusing to cooperate with law enforcement in its investigation and omitting material information that he knew.

e. Defendant Boteach published several AI-generated videos of persons affiliated with the Hotel in which he purports to quote them apologizing (*i.e.*, admitting misconduct) and denying the wrongfulness of antisemitism.

f. Defendant Boteach threatened that his counsel was preparing "the most devastating lawsuit from which I hope the rancid hotel will never recover."

g. Defendant Boteach posted "ANY JEW STILL STAYING AT THE [HOTEL] . . . OBVIOUSLY HAS A DEATH WISH. **THIS WILL HAPPEN TO YOU AND THERE WILL BE NOONE** [sic] **TO SAVE YOU**. #BOYCOTTFONTAINBLEAUNOW!!" (Emphasis added.)

h. Defendant Boteach published a statement that, in part, called for guests "who have booked" at the Hotel to "cancel your reservations" and a further statement calling for guests to "be smart and cancel and give your hard-earned money to a hotel that doesn't abide antisemites."

i. Defendant Boteach published a statement describing the Hotel as an "antisemitic sewer."

11. Defendant Boteach's statements demonstrate the maliciousness with which he defamed the Hotel and tortiously interfered with its business relationships.

12. While Defendant Boteach lionized himself as a hero to hundreds of thousands of social media followers, what he did not share with his followers is that he was simultaneously trying to negotiate for a huge amount of money from the Hotel to be funneled to a "charity" controlled by him.

13. At all hours of the day and night, Defendant Boteach proceeded to harass the Hotel and its representatives. For example, he posted a "headshot" photograph of the head of the Hotel's outside counsel with the words "DIGITALLY DECAPITATED" and later, at 3:49 am, menacingly threatened that counsel was "about to have a really interesting Shabbat" when he arrived at his synagogue, which Defendant Boteach identified by name and location. Defendant Boteach directly contacted counsel's clergy and posted harassing images of them.

14. Defendant Boteach's conduct is malicious and illegal. He has engaged in extortion against the Hotel.

15. The Hotel will seek to recover all of the damages Defendant Boteach has caused. These unwarranted attacks against a Florida hospitality institution have been unrelenting and have forced this litigation. Since 1954, guests of all backgrounds have traveled the world to enjoy the iconic Fontainebleau Hotel in Miami Beach. Defendant Boteach's false statements about the Hotel cannot be tolerated.

16. Plaintiff will seek an order requiring Defendant Boteach to pay all of the damages that he has caused the Fontainebleau, including uncapped punitive damages upon entry of an order granting leave for same because his conduct is financially motivated, and a restraining order against Defendant Boteach from continuing his unlawful conduct, including his scurrilous campaign of defamation, threats, and attempted character assassination.

**PARTIES, JURISDICTION AND VENUE**

17. Plaintiff is a foreign limited liability company with a principal place of business at 4441 Collins Avenue, Miami Beach, Florida 33140.

18. Defendant Boteach is an individual above the age of 18 who resides in Miami Beach, Florida.

19. Pursuant to Fla. Stat. § 47.051, venue is proper in this Court because the causes of action accrued against each Defendant in Miami-Dade County.

20. The amount in controversy exceeds the jurisdictional limit of this Court.

**GENERAL ALLEGATIONS**

21. Defendant Boteach champions himself as a fighter of antisemitism and utilizes his social media accounts in a quixotic manner wherein he is always the hero fighting not just antisemites, but also anyone whom he falsely claims to be antisemitic, such as Plaintiff and its representatives.

22. Defendant Boteach operates an international enterprise that depends entirely upon his ability to motivate people to act based on his words. Defendant is not only aware that the large audience to whom he publishes his statements believe them to be true, he counts on it. Defendant relies upon his "followers" and everyone who hears or reads his words acting solely on the words he publishes. Based on the issues he champions—real or imagined—he draws crowds to rallies, fundraisers, and other events. He does not encourage those reading or hearing his words to seek further clarity and do their own research, and his statements do not come with any caveats or other warnings that his words may only be his opinion. Instead, he writes the words he publishes with the clear intention to incite action and influence the public with the purported "truth" of his statements.

