# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL, LLC d/b/a FONTAINEBLEAU MIAMI BEACH, *a foreign limited liability company*,

*Plaintiff*,

v.

JACOB SHMUEL BOTACH a/k/a "SHMULEY BOTEACH," *an individual*, and John Doe,

*Defendants*.
_________________________________/

CASE NO. 1:25-cv-20251-KMM

**PLAINTIFF'S AMENDED LIST OF DOCUMENTS RELIED ON**

Plaintiff encloses the following documents which it intends to rely on at the hearing:

1. Exhibit C.1 – Plaintiff's First Amended Complaint (ECF No. 12.)

2. Exhibits C.2 – Counterclaim and Third Party Complaint filed July 23, 2025 (ECF. No. 40).

3. Exhibit C.3 – Email thread between T. Friedman and M. Mainen re Fontainebleau/Botach – Discovery re Counterclaim and Third-Party Complaint dated August 21, 2025.

4. Exhibit C.4 – Plaintiff's First Request for Production served June 18, 2025.

5. Exhibit C.5 – Defendant's Response to Plaintiff's First Request for Production served August 1, 2025.

6. Exhibit C.6 – Order denying Defendant's Motion to Dismiss Plaintiff's First Amended Complaint entered September 16, 2025 (ECF No. 57).

7. Exhibit C.7 – Paperless Order denying Defendant's Motion to Strike entered September 18, 2025 (ECF No. 59).

8. Exhibit C.8 – Email from S. Feldman re Demand for $100 Million, Abandonment of All Claims with Prejudice, and a Televised 30 Minute Apology to the Rabbi, For Liability Release dated September 18, 2025.

# EXHIBIT C.1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL, LLC d/b/a FONTAINEBLEAU MIAMI BEACH, *a foreign limited liability company*,

*Plaintiff*,

v.

JACOB SHMUEL BOTACH a/k/a "SHMULEY BOTEACH," *an individual*, and John Doe,

*Defendants*.

_________________________________/

CASE NO. 1:25-cv-20251-KMM

**FIRST AMENDED COMPLAINT**

**BURSTYN LAW PLLC**

Sean A. Burstyn
Florida Bar No. 1028778
1101 Brickell Avenue, Suite S700
Miami, FL 33131

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*
*d/b/a Fontainebleau Miami Beach*

## INTRODUCTION

1. In every context imaginable, reasonable people would call the actions of Defendant Jacob Shmuel Botach a/k/a "Shmuley Boteach" a "shakedown."

2. The social media influencer and rabbi has been on a multi-week assault on the Fontainebleau Miami Beach,[1] its personnel, and representatives—creating AI videos purporting to show them celebrating antisemitism, comparing them to Nazi collaborators, falsely accusing them of banning Jews from the property, and fabricating statements that they embraced a policy of Judenrein, *i.e.*, the extermination of six million Jews.

3. In addition to these defamatory and harassing statements made by Defendant Boteach, Defendant Boteach has also explicitly threatened the Hotel, and its personnel and representatives, with violence and harm. He has threatened to "uproot" them as "traitors" to their people, vowed to "fight" them "completely," and warned they have "no idea what's in store for them." In a video about the Hotel's outside counsel, he spoke of the "lessons" of a historical figure who "went after" traitorous Jews and killed them.

4. This is not the Hotel's first such experience with Defendant Boteach. Two years ago, Defendant Boteach again recorded a verbal altercation in the lobby of the Hotel, then approached Hotel management seeking compensation to calm the outrage that would follow a social media campaign amplifying the video recording.

5. While Defendant Boteach publicly claims that in 2023 he proposed aligning with the Hotel in exchange for a commitment to retrain security (which was already provided by the Hotel), Defendant Boteach omits that he also demanded personal lifetime access to the swimming pool and gym at the Hotel (the same place he says is unsafe). Ultimately, Defendant Boteach accepted some hotel perks and moved on.

---

[1] Plaintiff Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach ("Fontainebleau" or "Hotel").

6. Now he's back again, with a promise to "de-escalate" his campaign of harassment in exchange for a $1 million "donation" to his organization, World Values Network.

7. After the Hotel declined to cower to his extortion, Defendant Boteach intensified his calls for the public to boycott the Hotel on the basis of his categorically false statements that the Hotel obstructed a police investigation into heinous statements hurled at him by a third party unaffiliated with the Hotel on December 2, 2024.[2] Defendant Boteach's targeted harassment of innocent Hotel personnel is a harmful and misdirected response to the serious scourge of antisemitism, which the Hotel *again* condemns in no uncertain terms.

8. Defendant Boteach's conduct is malicious, illegal, intentional, and wildly out of control. In fact, he went through 3 law firms in the first 10 days since the Incident—a law firm attrition rate of approximately 1 firm every 3 days.

9. Defendant Boteach has posted information about the Hotel's financial transactions in connection with a demand that the Hotel pay him *$100 million*, which is outrageous on its face and designed to interfere with the Hotel's business relationships. Defendant Boteach's continued false statements that the Hotel affirmatively supports antisemitism are unrelenting and have forced the Hotel to commence litigation to end Defendant Boteach's extortion and remedy the damages caused by his misconduct.

10. Following the Incident and the Hotel's decision not to agree to his demand for $100 million, Defendant Boteach made multiple statements that were false, damaging, or otherwise displayed his malice towards the Hotel, including by way of example:

a. Defendant Boteach deliberately distorted a statement of the Hotel, deleting a portion that made clear it declined entry to persons threatening litigation against the Hotel, so

[2] What transpired on December 2, 2024 is described herein as the "Incident," the same word Defendant Boteach used to describe it.

as to create the false appearance that he was told that the Hotel enacted a policy to ban Jews.

b. Defendant Boteach falsely stated that the Hotel "denie[d]" he was subject to antisemitism and that he could not go to the Hotel because he is "too Jewish."

c. Defendant Boteach falsely claimed that the Hotel stated that he was "equally responsible" for the attack upon him.

d. Defendant Boteach posted a video falsely accusing the Hotel of unqualifiedly refusing to cooperate with law enforcement in its investigation and omitting material information that he knew.

e. Defendant Boteach published several AI-generated videos of persons affiliated with the Hotel in which he purports to quote them apologizing (*i.e.*, admitting misconduct) and denying the wrongfulness of antisemitism.

f. Defendant Boteach threatened that his counsel was preparing "the most devastating lawsuit from which I hope the rancid hotel will never recover."

g. Defendant Boteach posted "ANY JEW STILL STAYING AT THE [HOTEL] . . . OBVIOUSLY HAS A DEATH WISH. **THIS WILL HAPPEN TO YOU AND THERE WILL BE NOONE** [sic] **TO SAVE YOU**. #BOYCOTTFONTAINBLEAUNOW!!" (Emphasis added.)

h. Defendant Boteach published a statement that, in part, called for guests "who have booked" at the Hotel to "cancel your reservations" and a further statement calling for guests to "be smart and cancel and give your hard-earned money to a hotel that doesn't abide antisemites."

i. Defendant Boteach published a statement describing the Hotel as an "antisemitic sewer."

11. Defendant Boteach's statements demonstrate the maliciousness with which he defamed the Hotel and tortiously interfered with its business relationships.

12. While Defendant Boteach lionized himself as a hero to hundreds of thousands of social media followers, what he did not share with his followers is that he was simultaneously trying to negotiate for a huge amount of money from the Hotel to be funneled to a "charity" controlled by him.

13. At all hours of the day and night, Defendant Boteach proceeded to harass the Hotel and its representatives. For example, he posted a "headshot" photograph of the head of the Hotel's outside counsel with the words "DIGITALLY DECAPITATED" and later, at 3:49 am, menacingly threatened that counsel was "about to have a really interesting Shabbat" when he arrived at his synagogue, which Defendant Boteach identified by name and location. Defendant Boteach directly contacted counsel's clergy and posted harassing images of them.

14. Defendant Boteach's conduct is malicious and illegal. He has engaged in extortion against the Hotel.

15. The Hotel will seek to recover all of the damages Defendant Boteach has caused. These unwarranted attacks against a Florida hospitality institution have been unrelenting and have forced this litigation. Since 1954, guests of all backgrounds have traveled the world to enjoy the iconic Fontainebleau Hotel in Miami Beach. Defendant Boteach's false statements about the Hotel cannot be tolerated.

16. Plaintiff will seek an order requiring Defendant Boteach to pay all of the damages that he has caused the Fontainebleau, including uncapped punitive damages upon entry of an order granting leave for same because his conduct is financially motivated, and a restraining order against Defendant Boteach from continuing his unlawful conduct, including his scurrilous campaign of defamation, threats, and attempted character assassination.

## PARTIES, JURISDICTION AND VENUE

17. Plaintiff is a foreign limited liability company with a principal place of business at 4441 Collins Avenue, Miami Beach, Florida 33140.

18. Defendant Boteach is an individual above the age of 18 who resides in Miami Beach, Florida.

19. Pursuant to Fla. Stat. § 47.051, venue is proper in this Court because the causes of action accrued against each Defendant in Miami-Dade County.

20. The amount in controversy exceeds the jurisdictional limit of this Court.

## GENERAL ALLEGATIONS

21. Defendant Boteach champions himself as a fighter of antisemitism and utilizes his social media accounts in a quixotic manner wherein he is always the hero fighting not just antisemites, but also anyone whom he falsely claims to be antisemitic, such as Plaintiff and its representatives.

22. Defendant Boteach operates an international enterprise that depends entirely upon his ability to motivate people to act based on his words. Defendant is not only aware that the large audience to whom he publishes his statements believe them to be true, he counts on it. Defendant relies upon his "followers" and everyone who hears or reads his words acting solely on the words he publishes. Based on the issues he champions—real or imagined—he draws crowds to rallies, fundraisers, and other events. He does not encourage those reading or hearing his words to seek further clarity and do their own research, and his statements do not come with any caveats or other warnings that his words may only be his opinion. Instead, he writes the words he publishes with the clear intention to incite action and influence the public with the purported "truth" of his statements.

23. Defendant Boteach further lauds himself as "America's Rabbi." To that end, he has, for years, presented himself as an ostensibly reliable and trustworthy authority on antisemitism. He has held himself out as an Oxford lecturer. He has referred to prominent political figures as his "students." He has written books as a historian and analyst. He has appeared on television news programs as a

commentator. He presents himself as a public intellectual and debater. He has repeatedly and consistently posted messages and videos on social media explicitly purporting to present "the truth" about various people and events.

24. Defendant Boteach is no satirist, comedian, source of parody, or hyperbolist. He presents himself as a messenger of truth. He counts on his audience construing his words to be factual. Defendant Boteach's statements are not just susceptible of possibly being understood as assertions of fact; he insists that he is a credible speaker of the truth.

25. Furthermore, upon information and belief, Defendant Boteach funds a significant part of his international enterprise based upon funds derived from his extortionate activities. In this enterprise, Defendant Boteach capitalizes upon conflict and then offers to go away in exchange for pay. He does so with demands to fund his enterprise that are thinly "cloaked" in the guise of "settlement discussions." But his demands are extortionate demands (*i.e.*, pay now or the defamatory actions will continue).

26. A promise to stop unlawfully harming a person or business in exchange for payment is not protected by any recognized privilege and is certainly not a settlement discussion. This, in every conceivable way, is extortion.

27. With respect to the Hotel, Defendant Boteach has weaponized his influence. Unlike the character Don Quixote who delusionally tilted at windmills, Defendant Boteach is calculated, and *every single demand he has made upon Plaintiff has included a demand for money to compensate him for harm that Plaintiff did not cause and that he did not suffer*. Defendant Boteach is out to pad his bank account no matter if it means spewing falsehoods to ruin well-earned good reputations. Defendant Boteach has a long history of similar behavior as evidenced by his own social media and public news coverage of him.

28. Defendant Boteach's actions in this matter began on the evening of December 1, 2024, while

he was loitering in the lobby of the Fontainebleau Miami Beach. After more than an hour of loitering, Defendant Boteach engaged in an uneventful conversation with a registered guest of the Hotel and the two parted ways. More than an hour later (after midnight on Sunday, December 2, 2024), Defendant Boteach engaged in a verbal altercation with the same registered guest wherein the guest and Defendant Boteach exchanged hateful words at each other. The guest used language that was heinous and accused Defendant Boteach of being a "baby killer" and other words that are easily interpreted as antisemitic. Defendant Boteach, in turn, hurled anti-Islamic words at the registered guest and repeatedly shouted, "Allahu Akbar? Are you going to blow yourself up or something? … he uses the expressions of, like, suicide bombers."

29. Within hours, Defendant Boteach posted an edited video of the exchange on Instagram and began his campaign of threats against the Hotel, its ownership, its outside lawyer, and its employees—who had *nothing* to do with the altercation except that Hotel security de-escalated and ended it.

30. Upon information and belief, during the first conversation between the guest and Defendant Boteach prior to the Incident, they exchanged their views on events in the Middle East since the October 7, 2023 terrorist attack on Israel and the ongoing conflict. Upon further information and belief, Defendant Boteach and the guest never agreed, but the conversation remained civil and the two parted ways.

31. Upon additional information and belief, the Incident began when the guest glanced at Defendant Boteach's computer as he was passing by and realized that Defendant Boteach was checking the comments and ratings on his social media postings. Upon information and belief, the guest then confronted Defendant Boteach and accused Defendant Boteach of having false intentions and acting solely out of an intention to drive views and hits to his social media accounts by posting about feigned outrage and false interactions.

32. It appears that Defendant Boteach did not appreciate having his integrity questioned by the

guest, and the Incident commenced.

33. During the Incident, Hotel security standing nearby noticed the two men and intervened, separating the two using de-escalation techniques commonly employed by well-trained law enforcement and security professionals. These techniques resulted in the separation of Defendant Boteach and the guest by security and prevented escalation of the Incident. During their efforts to de-escalate the Incident, one of the security officers made a de-escalation gesture in response to which the guest took the security officer’s hand and initiated an embrace that was not reciprocated by the security officer. The security officer’s physical intervention was a technique that was intended to (and in fact did) shield Defendant Boteach from any danger, should such danger arise. In Defendant Boteach’s edited video, Defendant Boteach can be heard shouting that the security team is condoning antisemitism and supporting attacks on people of the Jewish faith.

34. Notably, in Defendant Boteach’s edited video, the Incident appears to be a loud event that disrupted the entire lobby. In fact, during the Incident, almost no one in the Hotel lobby even turned their heads with the exception of the Hotel security team, which was standing nearby and intervened.

35. Since the Incident, Defendant Boteach has called on people who shared his distorted narratives to demand the immediate dismissal of the very same employees that de-escalated the Incident and protected everyone from the escalation of a verbal altercation to a physical one. Furthermore, Defendant Boteach claims that the Hotel’s decision not to comply with his irrational demands is “proof” of antisemitism at the Hotel.

36. As noted herein, Defendant Boteach has gone so far as to carefully choose words threatening harm and inciting hatred and violence against the employees and owner of the Hotel and its outside legal counsel.

**A. The Incident**

37. Shortly after 12:00 am on Monday, December 2, 2024, a guest at the Hotel encountered

Defendant Boteach in the lobby, and an edited cellphone video that begins after their encounter commenced shows the guest shouting obscenities at Defendant Boteach.

38. Within approximately two minutes, Hotel security interceded, de-escalated, and separated the guest and Defendant Boteach. The Hotel thereafter barred the guest and Defendant Boteach from the premises.

39. The Incident was deplorable and has been repeatedly condemned by the Hotel as antisemitic.[3] It was also an isolated event that was outside of any control that the Hotel could have ever reasonably provided.

40. Additionally, the Incident ended when the Hotel's professional security staff responded within mere minutes, stood between the two individuals, and de-escalated the verbal altercation. Upon his arrival, the security guard—*who did not hear the words uttered in the cellphone recording before his arrival*—initiated his interaction by de-escalating and saying "I want to help you guys" to both Defendant Boteach and the guest, and physically distanced the guest from Defendant Boteach by fully extending his arm to the guest's shoulder. Once the two men were distanced, the security guard

---

[3] In a December 6, 2024 letter to Defendant Boteach's counsel, the Fontainebleau stated:

> There can be no serious doubt that ***the Fontainebleau unequivocally condemns antisemitism.*** Fontainebleau Miami Beach has a rich history of its support of all people of the world, especially the Jewish community.

