IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL,
LLC d/b/a FONTAINEBLEAU MIAMI
BEACH, *a foreign limited liability*          CASE NO. 1:25-cv-20251-KMM
*company*,

      Plaintiff,

v.

JACOB SHMUEL BOTACH a/k/a
"SHMULEY BOTEACH," *an individual*,
and John Doe,

      Defendants.

_____/

**DEFENDANT'S RESPONSES TO PLAINTIFF/COUNTER-
DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT FOR LIABILITY ON COUNTS I AND II OF THE AMENDED
COMPLAINT AND FOR SUMMARY JUDGMENT <u>ON COUNTS I-IV OF THE
COUNTERCLAIM</u>**

**General Background**

1.    Jacob Shmuel Botach ("Botach") is a Jewish man. (*See* Exhibit 33 at 19:5-7.)[1] **RESPONSE:**

    **Undisputed. However, while Rabbi Shmuley is a Jewish man, the citation does not**

    **support the assertion.** ***See*** **Ex. 33 at 12:16-19:12 for discussion of Rabbi Shmuley's**

    **Rabbinical Ordination.**

---

[1] Exhibit numbers refer to the March 20, 2026 Affirmation of Sean A. Burstyn filed contemporaneously with this Statement of Facts.

2.  Botach owns, controls, accesses, or uses an Instagram account at the handle "@rabbishmuley." (*See* Exhibit 8 at ¶ 10.)

**RESPONSE: Undisputed insofar as Rabbi Shmuley accesses and uses Instagram at the handle @rabbishmuley. Disputed insofar as Plaintiff asserts that Rabbi "owns and controls" the Instagram account.** *See* Exhibit 8 at ¶ 10.

3.  Botach owns, controls, accesses, or uses a Twitter/X account at the handle "@RabbiShmuley." *Id*.

**RESPONSE: Undisputed insofar as Rabbi Shmuley accesses and uses Twitter/X at the handle @Rabbishmuley. Disputed insofar as Plaintiff asserts that Rabbi "owns and controls" the Twitter/X account. *See* Exhibit 8 at ¶ 10.**

4.  Botach owns, controls, accesses, or uses a Facebook account at the handle Rabbi Shmuley Boteach. *Id*.

**RESPONSE: Undisputed insofar as Rabbi Shmuley accesses and uses Twitter/X at the handle "Rabbi Shmuley Boteach." Disputed insofar as Plaintiff asserts that Rabbi "owns and controls" the Facebook account. *See* Exhibit 8 at ¶ 10.**

5.  Botach posted more than twice a day about the Hotel on Instagram since December 1, 2024. (*See* Exhibit 33 at 91:24-93:1.)

**RESPONSE: Disputed. Plaintiff's citation does not support the factual averment. The averment is taken from questions by Plaintiff's counsel to Defendant. Within those questions Plaintiff's counsel represents that published "at least 550 Instagram posts about the Fontainebleau" between December 2, 2024, and August 8, 2025, and that those posts equate to an average of about 2 a day. Ex. 33 at 91:24-92:3, 8-15. Defendant clarifies that he does not post on the Sabbath or Jewish festivals. Ex. 33 at 92:4-9.**

6. He has posted with about the same frequency about the Hotel on Twitter in the same time frame. (*Id*. at 93:2-10.)

   **RESPONSE: Disputed. Defendant agreed that there is "some symmetry" but that he uses the platforms differently. Ex. 33 at 93:2-10.**

**2023 Incident**

7. Botach has stated he had a different altercation at the Hotel in 2023, where several men accosted him. (*Id.* at 31:24-32:7)

   **RESPONSE: Disputed insofar as Plaintiff characterizes the 2023 incident as an altercation. Instead, the testimony shows that Defendant was "attacked," "harassed," and "threatened" by 3 individuals in the lobby of Plaintiff's hotel. Ex. 33 at 31:7-32:10.**

8. On December 5, 2024, Botach referenced the 2023 incident during his appearance on a Local 10 News segment. (*See* Exhibit 6.)

