IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:25-cv-20251-KMM

FONTAINEBLEAU FLORIDA HOTEL,
LLC d/b/a FONTAINEBLEAU MIAMI
BEACH, a foreign limited liability
company,

       Plaintiff,

v.

JACOB SHMUEL BOTACH a/k/a
"SHMULEY BOTEACH," *an individual*,
and John Does 1-10,

       Defendants.

_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
TO STRIKE PORTIONS OF CHRIS SILVER SMITH'S EXPERT REPORT AND
PRECLUDE TESTIMONY AT TRIAL RELATING TO SAME [ECF NO. 196]**

Defendant, Jacob Shmuel Botach a/k/a "Shmuley Boteach," ("Rabbi Boteach" or

"Defendant"), respectfully submits his Response in Opposition to Plaintiff's *Daubert* Motion To

Strike Portions Of Chris Silver Smith's Expert Report And Preclude Testimony At Trial Relating

To Same ("Motion") (ECF No. 196).

**I. BACKGROUND**

In its *Daubert* Motion, Plaintiff seeks to exclude 17 opinions set forth in the expert report of

Chris Smith, dated November 26, 2026 ("Smith Report"). The Smith Report is attached as Exhibit

"1" of Plaintiff's Motion. Seven of these opinions are cited on pages 4-5 of Plaintiff's Motion and

the other 10 opinions are set forth in Exhibit 2 of the Motion. *See* Motion at 4-5, Ex. 2. These 17

opinions can be summarized as follows:

335604131v.1

1. Botach's "claim that he was banned for being 'too Jewish' appears to me to be figurative and opinion-based, not a factual assertion."  Motion at 4-5; Smith Report at ¶ 8)

2. Botach's "statements about the hotel not cooperating with police were reasonable opinions . . . .".  Motion at 4-5; Smith Report at ¶ 9.

3. "It is my understanding that under the Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, a statement must be substantively factual such that it could be proven to be true or false; otherwise, it qualifies as a constitutionally protected opinion and cannot be considered to be defamatory. This indicates a number of flaws with Plaintiff's Complaint." Motion at 4-5; Smith Report at ¶ 51.

4. "From my perspective, the collection of these significant deficiencies has created a case that likely has insufficient merit to survive on the theory that the defendant's words and actions constitute defamation towards the Plaintiff." Motion at 4-5; Smith Report at ¶ 58.

5. The allegedly defamatory statements attributed to the Defendant would appear to be readily disqualified by their internal logic as they comprise mixtures of factually accurate content, opinions, rhetorical content, hyperbolic content, parody, and boycott speech." Motion at 4-5; Smith Report at ¶ 153.

6. "As such, I would characterize [Botach's claim that the hotel refused to cooperate with police] as an opinion based on facts."  Motion at 4-5; Smith Report at ¶ 70.

7. "As such, it is my opinion that the rabbi's statements are largely a matter of perspective and interpretation and opinion, and as such would generally not be deemed to be false statements of fact."  Motion at 4-5; Smith Report at ¶ 79.

8. Botach's "statements appear to me to objectively represent largely a combination of opinions, hyperbole, and rhetorical speech rather than false statements of fact."  Motion at Ex. 2; Smith Report at ¶ 7.

9. "It is my understanding that any purported motive is irrelevant to defamation . . . ."  Motion at Ex. 2; Smith Report ¶ 48.

10. "Portions of [Botach's] statements are figurative or rhetorical hyperbole in my opinion ... [Botach's] statement on social media that he was subsequently banned for being "too Jewish" is likewise hyperbolic when accessed [sic] in context." Motion at Ex. 2; Smith Report ¶ 53.

11. Botach's "opinions about the hotel's speed of responsiveness in turning over surveillance videos to police or his characterization of their trespassing him from their property as 'banning' for his Jewishness are again opinions about events open to some degree of interpretation."  Motion at Ex. 2; Smith Report ¶ 55.

12. "As the various statements were substantially true, it seems likely that the defamation claims fall short of the threshold necessary to establish that they were defamatory. The Plaintiff

335604131v.1

should also be considered a 'public figure' in the context of the lawsuit, which raises the bar for a defamation suit a bit further." Motion at Ex. 2; Smith Report ¶ 57.

13. "Again, this appears to be hyperbolic speech, exaggeration, and an opinion construed by the defendant based on being trespassed by the plaintiff." Motion at Ex. 2; Smith Report ¶ 61.

14. "I find it not unreasonable that [Botach] felt 'banned' under the circumstances, and his opinion that he was banned from the hotel because he was 'too Jewish' is clear hyperbole." Motion at Ex. 2; Smith Report ¶ 68.

