IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL,
LLC d/b/a FONTAINEBLEAU MIAMI
BEACH, *a foreign limited liability
company*,

      Plaintiff,

v.

JACOB SHMUEL BOTACH a/k/a
"SHMULEY BOTEACH," *an individual*,
and John Does 1-10,

      Defendants.

_____/

CASE NO. 1:25-cv-20251-KMM

## PLAINTIFF FONTAINEBLEAU FLORIDA HOTEL, LLC'S MOTION FOR SANCTIONS AGAINST SHMULEY BOTEACH

**BURSTYN LAW PLLC**

Sean A. Burstyn, Esq.
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S700
Miami, FL 33131
Tel: (305) 204-9808

*Counsel for Plaintiff
Fontainebleau Florida Hotel, LLC
d/b/a Fontainebleau Miami Beach*

Plaintiff, Fontainebleau Florida Hotel, LLC d/b/a Fontainebleau Miami Beach ("Plaintiff" or "Hotel"), pursuant to Fed. R. Civ. P. 16 and this Court's inherent authority, moves for entry of an Order entering sanctions against Defendant Jacob Shmuel Botach a/k/a "Shmuley Boteach" ("Defendant" or "Botach").

## **INTRODUCTION**

In the time since Botach was ordered by this Court, in clear and certain terms, to "cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation," Botach has done nothing more than thumb his nose at the Court's authority with a series of more violative posts. (ECF No. 125 (the "Order").)

His misconduct crescendoed on May 24, 2026, in a clear and certain violation of that Order, when Defendant reengaged in precisely the harassing conduct and social media references to Plaintiff and its counsel that he was ordered to stop. He thinks this Court is powerless to stop him, as his attorneys apparently are--when his contemptuous conduct was brought to his counsel's attention, Botach immediately doubled down by publishing even more posts mocking the restrictions in the Order.

To the extent one wondered why Botach has continued to engage in this outrageous conduct ceaselessly for over a year, his deposition testimony removed all doubt. Botach admitted that the social media posts are intended to get the undersigned to "re-examine [his] actions" in this pending litigation and to influence Plaintiff's "strategy" and get Plaintiff to stop "paying" its undersigned counsel. (ECF No. 155-33 at 398:15-22.) In other words, Botach is making up links to the "Epstein files" and a victim's suicide not because they are true, but because he hopes his lies will break up the attorney-client relationship that sits adverse to him and take his conduct out of the Court's hands.

As an example of his recent violations, Botach returned to his attacks on the Hotel's

2

counsel. As set forth below, these are precisely the nature of attacks that precipitated the Order:



*See* Ex. 1. While this post is sufficient to issue sanctions, a sanctions order would also be supported by the several other violative posts identified below.

The Court has already cycled through escalating warnings and sanctions. First, Botach was expressly warned Botach that his misconduct could result in sanctions if his behavior continued. (ECF No. 121.) When that did not work, this Court ordered Botach to cease his harassing and toxic communication with Plaintiff and its counsel. (ECF No. 125.) And after Defendant deliberately violated the Protective Order by publishing the Hotel's confidential information online, this Court found that "Defendant's conduct was knowing and disregarded a clear Court Order," and

3

sanctioned Botach by ordering him to pay Plaintiff's attorney fees. (ECF No. 130.)

On February 20, 2026, the Court stated that it "is deeply disturbed by Defendant's conduct" including with regard to his "continued social media attacks aimed at Plaintiff and its counsel" and directed Botach to "cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation." (ECF No. 125 at 2.)

On May 24, 2026, Botach nevertheless published multiple posts on social media, violating the Court's Order and improperly seeking to influence the outcome of this trial by stirring the court of public opinion. For example, he wrote on X, "The trial between Rabbi Shmuley and the hotel is scheduled to begin on June 29. Rabbi Shmuley maintains that he has endured nearly two years of legal and public harassment by Burstyn and the hotel in an effort to financially and personally destroy him after speaking out about the alleged antisemitic attack."

And on May 28, 2026 – shortly after counsel for the parties met and conferred and Plaintiff's counsel warned that a motion for sanctions was forthcoming because Botach had continued his improper online references to "**the Fontainebleau**" – Defendant Botach published additional posts on Instagram, calling for the public to "support" Defendant against "'**that Hotel**' in Miami" in trial beginning on "June 29th."