23. Defendant Boteach further lauds himself as "America's Rabbi." To that end, he has, for years, presented himself as an ostensibly reliable and trustworthy authority on antisemitism. He has held himself out as an Oxford lecturer. He has referred to prominent political figures as his "students." He has written books as a historian and analyst. He has appeared on television news programs as a

5

commentator. He presents himself as a public intellectual and debater. He has repeatedly and consistently posted messages and videos on social media explicitly purporting to present "the truth" about various people and events.

24. Defendant Boteach is no satirist, comedian, source of parody, or hyperbolist. He presents himself as a messenger of truth. He counts on his audience construing his words to be factual. Defendant Boteach's statements are not just susceptible of possibly being understood as assertions of fact; he insists that he is a credible speaker of the truth.

25. Furthermore, upon information and belief, Defendant Boteach funds a significant part of his international enterprise based upon funds derived from his extortionate activities. In this enterprise, Defendant Boteach capitalizes upon conflict and then offers to go away in exchange for pay. He does so with demands to fund his enterprise that are thinly "cloaked" in the guise of "settlement discussions." But his demands are extortionate demands (*i.e.*, pay now or the defamatory actions will continue).

26. A promise to stop unlawfully harming a person or business in exchange for payment is  not protected by any recognized privilege and is certainly not a settlement discussion. This, in every conceivable way, is extortion.

27. With respect to the Hotel, Defendant Boteach has weaponized his influence. Unlike the character Don Quixote who delusionally tilted at windmills, Defendant Boteach is calculated, and *every single demand he has made upon Plaintiff has included a demand for money to compensate him for harm that Plaintiff did not cause and that he did not suffer*. Defendant Boteach is out to pad his bank account no matter if it means spewing falsehoods to ruin well-earned good reputations. Defendant Boteach has a long history of similar behavior as evidenced by his own social media and public news coverage of him.

28. Defendant Boteach's actions in this matter began on the evening of December 1, 2024, while

he was loitering in the lobby of the Fontainebleau Miami Beach. After more than an hour of loitering, Defendant Boteach engaged in an uneventful conversation with a registered guest of the Hotel and the two parted ways. More than an hour later (after midnight on Sunday, December 2, 2024), Defendant Boteach engaged in a verbal altercation with the same registered guest wherein the guest and Defendant Boteach exchanged hateful words at each other. The guest used language that was heinous and accused Defendant Boteach of being a "baby killer" and other words that are easily interpreted as antisemitic. Defendant Boteach, in turn, hurled anti-Islamic words at the registered guest and repeatedly shouted, "Allahu Akbar? Are you going to blow yourself up or something? … he uses the expressions of, like, suicide bombers."

29. Within hours, Defendant Boteach posted an edited video of the exchange on Instagram and began his campaign of threats against the Hotel, its ownership, its outside lawyer, and its employees— who had _nothing_ to do with the altercation except that Hotel security de-escalated and ended it.

30. Upon information and belief, during the first conversation between the guest and Defendant Boteach prior to the Incident, they exchanged their views on events in the Middle East since the October 7, 2023 terrorist attack on Israel and the ongoing conflict. Upon further information and belief, Defendant Boteach and the guest never agreed, but the conversation remained civil and the two parted ways.

31. Upon additional information and belief, the Incident began when the guest glanced at Defendant Boteach's computer as he was passing by and realized that Defendant Boteach was checking the comments and ratings on his social media postings. Upon information and belief, the guest then confronted Defendant Boteach and accused Defendant Boteach of having false intentions and acting solely out of an intention to drive views and hits to his social media accounts by posting about feigned outrage and false interactions.

32. It appears that Defendant Boteach did not appreciate having his integrity questioned by the

7

guest, and the Incident commenced.

33. During the Incident, Hotel security standing nearby noticed the two men and intervened, separating the two using de-escalation techniques commonly employed by well-trained law enforcement and security professionals. These techniques resulted in the separation of Defendant Boteach and the guest by security and prevented escalation of the Incident. During their efforts to de-escalate the Incident, one of the security officers made a de-escalation gesture in response to which the guest took the security officer's hand and initiated an embrace that was not reciprocated by the security officer. The security officer's physical intervention was a technique that was intended to (and in fact did) shield Defendant Boteach from any danger, should such danger arise. In Defendant Boteach's edited video, Defendant Boteach can be heard shouting that the security team is condoning antisemitism and supporting attacks on people of the Jewish faith.