Shortly after the Incident, the Fontainebleau issued the following public statement:

> A verbal altercation occurred over the weekend between two individuals in the lobby of our hotel. During this isolated incident, one of the individuals used abhorrent language, ***which we find horrific and will not be tolerated on our property***.
>
> Our security team prioritized de-escalating the incident to prevent any physical altercation, and once the individuals left on their own accords, ***we proactively engaged with the Miami Beach Police Department***.
>
> We sincerely apologize to those impacted by this individual's words, ***which in no way represent our company's views***.

lowered his hand from the guest's shoulder at which point *the guest* shook the guard's hand as the guard offered assistance to Defendant Boteach. With one hand in his pocket and the other shaken by the guest, the claim that the security guard was "hugging" the guest is false.

41. Defendant Boteach has since responded with relentless vitriol, malice, and harassment against the Hotel and its representatives.

42. Hotel security did not endorse *any* viewpoint in the Incident. Indeed, the majority of the statements Defendant Boteach complains of were made *before Hotel security even arrived*.

43. Ultimately, Hotel security achieved its goal of de-escalation, separation, avoiding conflict, and maintaining the safety of all Hotel guests.

**B. The Response Following the Incident: Defendant Boteach Falsely States that the Hotel is Racist and Obstructing Law Enforcement**

44. Defendant Boteach's gross mischaracterization of the Hotel security guard's successful de-escalation unfairly ***and falsely*** scapegoats an entirely innocent security guard as supportive of the detestable conduct during the Incident.

45. If Defendant Boteach believes, as he says he does, that he truly was "nearly annihilated" during the verbal altercation that he chose not to withdraw from, it was no one other than the guard who saved him.

46. Defendant Boteach then pivoted to calling the Fontainebleau and its representatives racists.

47. In the aftermath of Hotel security ensuring Defendant Boteach's safety, he openly admits that he is on an intentional campaign to cause harm to the Hotel—a campaign to "Raise Hell and Bankrupt" the Hotel. To that end, he has falsely accused Plaintiff of engaging in "bigotry, racism, and antisemitism" and threatened to specifically target high-traffic Jewish events at the Hotel with his insults.

48. As stated above, Defendant Boteach has subjected the Hotel to an incessant bombardment of malicious and false statements at all hours of the day and night. He has falsely accused the Hotel of

affirmatively denying antisemitism, actually supporting antisemitism, acting in a manner consistent with Nazi collaborators and embracing Jewish genocide, and obstructing a law enforcement investigation.

49. Defendant Boteach's statements were not "heat of the moment" sentiments. He continued to make them for days and weeks after the Incident, including during daytime television interviews and in established newspapers, and while he was represented by counsel.

50. These statements taken on their own, expressly and falsely state to the public that the Hotel is a dangerous place, that it supports discrimination, and that its security supports racists.

51. Defendant Boteach knew the falsity of his statements because, in fact, it was Hotel security that intervened, de-escalated, and successfully ended the Incident. Defendant Boteach's true purpose in the loud and crowded lobby of the Hotel on Saturday night and after midnight remains unclear—Defendant Boteach claims Jews are unsafe at the Hotel, yet at the same time frequents it regularly and complains that he's not allowed back in.

52. Defendant Boteach's statements are false and harmfully create the misimpression that the premises are unsafe.

**C. Defendant Openly Declares Malice, Causation, and Damages**

53. Defendant Boteach admits he has caused the Hotel damage by falsely accusing the Hotel of endorsing antisemitism.

54. For example, on December 9, 2024, he cheered that the Hotel was "UTTERLY DESTROYED BY THOUSANDS" and urged his hundreds of thousands of followers to "KEEP ON POSTING." By "posting" he was referring to negative comments on the Hotel's social media pages that he amplified.

55. Also on December 9, 2024, Defendant Boteach published the following statement on X with the commentary that "hundreds cancel their reservations":




56. Defendant Boteach's malicious and false statements have foreseeably subjected Plaintiff to hatred, distrust, ridicule, contempt, and disgrace.

57. Defendant Boteach's false statement that Plaintiff denied him access to the premises on the basis of his religion had an obvious effect—many individuals now believe Defendant Boteach's lie that Plaintiff denies access to patrons on the basis of their religion and condones antisemitism on its premises.

58. Defendant Boteach caused that false belief through his false and misleading social media posts, and then amplified it through X's repost feature.

59. Moreover, while he was "negotiating" for a "donation," to his privately controlled charity, which, upon information and belief, he uses to fund a lavish lifestyle and worldwide travel, Defendant tried stepping up the shakedown pressure by organizing a "GIANT RALLY" outside the Hotel, purportedly against antisemitism. Defendant Boteach has repeatedly postponed that "rally" while he has continued a demand for payments from the Hotel behind the scenes of his otherwise public attacks on the Hotel. Upon information and belief, Defendant Boteach is using the rally threat as part of his extortionate scheme.

Case 1:25-cv-20251-KMM Document 1-1 Entered on FLSD Docket 01/19/2025 Page 14 of 30

60. Upon information and belief, Defendant Boteach has used the Incident and others in an extortionate attempt to raise funds for organizations that he controls and with which he purportedly funds his lifestyle. He further actively seeking donations from individuals to attend his rally even though it will be on public property. Upon information and belief, some of the earnings of purportedly charitable 501(c)(3) organizations that he controls inure to his personal benefit, thus motivating him to leverage the defamatory statements identified herein to enrich himself.

61. For example, of all the many charitable organizations that exist in the world, Defendant Boteach insisted that he would only settle if the Fontainebleau paid $1 million to *his* "charitable" organization.

62. Upon information and belief, Defendant Boteach has previously lied about being sued in connection with efforts to raise money. Now, he vows to "file a lawsuit in a Florida court," merely upping the ante with his threats against a business that did nothing wrong.

63. Defendant Boteach's campaign to defame the Hotel is intentionally false, or made at least with reckless disregard for the truth, and motivated by unreasonable financial gain. Moreover, he engaged in this conduct with specific intent to harm Plaintiff and did in fact harm Plaintiff. Thus, Plaintiff will pursue through trial and appeal an award of uncapped punitive damages against Defendant Boteach.

64. All allegations herein with respect to third parties are made upon information and belief.

**COUNT I**
**DEFAMATION PER SE**
**(Against Defendant Boteach)**

65. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

66. Defendant Boteach published, or caused to be published, defamatory statements with knowledge of or reckless disregard for their falsity, resulting in actual harm to Plaintiff.

67. Since at least December 2, 2024, Defendant Boteach has knowingly published false statements to third parties concerning Plaintiff and its representatives. When Defendant Boteach published false

statements regarding Plaintiff's representatives, he attributed the substance of those statements to Plaintiff itself.

68. The defamatory statements were published on Instagram, Facebook, and X, and in fact reached and were accessed by thousands of members of the public. For example, the defamatory publications were "liked," shared, and commented on hundreds or thousands of times by the public. Upon information and belief, the statements were also published by Defendant Boteach in text message group chats.

69. As set forth in greater detail above, examples of Defendant Boteach's false statements about Plaintiff include, *inter alia*, stating that he was denied entry to the Hotel because he is "too Jewish" and stating that the Hotel refused to cooperate with a law enforcement investigation into the Incident.

70. Defendant Boteach knew that the statements were false or at least recklessly disregarded their falsity.

71. Defendant Boteach's knowledge or reckless disregard is evident in several ways. First, Defendant Boteach knew that he was disseminating false statements because *he made them up completely*. Second, Defendant Boteach knew that he was disseminating false statements because his claims were about events in which he purported to have been personally involved. For example, Defendant Boteach edited a letter that stated he was trespassed because of his threats of litigation by misleadingly deleting from that letter—that he had access to and read—the basis of the trespass (*i.e.*, his threats of litigation) and then he claimed the Hotel trespassed him because he is "too Jewish" (*i.e.,* falsely attributing those words to the Hotel).

72. The public did not know the truth (and that Defendant Boteach was lying) about the reason he was trespassed because Defendant Boteach deleted the truth, replaced it with a lie, and then published his lie as though it was the truth. Defendant Boteach's campaign of misinformation is inexcusable and harmful.

73. The claim that Defendant Boteach was trespassed from the Hotel for being "too Jewish" was false because Defendant Boteach was trespassed pursuant to Hotel policy to not entertain people who are threatening litigation against the Hotel.

74. Defendant also knew his statement that the Hotel refused to cooperate with law enforcement was false.

75. Defendant Boteach knew the statements were false, or at a minimum, was negligent in publishing the statements because he continued to publish them even after he was notified that Plaintiff had in fact cooperated with law enforcement.

76. Plaintiff never "refused" to cooperate with law enforcement, as Defendant falsely claimed. Indeed, Plaintiff cooperated with local and federal law enforcement at all material times.

77. Defendant Boteach knew that the false statements were harmful. Indeed, he used his false statements to support his calls for a boycott of Plaintiff and published statements that guests had canceled plans and numerous reservations with the Hotel.

78. Defendant Boteach's compulsive defamatory statements and demands for third parties to "repudiate" Plaintiff's personnel demonstrate that his behavior was animated by malice.

79. These statements naturally and proximately resulted in injury to Plaintiff. These false statements degrade and injure the Hotel's good name and reputation and substantially impair its ability to conduct business. For example, Defendant Boteach's false statements have, in fact, harmed Plaintiff's business, reputation, customer relationships, and business goodwill.

80. Defendant Boteach's false statements were culpably published by him and third parties, and they have damaged Plaintiff.

81. Several individuals on social media sites, including Instagram, X, and Facebook, have written that their perception of Plaintiff has been negatively influenced by Defendant Boteach's false statements about Plaintiff's response to the Incident.

82. Wherefore, Plaintiff demands judgment against Defendant Boteach, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT II**
**ORDINARY DEFAMATION**
**(Against Defendant Boteach)**

83. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

84. Defendant Boteach published, or caused to be published, defamatory statements with knowledge of or reckless disregard for their falsity, resulting in actual harm to Plaintiff.

85. Since at least December 2, 2024, Defendant Boteach has knowingly published false statements to third parties concerning Plaintiff and its representatives, attributing the statements of the latter to the former.

86. The defamatory statements were published on Instagram, Facebook, and X, and in fact reached and were accessed by thousands of members of the public. For example, the defamatory publications were "liked," shared, and commented on hundreds or thousands of times by the public. Upon information and belief, the statements were also published by Defendant Boteach in text message group chats and via email.

87. As set forth in greater detail above, examples of Defendant Boteach's false statements about Plaintiff include stating that he was denied entry to the Hotel because he is "too Jewish" and stating that the Hotel refused to cooperate with a law enforcement investigation into the Incident.

88. Defendant Boteach knew that the statements were false or at least recklessly disregarded their falsity.

89. Defendant Boteach's knowledge or reckless disregard is evident in several ways. First, Defendant Boteach knew that he was disseminating false statements because *he made them up completely*. Second, Defendant Boteach knew that he was disseminating false statements because his

claims were about events he purported to have been personally involved in. For example, Defendant Boteach edited a letter that stated he was trespassed because of his threats of litigation by misleadingly deleting from that letter—that he had access to and read—the basis of the trespass (*i.e.*, his threats of litigation) and then he claimed the Hotel trespassed him because he is "too Jewish" (*i.e.,* falsely attributing these words to the Hotel).

90. The public did not know the truth (and that Defendant Boteach was lying) about the reason he was trespassed because Defendant Boteach deleted the truth, replaced it with a lie, and then published his lie as though it was the truth. Defendant Boteach's campaign of misinformation is inexcusable and harmful.

91. The claim that Defendant Boteach was trespassed from the Hotel for being "too Jewish" was false because Defendant Boteach was trespassed pursuant to Hotel policy to not entertain people who are threatening litigation against the Hotel.

92. Defendant Boteach also falsely stated that the Hotel refused to cooperate with law-enforcement.

93. Defendant Boteach knew the statements were false, or at a minimum, was negligent in publishing the statements because he continued to publish them even after he was notified that Plaintiff had in fact cooperated with law enforcement.

94. Plaintiff never "refused" to cooperate with law enforcement, as Defendant falsely claimed. Indeed, Plaintiff cooperated with local law enforcement at all material times.

95. Defendant Boteach knew that the false statements were harmful. Indeed, he used his false statements to support his calls for a boycott of Plaintiff and published statements that guests had canceled plans and numerous reservations with the Hotel.

96. Defendant Boteach's compulsive defamatory statements and demands for third parties to "repudiate" Plaintiff's personnel demonstrate that his behavior was animated by malice.

97. These statements naturally and proximately resulted in injury to Plaintiff. These false statements degrade and injure the Hotel's good name and reputation and substantially impair its ability to conduct business. For example, Defendant Boteach's false statements have in fact harmed Plaintiff's sales, reputation, customer relationships, and business goodwill.

98. Defendant Boteach's false statements were culpably published by him and third parties, and they have damaged Plaintiff.

99. Several individuals on social media sites including Instagram, X, and Facebook have written that their perception of Plaintiff has been negatively influenced by Defendant Boteach's false statements about Plaintiff's response to the Incident.

100. Upon information and belief, Defendant Boteach has made additional defamatory statements. Plaintiff reserves the right to seek relief as to such statements through the course of discovery.

101. Wherefore, Plaintiff demands judgment against Defendant Boteach, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT III**
**AIDING AND ABETTING DEFAMATION**
**(Against Defendant John Doe)**

102. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

103. The allegations with respect to the John Doe Defendant are made upon information and belief as their identity will be determined through the course of discovery.

104. Defendant Boteach is the primary wrongdoer who committed the tort of defamation as set forth in Counts I and II, *supra*.

105. The John Doe Defendant rendered substantial assistance to Defendant Boteach's

commission of the tort of defamation against Plaintiff.

106. The John Doe Defendant knew that Defendant Boteach was publishing the defamatory statements about Plaintiff and rendered substantial assistance in defaming Plaintiff by manufacturing graphics containing statements that falsely attributed harmful statements to individuals purporting, in those graphics, to articulate the views of Plaintiff and its representatives. The John Doe Defendant also recorded, edited, and published the defamatory statements with reckless disregard for their falsity.

107. Wherefore, Plaintiff demands judgment against Defendant John Doe, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
**(Against Defendant Boteach)**

108. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

109. The Hotel has various business relationships pursuant to which it has legal rights, including with respect to hotel guests. Some of these hotel guests were future guests with bookings at the Hotel for stays after December 2, 2024. The Hotel has various business relationships with other identifiable entities and people, such as parties reserving venues within the Hotel after December 2, 2024.

110. Defendant Boteach knew Plaintiff has business relationships with guests who patronize the Hotel's services. Indeed, Defendant Boteach specifically urged the Hotel's guests to terminate their contractual relationships with Plaintiff.

111. Throughout his intentional interference with these relationships, Defendant Boteach *never* publicly communicated that he was seeking a personal donation to his "charity." His

interference with these relationships was unjustified because it was driven by a personal profit-interest and based on falsehoods.

112. Defendant Boteach intentionally interfered with Plaintiff's business relationships with its guests by, *inter alia*, publishing numerous statements accusing the Hotel of engaging in and/or supporting antisemitism. Defendant Boteach's actions were intentionally designed to cause and result in harm to those business relationships. Specifically, Defendant Boteach intentionally interfered with the Hotel's business relationship via the following statements: he distorted a statement of the Hotel to create the false appearance of a Hotel policy to ban Jews; he urged customers of the Hotel[4] to stop doing business with the Hotel and, specifically, to "cancel" any reservations at the Hotel; he published several AI-generated videos of persons affiliated with the Hotel in which he purported to quote them apologizing for the Incident and denying the wrongfulness of antisemitism; he stated "ANY JEW STILL STAYING AT THE [HOTEL] . . . OBVIOUSLY HAS A DEATH WISH. THIS WILL HAPPEN TO YOU AND THERE WILL BE NOONE TO SAVE YOU. #BOYCOTTFONTAINEBLEAU NOW!!;" Defendant's own words leave no room for doubt that he deliberately and tortiously interfered with business relationships.