   **RESPONSE: Disputed. The cited video does not mention the 2023 incident.**

9. On December 5, 2024, Botach wrote in a story on The Jerusalem Post that, "This is not the first time I was accosted in the lobby of the Fontainebleau. It happened about a year and a half ago when a well-dressed Arab man screamed 'Free Palestine' right in my face as I was working and threatened violence. The response of the hotel was pathetic." (*See* Exhibit 5.)

   **RESPONSE: Undisputed.**

10. Botach testified that his purported lifetime pool passes were indefinite, that there was absolutely no date on them whatsoever, that they were "absolutely indefinite," and that they have "absolutely no date, indefinite." (*See* Exhibit 33 at 102:7-16.)

    **RESPONSE: Undisputed.**

11. Printed on the back of Botach's purported lifetime passes is a disclaimer that "This card is the property of the Hotel, and its privileges may be revoked by Management." (*See* Exhibit 31.)

**RESPONSE: Undisputed.**

12. Botach testified that "I'm sure anything in life can be revoked." (*See* Exhibit 33 at 103:24-25.)

**RESPONSE: Undisputed that Defendant made the statement in conjunction with additional statements about the passes, such as, "they were given in perpetuity." Ex. 33 at 103:17 -104:5.**

13. Patrick Fisher, a former executive of the Hotel, testified that he did not ever give Botach lifetime passes to the Hotel, that no one had ever received lifetime passes from the Hotel, and he was 100 percent certain of these facts. (*See* Exhibit 39 at 48:2-51:25.)

**RESPONSE: Undisputed that Patrick Fisher testified he was "100 percent certain that [he] never would have offered someone a lifetime pass, 100 percent." Ex. 39 at 50:5-7. Disputed insofar as Mr. Fisher also testified that he could not recall what he provided to Defendant or whether he ever provided anyone with pool passes. *Id.* at 50:1-13, 58:25-59:19.**

**2024 Incident**

14. Late in the night of December 1, 2024, Botach walked from his home to the Hotel. (*See* Exhibit 33 at 246:5-11)

**RESPONSE: Undisputed that Defendant testified he walked to the Hotel but disputed that Defendant testified he walked there from his *home*. Exhibit 33 at 246:5-11.**

15. After walking into the Hotel, Botach sat on a couch in the main lobby of the Hotel to draft a speech on his laptop. (*Id.* 52:22-24, 246:15-247:5; Exhibit 1.)

**RESPONSE: Undisputed.**

16. Shortly before midnight, Faiz Akbar began speaking with Botach. (*See* Exhibit 1.)

    **RESPONSE: Undisputed that Faiz Akbar approached Defendant. Disputed insofar as this time frame does not reflect the first time Mr. Akbar approached Defendant that evening. The initial encounter occurred around 11:14 p.m., after Mr. Akbar circled the lobby, apparently recognized Defendant, then circled back to confront him. Ex. 1 at 29:52.**

17. Mr. Akbar and Botach exchanged heated words for a couple of minutes. (*See* Exhibit 2.)

    **RESPONSE: Disputed as characterized.**

18. An unidentified guest at the Hotel noticed the altercation between Mr. Akbar and Botach and approached and alerted a Hotel security guard, Ruben Yero. (See Exhibit 23 at 16:10-24.)

    **RESPONSE: Admitted.**

19. Mr. Yero intervened and separated Mr. Akbar and Mr. Yero. (Id. at 16:24-17:9, 63:24-64:3.)

    **RESPONSE: Admitted.**

20. A second Hotel security guard, Luben St. Fleur, also arrived to de-escalate the situation. (See Exhibit 35 at 12:8-13:5.)

    **RESPONSE: Undisputed that Mr. St. Fleur also approached but unknown what his intentions were.**

21. Hotel security escorted Mr. Akbar away from Botach. (Id. at 22:14-21.)

    **RESPONSE: Undisputed that Security .**

22. Botach voluntarily left the Hotel once the incident concluded. (ECF No. 40 ¶¶ 28, 48.)

    **RESPONSE: Undisputed that Defendant left the Hotel.**

**Botach's Pre-Trespass Conduct.**

23. On December 2, 2024, Botach posted to his personal Twitter account, in part, "The [Hotel] security not only did not help me, but actually hugged the Islamist attacker, even as he continued to threaten me with violence for being Jewish. The Fontainbleau has scores of Jewish guests, many with yarmulkes, staying there constantly. From this video, it does not appear that they are safe. Will the Hotel . . . finally take action to protect Jews?" (*See* Exhibit 3.)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