15. "His hyperbolic and dramatic opinion in this matter is that if Jewish people are not helping to protect other Jews, then they are similar in spirit to nazi collaborators." Motion at Ex. 2; Smith Report at ¶ 78.

16. "While I was unfamiliar with Rabbi Shmuley Boteach prior to being hired for this case, I could readily see from his social media posts that he is dramatic, extremely passionate, frequently hyperbolic, and often humorous." Motion at Ex. 2; Smith Report ¶ 38.

17. "Importantly, I believe that it is likelier than not that [Mr. Akbar] deliberately said "Allahu Akbar" to the Rabbi with the intention of setting him off with coded language." Motion at Ex. 2; at ¶ 10.

Defendant will refer to each of the 17 opinions at issue in Plaintiff's Motion by the numerical reference set forth above, for example, "Opinion 1", Opinion 2", etc. Plaintiff argues that all 17 of these opinions constitute impermissible legal conclusions. *See* Motion at 5-8. As described *infra*, Defendant agrees that Opinions 3, 4, 5, 9, and 12 constitute legal conclusions for which an expert may not testify at trial, and does not intend to have Mr. Smith testify with respect to these opinions. However, as described below, **Opinions 1, 2, 6-8, 10, 11, 13-17** are not impermissible legal conclusions, but are ***ultimate issues of fact***, which an expert may testify to at trial.

## II.  ARGUMENT

FRE 704(a) makes clear that "an opinion is not objectionable just because it embraces an ultimate issue." FRE 704(a). Thus, it is well-settled that an expert witness may testify as to an ***ultimate issue of fact***, as long as the expert does not tell the jury what conclusion it should reach. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *Congregation 3401 Prairie Bais Yeshaya D'Kerestir, Inc. v. City of Miami Beach*, 2023 U.S. Dist.

3

LEXIS 79828, at *6-10 (S.D. Fla. April 12, 2023) (expert could opine as to whether plaintiff is operating a religious institution); *Mizrahi v. Yamaha Motor Corp.*, U.S.A., 2019 U.S. Dist. LEXIS 125291, at *14-18 (S.D. Fla. July 19, 2018) (expert could opine on causation); *Clingman v. Knobel*, 2018 U.S. Dist. LEXIS 247774, at *5-13 (S.D. Fla. May 8, 2018) (expert could opine as to whether or not certain conduct is consistent with industry custom and practices); *Buccellati Holding Italia v. Laura Buccellati LLC*, 2014 U.S. Dist. LEXIS 192337 (S.D. Fla. Apr. 14, 2014) (although expert in trademark infringement case could not testify as to likelihood of confusion, expert was permitted to testify as to existence and extent of actual confusion in the consuming public).

Further, "a passing reference to a legal principle or assumption in an effort to place [the expert's] opinions in some sort of context will not justify the outright exclusion of the expert's report in its entirety." *Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.*, 2004 U.S. Dist. LEXIS 29575, at *2 (M.D. Fla. Aug. 20, 2004); *see also Maiz v. Virani*, 253 F.3d 641, 666-68 (11th Cir. 2001). Further, "the distinction between admissible testimony and inadmissible testimony may turn on the phrasing of a given question." *Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467, 1473 (11th Cir. 1984).

Opinions 1, 2, 6-8, 10, 11, 13-17 are not impermissible legal conclusions, but are ultimate issues of fact, which Mr. Smith should be permitted to testify to at trial. All of these opinions relate to how the defamatory statements are likely to *perceived* by readers, for example, hyperbolic, dramatic, comical, rhetorical, opinion, etc. Similarly, Mr. Smith's opinions relate to the likelihood the alleged defamatory statements will be perceived by readers as an expression of fact or opinion, whether a statement is likely to damage the online reputation of Plaintiff, and the degree of damage to Plaintiff's online reputation (if any) caused by the statement. As set forth in the declaration of Chris Smith ("Smith Declaration"), as an expert in online reputation repair, Mr. Smith routinely opines as to how allegedly defamatory/damaging statements are perceived by readers and the impact

4

of the statements to a plaintiff's (or other party's) online reputation. *See generally* Smith Declaration, attached hereto as **Exhibit 1.**

Mr. Smith states in his declaration and report that he has been retained to serve as an expert witness with respect to online reputation management ("ORM") in approximately 28 cases since 2012. *See* Smith Decl. at ¶ 2; Smith Report at 68-73. He has served in another 44 cases as an expert witness, predominantly trademark infringement, but also internet technology, online marketing, and related matters. *Id.* These expert witness services have grown consistently since 2012, and now comprise approximately 50% of his work. *See* Smith Decl. at ¶ 2.