Plaintiff does not bring this Motion lightly. Plaintiff refrained from burdening the Court with multiple past violations. But Botach's intensification and desire to use the court of public opinion to influence the upcoming trial makes clear he will not stop, calls to his counsel to bring him in line only result in escalation, and further judicial relief is required.

This Court has previously found that Botach has violated its Orders and sanctioned Defendant. This Court previously took the "opportunity to admonish Defendant in the clearest terms. The Protective Order is an Order of this Court. It is not optional . . . Defendant cannot simply disregard the Protective Order and take matters into his own hands. The Court further warns

4

Defendant that any future violation of the Protective Order will be treated with the utmost seriousness." (ECF No. 130.) As a sanction, Botach was ordered, personally, to pay Plaintiff.

This begs the question: Why are monetary sanctions not sufficient to get Botach to take Court Orders seriously? The answer, we learned, is that Botach has gotten out of paying the sanction awards. His insurance carrier, Chubb, paid the monetary sanctions with a check that used the questionable memorandum description stating it was for an "Investigator." (Ex. 2.)

Botach's collaboration with his carrier to get out of paying for his misconduct presents the paradigmatic "moral hazard problem (an insufficient incentive to be careful) . . . ." *Peoples Tel. Co., Inc. v. Hartford Fire Ins. Co.*, 36 F. Supp. 2d 1335, 1341 (S.D. Fla. 1997). Monetary sanctions accomplish nothing because Botach has immunized himself from their sting.

Regardless of who pays, the record is clear that Botach has repeatedly defied this Court's express authority, notwithstanding express warnings and awarding sanctions.

Accordingly, Plaintiff seeks an order striking Botach's affirmative defenses (ECF No. 69), entering default judgment against Botach on the Hotel's claims (ECF No. 12), dismissing Botach's Counterclaim (ECF No. 40) with prejudice, and ordering Botach to appear and show cause as to why he should not be held in civil and/or criminal contempt if the Court does not choose to impose such a sanction at this time.

### BACKGROUND

**A. The Court's Prior Warnings and Award of Sanctions to Plaintiff.**

As set forth in the record, this Court has previously admonished Botach on multiple occasions, even awarding Plaintiff monetary sanctions against Botach.

On February 10, 2026, the Court entered an order, providing, "**The Court is deeply disturbed by this trend, and cautions Defendant that sanctions, potentially including the striking of Defendant's pleadings, will be issued if this trend continues.**" (ECF No. 121.)

5

(Emphasis added.) The Court issued this admonition after reviewing evidence that while Botach was skipping out on deposition dates due to an alleged inability to travel based on a "back issue," Botach was engaged in "activities like ice skating, kayaking, and bicycling on social media." *Id*. Botach later attempted to excuse this conduct by swearing in an affidavit under penalty of perjury that his religious obligations involve him kayaking and ice skating.

On February 20, 2026, the Court stated that it was "deeply disturbed by Defendant's conduct, both in terms of its continued social media attacks aimed at Plaintiff and its counsel, as well as Defendant's attempt to effect service at an address he knew to belong to Mr. Soffer's child." (ECF No. 125.) After noting the "toxic communications between the Parties, especially Defendant's online communications," the Court "**DIRECTS Defendant to cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation**." *Id*. (Emphasis added.)

On February 25, 2026, the Court denied Botach's motion for reconsideration of the Order, cautioning Defendant that sanctions, potentially including the striking of Defendant's pleadings, will be issued if this trend continues. (ECF No. 128.)

On February 27, 2026, Magistrate Judge Elfenbein granted Plaintiff's Motion for Sanctions, stating that a " party subject to a court order cannot unilaterally decide the order does not apply to him and act accordingly," and further finding, *inter alia*, that "Defendant's conduct was knowing and disregarded a clear Court Order[.]" (ECF No. 130 at 13.)