34. Notably, in Defendant Boteach's edited video, the Incident appears to be a loud event that disrupted the entire lobby. In fact, during the Incident, almost no one in the Hotel lobby even turned their heads with the exception of the Hotel security team, which was standing nearby and intervened.

35. Since the Incident, Defendant Boteach has called on people who shared his distorted narratives to demand the immediate dismissal of the very same employees that de-escalated the Incident and protected everyone from the escalation of a verbal altercation to a physical one. Furthermore, Defendant Boteach claims that the Hotel's decision not to comply with his irrational demands is "proof" of antisemitism at the Hotel.

36. As noted herein, Defendant Boteach has gone so far as to carefully choose words threatening harm and inciting hatred and violence against the employees and owner of the Hotel and its outside legal counsel.

## A. The Incident

37. Shortly after 12:00 am on Monday, December 2, 2024, a guest at the Hotel encountered

Defendant Boteach in the lobby, and an edited cellphone video that begins after their encounter commenced shows the guest shouting obscenities at Defendant Boteach.

38. Within approximately two minutes, Hotel security interceded, de-escalated, and separated the guest and Defendant Boteach. The Hotel thereafter barred the guest and Defendant Boteach from the premises.

39. The Incident was deplorable and has been repeatedly condemned by the Hotel as antisemitic.[3] It was also an isolated event that was outside of any control that the Hotel could have ever reasonably provided.

40. Additionally, the Incident ended when the Hotel's professional security staff responded within mere minutes, stood between the two individuals, and de-escalated the verbal altercation. Upon his arrival, the security guard—*who did not hear the words uttered in the cellphone recording before his arrival*—initiated his interaction by de-escalating and saying "I want to help you guys" to both Defendant Boteach and the guest, and physically distanced the guest from Defendant Boteach by fully extending his arm to the guest's shoulder. Once the two men were distanced, the security guard

---

[3] In a December 6, 2024 letter to Defendant Boteach's counsel, the Fontainebleau stated:

> There can be no serious doubt that **the Fontainebleau unequivocally condemns antisemitism.** Fontainebleau Miami Beach has a rich history of its support of all people of the world, especially the Jewish community.

Shortly after the Incident, the Fontainebleau issued the following public statement:

> A verbal altercation occurred over the weekend between two individuals in the lobby of our hotel. During this isolated incident, one of the individuals used abhorrent language, **which we find horrific and will not be tolerated on our property**.

> Our security team prioritized de-escalating the incident to prevent any physical altercation, and once the individuals left on their own accords, **we proactively engaged with the Miami Beach Police Department**.

> We sincerely apologize to those impacted by this individual's words, **which in no way represent our company's views**.

lowered his hand from the guest's shoulder at which point *the guest* shook the guard's hand as the guard offered assistance to Defendant Boteach. With one hand in his pocket and the other shaken by the guest, the claim that the security guard was "hugging" the guest is false.

41. Defendant Boteach has since responded with relentless vitriol, malice, and harassment against the Hotel and its representatives.

42. Hotel security did not endorse *any* viewpoint in the Incident. Indeed, the majority of the statements Defendant Boteach complains of were made *before Hotel security even arrived*.

43. Ultimately, Hotel security achieved its goal of de-escalation, separation, avoiding conflict, and maintaining the safety of all Hotel guests.

### B. The Response Following the Incident: Defendant Boteach Falsely States that the Hotel is Racist and Obstructing Law Enforcement

44. Defendant Boteach's gross mischaracterization of the Hotel security guard's successful de-escalation unfairly ***and falsely*** scapegoats an entirely innocent security guard as supportive of the detestable conduct during the Incident.

45. If Defendant Boteach believes, as he says he does, that he truly was "nearly annihilated" during the verbal altercation that he chose not to withdraw from, it was no one other than the guard who saved him.

46. Defendant Boteach then pivoted to calling the Fontainebleau and its representatives racists.

47. In the aftermath of Hotel security ensuring Defendant Boteach's safety, he openly admits that he is on an intentional campaign to cause harm to the Hotel—a campaign to "Raise Hell and Bankrupt" the Hotel. To that end, he has falsely accused Plaintiff of engaging in "bigotry, racism, and antisemitism" and threatened to specifically target high-traffic Jewish events at the Hotel with his insults.