113. Defendant Boteach's interference was unjustified because, *inter alia*, Defendant Boteach published harmful statements that were false and designed to conjure outrage, disgust, and vitriol against the Hotel in furtherance of Defendant Boteach's scheme to coerce the Hotel into paying Defendant Boteach money.

---

[4] Upon information and belief, Plaintiff is not the only person or business Defendant Boteach has harassed or against whom he has incited hate and violence. He has posted many videos on social media showing him physically pursuing people while claiming they are putting him in fear for his life. Upon information and belief, while loitering alone in the Hotel lobby after midnight on a Sunday night, he sought to call attention to himself and escalate the Incident. Defendant Boteach's own social media accounts provide clear evidence that he uses escalation tactics in public places where he believes large numbers of Jewish people visit, including, but not limited to, the Hotel on a previous occasion when he chased purported assailants through the halls of the Hotel while filming them.

114. As a direct and proximate cause of Defendant Boteach's misconduct, the Hotel has suffered damages with respect to its business relationships. This includes, but is not limited to, canceled (and refunded) guest bookings and canceled (and refunded) event-space reservations.

115. Indeed, Defendant Boteach published statements gleefully reporting hundreds of cancellations by guests at the Hotel.

116. Wherefore, Plaintiff demands judgment against Defendant Boteach, an award of damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**COUNT V**
**<u>AIDING AND ABETTING TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS</u>**
**(Against Defendant John Doe)**

117. Plaintiff repeats and realleges every allegation preceding Count I as if fully set forth herein.

118. The allegations with respect to the John Doe Defendant are made upon information and belief as their identities will be determined through the course of discovery.

119. Defendant Boteach is the primary wrongdoer who tortiously interfered with Plaintiff's business relationships as set forth in Count IV, *supra*.

120. The John Doe Defendant rendered substantial assistance to Defendant Boteach's misconduct as alleged in Count IV.

121. The John Doe Defendant knew that Defendant Boteach was tortiously interfering with Plaintiff's business relationships, specifically threatening it with financial ruin through cancellations and organizing boycotts based on falsehoods, manufacturing graphics containing statements that falsely attributed harmful statements to individuals purporting, in those graphics, to articulate the views of Plaintiff and its representatives and target them towards guests with contracts with Plaintiff.

122. Wherefore, Plaintiff demands judgment against Defendant John Doe, an award of

damages in an amount to be determined at trial, injunctive relief, and such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for those issues that are so triable against the Defendants pursuant to Florida law.

Dated: February 18, 2025

Respectfully submitted,

**BURSTYN LAW PLLC**

By: */s/ Sean A. Burstyn*
Sean A. Burstyn
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S700
Miami, FL 33131

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*
*d/b/a Fontainebleau Miami Beach*

# EXHIBIT C.2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**JACOB SHMUEL BOTACH**

***Counterclaim Plaintiff,***

**v.**

**FAIZ AKBAR**

**and**

**JEFFREY SOFFER**

***Third Party Defendants,***

**and**

**FONTAINEBLEAU FLORIDA HOTEL, LLC**

***Counterclaim Defendant.***

**Case No. 1:25-cv-20251-KMM**

**Jury Trial Demand**

## COUNTERCLAIM AND THIRD PARTY COMPLAINT

Counterclaim Plaintiff Rabbi Jacob Shmuel Botach ("Rabbi Shmuley"), by and through undersigned counsel, hereby files this complaint against Third Party Defendants Faiz Akbar ("Akbar") and Jeffrey Soffer ("Soffer") and Counterclaim Defendant Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach ("the Fontainebleau") for violations of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a; the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; and the common law prohibitions on tortious interference with advantageous

business relationships. Rabbi Shmuley seeks to recover monetary damages, estimated at $20,000,000, as well as attorney's fees and costs and to obtain injunctive and declaratory relief.[1]

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 as the action arises under, *inter alia*, 42 U.S.C. § 2000a and 42 U.S.C. § 1981, laws of the United States, and all other claims are part of the same case or controversy pursuant to 28 U.S.C. § 1367.
2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Counterclaim Plaintiff's claims occurred in this judicial district, and Counterclaim and Third Party Defendants have conducted business in this judicial district and may be found conducting business in this judicial district.

**PARTIES**

3. Counterclaim Plaintiff Jacob Shmuel Botach ("Rabbi Shmuley") is an Orthodox Jew and world-renowned influencer on Jewish and Israeli affairs and human rights. Dubbed "America's Rabbi," he is the founder and executive director of the World Values Network, a non-profit organization.
4. Third Party Defendant Faiz Akbar is a natural person believed to reside in Virginia.
5. Third Party Defendant Jeffrey Soffer owns, in-whole or in-part, directly or through corporate entities, the Fontainebleau.
6. Counterclaim Defendant Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach ("the Fontainebleau"), is a corporation conducting business in Florida.

[1] On or about the date of filing this Complaint, a copy was sent to the Florida Commission on Human Relations solely to give notice of the events described herein and advise that Rabbi Shmuley seeks to vindicate his claims exclusively in federal court.

# GENERAL ALLEGATIONS

**Rabbi Shmuley's Background and Ties to Israel**

7. Rabbi Shmuley is a Jewish-American Orthodox Rabbi. He began his Jewish education at a Jewish school in Greater Miami. After grade school, he studied for two years at the Rabbinical Seminary of California in Los Angeles, followed by two years at the Toras Emes Yeshiva in Jerusalem. He then returned to the United States, studying at Oholei Torah, where he was chosen by the Lubavitcher Rebbe—the foremost global rabbinic leader of the time—to be one of ten rabbinical students sent to establish Sydney, Australia's first-ever rabbinical seminary, where he led community events and outreach for two years.

8. In 1988, Rabbi Shmuley returned to New York to complete his rabbinical ordination at Chabad headquarters at 770 Eastern Parkway, one of the largest and most well-known Chabad yeshivas in the world. Upon ordination, the Lubavitcher Rebbe appointed him as his emissary to Oxford University, where he served as Rabbi for eleven years. During his tenure at Oxford, Rabbi Shmuley brought numerous world leaders and Israeli Prime Ministers—including Benjamin Netanyahu, Ehud Olmert, Shimon Peres, Yitzchak Rabin, and Yitzchak Shamir—to campus to defend Israel against the widespread misinformation and libel being promoted, even at that time. His efforts helped galvanize support for Israel among students and intellectuals from around the world.

9. During his tenure at Oxford, Rabbi Shmuley founded the L'Chaim Society, one of the largest student organizations in the university's long history, second only to the Oxford Union, amassing over 5,000 members of every religion, denomination, ethnicity, and creed.

10. The organization's core mission was to foster Jewish pride, promote universal Jewish values, combat antisemitism, and vigorously defend Israel. Rabbi Shmuley brought a

constant stream of global leaders—including U.S. senators, members of Congress, and world-renowned figures such as Mikhail Gorbachev, Elie Wiesel, Michael Jackson, and Simon Wiesenthal—to speak on Israel's behalf and educate students. Some of these speakers were Nobel Peace Prize laureates whose powerful messages about the Holocaust and the need for a strong Jewish state left a lasting impact. Rabbi Shmuley developed a close relationship with Elie Wiesel and regularly appeared with him in public lectures, advocating that the IDF and a secure Israel are the most necessary responses to the atrocities of the Holocaust.

11. Following over a decade of service at Oxford, Rabbi Shmuley returned to New York to continue his mission with even greater intensity. He authored Holocaust Holiday, a deeply personal account of traveling to 100 Holocaust sites with his children to teach them about the darkest chapters of Jewish history and the necessity of Jewish resilience. He has maintained strong relationships with key figures in Israeli leadership, including Prime Minister Benjamin Netanyahu and Strategic Affairs Minister Ron Dermer, who served as Rabbi Shmuley's student president at Oxford and entered public service in Israel after completing his education. Rabbi Shmuley has taken out countless full-page ads in major media outlets—The New York Times, The Washington Post, USA Today, Los Angeles Times, and The Wall Street Journal—defending Israel in what are among the largest campaigns of their kind. As a result of this, as well as his thousands of syndicated weekly columns and many debates around the world against Israel's foremost critics, many of them televised, he has become a frequent commentator on CNN, Fox News, MSNBC, the BBC, Sky News Australia, and Newsmax, where he is known for refuting misinformation and passionately advocating for Israel. His book *The Israel Warrior*, endorsed by Alan

Dershowitz and other leading defenders of Israel, is widely used by high school and university students facing anti-Israel sentiment on campus.

12. Rabbi Shmuley has devoted his life to defending Israel and the Jewish people in his capacity as a clerical figure and due to his sincerely held religious belief that it is his duty to do so. He travels to Israel frequently and is the proud father of three children who have served in the IDF, including two as elite combat soldiers. His daughter Chana served in the IDF Spokesperson's Unit, escorting American four-star generals on official visits. His daughter-in-law, Dalia, served as a military social worker and was responsible for organizing funerals for dozens of fallen soldiers—heartbreakingly, even during the week of her own wedding just days after October 7, 2023 when terrorists invaded Israel from Gaza and killed or kidnapped over a thousand Israeli civilians.

**Rabbi Shmuley's Jewish Race, Religion, and National Origin Are Connected to Israel**

13. As described at length above, Rabbi Shmuley feels and publicly expresses a deep affinity for Israel, his family's ancestral homeland. Rabbi Shmuley, like the vast majority of Jews the world over, identifies Israel as his ultimate place of national origin. His racial and religious identities as a Jew are also intimately connected to Israel and the modern State of Israel. The terms "Jew," "Jewish," and "Judaism" literally come from the word "Judea," an important part of historic Israel.

14. Rabbi Shmuley's connection to Israel is neither idiosyncratic nor can it be chalked up to mere politics; it is at the core and very essence of what makes him (and millions of others) Jewish. The Bible itself references this ancient Jewish hope[2] while the Prophets and Writings of the Hebrew Bible repeatedly record this aspiration.[3] From a Jewish law

---

[2] *See, e.g.*, *Deuteronomy* 30:1-5.

[3] *See, e.g.*, *Isaiah* 11:11-12; *Jeremiah* 29:14; 20:41-42; *Psalm* 126; *Psalm* 137.

Case 1:25-cv-22251-KMM Document 54-3 Entered on FLSD Docket 07/23/2025 Page 6 of 10

perspective, over half of the Biblical commandments that Jews are bound to obey are specifically tied to the Jewish homeland.[4] From a doctrinal point of view, belief in and hope for the return to Zion (Israel) is expressed countless times in thrice daily prayers and is literally part of the 13 Principles of Jewish Faith.[5] Belief in the need for Zionism is no different than belief in the need to keep any of the other commandments. In fact, many commandments such as Sabbatical, Jubilee, consecration of first fruits and festival pilgrimages, presume religious commitment to the biblical Land of Israel.

15. Indeed, the Jewish religion is predicated on the belief that God promised Abraham that he and his descendants shall live in and maintain sovereignty over the Land of Israel,[6] and much of the narrative portions of the Torah and greater Jewish Bible detail the tribulations Jews experience when they do not have sovereignty over this land and their resulting struggle to achieve and maintain such sovereignty.

16. The concepts of a Jewish warrior class and the national defense of the Land of Israel are as integral to Rabbi Shmuley's Jewish religion, race, and national origin as the land of Israel is itself. Indeed, from a biblical or Jewish cultural narrative perspective, the first Jewish army is described a mere two chapters after the Torah details God's promise of Israel to Abraham.[7]

17. All of the aforementioned doctrinal aspects of Judaism are religious beliefs sincerely held by Rabbi Shmuley. Even from a purely secular perspective, this connection to Israel is a core feature of the cultural identity of those of Jewish national origin and race like Rabbi

---

[4] *About Us,* Torah VeHa'aretz Institute, https://en.toraland.org.il/about.

[5] *Maimonides Introduction to Perek Helek,* Maimonides Heritage Center, https://www.mhcny.org/qt/1005.pdf (explaining the 12th Fundamental Principle).

[6] *Genesis* 12:1-9.

[7] *Genesis* 14:14 ("And Abram heard that his kinsman had been taken captive, and he armed his trained men, those born in his house, three hundred and eighteen, and he pursued [them] until Dan.").

Shmuley. Whether one views Rabbi Shmuley's Judaism through the prism of religion, race, or national origin, Jewish sovereignty and self-determination in Israel is core to all three identities, which are in and of themselves indivisible.

18. As a result of Rabbi Shmuley's above detailed Judaism and Zionism, and his related public celebration and support of his Jewish race, religion, and national origin, patrons of the Fontainebleau subjected Rabbi Shmuley to antisemitic harassment and threats of violence as described below.[8]

**<u>The First Antisemitic Attack on Rabbi Shmuley at the Fontainebleau</u>**

19. Rabbi Shmuley has a deep attachment to the Fontainebleau. When he was approximately eight years old, his parents divorced and he moved with his mother to Miami Beach, often visiting the Fontainebleau, which was a refuge for Orthodox Jews, especially during holidays like Passover. Over the years, as an adult and public speaker, Rabbi Shmuley addressed various events held at the hotel attended by hundreds.

---

[8] Antisemitism is defined in detail by The International Holocaust Remembrance Alliance ("IHRA"), a multi-governmental organization with 35 member countries, including the United States, with a mission "to strengthen, advance and promote Holocaust education, remembrance, and research worldwide." *See* International Holocaust Remembrance Alliance, *About The International Holocaust Remembrance Alliance* (last visited Nov. 19, 2024), https://holocaustremembrance.com/who-we-are. Recognized as a "vital tool in the struggle against antisemitism" by the New York Governor's office (*See* Proclamation of Governor Kathy Hochul (Jun. 12, 2022), https://www.governor.ny.gov/sites/default/files/2022-06/IHRA_Antisemitism_Definition_Proclamation-2022.pdf), IHRA defines antisemitism as encompassing, inter alia, "making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions ("Jews Control the World Trope"); accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews ("Collective Responsibility Trope"); denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor ("Jewish Self-Determination Denial"); using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis ("Blood Libel Trope"); and drawing comparisons of contemporary Israeli policy to that of the Nazis ("Holocaust Inversion")." International Holocaust Remembrance Alliance, *Working Definition of Antisemitism* (last visited Nov. 19, 2024), https://holocaustremembrance.com/resources/working-definition-antisemitism (cleaned up). As of August 2024, 35 States and the District of Columbia have adopted IHRA, including Texas and New York. American Jewish Committee, *Use of the Working Definition in the U.S.* (last visited Nov. 19, 2024), https://www.ajc.org/use-of-the-working-definition-in-the-us.

20. After Rabbi Shmuley's father passed away in May 2020, he wanted to be closer to his mother, so he bought an apartment on 43rd and Collins Avenue, just two blocks from his cherished Fontainebleau. This was a familiar and comfortable location, as he had grown up nearby on 44th and Prairie Avenue, where his mother still lived.

21. However, things took an unexpected turn on or about January 3, 2023 when he was sitting inside the Fontainebleau lobby working on his laptop. Three individuals approached him and began shouting "Free Palestine" and making threatening gestures. Feeling threatened, he captured the tail-end of the harassment on his phone.

22. Rabbi Shmuley went to the hotel's security, thinking they would handle the situation properly and come to his defense, but to his surprise, the security staff accused *him* of harassing the guests, even though the video clearly showed that he was the one being attacked and harassed for no other reason other than sitting with a yarmulke and therefore identifiably Jewish in a hotel lobby.

23. The following day, Rabbi Shmuley reached out to Phil Goldfarb, Chief Operating Officer of the Fontainebleau. The two knew each other because Rabbi Shmuley had taken Goldfarb's daughter Dara to Israel on an all-expense paid Birthright trip to Israel, and she had introduced Rabbi Shmuley to her father, saying to call him if he ever needed anything. Goldfarb called Shmuley back quickly and apologized, acknowledging that the security staff handled the situation terribly and promising to retrain them to address issues related to antisemitism. Goldfarb expressed his complete shock and outrage at the attack on Rabbi Shmuley and noted his own great fears over the growing tide of antisemitism throughout the United States.