24. That same day, Botach posted on Twitter, in part, "We're going to see if this time, they [i.e., the Hotel] take[s] it seriously and if not, I I will take serious legal action. Already, Jewish tourists from all over the world are writing to me that they are canceling their reservations at the @fontainebleaumiamibeach." (*Id.)*

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by  Defendant.**

25. Later that same day, Botach posted on Twitter, in part, "We will also hold the @fontainebleaumiamibeach accountable for their actions last night, especially their security, who actually hugged the monster as he threatened me." (*Id.*)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by  Defendant.**

26. On December 3, 2024, Botach posted on Twitter, in part, "The vicious attack on me last night in Miami Beach by the unhinged Islamist fanatic, which the security at the @fontainebleaumiamibeach did nothing to prevent, is now inspiring copycat threats . . . I'm gonna hold the hotel completely accountable. Their security guard actually hugged the assailant." (*Id.*)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by  Defendant.**

27. That same day, Botach posted on Twitter, in part, "How is the @fontainebleaumiamibeach watching the tsunami of antisemitism, gushing forth from the incident at their hotel where I was attacked by a vicious antisemite, and doing absolutely nothing? Their security actually hugged [my] attacker. Disgusting and unforgivable." (*Id*.)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

28. On December 4, 2024, Botach posted on Twitter, in part, "the Miami Beach Police Department is asking the @fontainebleaumiamibeach for the surveillance video of the vicious antisemitic hate crime against me this week . . . Why won't the hotel provide their camera footage to the police? What are they hiding? . . . How can this have happened and why won't the hotel give the footage to the police? Until the @fontainebleaumiamibeach cooperates fully with the police investigation, I cannot see how any Jewish guest at the hotel is safe." (*See* Exhibit 4.)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by  Defendant.**

29. That same day, Botach posted on Twitter, in part, "the hotel will be held accountable for refusing to release surveillance footage and denying the attack was antisemitic and having its security guard hug the Jew-hater who threatened to destroy me." (*See* Exhibit 3.)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

30. On December 5, 2024, Botach appeared on a segment from Local 10 News in which he said, among other things, "We are going to file a $100 million lawsuit, God willing, against the Fontainebleau." (*See* Exhibit 6.)

    **RESPONSE: Undisputed that the above is an excerpt of from Defendant's interview with Local 10 News.**

**Botach is Trespassed**

31.  On December 6, 2024, the Hotel, through counsel, delivered a letter to Botach's counsel at the time, Ms. Jasmine Rand. (*See* Exhibit 7.)

**RESPONSE: Undisputed.**

32.  In that letter, the Hotel referred to Botach's "threat of a $100 million claim" and advised Botach's counsel of Botach's duty to preserve discoverable information.  The letter demanded that Botach cease and desist from "disseminating falsehoods" and stated those false statements included "but [were] not limited to, the defamatory claim that [the Hotel] has 'refused to cooperate' with law enforcement." (*Id.*)

**RESPONSE: Undisputed that the above is an excerpt of the December 6, 2024, letter.**

33.  The letter also advised "take notice that as authorized by Florida law, the Fontainebleau declines entry and service to individuals who are actively in or threatening litigation against the hotel." *See* Fla. Stat. § 509.092. As such, please advise your client to refrain from entering onto Fontainebleau property under any circumstances." (*Id*.)

**RESPONSE: Undisputed that the above is an excerpt of the December 6, 2024, letter.**

34.  The Hotel has never trespassed a guest because of that guest's religion, nor does it have any policy under which it excludes guests because of their religion. (*See* Exhibit 38 at 32:22-33:3; Exhibit 39 at 40:21-25.)

**RESPONSE: Undisputed that witnesses have denied that the Hotel excludes guests from its property because of religion. Disputed insofar as Defendant disagrees with the conclusions asserted above based on his own personal experience.**

**The Miami Beach Police Department Investigation**

35. At 9:30 a.m. on December 2, 2024, Detective Eugenio Abay of the Miami Beach Police Department received a call from the Miami Dade Police Homeland Bureau concerning the incident involving Botach at the Hotel earlier that day. (*See* Exhibit 18 at MBP00013.)