The other approximately 50% of Mr. Smith's work has consisted of providing online marketing consulting services. *See* Smith Decl. at ¶ 3. Approximately 80% of his online marketing work (40% of his entire work) relates to ORM in a *nonlitigation* context. *Id.* With respect to nonlitigation consulting, Mr. Smith has provided opinions regarding ORM, including online reputation repair, to hundreds of individuals and businesses. *Id.* Mr. Smith has also written multiple articles on the topic of ORM at MarTech and Search Engine Land, which are internet marketing industry news and information websites, and has been invited by industry peers to speak on ORM topics at multiple conferences worldwide. *See* Smith Decl. at ¶ 4.

Regardless of whether his consulting is litigation or nonlitigation, Mr. Smith's methodology involves both a quantitative and *qualitative* assessment of online statements that are allegedly damaging. *See* Smith Decl. at ¶ 5. This qualitative assessment focuses on how a statement is likely to be perceived by a reader, including whether it is likely to be perceived as damaging to the online reputation of the party that is the subject of the statement (whether an individual or business) and the extent of the damage to the online reputation. *Id.* This analysis often involves whether the statement at issue is likely to be perceived by the reader as a statement of fact or a statement of opinion. *Id.*

335604131v.1

In determining reader perception, Mr. Smith examines a range of facts that provide context to the statement and how the statement might impact the subject of the statement, regardless of whether the subject of the statement is a plaintiff in a litigation matter or a client in a nonlitigation matter that seeks to repair its online reputation. *See* Smith Decl. at ¶ 6. The facts and information relating to the subject that he examines in order to determine the context of the statement include, among other things: websites; online advertisements; news articles; social media posts; social media comments; online reviews; marketing materials; email communications; industry data; and sentiment analysis. *Id.* When analyzing an alleged damaging statement and its context, Mr. Smith also applies the knowledge, observations, and insights he has obtained over 28 years working in internet marketing and from over 17 years working in ORM as to how readers tend to perceive statements. *Id*.

The qualitative analysis is contained in ¶¶ 21-79, 112-119 of Mr. Smith's report. *See* Smith Decl. at ¶ 7; Smith Report at ¶¶ 21-79, 112-119. This qualitative analysis methodology described above is used by ORM consultants and experts throughout the ORM industry. *See* Smith Decl. at ¶ 8. Further, this qualitative methodology is also widely utilized and accepted among Mr. Smith's peers in the ORM industry. *Id*.

Specifically, in his qualitative analysis, Mr. Smith discusses the fact that there is a complete absence of any comments or other online reaction to Defamatory Statements 1 and 2. *See* Smith Report at ¶¶ 43-44. He discusses the *context* of the statement via Defendant's other publications (*see* Smith Report at ¶ 39); Defendant's video of the Incident (*see* Smith Report at ¶¶ 22-38); the Hotel's advertising, and similar posts, and the Amended Complaint (*see* Smith Report at ¶¶ 46-50; 52-64); and, the nature of the comments on social media relating to the relevant posts (*see* Smith Report at ¶¶ 112-119), including the absence of any comments or reaction to Defamatory Statements 1 and 2. Mr. Smith also notes in his report: "I have worked on a number of defamation lawsuits

and even more defamation victims' online cleanup projects through my work as a reputation management consultant, and, I would say that the majority of cases I have been involved with involved claims based on much more clear-cut defamation claims derived from clearly false statements versus statements that *appear* on the surface to be accurate statements of fact, tenable interpretations, and or expressions of opinion." *See* Smith Report at ¶ 45 (emphasis added).  It is telling that Plaintiff does not seek to strike that opinion, which is based upon reader perception. Opinions 1, 2, 6-8, 10, 11, 13-17 are similarly based upon reader perception.  For example, Smith opines that Defendant's "claim that he was banned for being 'too Jewish' *appears* to me to be figurative and opinion-based, not a factual assertion" (Opinion 1) (emphasis added); "Again, this *appears* to be hyperbolic speech, exaggeration, and an opinion construed by the defendant based on being trespassed by the plaintiff" (Opinion 13) (emphasis added); and that "it is my opinion that the rabbi's statements are largely a matter of perspective and interpretation and opinion, and as such would generally not be *deemed* [by a reader] to be false statements of fact." (Opinion 7) (emphasis added).

Indeed, this type of qualitative analysis was employed by the expert in the *Carroll v. Trump*, Case 1:22-cv-10016-LAK, Southern District of New York, which is a case Plaintiff cites to in its response to Defendant's Daubert Motion.  *See* ECF No. 179 at 5.  In *Carroll*, the court denied the defendant's Rule 59 motion directed at the testimony of plaintiff's expert on ORM, Prof. Ashlee Humphreys.  *See Carroll v. Trump*, 683 F. Supp. 3d 302, 329-33 (S.D.N.Y. 2023).  The report submitted by Prof. Humphreys ("Humphreys Report") is attached as **Exhibit 2.**  In addition to a thorough quantitative analysis, Humphreys conducts a robust qualitative analysis regarding the alleged defamatory statements at issue in that case.  *See* Humphreys Report at 36-45.