Before concluding, the Court took "this opportunity to admonish Defendant in the clearest terms. The Protective Order is an Order of this Court. It is not optional. It is not subject to Defendant's personal assessment of whether its terms are fair, whether the underlying designation is appropriate, or whether the footage is already available in some other form. If Defendant believes a designation is improper, the Protective Order provides a mechanism to challenge it. That

6

mechanism must be used. Defendant cannot simply disregard the Protective Order and take matters into his own hands. **The Court further warns Defendant that any future violation of the Protective Order will be treated with the utmost seriousness.** Should Defendant again publicly disseminate materials designated under the Protective Order without first obtaining relief from this Court in the form of a de-designation, the Court will entertain whether any or all of the following sanctions authorized by Rule 37(b)(2)(A) are appropriate under the circumstances[.]" *Id*. at 15 (listing sanctions available under Rule 37(b)(2)(A)) (emphasis added.)

In addition, this Court warned Defendant that more severe sanctions, such as precluding Defendant's evidence, would become available to address the harm caused and deter future violations upon showing "a more developed record establishing that lesser relief would be insufficient." (ECF No. 130 at 14.)

On March 30, 2026, the Court entered an Order granting Plaintiff an award of attorney's fees, ordering Botach (*not his carrier*) to pay the Hotel. (ECF No. 164.)

**B.   Botach has willfully violated the February 20 Order at least eight times.**

Plaintiff has exercised restraint, and refrained from seeking this Court's attention, despite Botach's history of willfully violating the Court's February 20, 2026 Order at least eight times.

During the parties' meet and confer on May 28, 2026, Botach's counsel chastised Plaintiff's counsel for not bringing these prior violations to the Court earlier and proceeded to blame Plaintiff's counsel for Defendant's violations of the Court's Order.

**i.        First Violation**

On February 26, 2026, *only six days after he was ordered on February 20th to cease harassing  conduct and social media references to Plaintiff and its counsel*, Defendant published a video on social media where he showed his knowledge of the Court Order by abstaining from

mentioning Plaintiff by name, but regardless, making it abundantly clear that he was talking about Plaintiff and its (Jewish) counsel:

> .... **You all know that I'm involved in a very big legal battle where a world-renowned establishment, after I was threatened with murder, blamed me for being the Jew with the yarmulke and the beard, who provoked the attack, for just being a Jew, loitering. That's disgusting**, and -- but it's been the mentality of many Jewish people throughout the centuries. As for me, I will always choose Mordechai . . . **I ain't bending down to no one. I'm not going to be broken by no one.**
>
> **I think the people who are currently trying to break me legally after I was prepared to just get an apology from them and a commitment to train the security to protect the Jewish guests, I think they're learning that I do not bow and I do not break, not this Jew**, because I'm a Mordechai Jew. You too should be a Mordechai Jew.
> . . .
> **There will always be self-hating Jews. There will always be sellout Jews. There will always be Jews who betray their people. Believe me, I'm encountering so many of them right now who are working for these people who seek to destroy me as a Jewish victim of an antisemitic hate crime. And they'll do it. These people will do it for money.  They'll do it any way they can. But you can't be one of them.**

*See* Ex. 3; *see also,* video linked, beginning at the 1:00 mark. We note that Botach's many hundreds of posts attacking the Hotel and its counsel remain online. Thus there is no question about which "establishment" or purportedly "self-hating" "sellout Jews" are trying to "break [him] legally".

### ii.      Second Violation

On March 10, 2026, Botach posted a video on social media the day after he sat for his deposition, with the Hotel in the background. (Ex. 4; *see also*, video linked.) A woman in the video expressed her view that a visibly Jewish person would not be safe in London, but "it's completely different here," and Botach sought to correct her by pointing to "a place behind you," turning and pointing directly at the Hotel, "that hotel—I'm not going to get into it—that would prove otherwise

. . . [Antisemitism] is here. It's here," he said while continuing to identify the Hotel. *Id.* Botach then again turned and pointed at the Hotel and said, "I know it's here because of what happened to me there [at the Hotel] and what's happened to me now [this lawsuit] because of what happened here." *Id.*

### iii. Third Violation

On March 11, 2026, Botach posted another video of him with the Hotel in the background, where he said, "I'm here in Miami Beach, where I had business with the Fontainebleau Hotel yesterday. It's right behind us. You guys all know the story of the Fontainebleau. I'm not going to get into it. Sad story . . . I had a tough day yesterday. Legal issues. I'm not going to get into them. But I'm a Jew that's never going to cower or bend to antisemites or those that seek to protect antisemites." (Ex. 5; *see also*, video linked.)