48. As stated above, Defendant Boteach has subjected the Hotel to an incessant bombardment of malicious and false statements at all hours of the day and night. He has falsely accused the Hotel of

10

affirmatively denying antisemitism, actually supporting antisemitism, acting in a manner consistent with Nazi collaborators and embracing Jewish genocide, and obstructing a law enforcement investigation.

49. Defendant Boteach's statements were not "heat of the moment" sentiments. He continued to make them for days and weeks after the Incident, including during daytime television interviews and in established newspapers, and while he was represented by counsel.

50. These statements taken on their own, expressly and falsely state to the public that the Hotel is a dangerous place, that it supports discrimination, and that its security supports racists.

51. Defendant Boteach knew the falsity of his statements because, in fact, it was Hotel security that intervened, de-escalated, and successfully ended the Incident. Defendant Boteach's true purpose in the loud and crowded lobby of the Hotel on Saturday night and after midnight remains unclear— Defendant Boteach claims Jews are unsafe at the Hotel, yet at the same time frequents it regularly and complains that he's not allowed back in.

52. Defendant Boteach's statements are false and harmfully create the misimpression that the premises are unsafe.

### C. Defendant Openly Declares Malice, Causation, and Damages

53. Defendant Boteach admits he has caused the Hotel damage by falsely accusing the Hotel of endorsing antisemitism.

54. For example, on December 9, 2024, he cheered that the Hotel was "UTTERLY DESTROYED BY THOUSANDS" and urged his hundreds of thousands of followers to "KEEP ON POSTING." By "posting" he was referring to negative comments on the Hotel's social media pages that he amplified.

55. Also on December 9, 2024, Defendant Boteach published the following statement on X with the commentary that "hundreds cancel their reservations":



56. Defendant Boteach's malicious and false statements have foreseeably subjected Plaintiff to hatred, distrust, ridicule, contempt, and disgrace.

57. Defendant Boteach's false statement that Plaintiff denied him access to the premises on the basis of his religion had an obvious effect—many individuals now believe Defendant Boteach's lie that Plaintiff denies access to patrons on the basis of their religion and condones antisemitism on its premises.

58. Defendant Boteach caused that false belief through his false and misleading social media posts, and then amplified it through X's repost feature.

59. Moreover, while he was "negotiating" for a "donation," to his privately controlled charity, which, upon information and belief, he uses to fund a lavish lifestyle and worldwide travel, Defendant tried stepping up the shakedown pressure by organizing a "GIANT RALLY" outside the Hotel, purportedly against antisemitism. Defendant Boteach has repeatedly postponed that "rally" while he has continued a demand for payments from the Hotel behind the scenes of his otherwise public attacks on the Hotel. Upon information and belief, Defendant Boteach is using the rally threat as part of his extortionate scheme.

60. Upon information and belief, Defendant Boteach has used the Incident and others in an extortionate attempt to raise funds for organizations that he controls and with which he purportedly funds his lifestyle. He further actively seeking donations from individuals to attend his rally even though it will be on public property. Upon information and belief, some of the earnings of purportedly charitable 501(c)(3) organizations that he controls inure to his personal benefit, thus motivating him to leverage the defamatory statements identified herein to enrich himself.

61. For example, of all the many charitable organizations that exist in the world, Defendant Boteach insisted that he would only settle if the Fontainebleau paid $1 million to *his* "charitable" organization.

62. Upon information and belief, Defendant Boteach has previously lied about being sued in connection with efforts to raise money. Now, he vows to "file a lawsuit in a Florida court," merely upping the ante with his threats against a business that did nothing wrong.

63. Defendant Boteach's campaign to defame the Hotel is intentionally false, or made at least with reckless disregard for the truth, and motivated by unreasonable financial gain. Moreover, he engaged in this conduct with specific intent to harm Plaintiff and did in fact harm Plaintiff. Thus, Plaintiff will pursue through trial and appeal an award of uncapped punitive damages against Defendant Boteach.

64. All allegations herein with respect to third parties are made upon information and belief.

**COUNT I**
**DEFAMATION PER SE**
**(Against Defendant Boteach)**

65. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

66. Defendant Boteach published, or caused to be published, defamatory statements with knowledge of or reckless disregard for their falsity, resulting in actual harm to Plaintiff.