24. Although Rabbi Shmuley did not publicly mention where the attack took place, the harassment had generated attention on social media. Goldfarb reached out again, seeing that the incident had gone globally viral, and asked if Rabbi Shmuley would consider publicly not mentioning the hotel. Rabbi Shmuley explained he had not named the hotel because he trusted the management's commitment to retrain the security staff to protect Jewish guests as Goldfarb promised. Goldfarb then had Patrick Fisher, Managing Director of the hotel, speak and meet with Rabbi Shmuley. Fisher offered Rabbi Shmuley free vacations at the hotel, which he refused, and then insisted on a small gesture like pool passes for Rabbi Shmuley and his grandkids on the infrequent occasions they were in Miami, which Rabbi Shmuley accepted.

**<u>The Second Antisemitic Attack on Rabbi Shmuley at the Fontainebleau</u>**

25. In or about the late hours of December 1, 2024 and early hours of December 2, Rabbi Shmuley was in the lobby of the Fontainebleau working on a proposed acceptance speech for one of President Trump's cabinet nominees who was friendly with Rabbi Shmuley and has expressed strong public support for Israel. He was approached from behind by Faiz Akbar, who recognized Rabbi Shmuley from his countless TV appearances and debates defending Israel and fighting antisemitism.

26. Akbar, appearing deeply dangerous, unhinged, and suffused with near-lethal hate launched into an unprovoked and physically threatening antisemitic tirade, nearly all of which was captured on film. Referencing Israel's defensive operations in Gaza and Rabbi Shmuley's ties to Israel, such as his sons' service in the IDF and his Jewish and Israeli advocacy on popular media such Piers Morgan Uncensored, Akbar falsely accused Rabbi Shmuley of being a "baby killer" and demanded that he leave the premises, aggressively throwing

virtually every curse word in book at him and saying things like "get the fuck out of here, pussy" and "get out of the lobby right now man I don't want to see people like you." Akbar's demands that Rabbi Shmuley leave the hotel were coupled with threats of imminent violence such as "I will spit on your face right now" and "I will fuck your shit." Akbar's menacing attack and taunts made clear his intention of imminently committing an act of violence against Rabbi Shmuley.

27. The incident, which was largely captured on video, occurred over several minutes and was in the proximity of hotel security guards who watched passively and failed to respond for an extended time. Rabbi Shmuley yelled for security to come to his aid and pleaded with security to call the police. Security finally responded and instead of calling the police to protect Rabbi Shmuley, a security guard threatened to call the police on him. The security guard astonishingly engaged in a handshake and hug with the assailant and did not promptly report the incident to law enforcement despite Rabbi Shmuley's pleas.

28. Fearing for his safety and with no law enforcement in sight, Rabbi Shmuley left the Fontainebleau that evening.

29. Rabbi Shmuley then sent the entire video of the attack to Goldfarb and then called him. Goldfarb did not accept his calls, acknowledge the video, or text back.

30. Absent meaningful communication from the hotel, on or about December 3, 2024, Rabbi Shmuley announced litigative plans to vindicate his civil right to patronize the Fontainebleau sans antisemitic harassment and threats of imminent violence, which would have been the case had the hotel responded effectively to Akbar's attack or properly trained its security following the 2023 incident.

31. That same week, the Fontainebleau released a statement calling the attack on Rabbi Shmuley "an altercation," refused to acknowledge that Rabbi Shmuley was the victim of a heinous antisemitic attack, and said that one of the parties had used "abhorrent language," suggesting it might have been Rabbi Shmuley rather than Akbar. Commentators condemned the hotel's failure to call out the antisemitic nature of the attack.[9]

32. On December 6, 2024, Rabbi Shmuley, through counsel, notified the Fontainebleau in writing of his intent to pursue litigation against the hotel for, *inter alia*, "discrimination in a public accommodation, and any other causes of action in State and Federal law uncovered."

**The Fontainebleau and Soffer's Retaliation Against Rabbi Shmuley**

33. On December 6, 2024, the Fontainebleau informed Rabbi Shmuley, via letter to counsel, that it was "declin[ing] entry and service to" Rabbi Shmuley because he was "actively in or threatening litigation against the hotel." At the time, Rabbi Shmuley held lifetime passes to access Fontainebleau facilities such as the swimming pool.

34. The letter also included cease-and-desist demands that Rabbi Shmuley remove videos exposing the attack and censor his commentary on it and the surrounding circumstances.

35. This letter also cites in its first paragraph Rabbi Shmuley's attempt to vindicate his civil rights through litigation. Similarly, the third paragraph mentions "Rabbi Botach's threats of a lawsuit."

36. Beginning on or about December 16, 2024, Jeffrey Soffer, a Fontainebleau owner, made multiple calls to Miriam Adelson—then a very close friend and supporter of the Rabbi—telling her that that Rabbi Shmuley went to the Fontainebleau on the night of the attack looking for a fight and that he is a fraudulent Jew and not really Orthodox. He further

[9] https://jewishjournal.com/commentary/columnist/editors-note/377439/miami-hotel-cant-bring-itself-to-say-antisemitism.

told Adelson that Rabbi Shmuley is crazy, insane, argumentative, and not normal. Soffer also claimed that a video from the hotel showed that Rabbi Shmuley had earlier approached and harassed Akbar, falsely portraying Rabbi Shmuley as the instigator of the attack. These statements were not true. Thereafter, Adelson stopped donating to Rabbi Shmuley's organization. At the time, Adelson was Rabbi Shmuley's largest donor and a close friend of nearly two decades.

37. Aware of the commercial relationship between Rabbi Shmuley and Adelson, Soffer also requested that Adelson pressure Rabbi Shmuley to not pursue his contemplated civil rights litigation against the Fontainebleau.

38. On or about December 18, 2024, Soffer continued his campaign of retaliation against Rabbi Shmuley by speaking to another group of supporters, the Falic family of Bal Harbor, and told Moshe Levy, Simon Falic's son-in-law, that Rabbi Shmuley intentionally got attacked to shakedown the hotel, he is a shakedown artist, and is a fake rabbi. Soffer indicated that Rabbi Shmuley searches for antisemitic attacks to justify his organization's existence. These statements were not true. Thereafter, the Falic family, which was counted among Rabbi Shmuley's closest supporters and friends, withdrew donations to Rabbi Shmuley's organization.

39. Aware of the business relationship between Rabbi Shmuley and the Falics, Soffer also requested that the Falics pressure Rabbi Shmuley to not pursue his contemplated civil rights litigation against the Fontainebleau.

40. On December 19, 2024, the Fontainebleau filed a retaliatory lawsuit against Rabbi Shmuley, the instant matter, including 63 paragraphs of introductory and background allegations that take up over eleven pages and were seemingly inserted to embarrass and humiliate Rabbi

Case 1:25-cv-22551-KMM Document 50 Entered on FLSD Docket 07/29/2025 Page 13 of 20

Shmuley. Many of the allegations therein contain statements and accusations about Rabbi Shmuley unrelated to the Fontainebleau's causes of action and some amount to nothing more than personal attacks and petty insults. The lawsuit not only accuses Rabbi Shmuley of criminal conduct like extortion and financial misconduct but also conduct unbecoming of a rabbi such as eating at non-kosher establishments like the Fontainebleau. The hotel also gratuitously dredged up alleged, irrelevant conflicts between Rabbi Shmuley and unnamed third parties and his family members.

41. The Fontainebleau filed a retaliatory lawsuit against Rabbi Shmuley, despite the fact that Soffer had earlier offered Adelson a public apology to Rabbi Shmuley so long as he did not file a claim. Due to Rabbi Shmuley's friendship with Adelson, Rabbi Shmuley agreed to these terms, adding that Soffer had to also agree to finally train his security to protect Jewish visitors. In the end, it appears Soffer was just buying time to build his retaliatory lawsuit against Rabbi Shmuley.

## <u>CAUSES OF ACTION</u>

### COUNT I

Violation of Title II of the Civil Rights Act of 1964
42 U.S.C. § 2000a
(Against Akbar, the Fontainebleau, Soffer)

42. Rabbi Shmuley incorporates all prior paragraphs as if they were stated fully herein.

43. 42 U.S.C. § 2000a(a) reads: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

44. For purposes relevant here, places of public accommodation are statutorily defined as including a "hotel" like the Fontainebleau. 42 U.S.C. § 2000a(1).

45. 42 U.S.C. § 2000a-2 reads "No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive any person of any right or privilege secured by section 2000a or 2000a–1 of this title, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 2000a or 2000a–1 of this title, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 2000a or 2000a–1 of this title."

46. 42 U.S.C. § 2000a-2(b) and 2(c) also function as anti-retaliation provisions. *See, e.g.*, *Fenton v. Dudley*, 761 F.3d 770, 776 (7th Cir. 2014) ("The Civil Rights Act has an anti-retaliation provision, section 203(b)"); *Hamm v. Rock Hill*, 379 U.S. 306, 310-11, 85 S. Ct. 384, 388-89 (1964) (looking to the anti-retaliation aspects of 2(c)).

47. Rabbi Shmuley is easily identifiable as Jewish because of his yarmulke, rabbinical beard, tzitzit, and public and primetime media persona as "America's Rabbi."

48. Akbar identified Rabbi Shmuley as a Jew, even referencing his Jewish advocacy on the Piers Morgan show and the ongoing Gaza War, and because of this subjected him to threats of violence. Akbar did not similarly threaten any non-Jews at the Fontainebleau that night. In threatening Rabbi Shmuley with violence, Akbar "attempt[ed] to . . . deny" or otherwise "attempt[ed] to deprive" Rabbi Shmuley "a[] right or privilege secured by section 2000a," 42 U.S.C. § 2000a-2(a), namely his right to enjoy the facilities of the Fontainebleau, a hotel and therefore a place of public accommodation. Akbar otherwise violated 42 U.S.C. § 2000a-2(b)-(c) by attempting to and succeeding in intimidating, threatening, coercing and punishing Rabbi Shmuley for exercising his rights. As Rabbi Shmuley left the premises,

fearing for his safety and life, Akbar in fact succeeded in denying and depriving Rabbi Shmuley of his rights.

49. Rabbi Shmuley also "attempted to exercise [his] right or privilege secured by section 2000a" by exposing the antisemitism he experienced and formulating and announcing plans to secure his right to patronize the Fontainebleau sans antisemitic harassment by commencing litigation against the Fontainebleau for inadequately addressing Akbar's attack, and clearly failing to train their security staff after other such attacks. In violation of 42 U.S.C. § 2000a-2, the Fontainebleau, with Soffer acting as their agent and in his individual capacity, retaliated against Rabbi Shmuley by revoking his access to the hotel and his lifetime facilities passes and making false and scandalous statements to his key donors. Thereafter the hotel filed a retaliatory lawsuit.

50. As a direct and proximate result of Akbar's, the Fontainebleau's, and Soffer's actions, Rabbi Shmuley experienced considerable financial loss, emotional distress, harm to his reputation, humiliation, and embarrassment.

51. For this Count, Rabbi Shmuley seeks costs, attorneys' fees, and declaratory and injunctive relief to the fullest extent permissible by law.

52. Wherefore, Rabbi Shmuley seeks an injunction against the Fontainebleau restoring his lifetime passes and access to the hotel and a declaration that retaliating against Rabbi Shmuley was unlawful; a declaration that Jeffrey Soffer's aforestated retaliation was unlawful and an injunction against further retaliation to the fullest extent permissible by law; and an injunction against Akbar requiring that he stay a reasonable distance away from Rabbi Shmuley and not further interfere with his civil rights and a declaration this his conduct was unlawful.

53. Rabbi Shmuley's request for attorneys' fees has a statutory basis. *See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 743 (11th Cir. 2021) (citing 42 U.S.C. § 2000a-3(b)) ("a prevailing party may recover its reasonable attorney's fees.")).

**COUNT II**

Violation of the Civil Rights Act of 1866
42 U.S.C. § 1981
(Against Akbar, the Fontainebleau, and Soffer)

54. Rabbi Shmuley incorporates all prior paragraphs as if they were stated fully herein.

55. 42 U.S.C. § 1981(a) reads in relevant part:"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws . . . for the security of persons and property."

56. 42 U.S.C. § 1981(b) reads: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

57. The statute under which this cause arises "was designed to do just what its terms suggest: to prohibit all racial discrimination . . . with respect to the rights enumerated therein." *Runyon v. McCrary*, 427 U.S. 160, 170, 96 S. Ct. 2586, 2594, 49 L. Ed. 2d 415 (1976).

58. The Supreme Court has "held that 42 U. S. C. § 1981 . . . prohibits not only racial discrimination but also retaliation against those who oppose it." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 354-55, 133 S. Ct. 2517, 2529 (2013) (citation omitted).

59. Rabbi Shmuley is a racially Jewish person within the jurisdiction of the United States who, because of his Jewish race, was unlawfully denied the same right to contract as others when Akbar unlawfully forced him but not any non-Jews out of the Fontainebleau with his threats of violence.

60. Akbar additionally violated Rabbi Shmuley's rights on the basis of his race in violation of § 1981 by depriving him the full and equal benefit of Florida's common law tort prohibiting assault and the related Fla. Stat. § 784.011, also a law for the security of persons and property, which prohibits the making of an "unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent."

61. Rabbi Shmuley opposed this discrimination, as well as the enabling of such discrimination, by formulating and announcing a plan to vindicate his civil rights through litigation against the Fontainebleau for inadequately addressing Akbar's attack.

62. The Fontainebleau, with Soffer acting as their agent and in his individual capacity, retaliated against Rabbi Shmuley for trying to enforce his rights by revoking his access to the hotel and his lifetime facilities passes, making false and scandalous statements to his key donors, and filing a retaliatory lawsuit against Rabbi Shmuley.

63. As a direct and proximate result of Akbar's, Soffer's, and the Fontainebleau's actions, Rabbi Shmuley experienced considerable financial loss, emotional distress, harm to his reputation, humiliation, and embarrassment.

64. Wherefore, Rabbi Shmuley seeks all relief available at law, including attorneys' fees, which are statutorily codified in 42 U.S.C. § 1988(b).

**COUNT III**
Violation of the Civil Rights Act of 1866
42 U.S.C. § 1982
(Against Akbar, the Fontainebleau, and Soffer)

65. Rabbi Shmuley incorporates all prior paragraphs as if they were stated fully herein.

66. 42 U.S.C. § 1982 reads "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

67. The statute under which this cause arises "was designed to do just what its terms suggest: to prohibit all racial discrimination . . . with respect to the rights enumerated therein." *Runyon v. McCrary*, 427 U.S. 160, 170, 96 S. Ct. 2586, 2594, 49 L. Ed. 2d 415 (1976).

68. The Supreme Court has long recognized that "§ 1982 encompasses retaliation claims." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 447, 128 S. Ct. 1951, 1955 (2008) (discussing *Sullivan v. Little Hunting Park, Inc*., 396 U.S. 229, 90 S. Ct. 400, 24 L. Ed. 2d 386)).

69. Rabbi Shmuley is a racially Jewish citizen. In addition to providing lodging, the Fontainebleau also sells a number of items that may become one's personal property upon purchase.

70. Because of Rabbi Shmuley's Jewish race, Akbar unlawfully deprived him of his rights under this statute by forcing him out of the Fontainebleau with threats of violence, precluding Rabbi Shmuley from making purchases at the Fontainebleau.

71. The Fontainebleau has similarly deprived Rabbi Shmuley of making such purchases because it banned him from the hotel in retaliation for exposing the discrimination he experienced and formulating and announcing a plan to vindicate his civil rights through litigation against the hotel for inadequately addressing Akbar's attack. The hotel also filed a retaliatory lawsuit against Rabbi Shmuley.

72. As a direct and proximate result of Fontainebleau and Soffer's actions, Rabbi Shmuley experienced considerable financial loss, emotional distress, harm to his reputation, humiliation, and embarrassment.

73. Wherefore, Rabbi Shmuley seeks all relief available at law, including attorneys' fees, which are statutorily codified in 42 U.S.C. § 1988(b).

**COUNT IV**

Tortious Interference with Advantageous Business Relationships
(Against the Fontainebleau and Soffer)

74. Rabbi Shmuley incorporates all prior paragraphs as if they were stated fully herein.

75. "In Florida, the elements of tortious interference are '(1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff.'" *Aerotek, Inc. v. Zahn*, 625 F. App'x 394, 395 (11th Cir. 2015) (quoting *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc*., 262 F.3d 1152, 1154 (11th Cir. 2001)).