   **RESPONSE: Undisputed that the above largely reflects information from the Miami Beach Police Report. Disputed insofar as the Police Report is inadmissible hearsay.**

36. That day, Detective Abay called the Hotel, and staff there confirmed there had been an incident, that it had been de-escalated, and that it had only been a verbal altercation. (*Id.*)

   **RESPONSE: Undisputed that the above largely reflects information from the Miami Beach Police Report. Disputed insofar as the Police Report is inadmissible hearsay.**

37. At about 2:45 p.m. on December 2, 2024, Detective Abay, along with another officer, visited the Hotel. While there, Hotel personnel permitted the officers to review surveillance footage of the incident. (*See* Exhibit 18 at MBP00014; Exhibit 32 at 48:8-18.)

   **RESPONSE: Undisputed that the above largely reflects information from the Miami Beach Police Report. Disputed insofar as the Police Report is inadmissible hearsay. Further disputed because Plaintiff's Corporate Representative testified that he did not have personal knowledge.**

38. Hotel personnel advised Detective Abay that they "did not mind" turning over the surveillance but needed a subpoena first. (*See* Exhibit 18 at MBP00014.)

   **RESPONSE: Undisputed that the above largely reflects information from the Miami Beach Police Report. Disputed insofar as the Police Report is inadmissible hearsay.**

39. Detective Abay testified that the request for a subpoena "was no problem because usually a lot of the hotels, wherever you go, they ask for a subpoena." (*See* Exhibit 36 at 51:4-6)

**RESPONSE: Undisputed that Det. Abay testified that he did not consider the Hotel's subpoena requirement to be a problem.**

40.  On December 4, 2024, at about 11:50 a.m., Detective Abay provided a signed subpoena to the Hotel. Hotel personnel uploaded copies of the surveillance footage to MBPD's AXON evidence database by 12:47 p.m. that same day. (*See* Exhibit 18 at MBP00015; Exhibit 38 at 42:12-43:5.)

**RESPONSE: Undisputed that the above largely reflects information from the Miami Beach Police Report. Disputed insofar as the Police Report is inadmissible hearsay.**

41.  Detective Abay testified that the Hotel uploaded "all the videos we requested." (*See* Exhibit 36 at 52:11.)

**RESPONSE: Undisputed that the above is a quote from Det. Abay's testimony.**

42.  On December 5, 2024, Detective Abay went to the hotel and interviewed Hotel security guard Ruben Yero to discuss the incident, and Mr. Yero voluntarily spoke with Detective Abay and did not refuse to answer any of the detective's questions. (*See* Exhibit 18; Exhibit 23 at 71:16-72:2.)

**RESPONSE: Undisputed that Mr. Yero testified that he did not refuse to answer any of Det. Abay's questions on December 5, 2024. Disputed insofar as the citations do not support the remaining assertions.**

43.  On December 11, 2024, Sergeant Reginald Lester of the MBPD emailed Botach to state that "we are scheduled to meet with the State Attorney tomorrow, Thursday, December 12, to present the findings of our investigation" and that "please be assured that if the evidence supports a criminal charge, we will take appropriate action granted to us by the State of Florida. (*See* Exhibit 27.)

**RESPONSE: Undisputed.**

44. On December 18, 2024, FBI agent Justin Houston advised Botach that their investigation had concluded in a determination that there was no federal nexus concerning the incident at the Hotel. (*See* Exhibit 37.)

    **RESPONSE: Undisputed.**

45. On March 9, 2025, Sergeant Reginald Lester of the MBPD emailed Botach and admonished him that "At no point has anyone and I mean ANYONE impeded our investigation or communicated unwarranted interest in its outcome." (*See* Exhibit 16 at Def0000896.)