Humphreys first notes the importance of qualitative analysis (in addition to a quantitative analysis) in rendering an opinion in ORM:  "In the qualitative assessment, I assess the nature of the

7

Statement and its more generalized harm and ongoing harm to a brand whose value derives from a general (rather than niche) public. I also take into account the nature of the associations and their likely harm to the person brand of a professional woman and assess the long-term nature of this harm. These are dynamics that occur on the sociocultural level and therefore require a more qualitative assessment." Humphreys Report at 37.  In forming her opinion, Humphreys relied upon, among other things, media coverage, book reviews, and the substance of social media comments. *See* Humphreys Report at 36-45.

Applying this qualitative methodology, Humphreys opined that the statements at issue in that case "denigrates Ms. Carroll's personal brand", "reengages the receptive public with the claims [i.e., the alleged defamatory statements]; "strengthens the attitudes of those who have heard the similar claims previously"; and "creates new associations for those who have not yet heard it". Humphreys Report at 45.  Overall, Humphreys opines that the alleged defamatory statements were "critically destructive" to Ms. Carroll's attempts to rebuild her reputation.  Humphreys Report at *Id*. Accordingly, these are opinions as to how the statements were likely to be perceived by readers and the resulting impact to the plaintiff's reputation.

Similarly, Opinions 1, 2, 6-8, 10, 11, 13-17 in the Smith Report are also qualitative opinions as to how Defendant's statements are likely to be perceived by readers and the resulting impact to the Hotel's online reputation.  As described above, Mr. Smith follows the same type of qualitative analysis as Prof. Humphreys.  It is also important to note that, in its Motion, Plaintiff has never challenged Mr. Smith's methodology in arriving at these opinions, but only the wording of the opinions, arguing that they constitute legal conclusions.

In support of its Motion, Plaintiff cites primarily to *Noshirvan v. Couture*, 2026 WL 759222 (M.D. Fla. Mar. 18, 2026), a *Daubert* ruling on a case in which Mr. Smith served as an expert.  *See generally Noshirvan.*  However, *Noshirvan* is distinguishable from the present case.  In *Noshirvan*,

the court only struck several of Mr. Smith's opinions on the sole basis that they constituted legal conclusions. *Id.* at 8-10. These legal conclusions included Mr. Smith's opinions that 1) "all of these statements could very readily be assumed to be libelous per se"; 2) "[t]he evidence strongly shows that the Defendants are responsible for the negative and damaging campaign brought against Noshirvan [the plaintiff]"; 3) "it is incontrovertible that Defendants are responsible for creating the content and that it was indeed negative as well as damaging"; and 4) "[p]unitive damages are also recommended because of the intentional and severity of the damaging reputation attack campaign conducted against Noshirvan." *Id.* It is clear that these statements are legal conclusions because they opine that the defendants' conduct either constituted defamation or that defendants were liable for defamation.

Again, in the present case, Defendant is not seeking to offer these types of opinions at trial. Rather, as discussed above, Opinions 1, 2, 6-8, 10, 11, 13-17 are issues of ultimate fact, and not legal conclusions because they opine as to whether Defendant's statements are likely to be perceived by readers and the resulting impact to the Hotel's online reputation. As such, they are distinguishable from the legal conclusions stricken in *Noshirvan*.

## CONCLUSION

Based upon the foregoing, Defendant respectfully requests that this Honorable Court enter an order denying Plaintiff's *Daubert* Motion To Strike Portions Of Chris Silver Smith's Expert Report And Preclude Testimony At Trial Relating To Same as to **Opinions 1, 2, 6-8, 10, 11, 13-17.**

Respectfully submitted this 11th day of May, 2026.

/s/ John Y. Benford
John Y. Benford, Esquire Florida
Bar No. 51950
john.benford@wilsonelser.com
alyssa.heitman@wilsonelser.com
Jacqueline M. Bertelsen, Esquire

9

335604131v.1

Florida Bar No. 123747
jacqueline.bertelsen@wilsonelser.com
daniela.ezeta@wilsonelser.com
Wilson Elser Moskowitz Edelman & Dicker LLP
111 N. Orange Avenue, Suite 1200
Orlando, FL 32801 Telephone:
407-203-7599 Counsel for
Defendant, Jacob Shmuel
Botach

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026, the foregoing document was filed using the CM/ECF system for the United States District Court, Southern District of Florida, which will send electronic notice of the foregoing to all counsel of record.

*/s/ John Y. Benford*
John Y. Benford, Esquire

10

335604131v.1