### iv. Fourth Violation

On March 16, 2026, Botach posted on social media, including a link to an article on his substack, titled, "Fontainebleau 'Water Park' will Destroy Miami Beach. Ron Desantis Can Still Stop It." (Composite Ex. 6.)

### v. Fifth Violation

On March 24, 2026, Botach posted another video on social media discussing a Broadway play about a wrongful conviction, and stated, "Can you imagine that I'm in court, the victim of an antisemitic hate crime. [Being] sued by people of overwhelming and endless financial power . . . Is the American judicial system fair? We hope so. But is it really if you're a billionaire? If you're someone like me who's up against a billionaire? Is it fair?" (Ex. 7; *see also*, video linked.)

Previously, on December 3, 2025, Defendant posted on social media that Plaintiff's principal, "this billionaire" "has thrown endless—***that's what billionaires do***, that's why there's such a backlash in America-- billionaires, they buy our politicians, ***they buy our courts***, they can

9

afford the most expensive and best lawyers on Earth . . . ." (Ex. 8; *see also*, video linked.) Rather than take accountability for his own misconduct, Botach attacks the judiciary itself.

### vi.   Sixth Violation

On March 28, 2026, Botach posted another video on social media where a provocateur approached Botach on the street in New York City to yell and curse at him, leading Botach to respond, "This is what happened to me at the Fontainebleau Hotel, I won't put up with it." (Ex. 9; *see also,* video linked.)

### vii.   Seventh Violation

On May 24, 2026, Botach posted about the Hotel, its counsel, and this case:

On the night of Shavuot in Jerusalem, Rabbi Shmuley and members of his family were allegedly confronted and harassed by Eli Lipskar, son of Rabbi Chaim Lipskar of Chabad's iconic Rok Shul in Downtown Miami. During the confrontation, Lipskar allegedly threatened Rabbi Shmuley by **invoking attorney Sean Burstyn** — a close associate of the Lipskar family and a prominent congregant of Rabbi Lipskar's synagogue — stating in front of multiple witnesses that Burstyn "is going to f—ck you up." **Burstyn is the attorney representing the Miami Beach hotel that sued Rabbi Shmuley** after Rabbi Shmuley publicly alleged that he had been threatened with murder by radical Islamist Faiz Akbar in an incident that drew international attention and generated a video viewed by millions worldwide. **Rabbi Shmuley has long maintained that the litigation was designed to intimidate and silence him** after he spoke publicly about what he describes as a vicious antisemitic attack.

According to Rabbi Shmuley's family, the confrontation unfolded in the Old City of Jerusalem on one of the holiest nights of the Jewish calendar, shortly after it became publicly known that he was lecturing in Jerusalem over the holiday. **It remains unknown whether anyone connected to the ongoing litigation had prior knowledge of, encouraged, or otherwise played any role in the confrontation**.

Rabbi Shmuley further alleges that after the initial incident, Lipskar continued following and harassing his family for approximately thirty minutes in what appeared to be an effort to prevent public exposure of the confrontation. Rabbi Shmuley also alleges that Lipskar initially identified himself by the false name "Nachum" before later being identified by acquaintances present at the scene, many of whom were reportedly deeply disturbed by the incident and the alleged threats. **The trial between Rabbi Shmuley and the hotel is scheduled to begin on June 29. Rabbi Shmuley maintains that he has endured nearly two years of legal**

**and public harassment by Burstyn and the hotel** in an effort to financially and personally destroy him after speaking out about the alleged antisemitic attack.

(Ex. 10 (emphases added).)

### viii.    Eighth Violation

And again on May 24, 2026, Defendant attempted to link Plaintiff and its counsel to the Jeffrey Epstein scandal, asserting the false and outrageous "question" about whether Plaintiff and its counsel had a role in the suicide of Epstein-victim Virginia Giuffre:



*See* Ex. 1.