67. Since at least December 2, 2024, Defendant Boteach has knowingly published false statements to third parties concerning Plaintiff and its representatives. When Defendant Boteach published false

statements regarding Plaintiff's representatives, he attributed the substance of those statements to Plaintiff itself.

68. The defamatory statements were published on Instagram, Facebook, and X, and in fact reached and were accessed by thousands of members of the public. For example, the defamatory publications were "liked," shared, and commented on hundreds or thousands of times by the public. Upon information and belief, the statements were also published by Defendant Boteach in text message group chats.

69. As set forth in greater detail above, examples of Defendant Boteach's false statements about Plaintiff include, *inter alia*, stating that he was denied entry to the Hotel because he is "too Jewish" and stating that the Hotel refused to cooperate with a law enforcement investigation into the Incident.

70. Defendant Boteach knew that the statements were false or at least recklessly disregarded their falsity.

71. Defendant Boteach's knowledge or reckless disregard is evident in several ways. First, Defendant Boteach knew that he was disseminating false statements because *he made them up completely*. Second, Defendant Boteach knew that he was disseminating false statements because his claims were about events in which he purported to have been personally involved. For example, Defendant Boteach edited a letter that stated he was trespassed because of his threats of litigation by misleadingly deleting from that letter—that he had access to and read—the basis of the trespass (*i.e.*, his threats of litigation) and then he claimed the Hotel trespassed him because he is "too Jewish" (*i.e.,* falsely attributing those words to the Hotel).

72. The public did not know the truth (and that Defendant Boteach was lying) about the reason he was trespassed because Defendant Boteach deleted the truth, replaced it with a lie, and then published his lie as though it was the truth. Defendant Boteach's campaign of misinformation is inexcusable and harmful.

73. The claim that Defendant Boteach was trespassed from the Hotel for being "too Jewish" was false because Defendant Boteach was trespassed pursuant to Hotel policy to not entertain people who are threatening litigation against the Hotel.

74. Defendant also knew his statement that the Hotel refused to cooperate with law enforcement was false.

75. Defendant Boteach knew the statements were false, or at a minimum, was negligent in publishing the statements because he continued to publish them even after he was notified that Plaintiff had in fact cooperated with law enforcement.

76. Plaintiff never "refused" to cooperate with law enforcement, as Defendant falsely claimed. Indeed, Plaintiff cooperated with local and federal law enforcement at all material times.

77. Defendant Boteach knew that the false statements were harmful. Indeed, he used his false statements to support his calls for a boycott of Plaintiff and published statements that guests had canceled plans and numerous reservations with the Hotel.

78. Defendant Boteach's compulsive defamatory statements and demands for third parties to "repudiate" Plaintiff's personnel demonstrate that his behavior was animated by malice.

79. These statements naturally and proximately resulted in injury to Plaintiff. These false statements degrade and injure the Hotel's good name and reputation and substantially impair its ability to conduct business. For example, Defendant Boteach's false statements have, in fact, harmed Plaintiff's business, reputation, customer relationships, and business goodwill.

80. Defendant Boteach's false statements were culpably published by him and third parties, and they have damaged Plaintiff.

81. Several individuals on social media sites, including Instagram, X, and Facebook, have written that their perception of Plaintiff has been negatively influenced by Defendant Boteach's false statements about Plaintiff's response to the Incident.

82. Wherefore, Plaintiff demands judgment against Defendant Boteach, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

### COUNT II
### <u>ORDINARY DEFAMATION</u>
### (Against Defendant Boteach)

83. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

84. Defendant Boteach published, or caused to be published, defamatory statements with knowledge of or reckless disregard for their falsity, resulting in actual harm to Plaintiff.

85. Since at least December 2, 2024, Defendant Boteach has knowingly published false statements to third parties concerning Plaintiff and its representatives, attributing the statements of the latter to the former.

86. The defamatory statements were published on Instagram, Facebook, and X, and in fact reached and were accessed by thousands of members of the public. For example, the defamatory publications were "liked," shared, and commented on hundreds or thousands of times by the public. Upon information and belief, the statements were also published by Defendant Boteach in text message group chats and via email.