76. Rabbi Shmuley had a business relationship with Miriam Adelson and the Falic family as they were central donors to Rabbi Shmuley's organization. The Fontainebleau and their agent Soffer were aware of the existence of this business relationship and in fact played on this relationship in attempting to thwart Rabbi Shmuley's contemplated civil rights litigation and silence him for exposing and opposing unlawful discrimination. Acting in pursuit of the Fontainebleau's interests, Soffer made false and scandalous statements to Rabbi Shmuley's donors with the intent of causing a rupture in their relations as punishment for Rabbi Shmuley's exposure of discrimination at the hotel and announced civil rights litigation against the Fontainebleau. Retaliating against someone for exposing discrimination and seeking to vindicate their civil rights in court is unjustified. As a result of the Fontainebleau and Soffer's actions, Rabbi Shmuley lost his largest donors.

77. As a direct and proximate result of Fontainebleau and Soffer's actions, Rabbi Shmuley experienced considerable financial loss, emotional distress, harm to his reputation, humiliation, and embarrassment.

78. Wherefore, Rabbi Shmuley seeks all relief available at law, including compensatory damages and punitive damages in an amount to be determined at trial, payment of Rabbi Shmuley's reasonable attorney's fees, expert fees, and costs, pre-judgment and post-judgment interest on the preceding items as provided by law, injunctive relief, declaratory relief, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Rabbi Shmuley prays as follows:

A. That the Court order Akbar, the Fontainebleau, and Soffer to pay compensatory damages;

B. That the Court order Akbar, the Fontainebleau, and Soffer to pay punitive damages;

C. That the Court enter judgment in favor of Rabbi Shmuley including injunctive relief and declaratory relief;

D. That the Court order Akbar, the Fontainebleau, and Soffer to pay Rabbi Shmuley's reasonable attorney's fees, expert fees, and costs;

E. That the Court order Akbar, the Fontainebleau, and Soffer to pay pre-judgment and post-judgment interest as provided by law; and

F. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Rabbi Shmuley demands a jury trial for all issues herein that are so triable.

Date: July 23, 2025

Respectfully submitted,

**National Jewish Advocacy Center, Inc.**

/s/ *Matthew Mainen*
Matthew Mainen
Maryland Bar No. 2012170265
*Appearing Pro Hac Vice*
3 Times Square
New York, NY 10036
Phone: (301) 814-9007
Email: matt@njaclaw.org

**Docketed and also Signed By**:

/s/ *Samuel Feldman*
Samuel Feldman
Florida Bar No. 1042262
Pennsylvania Bar No. 326206
71 Northeast 27th Avenue
Pompano Beach, FL 33062
Phone: (954) 682-8590
Email: sam@feld.law

# EXHIBIT C.3

## Fontainebleau/Botach - Discovery re Counterclaim and Third-Party Complaint

**Matthew Mainen** <Matt@njaclaw.org> Thu, Aug 21, 2025 at 3:23 PM
To: "todd@toddfriedmanpa.com" <todd@toddfriedmanpa.com>
Cc: Andrei Dambuleff <andrei.dambuleff@burstynlaw.com>, Bimaya De Silva <bimaya.desilva@burstynlaw.com>, "Bertelsen, Jacqueline" <Jacqueline.Bertelsen@wilsonelser.com>, Sean Burstyn <sean.burstyn@burstynlaw.com>, "Benford, John Y." <John.Benford@wilsonelser.com>

Yes, that is our position but I am happy to review any authority you are relying upon that suggests this position should change.

Best,

Matthew Mainen
Litigation Counsel
National Jewish Advocacy Center

---

**From:** todd@toddfriedmanpa.com <todd@toddfriedmanpa.com>
**Sent:** Thursday, August 21, 2025 2:22 PM
**To:** Matthew Mainen <Matt@njaclaw.org>
**Cc:** 'Andrei Dambuleff' <andrei.dambuleff@burstynlaw.com>; 'Bimaya De Silva' <bimaya.desilva@burstynlaw.com>; 'Bertelsen, Jacqueline' <Jacqueline.Bertelsen@wilsonelser.com>; 'Sean Burstyn' <sean.burstyn@burstynlaw.com>; 'Benford, John Y.' <John.Benford@wilsonelser.com>
**Subject:** Fontainebleau/Botach - Discovery re Counterclaim and Third-Party Complaint

Matt,

Following our meet and confer on Fontainebleau's discovery requests regarding the Counterclaim and Third Party Complaint, please confirm that Counter-Plaintiff and Third-Party Plaintiff Botach will not produce any documents or respond to any interrogatories concerning the allegations in the Counterclaim and Third Party Complaint, unless and until the Counterclaim and Third Party Complaint is authorized to proceed by the Court.

**Todd Friedman, Esq.**

Todd R. Friedman, P.A.

**Phone**: 786-536-7190

**Email**: todd@toddfriedmanpa.com

1101 Brickell Avenue

Suite S-700

Miami, Florida 33131

| | |
|---|---|
| | www.trf.law |

# EXHIBIT C.4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL, LLC d/b/a FONTAINEBLEAU MIAMI BEACH, *a foreign limited liability company,*

CASE NO.: 1:25-cv-20251-KMM

Plaintiff,

v.

JACOB SHMUEL BOTACH a/k/a "SHMULEY BOTEACH," *an individual*, and John Does 1-10,

Defendants.
_______________________________________/

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Plaintiff Fontainebleau Florida Hotel, LLC pursuant to Fed. R. Civ. P. 26 and 34 propounds these Requests for Production to Defendant Jacob Shmuel Botach ("Defendant Boteach") to produce the items and materials set forth within thirty (30) days for inspection and/or copying at the office of the undersigned attorney.

**INSTRUCTIONS**

**A.** Documents produced shall be segregated and marked according to the specific request in response to which they are produced.

**B.** When producing documents, please keep all documents segregated as to the file in which the documents are contained and indicate the name of the file that contains the documents and a description of the documents being produced.

**C.** In the event files and documents have been removed for the purpose of this action, or for some other purpose, provide the name and street address of the person who removed the files or documents, the name of each file and each sub-file maintained within the file, if any, a description of each document removed, and the present location of each such file and document.

**D.** If any documents responsive to any requests are no longer in your possession, please indicate:

**a.** When you received, reviewed, examined, possessed, or were aware of any such documents;

**b.** Where you received, reviewed, examined, possessed, or learned of any such documents;

**c.** Where such documents were kept;

**d.** Where such documents may be presently;

**e.** If any such documents were destroyed and, if so, when, where and by whom they were destroyed, in what manner they were destroyed, and the reason for their destruction.

**E.** None of these requests seeks production of privileged information. Any document as to which a claim of privilege is, or will be, asserted should be identified by title, date, author, signatory, addressee(s), description, general subject matter, present location, present custodian, and a complete statement of the grounds for the claim of privilege.

**F.** These Requests for Production impose continuing obligations. If, after producing documents, you become aware of any further documents responsive to this Request for Production, you are required to produce such additional documents.

**DEFINITIONS**

A. The term "Documents" means any and all written documents, reports, evaluations, memoranda, data, metrics, systems, rules, formulas, algorithms, policies, programs, incentives, initiatives, instructions, procedures, penalties, guidelines, communications, correspondence, emails, summaries, meeting minutes, text messages, social-media posts, or other written information, whether in physical or digital form, including all drafts, and all other information within the definition and scope of Fed. R. Civ. P. 26 and 34.

B. The term "Hotel" means the Fontainebleau Florida Hotel, LLC and its staff.

C. The term "Defendant Boteach" means the Defendant Jacob Shmuel Botach and his agents, accountants, and people and entities acting on behalf of him or under his authority or control.

D. The term "Incident" means the incident that occurred on the night of December 1, 2024 into the morning of December 2, 2024 at the Hotel, as defined and described in the Amended Complaint.

E. The term "Twitter Direct Messages" means messages sent or received via the direct-message function of the social-media app X (formerly known as Twitter), regardless of whether accessed or used via mobile app or Internet browser.

F. The term "Instagram Direct Messages" means messages sent or received via the messaging feature of the social-media app Instagram, regardless of whether accessed or used via mobile app or Internet browser.

G. The term "News Personnel" means journalists, news reporters, on-air talent, or other employees or staff of a journalism business, platform, or outlet.

H. The term "social-media posts" means documents or statements made, uploaded, or caused to made or uploaded to X (formerly known as Twitter), Instagram, Facebook, LinkedIn, YouTube, or TikTok, which individually and collectively are "accounts."

I. The term "relating to or describing" means concerning, respecting, referring to, embodying, summarizing, reflecting, establishing, evidencing, comprising, connected with, commenting upon, responding to, agreeing or disagreeing with, showing, analyzing, representing, constituting, or including.

## REQUESTS FOR PRODUCTION

1. All of Defendant Boteach's text messages since November 1, 2024 relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement, except for text messages with attorneys (if any).

2. All of Defendant Boteach's Twitter Direct Messages from November 1, 2024 to the present relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.

3. All of Defendant Boteach's Instagram Direct Messages from November 1, 2024 to the present relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.

4. All documents exchanged between Defendant Boteach and News Personnel from November 1, 2024 to present that relate to the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.

5. All communications between Defendant Boteach and any law enforcement personnel or other government agency from December 1, 2024 to the present that relate to or describe the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.

6. All of Defendant Boteach's emails, sent or received, from November 1, 2024 to the present that relate to the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement, except for emails with attorneys.

7. All of Defendant Boteach's social-media posts from November 1, 2024 to the present relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement, or this litigation, including from accounts in Defendant's name or owned, controlled, or accessible by Defendant.

8. All of Defendant Boteach's communications or documents from November 1, 2024 to the present that relate to or describe the Incident or the Hotel that are not covered by Requests for Production Nos. 1-7.

9. The formation documents for any charity organizations Defendant Boteach founded or owns.

10. All video, audio, and/or photo recordings in Your possession of any conversations between You and any person relating to the Hotel or the Incident.

11. All documents and communications, other than communications between You and Your counsel, discussing this lawsuit.

12. All recordings from November 1, 2024 to the present of Defendant Boteach making television appearances during which Defendant Boteach discussed the Incident, the Hotel, or this litigation.

13. All documents or communications from November 1, 2024 to the present in which you discuss or mention Hotel staff.

14. Documents sufficient to show your organization of a "giant rally," as alleged in Paragraph 59 of the Amended Complaint, including documents sufficient to show how many people registered for the rally and the identities of those who registered.

15. Documents sufficient to show the damages calculation of Defendant Boteach's demand to the Hotel that the Hotel pay him $100 million.

16. Documents sufficient to show Defendant Boteach's relationship with The World Values Network.

17. Documents sufficient to show the employees, contractors, directors, interns, and agents of The World Values Network.

Dated: June 18, 2025
Miami, Florida

Respectfully submitted,

**BURSTYN LAW PLLC**

By: *<u>/s/ Sean A. Burstyn</u>*
Sean A. Burstyn, Esq.
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S700
Miami, FL 33131

*Counsel for Plaintiff*
*The Fontainebleau Miami Beach*

# EXHIBIT C.5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:25-cv-20251-KMM

FONTAINEBLEAU FLORIDA HOTEL, LLC d/b/a FONTAINEBLEAU MIAMI BEACH, a foreign limited liability company,

Plaintiff,

v.

JACOB SHMUEL BOTACH a/k/a "SHMULEY BOTEACH," *an individual*, and John Does 1-10,

Defendants.
_______________________________/

**DEFENDANT, JACOB SHMUEL BOTACH A/K/A SHMULEY BOTEACH'S**
**RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION**

Defendant, Jacob Shmuel Botach A/K/A Shmuley Boteach (hereinafter "Defendant") pursuant to Rule 34, Federal Rules of Civil Procedure, hereby responds to Plaintiffs' First Request for Production as follows:

**REQUEST NO. 1: All of Defendant Boteach's text messages since November 1, 2024 relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement, except for text messages with attorneys (if any).**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Defendant further objects on the grounds that the request seeks materials protected by the attorney-client and work-produce privileges. Notwithstanding the foregoing, Defendant has retained a third-party vendor to identify and collect

the text messages and will produce the non-privileged, responsive texts on a rolling production basis.

**REQUEST NO. 2: All of Defendant Boteach's Twitter Direct Messages from November 1, 2024 to the present relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Notwithstanding the foregoing, Defendant has retained a third-party vendor to identify and collect the messages and will produce the non-privileged, responsive messages on a rolling production basis.

**REQUEST NO. 3: All of Defendant Boteach's Instagram Direct Messages from November 1, 2024 to the present relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Notwithstanding the foregoing, Defendant is not in possession of such documents.

**REQUEST NO. 4: All documents exchanged between Defendant Boteach and News Personnel from November 1, 2024 to present that relate to the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Notwithstanding the foregoing, Defendant has retained

a third-party vendor to identify and collect the messages and will produce the non-privileged, responsive messages on a rolling production basis.

**REQUEST NO. 5: All communications between Defendant Boteach and any law enforcement personnel or other government agency from December 1, 2024 to the present that relate to or describe the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Notwithstanding the foregoing, Plaintiff is already in possession of subpoena responses that includes communications between Defendant, Defendant's counsel, and the Miami Police Department. Further, Defendant has retained a third-party vendor to identify and collect the messages and will produce the non-privileged, responsive messages on a rolling production basis.

**REQUEST NO. 6: All of Defendant Boteach's emails, sent or received, from November 1, 2024 to the present that relate to the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement, except for emails with attorneys.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Defendant further objects on the grounds that the request seeks materials protected by the attorney-client and work-product privileges. Notwithstanding the foregoing, Defendant will produce documents responsive to this request on a rolling production basis.

**REQUEST NO. 7: All of Defendant Boteach's social-media posts from November 1, 2024 to the present relating to or describing the Incident, the Hotel, the trespassing of Defendant Boteach by the Hotel or purported reasons therefor, and/or the Hotel's cooperation, or lack thereof, with law enforcement, or this litigation, including from accounts in Defendant's name or owned, controlled, or accessible by Defendant.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Notwithstanding the foregoing, Defendant will produce documents responsive to this request on a rolling production basis.

**REQUEST NO. 8: All of Defendant Boteach's communications or documents from November 1, 2024 to the present that relate to or describe the Incident or the Hotel that are not covered by Requests for Production Nos. 1-7.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Defendant further objects on the grounds that the request is overly vague as to "all … communications and documents . . . that related to or described the Incident or the Hotel that are not covered by Requests for Production Nos. 1-7" and, therefore, unduly burdensome. Defendant further objects on the grounds that the request seeks materials protected by the attorney-client and work-product privileges. Notwithstanding the foregoing, Defendant will produce documents responsive to this request on a rolling production basis.

**REQUEST NO. 9: The formation documents for any charity organizations Defendant Boteach founded or owns.**

RESPONSE: Defendant objects to this request on the grounds that it seeks information that is not relevant or proportional to the needs of this case. The charitable organizations Defendant funds or owns are not parties to this lawsuit. The allegations in the Amended Complaint

which contend that Defendant engaged in criminal activity, such as extortion or financial misconduct through a charitable organization run by Defendant, are the subject of pending motions to dismiss and strike. Finally, Defendant objects to this request as premature because no judgment has been entered in Plaintiff's favor and Plaintiff is not entitled to information related to collection of a judgment.

**REQUEST NO. 10: All video, audio, and/or photo recordings in Your possession of any conversations between You and any person relating to the Hotel or the Incident.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the Incident. Notwithstanding the foregoing, Defendant will produce documents responsive to this request on a rolling production basis.

**REQUEST NO. 11: All documents and communications, other than communications between You and Your counsel, discussing this lawsuit.**

RESPONSE: Defendant objects to this request as it is overly broad and vague as to "All documents and communications … discussing this lawsuit." It is therefore unduly burdensome. Defendant further objects because this request is harassing. It seeks private communications with third parties about a subject-matter that cannot support the claims and allegations asserted in the Amended Complaint. Notwithstanding the foregoing, Defendant will produce documents responsive to this request on a rolling production basis.

**REQUEST NO. 12: All recordings from November 1, 2024 to the present of Defendant Boteach making television appearances during which Defendant Boteach discussed the Incident, the Hotel, or this litigation.**

RESPONSE: Defendant is not in possession of such documents.