    **RESPONSE: Disputed as phrased. The email referenced in paragraph 45 was sent on March 11, 2025, not March 9, 2025. Furthermore, "admonished" mischaracterizes Sgt. Lester's email.**

**Botach's Refusal-to-Cooperate Statements**

46. See ¶¶ 28-29.

    **RESPONSE: *See* responses to *supra* ¶¶ 28-29.**

47. On December 5, 2024, Botach posted on Twitter, in part, "the police will not stop until all surveillance footage and evidence is obtained from the @fontainebleaumiamibeach who thus far are not cooperating . . . I will fight to ensure that Management of the @fontainebleau are held accountable for failure to cooperate with law enforcement . . . ." He sent a service-list email the same day containing the same language. (*See* Exhibit 34; Exhibit 9.)

    **RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant and that the same post was sent in an email.**

48. On December 7, 2024, Botach posted on Instagram and stated, in part, "The hotel is lying. Miami Beach Chief of Police Wayne Jones and his detective Eugenio Abay have confirmed that their request for surveillance footage from the hotel has been denied." (*See* Exhibit 15.)

**RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant, which also included the entire December 6, 2024, letter. (See Ex. 7).**

49. On December 10, 2024, Botach posted on Twitter, in part, Just because the @fontainebleaumiamibeach won't release the footage of the vile attack to the police (the hotel is lying that they are cooperating . . . ." (*See* Exhibit 11.)

**RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

50. Along with the text of that December 10 post, Botach recorded and posted a video of himself speaking to the camera. He stated, among other things, "[the Hotel's counsel] said we are cooperating with the police. That's garbage. The Fontainebleau Hotel has still not provided the surveillance tapes of the attack on me to the Miami Beach Police Department, who have repeatedly requested it . . . Not to mention not protecting the Jewish community by refusing to turn over the surveillance tapes cuz they know what it shows. They know what it shows. They're not cooperating with the police." (*See* Exhibit 10.)

**RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

51. On December 19, 2024, Botach emailed the Jerusalem Post and stated, "the Fontainebleau refused to release the surveillance footage and would not cooperate with the police." (*See* Exhibit 30.)

**RESPONSE: Undisputed that the above is an excerpt from an email from Defendant to the Jerusalem Post.**

52. On December 20, 2024, Botach appeared on Channel 10 News and said, "To all the people at the Fontainebleau, where is the surveillance footage? You're saying it was all made up? Why won't you release the surveillance footage?" (*See* Exhibit 24.)

**RESPONSE: Undisputed that the above is an excerpt from Defendant's interview on Channel 10 News.**

53. On December 22, 2024, Botach posted on Twitter, in part, about the Hotel, "What are they hiding? And why won't they release the footage?" (*See* Exhibit 12.)

**RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

54. On January 4, 2025, Botach posted on Instagram that he "immediately released all of his video . . . The only one who steadfastly refuses to release the footage of the incident to the public is billionaire Jeffrey Soffer." (*See* Exhibit 13.)

**RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

55. On December 8, 2024, Botach emailed Nelson Delgado, an FBI agent, and copied MBPD personnel and asked them to "forward [Mr. Delgado] the police report as well as the surveillance videos from the hotel which my understanding is, after they originally refused to turn them over, have now done so after substantial public and media pressure." (*See* Exhibit 14.)

**RESPONSE: Undisputed that the above is an excerpt of an email sent by Defendant to Agent Delgado.**

56. On December 8, 2024, Botach posted a video on Twitter in which he stated, among other things, that the Hotel "initially didn't cooperate with the police. Now they finally turned over the footage." (*See* Exhibits 21 at :10-:16 and Exhibit 22.)

**RESPONSE: Undisputed that the above is an excerpt of a Twitter post by Defendant.**

57. On December 10, 2024, Botach emailed Wayne Jones, Miami Beach Police Department Chief, and asked him, "did MBPD get the surveillance footage from the Hotel please?" (*See* Exhibit 16 at Defendant0000902).

**RESPONSE: Undisputed that the above largely reflects a portion of an email from Defendant to Chief Jones.**

58. On December 11, 2024, Chief Jones responded to Botach and stated "The video was received." (*Id.* at Defendant0000901.)