### C.  Monetary sanctions are inadequate because Botach is not paying for them.

As set forth in this Court's Order, "the Court **AWARDS** Plaintiff $15,000.00 under Federal

Rule of Civil Procedure 16(f). *See* Fed. R. Civ. P. 16(f). Defendant **SHALL** pay Plaintiffs $15,000.00 **no later than April 26, 2026**." (ECF No. 164.)

On March 31, 2026, Chubb Insurance sent the $15,000 payment to Plaintiff's counsel. (Ex. 2). Moreover, Chubb Insurance noted in the "DESCRIPTION" section that the payment was for an "Investigator." *Id*.

**D. Botach's willful violation of the Court's February 20 Order *after* counsel for the parties met and conferred.**

Plaintiff's counsel emailed Defendant's counsel on May 21, 2026 and May 26, 2026, providing Defendant's counsel with copies of Defendant's foregoing social posts and raising the issue of Defendant's violation of the February 20, 2026 Order.

Rather than desist from this violative misconduct, Botach doubled down, publishing the following stories on Instagram on May 28, 2026, **shortly after his counsel met and conferred on this issue**:



*See* Composite Ex. 11.

12

Earlier that day, Defendant's counsel chastised Plaintiff's counsel for expressing concern that Defendant was attempting to influence the court of public opinion ahead of the June 29, 2026 trial date.

**LEGAL STANDARD**

Pursuant to Fed. R. Civ. P. 16(f), the Court "may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii) if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 37(b)(2)(A)(ii)-(vii) in turn provides various forms of permissible sanctions:

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Rule 16(f)(2) also generally requires the imposition of attorney's fees.

Further, the Court has "the inherent authority to control the proceedings before [it], which includes the authority to impose 'reasonable and appropriate' sanctions." *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002). "[C]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306, 1320 (11th Cir. 2002). "A court may exercise this power 'to sanction the willful disobedience of a court order . . . .'" *Purchasing Power, LLC v.*

13

*Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). Invocation of a court's inherent authority requires a finding of subjective bad faith. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). "A court does not need direct evidence of subjective bad faith." *City of Jacksonville v. Shoppes of Lakeside, Inc.*, 2025 WL 2988771 at *3 (M.D. Fla. 2025). "[T]his standard can be met if [a party's] conduct is so egregious that it could only be committed in bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224–25 (11th Cir. 2017). If "the conduct sanctionable under the Rules [i]s intertwined within conduct that only the inherent power could address," a court can sanction the entire course of conduct under its inherent authority. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51 (1991).

A "party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Georgia Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007).

"Unlike criminal contempt proceedings, a party petitioning for civil contempt does not have to establish that the respondent intended to violate, or willfully violated, the order." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 2004 WL 7340355 at *4 (S.D. Fla. 2004). "[T]he focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990). "Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply." *Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992).

14

"The duty of the magistrate judge [in this context] is simply to investigate whether further contempt proceedings are warranted, not to issue a contempt order." *Lapinski v. St. Croix Condo. Ass'n, Inc.*, 2018 WL 4381168 at *2 (M.D. Fla. 2018). "The determination of whether a litigant's actions warrant the issuance of contempt sanctions is ultimately left to the discretion of the district court." *Id.*

With regard to criminal contempt, the "three elements of criminal contempt are (1) a lawful and reasonably specific order that (2) the defendant has violated (3) willfully." *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1242 (11th Cir. 2007). "[C]ontempt is a 'wilful disregard or disobedience of a public authority'. The requisite intent may of course be inferred if [the] conduct discloses a reckless disregard" for authority. *Sykes v. United States*, 444 F.2d 928, 930 (D.C. Cir. 1971). "A federal court may punish contemptuous conduct that occurs outside its presence only after giving notice of 'the essential facts constituting the charged criminal contempt,' 'request[ing] that the contempt be prosecuted by an attorney for the government,' and affording other procedural protections." *Romero,* 480 F.3d at 1242.

## ARGUMENT

The Court's February 20, 2026 Order was clear. Botach's violation of it is, too. This Court has cautioned Botach that it would impose sanctions for his misconduct. This Court has imposed monetary sanctions to address and deter Botach's misconduct. This Court has warned Botach that more severe sanctions would follow if Plaintiff established a record showing that lesser relief would be insufficient.