87. As set forth in greater detail above, examples of Defendant Boteach's false statements about Plaintiff include stating that he was denied entry to the Hotel because he is "too Jewish" and stating that the Hotel refused to cooperate with a law enforcement investigation into the Incident.

88. Defendant Boteach knew that the statements were false or at least recklessly disregarded their falsity.

89. Defendant Boteach's knowledge or reckless disregard is evident in several ways. First, Defendant Boteach knew that he was disseminating false statements because *he made them up completely*. Second, Defendant Boteach knew that he was disseminating false statements because his

claims were about events he purported to have been personally involved in. For example, Defendant Boteach edited a letter that stated he was trespassed because of his threats of litigation by misleadingly deleting from that letter—that he had access to and read—the basis of the trespass (*i.e.*, his threats of litigation) and then he claimed the Hotel trespassed him because he is "too Jewish" (*i.e.,* falsely attributing these words to the Hotel).

90. The public did not know the truth (and that Defendant Boteach was lying) about the reason he was trespassed because Defendant Boteach deleted the truth, replaced it with a lie, and then published his lie as though it was the truth. Defendant Boteach's campaign of misinformation is inexcusable and harmful.

91. The claim that Defendant Boteach was trespassed from the Hotel for being "too Jewish" was false because Defendant Boteach was trespassed pursuant to Hotel policy to not entertain people who are threatening litigation against the Hotel.

92. Defendant Boteach also falsely stated that the Hotel refused to cooperate with law-enforcement.

93. Defendant Boteach knew the statements were false, or at a minimum, was negligent in publishing the statements because he continued to publish them even after he was notified that Plaintiff had in fact cooperated with law enforcement.

94. Plaintiff never "refused" to cooperate with law enforcement, as Defendant falsely claimed. Indeed, Plaintiff cooperated with local law enforcement at all material times.

95. Defendant Boteach knew that the false statements were harmful. Indeed, he used his false statements to support his calls for a boycott of Plaintiff and published statements that guests had canceled plans and numerous reservations with the Hotel.

96. Defendant Boteach's compulsive defamatory statements and demands for third parties to "repudiate" Plaintiff's personnel demonstrate that his behavior was animated by malice.

97. These statements naturally and proximately resulted in injury to Plaintiff. These false statements degrade and injure the Hotel's good name and reputation and substantially impair its ability to conduct business. For example, Defendant Boteach's false statements have in fact harmed Plaintiff's sales, reputation, customer relationships, and business goodwill.

98. Defendant Boteach's false statements were culpably published by him and third parties, and they have damaged Plaintiff.

99. Several individuals on social media sites including Instagram, X, and Facebook have written that their perception of Plaintiff has been negatively influenced by Defendant Boteach's false statements about Plaintiff's response to the Incident.

100.     Upon information and belief, Defendant Boteach has made additional defamatory statements. Plaintiff reserves the right to seek relief as to such statements through the course of discovery.

101.     Wherefore, Plaintiff demands judgment against Defendant Boteach, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

## COUNT III
## AIDING AND ABETTING DEFAMATION
### (Against Defendant John Doe)

102.     Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

103.     The allegations with respect to the John Doe Defendant are made upon information and belief as their identity will be determined through the course of discovery.

104.     Defendant Boteach is the primary wrongdoer who committed the tort of defamation as set forth in Counts I and II, *supra*.

105.     The John Doe Defendant rendered substantial assistance to Defendant Boteach's

commission of the tort of defamation against Plaintiff.

106.     The John Doe Defendant knew that Defendant Boteach was publishing the defamatory statements about Plaintiff and rendered substantial assistance in defaming Plaintiff by manufacturing graphics containing statements that falsely attributed harmful statements to individuals purporting, in those graphics, to articulate the views of Plaintiff and its representatives. The John Doe Defendant also recorded, edited, and published the defamatory statements with reckless disregard for their falsity.

107.     Wherefore, Plaintiff demands judgment against Defendant John Doe, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
**(Against Defendant Boteach)**

108.     Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

109.     The Hotel has various business relationships pursuant to which it has legal rights, including with respect to hotel guests. Some of these hotel guests were future guests with bookings at the Hotel for stays after December 2, 2024. The Hotel has various business relationships with other identifiable entities and people, such as parties reserving venues within the Hotel after December 2, 2024.