**REQUEST NO. 13: All documents or communications from November 1, 2024 to the present in which you discuss or mention Hotel staff.**

RESPONSE: Defendant objects to this request insofar as it is overly broad in time and seeks materials which predate the incident. Defendant objects to this request because it is overly broad and vague as to "all documents or communications" because the request is not limited to materials that support Plaintiff's claims or the publication that Plaintiff has already identified as defamatory. Defendant further objects on the grounds that the request seeks materials protected by the attorney-client and work-produce privileges. Finally, this request is duplicative to the foregoing requests. Notwithstanding the foregoing, Defendant will produce documents responsive to this request on a rolling production basis.

**REQUEST NO. 14: Documents sufficient to show your organization of a "giant rally," as alleged in Paragraph 59 of the Amended Complaint, including documents sufficient to show how many people registered for the rally and the identities of those who registered.**

RESPONSE: Defendant objects to this request as it seeks information regarding individuals who are not party to this lawsuit and who do not have information that could support Plaintiff's claims as asserted in the Amended Complaint. Furthermore, this request seeks information which violates third-party individual's right to privacy.

**REQUEST NO. 15: Documents sufficient to show the damages calculation of Defendant Boteach's demand to the Hotel that the Hotel pay him $100 million.**

RESPONSE: Defendant objects on the grounds that this request seeks information secondary to confidential settlement discussions. Defendant also objects because he is the Defendant, not the Plaintiff, in this matter. This Request also seeks immaterial and impertinent information unrelated to the elements necessary to prove any of the claims Plaintiff pleaded in the

Amended Complaint. Finally, this request is argumentative and harassing. The allegations in the Amended Complaint which contend that Defendant engaged in criminal activity, such as extortion or financial misconduct through a charitable organization run by Defendant, are the subject of pending motions to dismiss and strike. Notwithstanding the foregoing, Defendant made a single hyperbolic comment during an interview that he planned to file a lawsuit against the Hotel for $100 million dollars. Defendant contends that the comment was a euphemism for not letting the Hotel get away with allowing an antisemitic attack on him and threats to his family occur in their Lobby.

**REQUEST NO. 16: Documents sufficient to show Defendant Boteach's relationship with The World Values Network.**

RESPONSE: Defendant objects to this request on the grounds that it is harassing and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. The allegations in the Amended Complaint which contend that Defendant engaged in criminal activity, such as extortion or financial misconduct through a charitable organization run by Defendant are the subject of pending motions to dismiss and strike. The World Values Network is not a party to this lawsuit. Defendant further objects on the grounds that Plaintiff is seeking information secondary to confidential settlement discussions. Finally, Defendant objects to this request as premature because no judgment has been entered in Plaintiff's favor and Plaintiff is not entitled to information related to collection of a judgment.

**REQUEST NO. 17: Documents sufficient to show the employees, contractors, directors, interns, and agents of The World Values Network.**

RESPONSE: *See* Response to Request No. 16. Defendant further objects because this request seeks the confidential, personal information of individuals who are not parties to this lawsuit.

Respectfully submitted this 1st day of August 2025.

/s/ John Y. Benford
John Y. Benford, Esquire
Florida Bar No. 51950
john.benford@wilsonelser.com
alyssa.heitman@wilsonelser.com
Jacqueline M. Bertelsen, Esquire
Florida Bar No. 123747
jacqueline.bertelsen@wilsonelser.com
daniela.ezeta@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker LLP
111 N. Orange Avenue, Suite 1200
Orlando, FL 32801
Telephone: 407-203-7599
Facsimile: 407-648-1376
Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2025, I electronically served the foregoing via email on Sean A. Burstyn, Esquire, Burstyn Law PLLC, 1101 Brickell Avenue, Suite S700, Miami, FL 33131, Attorney for Plaintiff, at sean.burstyn@burstynlaw.com, andrei.dambuleff@burstynlaw.com, bimaya.desilva@burstynlaw.com.

/s/ John Y. Benford
John Y. Benford, Esquire

# EXHIBIT C.6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:25-cv-20251-KMM

FONTAINEBLEAU FLORIDA HOTEL, LLC,

Plaintiff,

v.

JACOB SHMUEL BOTACH, *et al.*,

Defendants.
_______________________________________/

**ORDER ON MOTION TO DISMISS**

THIS CAUSE came before the Court upon Defendant Jacob Shmuel Botach's Motion to Dismiss Plaintiff's First Amended Complaint. ("Motion" or "Mot.") (ECF No. 19). Plaintiff Fontainebleau Florida Hotel, LLC ("Plaintiff") filed a Response in opposition, ("Resp." or "Response") (ECF No. 27), and Defendant filed a Reply, ("Reply") (ECF No. 29). The Motion is now ripe for review.

## I. BACKGROUND[1]

This case arises from an incident that occurred at the Fontainebleau Florida Hotel (the "Hotel") on December 2, 2024. *See generally* FAC. Plaintiff alleges that the following events occurred:

> After more than an hour of loitering, Defendant Boteach engaged in an uneventful conversation with a registered guest of the Hotel and the two parted ways. More than an hour later (after midnight on Sunday, December 2, 2024), Defendant Boteach engaged in a verbal altercation with the same registered guest wherein the guest and Defendant Boteach exchanged hateful words at each other. The guest used language that was heinous and accused Defendant Boteach of being a "baby killer" and other words that are easily interpreted as antisemitic. Defendant

[1] The following facts are taken from the First Amended Complaint ("FAC") (ECF No. 12) and are accepted as true for purposes of ruling on the Motion to Dismiss. *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1302 (11th Cir. 2022).

> Boteach, in turn, hurled anti-Islamic words at the registered guest and repeatedly shouted, "Allahu Akbar? Are you going to blow yourself up or something? … he uses the expressions of, like, suicide bombers." Within hours, Defendant Boteach posted an edited video of the exchange on Instagram and began his campaign of threats against the Hotel, its ownership, its outside lawyer, and its employees—who had nothing to do with the altercation except that Hotel security de-escalated and ended it.

*Id.* ¶¶ 28–29. Plaintiff alleges that following the altercation, the Defendant, who the FAC describes as a "social media influencer and rabbi" with "hundreds of thousands of social media followers[,]" went on a "multi-week assault on the [Hotel], its personnel, and representatives—creating AI videos purporting to show them celebrating antisemitism, comparing them to Nazi collaborators, falsely accusing them of banning Jews from the property, and fabricating statements that they embraced a policy of Judenrein, i.e., the extermination of six million Jews." *Id.* ¶¶ 2, 12. The FAC alleges that Defendant falsely stated that he was denied entry to the Hotel because he is "too Jewish," that the Hotel refused to cooperate with law enforcement's investigation of the incident, and that he "was trespassed from the Hotel for being 'too Jewish[.]'" *Id.* ¶¶ 87, 91. Plaintiff further alleges that "Defendant Boteach published a statement that, in part, called for guests 'who have booked' at the Hotel to 'cancel your reservations'" and to "'be smart and cancel and give your hard-earned money to a hotel that doesn't abide antisemites.'" *Id.* ¶ 10. Moreover, Plaintiff alleges:

> At all hours of the day and night, Defendant Boteach proceeded to harass the Hotel and its representatives. For example, he posted a "headshot" photograph of the head of the Hotel's outside counsel with the words "DIGITALLY DECAPITATED" and later, at 3:49 am, menacingly threatened that counsel was "about to have a really interesting Shabbat" when he arrived at his synagogue, which Defendant Boteach identified by name and location. Defendant Boteach directly contacted counsel's clergy and posted harassing images of them.

*Id.* ¶ 13.

On January 16, 2025, this action was removed from the 11th Judicial Circuit in and for Miami-Dade County to this Court. *See generally* (ECF No. 1). On February 18, 2025, Plaintiff

filed the FAC alleging: (1) defamation *per se* against Defendant ("Count I"), (2) ordinary defamation against Defendant ("Count II"), (3) aiding and abetting defamation against unnamed defendants ("Count III"), (4) tortious interference with business relationships against Defendant ("Count IV"), and (5) aiding and abetting tortious interference with business relationships against unnamed defendants ("Count V"). *See generally* FAC. Now before the Court is Defendant's Motion to Dismiss which seeks dismissal of Counts I, II, and IV of the FAC with prejudice. *See generally* Mot.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

**III. DISCUSSION**

In the instant Motion, Defendant argues that (1) the FAC is a shotgun pleading, (2) Plaintiff's ordinary defamation claim (Count II) fails as a matter of law, (3) Plaintiff's *per se* defamation claim (Count I) fails as a matter of law, (4) Plaintiff is not entitled to injunctive relief, and (5) Plaintiff's tortious interference with business relationships (Count IV) claim fails as a matter of law. *See generally* Mot. Defendant moves to dismiss Counts I, II, and IV with prejudice. *Id.* at 21. The Court will address Defendant's arguments, along with Plaintiff's Response and Defendant's Reply, in turn.

**A. The FAC is not a Shotgun Pleading**

As an initial matter, the Court is not convinced by Defendant's argument that the FAC is a shotgun pleading. *See* Mot. at 11. Defendant argues that because the FAC "includes superfluous references to settlement negotiations, prior events, accusations of extortion, and descriptions of conduct completely unrelated to the alleged defamatory statements or the underlying incident[,]" it is a shotgun pleading. *Id.* In response, Plaintiff asserts that "'[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'" Resp. at 13 (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015)). Plaintiff further contends that the FAC "does not come close to the level of dysfunctional pleading to which shotgun-pleadings caselaw applies." Resp. at 13. The Court agrees and finds that the FAC sufficiently places Defendant on notice of the claims brought against him. Accordingly, to the extent Defendant seeks dismissal of the FAC on shotgun pleading grounds, the Motion is DENIED.

Case 1:25-cv-22251-KMM Document 65-3 Entered on FLSD Docket 09/26/2025 Page 5 of 13

### B. Dismissal of Count II (Ordinary Defamation) is Improper

Under Florida law, the tort of defamation, which includes libel and slander, is generally defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015). To state a claim for defamation, a plaintiff must plausibly allege that the defendant (1) published, (2) to a third party, (3) a false statement about the plaintiff, and (4) the falsity of the statement caused injury to the plaintiff. *Id*. (quoting *Valencia v. Citibank Int'l*, 728 So.2d 330, 330 (Fla. 3rd DCA 1999)). "True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985)). "Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court." *Id.* at 1262–63.

The FAC alleges that Defendant falsely stated that he was denied entry to the Hotel because he is "too Jewish," that the Hotel refused to cooperate with law enforcement's investigation of the incident, and that he "was trespassed from the Hotel for being 'too Jewish[.]'" FAC ¶¶ 87, 91. Defendant argues that "alleged defamatory statements amount to pure opinion" and that "expressions of opinion, regardless of how offensive, [including] that a party or entity is 'racist' or 'Nazi'[,] are not actionable as defamation[.]" Mot. at 14 (citations omitted). In Response, Plaintiff argues that "[w]hether the Hotel trespassed Defendant Boteach because he is 'too Jewish' is capable of being proven true or false." Resp. at 5. In Reply, Defendant argues that "[t]he statement that Defendant was banned for being 'too Jewish' is obviously Defendant's hyperbolic

opinion based on the sequence of events and circumstances laid out in [the FAC]." Reply at 4. The Court disagrees. The FAC alleges that:

> Defendant Boteach knew that he was disseminating false statements because his claims were about events in which he purported to have been personally involved. For example, Defendant Boteach edited a letter that stated he was trespassed because of his threats of litigation by misleadingly deleting from that letter—that he had access to and read—the basis of the trespass (i.e., his threats of litigation) and then he claimed the Hotel trespassed him because he is "too Jewish" (i.e., falsely attributing those words to the Hotel). . . . The claim that Defendant Boteach was trespassed from the Hotel for being "too Jewish" was false because Defendant Boteach was trespassed pursuant to Hotel policy to not entertain people who are threatening litigation against the Hotel.

FAC ¶¶ 71, 73. Accepting the FAC's allegations as true, the Court finds that Defendant's statement that he was "banned for being 'too Jewish'" is capable of being proven false, and thus, a statement of fact or, in other words, the statement is actionable as defamation.[2] Accordingly, Defendant's Motion as to Count II is DENIED.

### C. Dismissal of Count I (Defamation *Per Se*) is Improper

To state a claim for defamation *per se*, a plaintiff must plausibly allege that the defendant (1) published, (2) to a third party, (3) a false statement about the plaintiff, (4) that rises to the level of defamation *per se*. *Berisha v. Lawson*, 378 F. Supp. 3d 1145, 1155 (S.D. Fla. 2018), *aff'd,* 973

---

[2] While the Response and Reply discuss whether the FAC's allegation that Defendant falsely stated that the Hotel "'refused' to cooperate with a law enforcement investigation following the Incident" plausibly states a claim for ordinary defamation, the Court need not address this statement, because this argument was not raised in the Motion. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." (cleaned up)); *see also* Resp. at 3; Reply at 4; *see generally* Mot. The Court further notes that in his Motion, Defendant makes general arguments about the alleged defamatory statements but fails to convey which specific statement(s) he is referencing. *See, e.g.*, Mot. at 15 ("Here, Defendant's alleged defamatory statements amount to pure opinion, especially when they are considered in the context of on the events of December 2, 2024, as described in the Complaint and captured on the disturbing video. Moreover, Defendants' statements that the hotel supports antisemitism can only be considered hyperbolic statements of opinion."); *see also United States v. Dunkel*, 927 F. 2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

F.3d 1304 (11th Cir. 2020). "Defamation *per se* does not require any additional explanation to prove the defamatory nature of the statement." *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1293–94 (S.D. Fla. 2023). "In a defamation *per se* action, the injurious nature of the statement is apparent from the words in the statement itself and the court consequently takes notice of that fact." *Id.* (citing *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953)). "A publication may be defamation *per se* when, considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt or disgrace; or (4) it charges conduct, characteristics, or a condition incompatible with the proper exercise of a lawful business, trade, profession or office which thereby tends to injure one in his trade or profession." *Akai Custom Guns*, 707 F. Supp. 3d at 1294 (citing *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)). Moreover, "[t]o injure one in his trade or profession, the statement must, without innuendo, strike at 'professional competence and fitness to engage in a given profession.'" *San Juan Prods., Inc. v. River Pools & Spas, Inc.*, No. 8:21-CV-2469-TPB-JSS, 2023 WL 1994087, at *8 (M.D. Fla. Feb. 14, 2023) (quoting *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1346 (M.D. Fla. 2003)). "The false statement must do more than merely harm the person or entity in its trade or business – the statements must impute fraud, want of integrity, or actual misconduct." *Id.* (citation omitted).

Relatedly, Defamation *per se* against a corporate defendant may be recoverable. *See id.* "Some examples of statements that have constituted defamation *per se* include explicit statements accusing a person or entity of committing specific crimes punishable by law, such as insurance fraud, or statements that a hospital performed and charged for unnecessary tests and medications

and made profits by leaving patients in intensive care for a longer period of time whenever possible[.]" *Id.* (citations omitted).

As an initial matter, in arguing Count I of the FAC should be dismissed, Defendant only addresses the FAC's allegation that Defendant published the following statement: "@fontainbleumiamibeach being slaughtered on their own social media as hundreds cancel their reservations[.]" Mot. at 17 (quoting FAC ¶ 55). While Defendant notes that this is "the only publication identified in the [FAC,]" the Court finds that Plaintiff is not required to attach the FAC's referenced publications at this stage. *Id.*; *see also Mennella v. Am. Airlines, Inc.*, No. 17-21915-CIV, 2019 WL 1429636, at *4 (S.D. Fla. Mar. 29, 2019), *aff'd*, 824 F. App'x 696 (11th Cir. 2020) ("To meet the standard for publication to a third party, a plaintiff must allege the identity of the particular person to whom the remarks were made with a reasonable degree of certainty[.]"). Relatedly, the FAC alleges that Defendant published statements asserting that "he was denied entry to the Hotel because he is 'too Jewish'" and that "the Hotel refused to cooperate with a law enforcement investigation into the Incident." FAC ¶¶ 68–69. Consequently, because (1) Plaintiff is not required to attach the alleged publications at this stage and (2) the Motion fails to address several grounds for relief raised in the FAC, the Court finds dismissal of Count I inappropriate. *See Jones v. Poole*, No. CV 118-206, 2019 WL 4795677, at *2 (S.D. Ga. Sept. 30, 2019) (quotations omitted) ("It is not the role of the [c]ourt to make arguments for the parties but to consider and decide the specific arguments made by the parties."); *Amargos v. Verified Nutrition, LLC*, 666 F. Supp. 3d 1249, 1250 (S.D. Fla. 2022) (quotations omitted) ("It's well-established that arguments not properly presented in a party's initial brief or raised for the first time in a reply brief are deemed waived."). Accordingly, Defendant's Motion as to Count I is DENIED.