**RESPONSE: Undisputed that the above is an excerpt of an email from Chief Jones.**

59. Botach testified that he never read Chief Jones' December 11, 2024 email. (*See* Exhibit 33 at 298:16-300:4.)

**RESPONSE: Disputed. Defendant testified that "to the best of my recollection, I'm not – I have not – I was not aware of this email." Ex. 33 at 300:25-301:2.**

60. On December 15, 2024, Botach emailed Sergeant Lester of MBPD and asked, "Has the Fontainebleau provided the footage please?" (*See* Exhibit 28.)

**RESPONSE: Undisputed that the above is an excerpt of an email from Defendant.**

61. On December 16, 2024, Botach emailed Steven Meiner, the Mayor of the City of Miami Becah, and asked him, "Did the police ever get the surveillance footage from the Fontainebleau Hotel . . . ." (*See* Exhibit 29.)

**RESPONSE: Undisputed that the above is an excerpt of an email from Defendant.**

62. No later than December 3, 2024, Botach had Detective Abay's cellphone number and had contacted him via cellphone. (*See* Exhibit 17.)

**RESPONSE: Undisputed.**

63. No later than December 5, 2024, Botach had Chief Jones' cellphone number and had contacted him via cellphone. (*See* Exhibit 19.)

    **RESPONSE: Undisputed.**

64. No later than December 5, 2024, Botach has Mayor Meiner's cellphone number and had contacted him via cellphone. (*See* Exhibit 20.)

    **RESPONSE: Undisputed.**

**Botach's Trespass Statements**

65. On December 7, 2024, Botach posted on Twitter and wrote, in part, Grant the @fontainebleau its wish of having the hotel JUDENREIN, free of Jews who defend themselves . . . Remember: they don't expel the would-be terrorists. Only the attacked Jews who dare resist . . . decide if you want to experience the Gehinnom-Hell I was just put through by the hotel for being a Jew." (*See* Exhibit 25.)

    **RESPONSE: Undisputed that the above is an excerpt from a Twitter post by Defendant. Disputed insofar as the post was dated December 8, 2024, not December 7.**

66. Along with the text of that December 7 post, Botach included four pictures. One of those pictures was a distorted excerpt of the Hotel's December 6 letter. Botach excised language from that letter so that the text he posted as an image read, "The Fontainebleau declines entry and service . . . please advise your client to refrain from entering onto Fontainebleau property under any circumstances." (Ellipses in original, *Id.*)

    **RESPONSE: Undisputed that the above is an excerpt from a Twitter post by Defendant. Disputed insofar as the post was dated December 8, 2024, not December 7.**

67. On December 7, 2024, Botach posted an image showing a portion of the Hotel's December 6 letter on Instagram. (*See* Exhibit 15.)

**RESPONSE: Disputed. The subject post includes the entire December 6, 2024, letter.**

68. On December 8, 2024, two days after he was trespassed and one day after tweeting that he had been expelled from the Hotel, Botach posted a video of himself on Twitter. In that video, he stated, "I can't go to the Hotel. Too Jewish." (*See* Exhibits 21 and 22.)

   **RESPONSE: Undisputed that the above paragraph excises a short phrase from Defendant's 4:52 videopost.**

**Botach's Deposition Testimony[2]**

69. Botach testified that he could not recall buying anything at the Hotel on December 1 or 2, 2024. (*See* Exhibit 33 at 109:4-14.)

   **RESPONSE: Disputed insofar as the citation does not support the assertion. Undisputed insofar as Defendant testified consistent with the assertion, See Ex. 33 at 254:12-15.**

70. Botach testified that he did not try to contract with the Hotel on the night of the incident. (*Id*. at 254:12-15.)

   **RESPONSE: Disputed.**

71. Botach testified that donations made to World Values Network are voluntary. (*Id.* at 231:18-22.)

   **RESPONSE: Undisputed.**

72. Botach testified that WVN has no contracts with any donors obligating any, or continuing, donations. (*Id*. at 231:18-232:15.)