As demonstrated by the foregoing factual record, and as further demonstrated below, another monetary sanction will neither address nor deter Botach's contumacious and willful disregard for this Court's authority, this process, and basic decency.

15

**A.      The February 20, 2026 Order was valid and lawful, clear, and unambiguous, and Botach had the ability to comply with the Order.**

At a minimum, a finding of civil contempt is proper because clear and convincing evidence establishes that "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Georgia Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007).

First, the record is clear that the February 20, 2026 Order was valid and lawful. Defendant did not seek reconsideration or interlocutory review of the February 20, 2026 Order. During the parties' May 28, 2026 meet and confer, Defendant's counsel did not suggest that the February 20, 2026 Order was invalid or unlawful. Botach's statements also objectively fail to serve any legitimate purpose, and are subjectively illegitimate as he admitted his intention to disrupt this litigation. *See Noshirvan v. Couture*, 2025 WL 2322740, at *12 (M.D. Fla. Aug. 12, 2025) ("Noshirvan's communications are sanctionable under the Court's inherent powers because they served no purpose other than to improperly influence the litigation by disrupting the court proceedings and harassing and intimidating opposing counsel.").

Second, the February 20, 2026 Order was clear and unambiguous. In plain terms, it "DIRECTS Defendant to cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation." (ECF No. 125.) This litigation is still pending. Nevertheless, Defendant is harassing Plaintiff and its counsel with social media references, which include accusing Plaintiff and its counsel of being in the Epstein files, contributing to the suicide of an Epstein victim, and being "scumbags."

Third, Defendant has had the ability to comply with the Order. He has the ability to refrain from harassing and referencing Plaintiff and its counsel on social media by simply not mentioning them. Defendant testified that he controls his own social media. (ECF No. 155-33 at 376:16-22,

377:2-5, 60:16-61:7, 93:3-94:10.)

**B.    Botach's violations were intentional.**

"Unlike criminal contempt proceedings, a party petitioning for civil contempt does not have to establish that the respondent intended to violate, or willfully violated, the order." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 2004 WL 7340355 at *4 (S.D. Fla. 2004).

Nevertheless, the record is clear that Defendant intentionally violated the February 20, 2026 Order. Defendant's knowledge of the Order is readily apparent from the evolving nature of his posts about Plaintiff and its counsel, where he progressively referred to Plaintiff and its counsel in tangential, but unmistakable references, followed by limited references to Plaintiff and its counsel, followed by accusing Plaintiff and its counsel of being in the Epstein files, contributing to a suicide, and calling them "scumbags."

Beginning on February 26, 2026, Botach referred to a "well-renowned establishment" instead of mentioning Plaintiff by name, and the "people who are trying to break me" instead of mentioning Plaintiff's counsel by name. Of course, his hundreds or thousands of other posts about Plaintiff and its counsel remain online, leaving no question about which "establishment" or "people" he was referring to.

Likewise on March 10, 2026, while standing outside the Hotel and filming it in the background, Botach posted a video recording in which he referred to "a place behind you," turning and pointing at the Hotel, and stating, "that hotel—I'm not going to get into it . . . ."

On March 11, 2026, when he posted, "You guys all know the story of the Fontainebleau. I'm not going to get into it[,]" and on March 24, when he posted, "[c]an you imagine that I'm in court, the victim of an antisemitic hate crime. [Being] sued by people of overwhelming and endless financial power . . . Is the American judicial system fair? We hope so. But is it really if you're a billionaire? If you're someone like me who's up against a billionaire? Is it fair?"

17

And on May 28, 2026, Defendant Botach went back to posting about "'that Hotel' in Miami" in display of his knowledge of this Court's Order.

Moreover, counsel for Defendant met and conferred with Plaintiff's counsel on May 28, 2026, **after Defendant's counsel had conferred with Defendant about the violative posts in relation to the February 20, 2026 Order**. Consequently, as of May 28, 2026, Defendant had conferred with his counsel about his misconduct, but nevertheless, attacked Plaintiff on social media.