110.     Defendant Boteach knew Plaintiff has business relationships with guests who patronize the Hotel's services. Indeed, Defendant Boteach specifically urged the Hotel's guests to terminate their contractual relationships with Plaintiff.

111.     Throughout his intentional interference with these relationships, Defendant Boteach *never* publicly communicated that he was seeking a personal donation to his "charity." His

19

interference with these relationships was unjustified because it was driven by a personal profit-interest and based on falsehoods.

112.     Defendant Boteach intentionally interfered with Plaintiff's business relationships with its guests by, *inter alia*, publishing numerous statements accusing the Hotel of engaging in and/or supporting antisemitism. Defendant Boteach's actions were intentionally designed to cause and result in harm to those business relationships. Specifically, Defendant Boteach intentionally interfered with the Hotel's business relationship via the following statements: he distorted a statement of the Hotel to create the false appearance of a Hotel policy to ban Jews; he urged customers of the Hotel[4] to stop doing business with the Hotel and, specifically, to "cancel" any reservations at the Hotel; he published several AI-generated videos of persons affiliated with the Hotel in which he purported to quote them apologizing for the Incident and denying the wrongfulness of antisemitism; he stated "ANY JEW STILL STAYING AT THE [HOTEL] . . . OBVIOUSLY HAS A DEATH WISH. THIS WILL HAPPEN TO YOU AND THERE WILL BE NOONE TO SAVE YOU. #BOYCOTTFONTAINEBLEAU NOW!!;" Defendant's own words leave no room for doubt that he deliberately and tortiously interfered with business relationships.

113.     Defendant Boteach's interference was unjustified because, *inter alia*, Defendant Boteach published harmful statements that were false and designed to conjure outrage, disgust, and vitriol against the Hotel in furtherance of Defendant Boteach's scheme to coerce the Hotel into paying Defendant Boteach money.

---

[4] Upon information and belief, Plaintiff is not the only person or business Defendant Boteach has harassed or against whom he has incited hate and violence. He has posted many videos on social media showing him physically pursuing people while claiming they are putting him in fear for his life. Upon information and belief, while loitering alone in the Hotel lobby after midnight on a Sunday night, he sought to call attention to himself and escalate the Incident. Defendant Boteach's own social media accounts provide clear evidence that he uses escalation tactics in public places where he believes large numbers of Jewish people visit, including, but not limited to, the Hotel on a previous occasion when he chased purported assailants through the halls of the Hotel while filming them.

114.     As a direct and proximate cause of Defendant Boteach's misconduct, the Hotel has suffered damages with respect to its business relationships. This includes, but is not limited to, canceled (and refunded) guest bookings and canceled (and refunded) event-space reservations.

115.     Indeed, Defendant Boteach published statements gleefully reporting hundreds of cancellations by guests at the Hotel.

116.     Wherefore, Plaintiff demands judgment against Defendant Boteach, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT V**
**AIDING AND ABETTING TORTIOUS INTERFERENCE**
**WITH BUSINESS RELATIONSHIPS**
**(Against Defendant John Doe)**

117.     Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

118.     The allegations with respect to the John Doe Defendant are made upon information and belief as their identities will be determined through the course of discovery.

119.     Defendant Boteach is the primary wrongdoer who tortiously interfered with Plaintiff's business relationships as set forth in Count IV, *supra*.

120.     The John Doe Defendant rendered substantial assistance to Defendant Boteach's misconduct as alleged in Count IV.

121.     The John Doe Defendant knew that Defendant Boteach was tortiously interfering with Plaintiff's business relationships, specifically threatening it with financial ruin through cancellations and organizing boycotts based on falsehoods, manufacturing graphics containing statements that falsely attributed harmful statements to individuals purporting, in those graphics, to articulate the views of Plaintiff and its representatives and target them towards guests with contracts with Plaintiff.

122.     Wherefore, Plaintiff demands judgment against Defendant John Doe, an award of

damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for those issues that are so triable against the Defendants pursuant to Florida law.

Dated: February 18, 2025

Respectfully submitted,

**BURSTYN LAW PLLC**

By: */s/ Sean A. Burstyn*
Sean A. Burstyn
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S700
Miami, FL 33131

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*
*d/b/a Fontainebleau Miami Beach*