### D. The Hotel is not a Public Figure

Whether an individual or entity is a public figure "'is a question of law to be determined by the court.'" *San Juan Prods*, 2023 WL 1994087, at *7 (quoting *Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1309 (M.D. Fla. 2021)). Florida law recognizes both general and limited public figures. *See Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018). Defamation of a general public figure requires a showing of actual malice. *See id.* Defamation of a limited public figure, however, requires a showing of "actual malice only in regard to certain issues." *Id.* Notably, "the *Twombly/Iqbal* 'plausibility pleading standard applies to the actual malice standard in defamation proceedings.'" *Id.* (quotations omitted). "Thus, to plead actual malice, [Plaintiff] must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quotations omitted).

Nevertheless, in his Motion, Defendant failed to sufficiently argue that the Hotel is a public figure. Notably, the sole case cited by Defendant, asserting that the Hotel is a public figure, is both egregiously misquoted and concerns the application of Alabama law. *Compare* Mot. at 11 (quoting *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (emphasis added) ("'When applying state defamation law to public figures, **such as the Fontainebleau Hotel,** the First Amendment imposes additional limitation[.]'") (emphasis added), *with Coral Ridge Ministries Media, Inc.*, 6 F.4th at 1252 ("When applying state defamation law to public figures, the First Amendment imposes additional limitations.").

Moreover, even if this Court found that the Hotel is a public figure, that determination would have no impact on this Court's ruling, because the FAC sufficiently pleads actual malice on behalf of the Defendant. *See* FAC ¶ 10 ("Defendant Boteach deliberately distorted a statement of

the Hotel, deleting a portion that made clear it declined entry to persons threatening litigation against the Hotel, so as to create the false appearance that he was told that the Hotel enacted a policy to ban Jews."); *see also id.* ("Defendant Boteach threatened that his counsel was preparing "the most devastating lawsuit from which I hope the rancid hotel will never recover."); *id.* ("Defendant Boteach published several AI-generated videos of persons affiliated with the Hotel in which he purports to quote them apologizing (i.e., admitting misconduct) and denying the wrongfulness of antisemitism.").

**E. Tortious Interference of Business Relationship (Count IV)**

To prove tortious interference with a business relationship, a plaintiff must show: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff because of the breach of the relationship. *Novell v. Bank of Am. Corp.*, No. 14–CV–80672–RLR, 2014 WL 7564678, at *3 (S.D. Fla. Dec. 3, 2014).

Defendant argues that the FAC "fails to identify any actual 'business relationship' with which Defendant 'intentionally or unjustifiably' interfered." Mot. at 20; *see also id.* at 19 (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla.1994)) ("It is well-established that 'business relationship' requires a relationship with a particular party, and not a relationship with the general business community."). In response, Plaintiff contends that "a tortious interference pleading need only show identifiable people; the standard does not require identified people at the pleading stage." Resp. at 7; *see also id.* (quoting *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 821 (Fla. 1996)) ("To 'establish the tort of tortious interference with a business relationship, the plaintiff must prove a business relationship with identifiable customers.'"). Defendant does not respond to Plaintiff's argument in his Reply. *See*

*generally* Reply; *see also Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (quotations omitted)).

Nevertheless, in the case cited by Defendant, *Ethan Allen, Inc.*, the Supreme Court of Florida notes that "a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers but no cause of action exists for tortious interference with a business's relationship to the community at large." 647 So. 2d at 815 (citations omitted). Here, the Court finds that the FAC sufficiently alleges tortious interference "with present or prospective customers." *Id.*; *see also* FAC ¶¶ 114–115 (discussing Defendant's published statements regarding "hundreds of cancellations by guests at the Hotel").[3] The Court further finds that the FAC sufficiently alleges damages. *See* FAC ¶¶ 114–115. Accordingly, Defendant's Motion as to Count IV is DENIED.

**F. The Court Defers Ruling on Whether Injunctive Relief is Appropriate**

Defendant argues that "Plaintiff is not entitled to injunctive relief as it would amount to impermissible prior restraint on speech in violation of the First Amendment, even if, as Plaintiff suggests, such speech is made for profit." Mot. at 19. In response, Plaintiff asserts that "Plaintiff has not yet moved for issuance of an injunction and it is far too premature to resolve on the merits Plaintiff's ability to seek an injunction for Defendant's commercial speech that was designed to enrich himself through extortion at the expense of Plaintiff's business." Resp. at 12. In reply,

[3] In the instant Motion, Defendant merely argues that the FAC fails to identify "any actual business relationships or resultant damages" and provides no argument as to the remaining elements of tortious interference with a business relationship, such as knowledge and intentionality. Mot. at 20; *see also Novell*, 2014 WL 7564678, at *3. Consequently, this Court will merely consider whether (1) the FAC sufficiently alleges the existence of a business relationship and (2) the FAC sufficiently alleges damages. *Id.*

Defendant asserts that “Plaintiff admits that it did not identify any basis for injunctive relief yet continues to double down on its accusations salacious and impertinent accusations of criminal conduct.” Reply at 7. In this case, the Court declines to consider whether injunctive relief is appropriate at this stage in the litigation, because Plaintiff has not moved for injunctive relief nor brought a claim solely requesting injunctive relief. Accordingly, Defendant’s Motion as to Plaintiff’s request for injunctive relief is DENIED WITHOUT PREJUDICE.

**G. Dismissal Under the Single Publication Rule is Improper**

In his Motion, Defendant argues that “this Court must dismiss either Count I or Count II and Count IV for tortious interference because the single publication/single action rule mandates dismissal of torts based on the same publications and facts as a defamation claim.” Mot. at 21 (citing *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 594–95 (Fla. 4th DCA 1983)). In response, Plaintiff argues that Defendant “distorts” the facts and “misapprehends Florida law with respect to the single-publication rule.” Resp. at 1. Plaintiff contends that the correct interpretation of the rule is one that “generally bars plaintiffs from asserting multiple causes of action based on the same, single defamatory statement.” *Id.* (citing *Callaway Land & Cattle Co. v. Banyan Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002)).

Notably, the case cited by Defendant, *Byrd v. Hustler Mag., Inc.*, held that a “a picture and its caption must be viewed as a composite” in determining whether a publication is defamatory. 433 So. 2d at 594. As Defendant provides no insight as to why this holding is relevant to the facts here, the Court does not find Defendant’s contention that “this Court must dismiss either Count I or Count II and Count IV” compelling. *See Dunkel*, 927 F. 2d at 956. Moreover, Plaintiff notes that in this case, “there are multiple publications at issue, and the statements underlying the defamation claims in Counts I and II are different from the statements underlying Count IV.” Resp.

at 9. At this stage of the litigation, and considering the Parties' arguments, the Court does not find dismissal under the single publication rule appropriate. *See, e.g., Ditthardt v. N. Ocean Condos, L.P.*, 580 F. Supp. 2d 1288, 1290 (S.D. Fla. 2008) (citation omitted) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true.").

**IV. CONCLUSION**

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant Jacob Shmuel Botach's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 19) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 16th day of September 2025.



K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record

# EXHIBIT C.7

Gmail

**BurstynLaw Docketing <docketing@burstynlaw.com>**

---

## Activity in Case 1:25-cv-20251-KMM Fontainebleau Florida Hotel, LLC v. Botach Order on Motion to Strike

1 message

---

**cmecfautosender@flsd.uscourts.gov** <cmecfautosender@flsd.uscourts.gov> Thu, Sep 18, 2025 at 3:31 PM

To: flsd_cmecf_notice@flsd.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Southern District of Florida**

### Notice of Electronic Filing

The following transaction was entered on 9/18/2025 at 3:31 PM EDT and filed on 9/18/2025

| | |
|---|---|
| **Case Name:** | Fontainebleau Florida Hotel, LLC v. Botach |
| **Case Number:** | 1:25-cv-20251-KMM |
| **Filer:** | |
| **Document Number:** | 59(No document attached) |

**Docket Text:**

**PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant's Motion to Strike. [20]. Therein, Defendant requests that this Court enter an order striking portions of the First Amended Complaint ("FAC") [12] and argues that portions of the FAC contain "impertinent, scandalous, and inflammatory allegations[, and] must be struck because they unfairly prejudice Defendant and cause confusion." [20] at 3. In response, Plaintiff asserts that the FAC's allegations are "relevant to the Hotel's claims for defamation and tortious interference. The allegations specified in the Motion describe Defendant Boteach's conduct, the motive and purpose behind his statements comprising the tortious-interference and defamation claims, his intent to be viewed as a speaker of truth, and the deceptive nature of his defamatory statements." [28] at 2.**

**"Under Rule 12(f), a 'court may strike from a pleading... any redundant, immaterial, impertinent, or scandalous matter.'" United States ex rel Sedona Partners LLC v. Able Moving & Storage Inc., 146 F.4th 1032, 1044-45 (11th Cir. 2025) (quoting Fed. R. Civ. P. 12(f)). "Even when allegations fall into one of the listed descriptions of matter that may be struck, a Rule 12(f) motion 'should be granted only when the pleading to be stricken has no possible relation to the controversy' because Rule 12(f) 'is a drastic remedy to be resorted to only when required for the purposes of justice.'" Id. (quoting Augustus v. Bd. of Pub. Instruction, 306 F.2d 862, 868 (5th Cir. 1962)).**

**Here, Defendant has not shown that the FAC's allegations discussed in his Motion have "no possible relation" to the relief sought in the FAC. See id. Furthermore, the Court agrees with Plaintiff, and finds that the "inflammatory allegations" referenced in the Motion are**

**probative of intentionality and malice. Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant's Motion to Strike [20] is DENIED. Signed by Judge K. Michael Moore on 9/18/2025. (dp01)**

**1:25-cv-20251-KMM Notice has been electronically mailed to:**

Jacqueline McClure Bertelsen     jacqueline.bertelsen@wilsonelser.com

John Yates Benford     john.benford@wilsonelser.com, alyssa.heitman@wilsonelser.com

Matthew Mainen     matt@njaclaw.org

Samuel Clifford Feldman     sam@feld.law

Sean Alexander Burstyn     sean.burstyn@burstynlaw.com, 1620702420@filings.docketbird.com, andrei.dambuleff@burstynlaw.com, daniel.diclemente@burstynlaw.com, docketing@burstynlaw.com

**1:25-cv-20251-KMM Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

# EXHIBIT C.8

Gmail

Bimaya De Silva <bimaya.desilva@burstynlaw.com>

## RE: BOTEACH V. FONT -- DEMAND FOR $100 MILLION, ABANDONMENT OF ALL CLAIMS WITH PREJUDICE, AND A TELEVISED 30 MINUTE APOLOGY TO THE RABBI, FOR LIABILITY RELEASE

1 message

**Benford, John Y.** <John.Benford@wilsonelser.com> Thu, Sep 18, 2025 at 8:29 PM
To: Matthew Mainen <Matt@njaclaw.org>, Bimaya De Silva <Bimaya.DeSilva@burstynlaw.com>, "Weisman, Danielle" <Danielle.Weisman@wilsonelser.com>, "Heitman, Alyssa J." <Alyssa.Heitman@wilsonelser.com>, "Bertelsen, Jacqueline" <Jacqueline.Bertelsen@wilsonelser.com>, Sean Burstyn <sean.burstyn@burstynlaw.com>
Cc: Todd Friedman <todd@toddfriedmanpa.com>, Andrei Dambuleff <andrei.dambuleff@burstynlaw.com>, Mark Goldfeder <Mark@njaclaw.org>

Sean,

In furtherance to what Matt said, this email from Sam Feldman was not authorized by me, Wilson Elser, or the client.

Thanks,

John Y. Benford
Attorney at Law
Wilson Elser Moskowitz Edelman & Dicker LLP
111 North Orange Avenue Suite 1200
Orlando, FL 32801
407.203.7594 (Direct)
321.438.4138 (Cell)
407.203.7599 (Main)
407.648.1376 (Fax)
john.benford@wilsonelser.com

---

**From:** Matthew Mainen <Matt@njaclaw.org>
**Sent:** Thursday, September 18, 2025 8:13 PM
**To:** Bimaya De Silva <Bimaya.DeSilva@burstynlaw.com>; Weisman, Danielle <Danielle.Weisman@wilsonelser.com>; Benford, John Y. <John.Benford@wilsonelser.com>; Heitman, Alyssa J. <Alyssa.Heitman@wilsonelser.com>; Bertelsen, Jacqueline <Jacqueline.Bertelsen@wilsonelser.com>; Sean Burstyn <sean.burstyn@burstynlaw.com>
**Cc:** Todd Friedman <todd@toddfriedmanpa.com>; Andrei Dambuleff <andrei.dambuleff@burstynlaw.com>; Mark Goldfeder <Mark@NJACLaw.org>
**Subject:** Re: BOTEACH V. FONT -- DEMAND FOR $100 MILLION, ABANDONMENT OF ALL CLAIMS WITH PREJUDICE, AND A TELEVISED 30 MINUTE APOLOGY TO THE RABBI, FOR LIABILITY RELEASE

**EXTERNAL EMAIL** This email originated from outside the organization.

Sending this under FRE 408. The below email was not authorized by me or the client. Please disregard.

---

**From:** Sam Feldman <sam@feld.law>
**Sent:** Thursday, September 18, 2025 5:33:30 PM
**To:** Bimaya De Silva <Bimaya.DeSilva@burstynlaw.com>; Danielle <Danielle.Weisman@wilsonelser.com>; Benford, John Y. <John.Benford@wilsonelser.com>; Heitman, Alyssa J. <alyssa.heitman@wilsonelser.com>; Bertelsen, Jacqueline <jacqueline.bertelsen@wilsonelser.com>; Ezeta, Daniela <daniela.ezeta@wilsonelser.com>; Matthew Mainen <Matt@njaclaw.org>; Kristin <kristin.carlson774@gmail.com>
**Cc:** Sean Burstyn <sean.burstyn@burstynlaw.com>; Todd Friedman <todd@toddfriedmanpa.com>; Andrei Dambuleff <andrei.dambuleff@burstynlaw.com>; BurstynLaw Docketing <docketing@burstynlaw.com>; Mark Goldfeder <Mark@NJACLaw.org>
**Subject:** BOTEACH V. FONT -- DEMAND FOR $100 MILLION, ABANDONMENT OF ALL CLAIMS WITH PREJUDICE, AND A TELEVISED 30 MINUTE APOLOGY TO THE RABBI, FOR LIABILITY RELEASE

We demand you tender the sum of $100 million to us, and entirely yield otherwise, and very publicly and sincerely apologize to Rabbi Shmuley, all within the next 14 calendar days. We will do you an undeserved favor, true charity to an operation that is not doing anything good for humanity and plenty bad, for a global liability release. That is our proposal to resolve this lawsuit. I suggest you consider it *very* carefully. Because, if you turn it down, maybe the future will retroactively reveal our present generosity. I think the figure should be much higher. But, hey, who am I, right? I'm just a guy that knows when some bastion of Corporate America reallyyyyyyy shit the bed . . . . and opened all the way wide their corporate coffers for a huge ensemble of zeros behind a non-zero number to make their way to us, the good guys. I don't want to give any of you a heart attack, now, so I felt a stroke of mercy and decided to temper the tension a bit with the note below. But I still hope I get to file this demand. Enjoy.

* * *

Response to your service of this "written discovery": Thank you! For these great papers / writing. I don't want to leave you guys hanging for full time until our R&Os, so I wanted to leave you with some breadcrumbs to wet your beak, banter with you all a little bit, tease you a bit, friendly competition type chatter, on . . . hmmmm . . . could do any of the 3, so much to work with, but let's do RFAs. And I will give it to you in one, nice, neat, massive, justified, paragraph.