   **RESPONSE: Undisputed.**

---

[2] Video clips of Defendant's deposition testimony cited herein are available here:
https://www.dropbox.com/scl/fo/5tn7nmpsg3407g815ykuu/AGIvI6cHEnYyjJlYtmdQl2c?rlkey=mo1tj6x0by7tyzn80athk7r9i&st=79z3qj8y&dl=0

73. Botach testified that he did not actually hear what Jeffrey Soffer said to Miriam Adelson but only was told by Ms. Adelson what Mr. Soffer had told her. (*Id.* at 189:7-14; 190:17-20; 194:2-12; 202:1-17.)

**RESPONSE: Undisputed.**

74. Botach testified that he did not actually hear what Jeffrey Soffer said to any member of the Falic family of Bal Harbor but was only told what someone else may have heard what Mr. Soffer said. (*Id.* at 204:7-24; 206:15-207:16.)

**RESPONSE: Undisputed.**

75. Botach testified that he did not have evidence or reasons for his trespass other than what was stated in the December 6 letter from the Hotel. (*Id.* at 237:1-3, 242:24-243:21, 245:3-20.)

**RESPONSE: Disputed.**

76. Botach testified that the Hotel "denied me access because I dared speak out about an antisemitic attack, unlike others who might say, Let's not make trouble. Let's not create waves. Let's just be silent about it." He also testified "You are using the word 'too Jewish' in a very physical sense. You're saying the way you look. You said 'visibly.' For me, 'too Jewish' is a Jew prepared to speak out. They denied me access because I was too Jewish in speaking out against antisemitism." (*Id.* at 337:5-338:24.)

**RESPONSE: Undisputed insofar as Defendant testified as stated, but disputed insofar as Defendant's actual testimony includes a much broader discussion.**

77. Botach testified that he was supposed to have a Zoom meeting with Detective Abay, but Detective Abay canceled it. He could then not explain why that cancellation meant he couldn't get information from MBPD. (*Id.* at 281:2-19, 284:14-286:21.)

**RESPONSE: Disputed.**

78. Botach testified that a purpose in his life is to be a public fighter of antisemitism. (*Id.* at 32:6-7; 331:1-332:15.)

    **RESPONSE: Disputed as to the "public fighter" characterization. Defendant testified that his has dedicated his life to fighting antisemitism.**

79. Botach testified that "too Jewish" means "those who decided to lead a very Jewish life" and that "Judenrein means when a place is empty of Jews." (*Id.* at 335:25-336:1, 339.)

    **RESPONSE: Disputed insofar as Plaintiff has "excised" a single word from an elaborate discussion about the phrase "too Jewish." Defendant's explanation drew contrasts between Jews who "conceal their identity" by not wearing a yarmulke or beard and jews (like himself) who vigorously defend Israel in the media and whose children fight in the Israeli army. Ex. 33 at 335:10-3365.25.**

80. Botach testified "the answer is the hotel refused entry as it would – as retaliation, because they said I had provoked an attack because I was a defender of Israel. Because I am known as a defense of Israel." (*Id.* at 336:20-22.)

    **RESPONSE: Undisputed.**

81. Botach testified that he did not know of a similarly situated comparator who was trespassed by the Hotel. (*Id.* at 237:20-24.)

    **RESPONSE: Disputed.**

82. Botach testified that, as to his evidence that the Hotel discriminated against him, he believes it was "simple cause and effect" and that "of course [he] believe[s] it was punitive." (*Id.* at 251:15-18; 252:18-2.)

    **RESPONSE: Undisputed.**

83. Botach testified that "it was my Jewishness that got me attacked, and it was my insistence that there has to be accountability that brought punitive action." (*Id.* at 253:15-17.)

**RESPONSE: Undisputed.**

84. During his deposition, Botach berated the Hotel's counsel for asking a question about the element of his claims in Counts I-III. (*See* Exhibit 33 at 234:13-15.)

**RESPONSE: Disputed.**

85. Botach testified he tagged the Hotel on social media to drive attention to the Hotel and "hold them accountable so that they begin to re-examine their actions." (*See* Exhibit 33 at 397:16-398:16.)

**RESPONSE: Disputed.**

86. Botach testified as to his personal social media "[i]f it's my own private social media, no. It's my own private social media." (*See* Exhibit 33 at 374:11-22.)