Botach's reaction to the Order is to mock the Court's authority. Over time, he has pushed the envelope further. His wink-wink, nod-nod tactics (*e.g.*, "that Hotel") reveal his consciousness of guilt. He knew he was not permitted to harass and reference Plaintiff and its counsel on social media. He knew to try to walk the line, meaning that he knew what the Order required.

And when he faced no consequences, his oblique references became indirect references. And when he faced no consequences for his indirect references, his references became explicit.

### C.      Monetary sanctions are not sufficient to address and deter this conduct.

Having suffered no sufficient repercussions for a litany of prior violations, Defendant is emboldened to continue to violate the Court's Order for the purpose of improperly influencing the outcome of the forthcoming trial.

On multiple prior occasions, this Court has expressly warned Defendant that failing to follow its Orders would result in sanctions, including striking his pleadings. (ECF No. 121.) When the Court most recently awarded Plaintiff monetary sanctions, the Court also warned Defendant that further violations "will be treated with the utmost seriousness" and listed the full panoply of consequences under Rule 37(b)(2)(A) for future violations. (ECF No. 130 at 15.)

Nevertheless, Botach continued to treat this Court's February 20, 2026 Order as optional, just as he had with other Orders. He made false and incendiary posts about Plaintiff and its counsel,

attempting to incite rage and distrust of the judicial process within the context of discussing the upcoming trial of this matter. He is seeking to stir the court of public opinion to challenge the legitimacy of the judicial process.

With trial less than a month away, Botach continued his practice of escalating his conduct to rally the "support" of the court of public opinion. Botach testified that he uses social media "to hold [people] accountable so that they begin to re-examine their actions." (ECF No. 155-33 at 398:15-16.) Now, his specific mention of the June 29, 2026 trial date and his demand for "support" shows his intent to influence this litigation. Trial is drawing nearer and he is intensifying what he believes to be a pressure campaign to get the Hotel to accept his latest settlement offer to the Hotel.

Ultimately, monetary sanctions and warnings already handed down in this case have proven ineffective. Judge Moore's warning that  it "is deeply disturbed by this trend, and **cautions Defendant that sanctions, potentially including the striking of Defendant's pleadings, will be issued if this trend continues**" was not enough. (ECF No. 121 (emphasis added).)   Judge Elfenbein's clear instruction that "**[t]he Protective Order is an Order of this Court. It is not optional**," was not enough. (ECF No. 130 at 12 (emphasis added).) Monetary sanctions will not suffice to address this contumacious and willful disregard of the Court's authority.

D. **Non-monetary sanctions, such as a default  and a finding of contempt are the only appropriate remedy.**

The Court has been patient. The Court has been clear. As set forth above, there is an ample evidentiary record to support a finding that Defendant has engaged in a clear pattern of willful contempt and that a lesser sanction of monetary fines will not suffice. *See World Thrust Films, Inc. v. Int'l Family Entm't, Inc.*, 41 F.3d 1454, 1456 (11th Cir. 1995).

"Where lesser sanctions have been ineffective, entry of a default judgment is permissible." *Mandel v. Howard*, 2013 WL 12383545, at *2 (S.D. Fla. 2013) (entering default judgment).

"[L]esser sanctions have proven ineffective to compel [defendant's] compliance with the Orders of this Court . . . Despite ample warning of the possibility of a more severe sanction, [defendant] has again failed to comply with an order of this Court." *Little River Transp., LLC v. Oink Oink, LLC*, 2023 WL 5173756 at *4 (S.D. Fla. 2023), *R&R adopted*, 2023 WL 5035119 at *1 (S.D. Fla. 2023) (same). "[W]hen a noncompliant party demonstrates 'a flagrant disregard for the court,' [a] 'severe' sanction . . . is not an abuse of discretion." *Glanzrock v. Patriot Roofing Indus., Inc.,* 2008 WL 3833950 at *1 (M.D. Fla. 2008) (striking defendant's answer and entering default). *Glanzrock* entered such relief for straightforward issues due to failures to comply with scheduling orders. Here, Defendant's horrendous conduct intended to disrupt these proceedings warrants greater sanctions. "At this stage in the case, extreme sanctions are required. Without them, [defendant] clearly will continue to act with impunity." *Sec. & Exch. Comm'n v. Lauer*, 2006 WL 2457671 at *7 (S.D. Fla. 2006) (striking defendant's affirmative defenses and precluding defendant from testifying at trial or using his deposition at summary judgment).