Bad news (for you): Did you know Florida does not have a specific statute for civil extortion? Under the common law, a plaintiff must show the defendant made a threat to obtain a benefit such as money, property, etc. A plaintiff must show that threat was *wrongful*. The Florida courts define wrongful as predicated upon undue influence, pressure, coercion, intimidation, strong-arming, aggressive bullying. Additionally, wrongfulness cannot be kindred to colorable liability. Meaning, there could be no reasonable mind to determine the party being accused of "extortion" was, in fact, aggressively negotiating and advocating to try to receive some compensation pursuant to legit liability of, here, the hotel, to the accused, here, Rabbi Shmuley. Otherwise, we call this a . . . "litigation demand." :) Basically every other day, I write a short letter to the effect of: Hello. I represent Fibbin Goldfarb. You incurred liability to Fib by [recitation of actionable conduct]. We demand you pay us . . . 0.000001% of our conglomerates annual revenues. (Damn, that figure is oppressive; I mean there is virtually no option, that poor defendant must comply, right? Truly forced, no way out.) Those demand financial metrics. Which we fraudulently report to the market by several dynamics such as total absence of required internal controls over financial reporting. (Oofta, Messrs CEO and CFO, for those damn SOX certs allllll the way at the bottom in our Forms 10-Q and 10-K.) Otherwise, I am going to file a big scary lawsuit, aka, I am going to use our country's proper dispute resolution vehicle to vindicate my rights! I have lodged many SHARK-LIKE, rock-the-boat type, litigation demands . . . for . . . sums . . . over . . . $100mm. Do you think I get sued for extortion? Ever once? It's called: legit liability. Uh oh, don't let me one-up you: My forthcoming theory of YOUR CLIENT's extortion, which will have many happy equally strong certainly viable brother and sister claims arriving concurrently, will, respectfully, be much closer to the mark. . . . . Okay, fess up: Which first-year over there stuffed some botched prompt into Lexis Protégé, and put personal touches on to further screw up the already-incorrect output? And what partner overbilled to pretend to review it, and thus missed every single, did not correct any single, of the many aspects of and assumptions within your ridiculously wrong (in light of the law) conclusions? In the unlikely chance those over-billing partners actually did review the first-year's junk . . . . . . Wow. Those optics would be quite worse for y'all. Anyways, that undue influence must be so powerful, it virtually overcomes the plaintiff's free will. The Florida courts clearly differentiate between aggressive bargaining, negotiating, applying proper leverage to try to resolve a dispute, vindicate a right, or get back at someone for screwing them over -- all of which are *not* actionable -- and conduct sufficiently more egregious than those examples to rise to extortion. A plaintiff must show that, due to a reasonable fear of harm flowing from the defendant's "threat," that the plaintiff ultimately capitulated and complied with virtually all of the demands kindred to the threat, *i.e.*, paid the ransom, because, in light of the pressure applied by the defendant to the plaintiff, the plaintiff reasonably felt it had no other choice or way out. The plaintiff must establish all of a long list of very specific qualities about the threat. It must have been very detailed, coherent, pointed, targeted, terms of when, where, who, how it will go down and "be ugly" if the poor plaintiff

does not meet all requirements tandem to the threat . . . all of which, again, must be very specific in several ways. Boils down to: If you don't complete all of [hyper specific detailed demands], *e.g.*, place exactly $50,000 in a briefcase and leave it by the mailbox at my grandma's house, before knocking on the door to tell her a package has arrived for her grandson, and deliver these Christmas cards I've made for her while you're on site, and grab some of her choc chip cookies to bring back to me, and keep your mouth shut for the rest of your life, and then send me $10,000 by wire to Account No. 69 on the first of each month into perpetuity . . . oh boy . . . I am going to [hyper specific detailed threats]. I'll let you use your own imagination to come up with an example of the latter set of requirements. But, again, based on what I've already told you, just know, it must make the plaintiff feel that they have NO CHOICE. Such that their decision whether to comply with the threat is illusory; they are forced one way. Illusory just like the grimy unconsummated proto "oral contract" your Goldfarb shamelessly begged through, saying your crap hotel would jump through a series of performative hoops including sensitivity retraining, ones without any credence for ensuring institutional memory of the techniques, information, whatever updates you guys did not make but should have, from personnel to personnel in your revolving-door security department, to ensure Jews could become safe again . . . conditions on which you never followed through. Conditions which quite conveniently did not touch on discussion of existing policies and procedures, and updates proven necessary by the incidents suffered by Rabbi Shmuley and many other Jews thanks to your shit hotel. Did you know going back like some 70 years, there was a whole ass fire in your building targeting Jews? And the circus of many further incidents of endangered Jews experienced by you and your weird Turnberry overlords and private equity daddies . . . ? Don't worry, we are "adding them to the chat" shortly. Time for one of those fat checks they are writing to end up in ourrrr pockets, not yours. Time for me to EXPOSE, EXPOSE, EXPOSE, Jeffrey Soffer. We recently learned some very interesting thingssss . . . . Hopefully, your insurance carriers will still cover some aspects of the catastrophe to unfold for your clients. But . . . . I have spent enough time wallowing through commercial insurance policies including D&Os with all sides . . . I look forward to reading every single word of every single policy related to every single one of the soon-to-be expanded ensemble of named defendants, but based on my past experience alone, I know they do tend to carve-out indemnification, advancement of expenses, coverage whatsoever, etc. for problematic ones like . . . crimes, intentional torts, certain securities claims. Scout's honor, I am going to "thread those needles" . . . and many more. Returning, that sentiment of "I have no choice so I must comply with the ransom terms" must be reasonable. Your client is a big stinky hotel network of . . . ? Rabbi Shmuley is an honorable man. You are talking about figures like $1,000,000 -- and doing so in ways that, per our ongoing factual investigation -- unfortunately seem at least partially patently false in a way you must either know or have failed to minimally investigate. Have you checked your parent's / affiliate's / individual location's net revenues at all recently? Are those figures, in light of $1,000,000, reconcilable to conclude poor little Fountain Blew had virtually no choice? You guys should have jumped with joy upon receipt of such an offer if it even did happen, which we have pretty tight reasons to doubt in light of your mosaic of credibility losses constantly manifesting here and elsewhere in case developments. You should have paid the $1,000,000 because you would have got away with a highway robbery . . . meaning securing liability release for claims that, I promise you, will result in MUCH HIGHER RECOVERIES. Whoever made that internal decision to say no, if that request even happened, which it probably didn't, and instead decided to wage a frivolous lawsuit and many other improper attempts at leverage versus an individual, in bad faith, in abuse of the court system, including the discovery process, a rabbi and his family, who, despite his international rock-star celebrity status, you did not protect with the additional security measures with which you routinely have accommodated other humans you must deem more important "celebrities," despite their virtual worthlessness or very low value in terms of meaningful conduct, purpose, rarely positive, presence in the world, if any? You did so to try to strong-arm him into silence? (Uh oh, to the person with whom the buck stopped, whoever pulled that trigger, and to the entity at which they work, I hope you have good malpractice insurance.) Silence about warning our fellow community members of the truth that they were not safe to patronize your overrated (meaning it is poorly rated but its rating should be even poorer), overpriced shitty hotel, where you use a lot of questionable tactics to try to juice your bottom-lines, *e.g.*, intentionally allow prostitutes to frequent the bar scene as we know from confidential witnesses, former employees, and public information that is abundant, and you do so knowingly. It was the hatred and violence of many people and groups over a very long history of exterminations and expulsions that basically, by natural selection, ensured it was only those Jews like us who are mindful to warn our fellow Jews of dangers known, and to listen to such warnings from our fellows, were those who survived. Do you know anything about the social dynamics of a meerkat community? I invite you to look into some of the peer-reviewed research / publications on topic of how meerkats arrived to engage in certain group-wide behaviors. I will give you one tidbit to wet your palate probably dry from that hotel's stale air: if the look-out meerkat on duty during a particular time is unfortunately subdued by a predator, it is almost certain all or close to all of the entire remaining group will perish shortly thereafter. Your own social page was the source of most of the bad publicity surrounding your despicable conduct; you were in control of keeping that up, which you chose to do. Yes . . . I am laughing at you too, not just Shmuley. I am laughing at you for that previous self-inflicted wound. And I am laughing at the amateur hour ongoing wherein somebody over there thinks that's an actionable statement about cancellations. By the way, have you seen your BBB ratings and complaints about obstacles to cancellations, your thefts in connection, and other slimy conduct? You are lodging this claim in response to a Rabbi's communication to our community of a despicable episode of antisemitism that happened, front-and-center, at your busy establishment. One of your workers fist-bumped the guy who berated Shmuley after that loser did so. By the way, these events transpired in your strange-smelling, public location, in presence of many witnesses and recorded in clips that do not even match up with your recitation of the dialogues from your "complaint." You did not intervene, stop the attacker, have minimally adequate security staff on standby in light of industry standards. By the way, Shmuley got attacked at your strangely-named establishment in similar fashion years ago such that you knew this breed of attack to not only be highly likely, but . . . see where I'm going? You disrupted the law enforcement investigation including by refusing to provide security tapes that

would have shown the attacker's face and allowed neutralization of the ongoing threat to Miami Beach's dense Jewish community. You did so during a time of statistically all-time-high and exponentially growing rates of antisemitism and violent hate crimes against Jews. Put differently, you went out of your way to do something very strange and tending to suggest guilty conscience, in order to ensure the ongoing threat to the safety of Jews was perpetuated. You appointed your head of security with first-hand factual knowledge as your 30b6 corporate rep and still had a little disaster today.

PS! Here are some decent hits from my highlight reel. Please, I would be flattered for you to investigate the dockets closely and glean some of my work, and the lawyers and firms who tried to stop me, and what happened ultimately. I promise I did not waste the time to assemble this for your viewing. We are filing some big cases, conveniently was available for my copy-paste in an adequacy paragraph under Rule 23, that tricky class action one.

PS If you say know, I already have the PFS drafted to file. ;)

***In re Snap Incorporated Securities Litigation***, Case No. 2:17-cv-03679-SVW-AGR (C.D. Cal.) (Wilson, J.) (our small Kessler Topaz case team litigated aggressively against top-flight defense counsel to recover **$187,500,000** for class members who invested in Snap common stock during the class period from the March 2, 2017 initial public offering -- registration statement for which contained materially false and misleading statements downplaying competition from Instagram which mimicked Snap's signature "stories feature" -- through the corresponding corrective disclosures of August 10, 2017, which revealed the truth underlying Instagram's competitive threat causing Snap's share price to tank upon removal from the same of the fraud's artificial inflation); ***Baker v. SeaWorld Entertainment Incorporated***, Case No. 14-cv-02129 (S.D. Cal.) (Anello, J.) (recovered **$65,000,000** for investors defrauded by misrepresentations concerning the impact on park attendance of the notorious *Blackfish Documentary*); ***SEB Investment Management AB v. Endo International PLC, et al.***, Case No. 2:17-cv-3711 (E.D. Pa.) (Savage, J.) (recovered **$82,500,000** for defrauded investors); ***In re Advance Auto Parts Incorporated Securities Litigation***, Case No. 18-cv-00212-RTD-SRF (D. Del.) (Noreika, J.) (recovered **$49,250,000** for defrauded investors); ***In re Acuity Brands Incorporated Securities Litigation***, Case No. 1:18-cv-02140 (N.D. Ga.) (Cohen, J.) (recovered **$15,800,000** for defrauded investors); ***In re Adeptus Health Incorporated Securities Litigation***, Case No. 4:17-cv-0449-ALM (E.D. Tex.) (Mazzant III, J.) (recovered **$44,000,000** for defrauded investors); ***In re Under Armour Securities Litigation***, Case No. 1:17-cv-00388-RBD (D. Md.) (Bennett, J.) (recovered **$434,000,000** for defrauded investors); ***Dahhan v. OvaScience, Incorporated, et al.***, Case No. 1:17-cv-10511-IT (D. Mass.) (Talwani, J.) (recovered **$15,000,000** for defrauded investors); ***Flynn v. Exelon Corporation et al.***, Case No. 1:19-cv-08209 (N.D. Ill.) (Kendall, J.) (recovered **$173,000,000** for defrauded investors); ***Hudson v. GoHealth, Incorporated***, Case No. 1:20-cv-05593 (N.D. Ill.) (Daniel, J.) (recovered **$29,250,000** for defrauded investors); ***In re Cognizant Technology Solutions Corporation Securities Litigation***, Case No. 2:16-cv-06509-ES-CLW (D.N.J.) (Walls, J.) (recovered **$95,000,000** for defrauded investors); ***In re Valeant Pharmaceuticals International Incorporated Securities Litigation***, No. 3:15-cv-07658-MAS-LHG (D.N.J.) (Shipp, J.) (our small Robbins Geller case team battled uphill against top-flight defense counsel to recover **$1,200,000,000** for defrauded investors -- the largest pharmaceutical securities class action recovery of all time).

Samuel C. Feldman, Esq.

Feldman Law Firm PLLC

71 Northeast 27th Avenue

Pompano Beach, FL 33062

(954) 682-8590 / Phone

(954) 941-7003 / Fax

Sam@Feld.Law

---

**From:** Bimaya De Silva <Bimaya.DeSilva@burstynlaw.com>
**Sent:** Thursday, September 18, 2025 5:07 PM
**To:** Danielle <Danielle.Weisman@wilsonelser.com>; Benford, John Y. <John.Benford@wilsonelser.com>; Heitman, Alyssa J. <alyssa.heitman@wilsonelser.com>; Bertelsen, Jacqueline <jacqueline.bertelsen@wilsonelser.com>; Ezeta, Daniela <daniela.ezeta@wilsonelser.com>; Matthew Mainen <Matt@njaclaw.org>; Sam Feldman <sam@feld.law>
**Cc:** Sean Burstyn <sean.burstyn@burstynlaw.com>; Todd Friedman <todd@toddfriedmanpa.com>; Andrei Dambuleff <andrei.dambuleff@burstynlaw.com>; BurstynLaw Docketing <docketing@burstynlaw.com>
**Subject:** SERVICE OF COURT DOCUMENTS - Fontainebleau Florida Hotel, LLC v. Jacob Shmuel Botach, Case No.: 1:25-cv-20251-KMM

Dear Counsel,

Please find **attached**.

| | |
|---|---|
| **COURT:** | UNITED STATES DISTRICT COURT FOR THE<br>SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION |
| **CASE NAME:** | *Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach v. Jacob Shmuel Botach a/k/a Shmuley Boteach* |
| **CASE NO.:** | 1:25-cv-20251-KMM |
| **SERVED BY:** | Plaintiff |
| **DOCUMENT(S) SERVED:** | 1. Plaintiff's First Set of Requests for Admission<br>2. Plaintiff's Second Set of Interrogatories to Defendant<br>3. Plaintiff's Third Request for Production of Documents |
| **SENDER:** | Sean A. Burstyn<br>sean.burstyn@burstynlaw.com<br>(305) 204-9808 |

Kind regards,


**Bimaya De Silva, Paralegal**
**Burstyn Law PLLC**

1101 Brickell Avenue, Suite S700, Miami, FL 33131

BurstynLaw.com | Bimaya.DeSilva@BurstynLaw.com

**Direct: 305.204.0451**



This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at 305.204.0451 and permanently delete the original email (and any copy of any email) and any printout thereof.

IMPORTANT NOTICE: Beware of Cyber Fraud.
You should NEVER wire money to any bank account that Wilson Elser Moskowitz Edelman & Dicker LLP provides to you either in the body of this or any email or in an attachment without first speaking

with the attorney in our office who is handling your transaction. Further, DO NOT accept emailed wire instructions from anyone else without voice verification. Even if an email looks like it has come from this office or someone involved in your transaction,
CALL US FIRST AT A NUMBER YOU KNOW TO BE CORRECT FOR THIS OFFICE to verify the information before wiring any money.
Failure to do so is at your own risk.
Be particularly wary of any request to change wire instructions you have already received.

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman & Dicker LLP, please see our website at www.wilsonelser.com or refer to any of our offices.

Thank you.