**RESPONSE: Disputed. The above quote was part of a discussion about Defendant's work with editors at various media publications and his use of social media. Ex. 33 at 374:5-375:25.**

87. Asked whether anyone fact checks his posts on social media, Botach testified "Who would fact-check it? It's — it's Rabbi Shmuley. It's my social media." (*See* Exhibit 33 at 377:4-5.)

**RESPONSE: Undisputed. *See supra* 86.**

88. As to his social media, Botach testified "They're my social media. They're my posts about — and my take on things going on in the world," sometimes covering facts, sometimes editorial. (*See* Exhibit 33 at 375:4-13.)

**RESPONSE: Undisputed. *See supra* 86.**

89. Botach testified that he does not apply any standards to his social media other than the terms of use of the websites themselves. (*See* Exhibit 33 at 377:6-12.)

   **RESPONSE: Disputed.**

90. Asked if his social media was biased or self-interested, Botach testified: "[t]hat's a very strange question. It's my social media. So obviously it's going to be my take on the world," and "Do you expect me to be objective about things that I'm very passionate about?"; "It's like asking Taylor Swift is she biased in favor of her lyrics and her music. I bet she is." (*See* Exhibit 33 at 377:13-17; see also id. at 377:19-25.)

   **RESPONSE: Undisputed.**

91. As to interaction with his social media posts, Botach testified "[s]ometimes I turn comments on. Sometimes I turn comments off," (*See* Exhibit 33 at 392:19-20), and "[s]ometimes they can comment; sometime[s] they cannot, such as the Fontainebleau," (*See* Exhibit 33 at 392:23-25), and admitted knowing that closing comments meant he would stifle debate, explaining that social media does allow "interaction and education," "[b]ut sometimes you just want to make a statement." (*See* Exhibit 33 at 393:4-7.)

   **RESPONSE: Disputed.**

92. Botach testified "all social media lends itself to a little bit of humor, a little bit of hyperbole." (*See* Exhibit 33 at 338:11-13.)

   **RESPONSE: Undisputed.**

Respectfully submitted this 10th day of April, 2026.

| | |
|---|---|
| */s/ Austin M. Krtausch* | */s/ John Y. Benford* |
| Christopher D. Cathey, Esq. | John Y. Benford, Esquire |
| Florida Bar No. 663255 | Florida Bar No. 51950 |
| chris.cathey@offitkurman.com | john.benford@wilsonelser.com |
| Austin M. Krtausch, Esq. | alyssa.heitman@wilsonelser.com |
| Florida Bar No. 1025521 | Jacqueline M. Bertelsen, Esquire |

austin.krtausch@offitkurman.com
Offit Kurman, P.A.
100 SE Third Ave, 10th Floor
Ft. Lauderdale, FL 33394
Phone: 954-353-4180
*Counsel for Counter-Plaintiff, Botach*

Florida Bar No. 123747
jacqueline.bertelsen@wilsonelser.com
daniela.ezeta@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker LLP
111 N. Orange Avenue, Suite 1200
Orlando, FL 32801
Telephone:  407-203-7599
*Counsel for Defendant, Jacob Shmuel Botach*

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, the foregoing document was filed using the CM/ECF system for the United States District Court, Southern District of Florida, which will send electronic notice of the foregoing to all counsel of record.

/s/ *Austin M. Krtausch*
Christopher D. Cathey, Esq.
Florida Bar No. 663255
chris.cathey@offitkurman.com
Austin M. Krtausch, Esq.
Florida Bar No. 1025521
austin.krtausch@offitkurman.com
Offit Kurman, P.A.
100 SE Third Ave, 10th Floor
Ft. Lauderdale, FL 33394
Phone: 954-353-4180
*Counsel for Counter-Plaintiff, Botach*

/s/ *John Y. Benford*
John Y. Benford, Esquire
Florida Bar No. 51950
john.benford@wilsonelser.com
alyssa.heitman@wilsonelser.com
Jacqueline M. Bertelsen, Esquire
Florida Bar No. 123747
jacqueline.bertelsen@wilsonelser.com
daniela.ezeta@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker LLP
111 N. Orange Avenue, Suite 1200
Orlando, FL 32801
Telephone:  407-203-7599
*Counsel for Defendant, Jacob Shmuel Botach*