The timeline is important. Botach was directed to cease his social media conduct on February 20, 2026 and sanctioned for his social media conduct on February 27, 2026. There is no way to interpret his subsequent violations of the February 20, 2026 Order as anything other than intentional and done in bad faith.

As Judge Elfenbein explained, a "party subject to a court order cannot unilaterally decide the order does not apply to him and act accordingly." (ECF No. 130 at 12.) Judge Elfenbein further instructed that the proper course is not to simply violate orders but, if necessary, "seek relief from this Court." *Id.* Botach never asked the Court to reconsider its February 20, 2026 Order and never sought leave to resume his harassing social media posts notwithstanding the Order. He just decided the Order does not matter.

That decision was intentional, and Botach has no excuse. Botach himself acknowledged in

20

his March 10 and March 11, 2026 videos that he was "not going to discuss" this case and "was not going to get into" what happened in this case. (Exs. 2, 3.) Clearly, he knew he was not to discuss the Hotel or its counsel on social media, but he chose to do it anyway. That is black-and-white bad faith.

These willful and intentional violations also amount to criminal contempt. *See Pliteq, Inc. v. Mostafa*, 2025 WL 3033929 at *4 (S.D. Fla. 2025) ("[T]he 'three elements of criminal contempt are (1) a lawful and reasonably specific order that (2) the defendant has violated (3) willfully."); *E.A. Renfroe & Co., Inc. v. Moran*, 508 F. Supp. 2d 986, 998 (N.D. Ala. 2007) (finding conduct was a sufficient basis for criminal contempt and formally referring the matter to the appropriate United States Attorney's Office).

After awarding monetary sanctions, Judge Elfenbein "decline[d] to impose it absent a more developed record establishing that lesser relief would be insufficient." (ECF No. 130 at 14).  That more developed record has arrived.

## CONCLUSION

Violations of Court Orders committed after warnings and imposition of sanctions compel the most severe sanctions. Botach's disregard for the Court has been knowing and intentional. As a result, the Hotel respectfully requests the Court impose severe sanctions, namely striking Botach's affirmative defenses (ECF No. 69), entering default judgment against Botach on the Hotel's claims (ECF No. 12), dismissing Botach's Counterclaim (ECF No. 40) with prejudice, awarding attorneys' fees, ordering him to show cause why civil and/or criminal contempt should not be found if the Court deems it suitable to impose such sanctions, along with any other relief it deems appropriate.

## CERTIFICATION OF CONFERRAL

On May 26, 2026, Plaintiff's counsel provided Defendant's counsel via email with copies of the May 24, 2026 social media posts, and notified Defendant of the dates of prior posts by Defendant that violated this Court's Order. On May 26, 2026, Defendant's counsel requested copies of those additional posts, and Plaintiff's counsel obliged Defendant's request, and Plaintiff requested a meet-and-confer where Defendant would propose a remedy with full authority.

On May 21, 2026, Plaintiff's counsel also emailed Defendant's counsel, identifying by date other posts regarding Plaintiff and its counsel, and reiterated its request to Defendant's counsel that they comply with their ongoing discovery obligations by collecting and producing Botach's responsive posts.

On May 28, 2026, counsel for the parties met and conferred via videoconference and Defendant's counsel offered to instruct Defendant to take down the violative posts. Accordingly, the parties were not able to resolve this matter.

Dated: May 29, 2026
     Miami, Florida

Respectfully submitted,

**BURSTYN LAW PLLC**

By: */s/ Sean A. Burstyn*
Sean A. Burstyn, Esq.
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S700
Miami, FL 33131
Tel: (305) 204-9808

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*
*d/b/a Fontainebleau Miami Beach*

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2026, a true and correct copy of the foregoing was electronically filed on the CM/ECF system, which will serve it via electronic mail to counsel of record.

By: /s/ *Sean A. Burstyn*
Sean A. Burstyn, Esq.