UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CV-20251-MOORE/Elfenbein

FONTAINEBLEAU FLORIDA HOTEL, LLC,

      Plaintiff,

v.

SHMULEY BOTEACH JACOB
A/K/A SHMUEL BOTACH, *et al.*,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR SANCTIONS

**THIS CAUSE** is before the Court on Plaintiff Fontainebleau Florida Hotel, LLC's ("Plaintiff") Motion for Sanctions (the "Motion for Sanctions"). *See* ECF No. [208]. The Honorable K. Michael Moore referred the Motion to the undersigned "to take all necessary and proper action as required by law[.]" ECF No. [211]. Having reviewed the Motion, Defendant Shmuley Boteach's ("Defendant") Response in Opposition, Plaintiff's Reply in Support of the Motion, Plaintiff's Supplement Declaration in Support of its Reply, Defendant's Sur-Reply in Response to Plaintiff's Reply, Defendant's Supplemental Declaration in Support of his Sur-Reply, the pertinent portions of the record, the applicable law, and being otherwise fully advised in the premises, the undersigned respectfully **RECOMMENDS** that the Motion for Sanctions, **ECF No. [208]**, be **GRANTED in part and DENIED in part**.

## I.    BACKGROUND

### a.  Procedural History

This action arises from an encounter between Defendant and then-hotel guest Faiz Akbar ("Akbar") in the lobby of Plaintiff's hotel in December 2024. *See* ECF No. [130] at 1. The Parties

sharply dispute the nature of the encounter, who initiated or escalated it, and whether Plaintiff responded appropriately to Defendant's subsequent complaints. *See id.* Plaintiff's operative First Amended Complaint alleges that Defendant published false statements concerning the incident and Plaintiff's response to it, including statements that Plaintiff discriminated against Defendant because he is Jewish, knowingly permitted an antisemitic assault to occur on its premises, removed Defendant rather than the alleged aggressor, and refused to cooperate with law enforcement. *See* ECF No. [12] at 5–13. Based on those allegations, Plaintiff asserts claims against Defendant for defamation and tortious interference with business relationships. *See id.* at 13–21.

Defendant filed a Counterclaim and Third-Party Complaint asserting claims against Plaintiff and naming Jeffrey Soffer ("Soffer") and Akbar as Third-Party Defendants. *See* ECF No. [40]. Defendant's Counterclaim alleges, among other things, that he was subjected to an antisemitic verbal attack at the hotel, that Plaintiff failed to protect him or adequately cooperate with the ensuing investigation, and that Plaintiff thereafter excluded him from its properties. *See id.* at ¶¶7–41. Defendant asserted claims under federal civil-rights statutes and a claim for tortious interference with business relationships. *See id.* at ¶¶42–78. Defendant later filed his Answer and Affirmative Defenses to the First Amended Complaint on September 30, 2025. *See* ECF No. [69]. Plaintiff moved to dismiss Defendant's Counterclaim on October 9, 2025. *See* ECF No. [80].

The merits of the Parties' competing claims are not directly before the Court in the Motion for Sanctions. *See* ECF No. [208]. Instead, the dispute concerns Defendant's conduct during the litigation, the meaning and scope of the District Court's February 20, 2026 Order ("the February 20 Order"), and whether Defendant's subsequent social-media activity violated that Order in a manner warranting sanctions under Federal Rule of Civil Procedure 16(f) or the Court's inherent authority. *See* ECF Nos. [125]; [208]; [214]; [218]; [219]; [226]; and [230].

2

The Parties' disputes regarding Defendant's public dissemination of material relating to this case began well before the Motion for Sanctions. *See* ECF Nos. [31]; [32]; and [61]. On March 11, 2025, Defendant served a subpoena on the Miami Beach Police Department seeking video footage of the underlying incident that Plaintiff previously provided to the department. *See* ECF Nos. [61] at 3; [88] at 7–8. The Miami Beach Police Department produced responsive surveillance footage to Defendant's counsel on March 26, 2025, and counsel thereafter transmitted that footage to Defendant. *See id.* On April 2, 2025, before the entry of a protective order, Defendant posted an excerpt of the surveillance footage to his public Instagram account, which had more than 90,000 followers. *See* ECF Nos. [61] at 3–4; [88] at 8, 11. On April 7, 2025, the Parties jointly moved for entry of a stipulated protective order governing discovery in this action. *See* ECF No. [31]. The Court entered the Parties' Stipulated Protective Order on April 9, 2025. *See* ECF No. [32].

The Protective Order provides that material produced by a nonparty is automatically treated as "Outside Counsel Eyes Only" for thirty days following production without the need for an affirmative designation by a party. *See* ECF No. [32] at ¶19. The Protective Order further prohibits the use of discovery material for any purpose unrelated to this litigation, including any public, commercial, business, or personal purpose. *See id.* at ¶27. The Protective Order restricts access to material designated as "Highly Confidential" or "Outside Counsel Eyes Only" to specified persons and does not permit unrestricted public dissemination of such material. *See id.* at ¶¶31, 34. It also establishes a procedure for challenging a confidentiality designation, requiring written notice, a good-faith conferral, and, if necessary, a request for judicial relief while the material continues to be treated in accordance with its existing designation. *See id.* at ¶44.

3

On April 10, 2025, one day after entry of the Protective Order, Defendant again posted the surveillance footage to his social-media accounts. *See* ECF Nos. [61] at 3; [88] at 9. On April 16, 2025, Plaintiff formally designated the materials produced by the Miami Beach Police Department as "Highly Confidential," and Plaintiff's counsel communicated that designation to Defendant's counsel. *See* ECF Nos. [61] at 3; [88] at 9. Defendant's counsel then informed Defendant of the designation, after which Defendant removed the footage. *See* ECF No. [88] at 9. Defendant contemporaneously published a social-media post acknowledging that he was "required under the rules to remove the video." *See* ECF Nos. [61] at 4–5; [61-3].

Notwithstanding his knowledge of the Protective Order and Plaintiff's confidentiality designation, Defendant again posted the surveillance footage on September 17, 2025. *See* ECF Nos. [61] at 5–6; [88] at 10–11. Plaintiff thereafter moved for sanctions based on Defendant's public dissemination of the footage. *See* ECF No. [61]. Plaintiff requested evidentiary sanctions, an award of attorney's fees and expenses, an order requiring Defendant to show cause why he should not be held in contempt, and additional protections governing future discovery. *See id.* at 7–8. Defendant opposed the motion, arguing that the footage had entered the public domain, that the confidentiality designation was improper, that Rule 16 did not authorize sanctions for violation of the Protective Order, and that his September 2025 publication was inadvertent. *See* ECF No. [88] at 8–18.

On February 26, 2026, the undersigned granted Plaintiff's motion in part and denied it in part. *See* ECF No. [130]. The undersigned concluded that the Protective Order constituted a pretrial order enforceable under Rule 16(f) and such rule provided a sanctions mechanism for Defendant's violation. *See id.* at 9–12. The undersigned further determined that Defendant violated the Protective Order by publicly disseminating the footage while it was subject to the

4

Order's confidentiality provisions. *See id.* at 12–14. The undersigned rejected Defendant's contention that he could disregard the Protective Order based on his unilateral belief that the footage was not properly designated or was otherwise publicly available, explaining that a party subject to a Court order may not unilaterally decide that the order does not apply and instead must comply with the order unless and until relief is obtained from the Court. *See id.* at 12. The undersigned found that Defendant's conduct was knowing because he had previously acknowledged the restriction on dissemination, removed the footage after being advised of its designation, and nevertheless later republished it without first seeking relief from the Protective Order. *See id.* at 13–14.

Although Plaintiff requested severe evidentiary and litigation-ending sanctions, the undersigned concluded that those sanctions were not then supported by the record because a lesser sanction had not previously been imposed for the violation. *See id.* at 14–16. The undersigned instead awarded Plaintiff its reasonable attorney's fees and costs attributable to the sanctions motion and expressly admonished Defendant that the Protective Order was not optional. *See id*. The undersigned further warned Defendant that any future violation of the Protective Order would be treated with the utmost seriousness, including case-dispositive sanctions. *See id.*

After further proceedings concerning the amount of the award, the Court ordered Defendant to pay Plaintiff $15,000.00 no later than April 26, 2026. *See* ECF No. [164]. Plaintiff represents that Defendant's insurer, Chubb Insurance Company of New Jersey, transmitted the $15,000.00 payment to Plaintiff's counsel on March 31, 2026. *See* ECF No. [208] at 11–12; ECF No. [208-3]. The check identified the payment in its description field as relating to an "Investigator." ECF No. [208-3]. In the Motion for Sanctions, Plaintiff relies on the insurer's payment of the monetary sanction to argue that another monetary award imposed directly against

5

Defendant would not adequately deter future misconduct.  *See* ECF Nos. [208] at 4–5, 11–12; [218] at 2–3, 15–18.

Separate from the Protective Order dispute, the District Court addressed Defendant's social-media activity in connection with pretrial scheduling and discovery matters.  *See* ECF Nos. [121] and [125].  On February 10, 2026, Plaintiff moved for an extension of time to take Defendant's deposition and represented that Defendant had repeatedly scheduled and cancelled depositions based on asserted physical limitations while simultaneously publishing social-media content showing him engaged in activities including ice skating, kayaking, and bicycling.  *See* ECF Nos. [118] and [121].  The District Court granted Plaintiff additional time to take Defendant's deposition and stated that it was "deeply disturbed by this trend."  ECF No. [121].  The District Court cautioned Defendant that sanctions, "potentially including the striking of Defendant's pleadings," would be imposed if the conduct continued.  *Id.*

Defendant thereafter moved to reconsider the Court's February 10, 2026 Order, although he did not oppose the extension of time that the Order granted Plaintiff.  *See* ECF No. [126] at 2, 6.  Defendant argued that Plaintiff had not adequately disclosed during the prefiling conferral that it intended to rely on Defendant's social-media activity and that Defendant had not been afforded a sufficient opportunity to explain the activities depicted in the posts.  *See id.* at 2–6.  Defendant submitted explanations addressing his physical activities, his travel, and his ability to participate in a deposition.  *See id.* at 4–5; ECF No. [126-1].  The District Court ultimately denied reconsideration.  *See* ECF No. [128].

Meanwhile, on February 10, 2026, Defendant moved to amend the Scheduling Order and continue the trial.  *See* ECF No. [119].  Defendant also moved for additional time to serve Soffer and Akbar as third-party defendants.  *See* ECF No. [120].  Plaintiff opposed those motions and

relied, in part, on Defendant's online communications concerning Plaintiff, Plaintiff's counsel, and this litigation. *See* ECF Nos. [123]. On February 20, 2026, the District Court denied Defendant's Motion to Amend the Scheduling Order and Continue Trial and denied Defendant's request for additional time to serve the third-party defendants. *See* ECF No. [125]. The District Court found that Defendant had not diligently pursued discovery concerning his Counterclaim and had not demonstrated good cause or excusable neglect warranting modification of the existing deadlines. *See id.* The District Court also found that Defendant had not demonstrated good cause for additional time to serve Soffer and Akbar and ordered Defendant to show cause why the third-party claims should not be dismissed for failure to prosecute. *See id.*

Notably, in the February 20 Order, the District Court observed that the communications between the Parties had become "toxic," particularly in light of Defendant's online communications, and agreed with Plaintiff that the time had come for the matter to proceed toward resolution. *Id.* The District Court stated that it was "deeply disturbed by Defendant's conduct," including his "continued social media attacks aimed at Plaintiff and its counsel" and his attempt to effect service at an address he knew belonged to Soffer's child. *Id.* The District Court then expressly "DIRECT[ED] Defendant to cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation." *Id.*

Electronic notice of the February 20, 2026 Order was transmitted to Defendant's counsel through the CM/ECF system on the date of its entry. *See* ECF No. [219-1] at 2–5. Plaintiff's counsel also emailed defense counsel that same day, quoting the District Court's directive that Defendant cease his harassing conduct and social media references to Plaintiff and its counsel, and requested that counsel immediately communicate the directive to Defendant. *See id*. One of Defendant's attorneys responded that Plaintiff's counsel's "directives" were "not well taken" and

stated that defense counsel would "handle [its] side." *Id.* at 2. Another of Defendant's attorneys separately confirmed to Plaintiff's counsel that defense counsel would speak with Defendant about the Order. *See* ECF No. [219-2]. Thus, regardless of the Parties' later disagreement regarding the legal effect of the word "DIRECTS," Defendant's counsel acknowledged receiving notice of the District Court's instruction concerning Defendant's social-media activity. *See* ECF Nos. [125]; [219-1]; and [219-2].

### b. The Motion for Sanctions

In the Motion for Sanctions, Plaintiff contends that Defendant continued to publish social-media content referencing Plaintiff, Plaintiff's counsel, and this litigation almost immediately after entry of the February 20 Order. *See* ECF No. [208] at 6–13. Plaintiff identifies multiple occasions between February 26 and May 28, 2026, on which Defendant allegedly violated the Order. *See id.*; ECF No. [219]. Defendant does not dispute that the posts appeared on his social-media accounts but disputes their meaning, their relationship to the Order, and, as to certain May 24 posts, whether he intentionally published them. *See* ECF No. [214] at 2–6, 12–18. The Court summarizes the content of each post below.

### i. The February 26, 2026 Post

On February 26, 2026 — just six days after the District Court entered its Order directing Defendant to cease harassing conduct and refrain from referencing Plaintiff or its counsel on social media during the pendency of this litigation — Defendant published a video discussing litigation involving what he described as a "world-renowned establishment." ECF No. [208] at 7–8. In the video, Defendant stated that he is involved in a significant legal dispute arising from an incident in which he claims he was threatened with murder and that the establishment blamed him for provoking the attack because he was visibly Jewish. *See id.* at 8. Defendant further stated that he

8

initially sought only an apology and a commitment to improve security training to better protect Jewish guests but now believes the opposing parties are attempting to "break" him through litigation. *Id.* He characterized himself as a "Mordechai Jew," invoking the biblical figure Mordechai as an example of refusing to submit, and encouraged other Jewish people to do the same. *Id.* Defendant also asserted that there are "self-hating," "sellout," and other Jews who "betray their people," alleging that some are assisting those he believes are seeking to destroy him as the victim of an antisemitic hate crime, including for financial gain. *Id.*

ii.   The March 10, 2026 Post

On March 10, 2026, the day after his deposition, Defendant posted another video on social media while standing with the Fontainebleau Hotel visible in the background. *See* ECF No. [208] at 8–9. During the video, a woman stated her view that a visibly Jewish person would not be safe in London but that "it's completely different here." *Id.* Defendant responded by directing her attention to "a place behind you," turning and pointing directly at the hotel, and stating, "that hotel — I'm not going to get into it — that would prove otherwise." *Id.* He then added, while continuing to identify the hotel, that antisemitism "is here." *Id.* Defendant subsequently turned and pointed at the hotel again, stating, "I know it's here because of what happened to me there and what's happened to me now because of what happened here." *Id.*

iii.   The March 11, 2026 Post

One day later, on March 11, 2026, Defendant posted another video on social media while standing with the Fontainebleau Hotel visible in the background. *See* ECF No. [208] at 9. In the video, Defendant stated: "I'm here in Miami Beach, where I had business with the Fontainebleau Hotel yesterday. It's right behind us. You guys all know the story of the Fontainebleau. I'm not going to get into it. Sad story." *Id.* He then added: "I had a tough day yesterday. Legal issues.

I'm not going to get into them.  But I'm a Jew that's never going to cower or bend to antisemites or those that seek to protect antisemites." *Id.*

#### iv.   The March 16, 2026 Post

On March 16, 2026, Defendant posted on social media a link to an article published on his Substack titled, "Fontainebleau 'Water Park' Will Destroy Miami Beach.  Ron DeSantis Can Still Stop It." *See* ECF Nos. [208] at 9; [208-7].  Plaintiff contends that the post directly referenced and criticized Plaintiff while the litigation remained pending.  *See id.*  Defendant responds that the post concerned an independent, publicly reported zoning controversy unrelated to the claims or defenses in this action.  *See* ECF No. [214] at 3, 14–15.  In its Reply, Plaintiff withdrew its argument that sanctions are warranted based on this social media post.  *See* ECF No. [218] at 10 n.7.

#### v.   The March 24, 2026 Post

On March 24, 2026, Defendant posted another video on social media discussing a Broadway play about a wrongful conviction.  *See* ECF Nos. [208] at 9–10; [208-8].  In the video, Defendant stated: "Could you imagine that I'm in court, the victim of an antisemitic hate crime, being sued by people of overwhelming and endless financial power." *Id.*  He then added "Is the American judicial system fair?  We hope so.  But is it really if you're a billionaire? If you're someone like me who's up against a billionaire?  Is it fair?"  Plaintiff contends that the comparison was a thinly veiled reference to Plaintiff, Soffer, and this case.[1]  *See* ECF No. [208] at 9.  Defendant

---

[1]  Plaintiff argues that this is because, on December 3, 2025, Defendant posted a video on social media in which he stated, "You all know Faiz Akbar, a radical islamist stopped me in Fontainebleau and threatened to murder me."  *See* ECF No. [208] at 9–10.  He then referred to Plaintiff's principal as "this billionaire" and stated that he has thrown endless resources to silence him — "that's what billionaires do, they buy our politicians, they buy our courts, they can afford the most expensive and best lawyers on Earth."  *Id.*  In both videos, Defendant suggested that Plaintiff's financial resources undermine the fairness of these proceedings and the judicial system more broadly.

maintains that the video addressed the Broadway production and his broader experience as a litigant rather than constituting harassment of Plaintiff or its counsel. *See* ECF No. [214] at 3, 15.

vi.    The March 28, 2026 Post

On March 28, 2026, Defendant posted another video on social media depicting an individual approaching him on a street in New York City, yelling and using profane language toward him. *See* ECF Nos. [208] at 10; [208-10]. During the encounter, Defendant stated, "This is what happened to me at the Fontainebleau Hotel. I won't put up with it." *Id.* Plaintiff contends that Defendant again invoked the underlying facts of this case and repeated his criticisms of Plaintiff's response to the underlying incident. Defendant characterizes the post as a discussion of an unrelated confrontation that merely used the hotel incident as a point of comparison. *See* ECF No. [214] at 3, 15.

vii.    The May 24, 2026 Posts

According to Plaintiff, the most substantial dispute concerns a series of posts published on May 24, 2026. *See* ECF Nos. [208] at 10–11; [214] at 3–4, 14–16. In one instance, Defendant published a social media post concerning the hotel, its counsel, and this litigation. *See* ECF Nos. [208] at 10–11; [208-11]. In the post, Defendant alleged that a member of his family was confronted and threatened in Jerusalem by an individual who invoked Plaintiff's counsel. *See id.* Defendant identified Plaintiff's counsel as the attorney representing the hotel in this action and asserted that this lawsuit was filed to "intimidate and silence him" after he publicly alleged that he had been threatened with murder in an antisemitic attack. *Id.* Defendant further stated that it "remains unknown whether anyone connected to the ongoing litigation had prior knowledge of, encouraged, or otherwise played any role in the confrontation." The post concluded by asserting that Defendant "has endured nearly two years of legal and public harassment by [Plaintiff's

11

counsel] and the hotel in an effort to financially and personally destroy him after speaking out about the alleged antisemitic attack." *Id.*

In another May 24, 2026 post, Defendant referred by name to Plaintiff, Soffer, and Plaintiff's counsel, Sean Burstyn, and questioned whether Burstyn appeared in materials associated with Jeffrey Epstein. *See* ECF Nos. [208] at 11; [208-2]. The post also referenced Burstyn's representation of another client, questioned Burstyn's role in events preceding the death of Virginia Giuffre, criticized Burstyn's representation of Plaintiff, and concluded with an assertion concerning public distrust of attorneys, stating that Plaintiff's counsel "is the reason that 84% of Americans believe that attorneys are scumbags." *See* ECF No. [208-2]. Plaintiff maintains that the post was precisely the type of personal attack against Plaintiff and its counsel that prompted the February 20 Order. *See* ECF No. [208] at 2–4, 11.[2]

viii.   The May 28, 2026 Posts

On May 26, 2026, Plaintiff's counsel discussed the foregoing posts with Defendant's counsel, provided copies of Defendant's social media posts, and advised that Defendant violated the Court's February 20 Order. *See* ECF No. [208] at 12–13, 22. The Parties met and conferred

---

[2] Defendant denies intentionally publishing the duplicative May 24 posts concerning Burstyn's prior representations and the Epstein-related allegations. *See* ECF Nos. [214] at 3–4, 15–17; [214-1] at ¶¶18–24; [214-2] at ¶¶3–13. Defendant states that the material consisted of old drafts that were not intended to be published and that the posts appeared after he replaced his mobile telephone and restored data to the new device. *See* ECF Nos. [214-1] at ¶¶18–24; [214-2] at ¶¶3–13. Defendant's assistant, Gavriel Bell ("Bell"), similarly declares that Defendant experienced technological issues after replacing his telephone and that certain old drafts or posts appeared during the restoration process. *See* ECF No. [214-2] at ¶¶3–13. Bell further states that the timing, duplication, typographical errors, and formatting of the posts without graphics were inconsistent with Defendant's ordinary posting practices. *See id.* at ¶¶7–13. Plaintiff disputes the technological-error explanation and argues that Defendant's evidence is speculative and does not establish that the May 24 publications occurred without Defendant's involvement. *See* ECF No. [218] at 2, 11–14. Plaintiff also submitted examples of other posts from Defendant's accounts that were published at unusual hours, contained typographical or grammatical errors, appeared as plain text without a graphic, or were duplicated. *See* ECF Nos. [219] at ¶7; [219-3]. Plaintiff offers those examples to rebut Defendant's contention that the characteristics of the challenged May 24 post demonstrates that it could not have been intentionally published by Defendant. *See* ECF Nos. [218] at 11–15; [219] at ¶7.

on May 28, 2026 and discussed the prospect of a motion for sanctions. *Id.* Shortly after the conferral, that same day, Defendant published two posts that stated, "June 29th Rabbi Shmuley's Trial Against 'that Hotel' in Miami Begins. He will absolutely defeat the antisemitism-deniers. We need your support. Shmuley.com." *See* ECF Nos. [208] at 12; [208-12] at 2. Plaintiff contends that the post expressly identified the hotel, the pending case, and the scheduled trial, and therefore directly contravened the February 20 Order. *See* ECF No. [208] at 15–21. Plaintiff interprets those posts as an immediate escalation following counsel's discussion of the February 20 Order and the prospect of a sanctions motion. *See* ECF No. [208] at 12–13. Defendant disputes that the posts constituted harassment or a substantive violation of the Order and argues that they did not expressly identify Plaintiff by name. *See* ECF No. [214] at 15–18.

### ix. The Parties' Arguments

Plaintiff filed the Motion for Sanctions on the following day, May 29, 2026. *See* ECF No. [208]. Plaintiff seeks sanctions under Rule 16(f) and the Court's inherent authority. *See id.* at 1–2, 13–21. Plaintiff requests that the Court strike Defendant's affirmative defenses, enter default judgment against Defendant on Plaintiff's claims, dismiss Defendant's Counterclaim with prejudice, award Plaintiff its reasonable attorney's fees, and order Defendant to show cause why he should not be held in civil or criminal contempt. *See id.* at 5, 21.

In his Response, Defendant first argues that the February 20 Order does not provide a proper basis for Rule 16 sanctions because it used the word "DIRECTS," rather than separately stating that Defendant was "ORDERED" to cease the conduct. *See* ECF No. [214] at 5, 8–10. Defendant also characterizes the social-media language in the February 20 Order as *dicta* ancillary to the scheduling and service issues that were formally presented for resolution. *See id.* at 2, 8–10. Defendant next argues that the February 20 Order was not a "scheduling or other pretrial

13

order" within the scope of Rule 16(f), and that Rule 16 does not authorize sanctions for generalized out-of-court conduct unrelated to attendance at a conference or compliance with a scheduling deadline. *See id.* at 5–6, 10–12. Defendant distinguishes the undersigned's prior sanctions ruling at ECF No. [130] on the ground that the earlier ruling concerned a stipulated discovery Protective Order rather than a restriction on social-media conduct. *See id.* at 5, 10–12. Defendant further argues that, during the May 28 conferral, he offered to remove the challenged material but Plaintiff elected to proceed with the Motion for Sanctions. *See id.* at 4, 12–13.

As to the substance of the posts, Defendant argues that several did not name Plaintiff or Plaintiff's counsel, concerned independent news events or encounters with third parties, or merely summarized Defendant's litigation position. *See id.* at 3–6, 13–18. Defendant further contends that Plaintiff's counsel has himself discussed the litigation publicly, including by posting the Complaint and participating in an interview concerning Defendant and the case. *See id.* at 4; ECF Nos. [138]; [152].

In his Declaration, Defendant denies intending to publish the duplicative May 24 posts and attributes their appearance to the replacement and restoration of his mobile telephone. *See id.* at ¶¶18–24. Bell's Declaration provides additional details regarding the telephone replacement, the restoration process, and the anomalies Bell perceived in the challenged posts. *See* ECF No. [214-2] at ¶¶3–13. Defendant also opposes any contempt finding, arguing that Plaintiff has not established a clear and unambiguous command, an intentional violation, or the other requirements for civil or criminal contempt. *See* ECF No. [214] at 6, 18–20. Defendant maintains that Plaintiff has not shown that any violation was willful and has not established that the severe sanctions requested are necessary or proportionate. *Id.* at 17–20.

CASE NO. 25-CV-20251-MOORE/Elfenbein

In its Reply, Plaintiff argues that the February 20 Order was an enforceable judicial directive and that Defendant's proposed distinction between the words "directs" and "orders" is inconsistent with the authoritative nature of a court's commands. *See* ECF No. [218] at 3–7. Plaintiff further contends that the February 20 Order was not *dicta* because Defendant's online conduct formed part of the District Court's stated basis for denying the requested continuance and directing the case toward resolution. *See id.* at 4–7. Plaintiff also argues that the February 20 Order qualifies as a pretrial order because it was entered during the pretrial phase, governed the Parties' conduct while the case remained pending, and was directed toward the orderly administration of the litigation. *See id.* at 7–9. Plaintiff maintains that Rule 16(f) is not limited to misconduct occurring inside the courtroom and that Defendant's out-of-court campaign was intended to affect in-court proceedings by pressuring Plaintiff and its counsel to alter their litigation strategy. *See id.* at 7–11.

In support of that contention, Plaintiff relies on Defendant's deposition testimony concerning his reasons for publishing statements about Plaintiff's counsel. *See* ECF Nos. [208] at 2; [218] at 7. According to the cited testimony, Defendant stated that he wanted Burstyn to reexamine his actions, wanted Plaintiff to reconsider its strategy, and questioned why Plaintiff continued to pay Burstyn. *See* ECF No. [155-33] at 398:15–22. Plaintiff interprets that testimony as an admission that Defendant's social-media activity was intended to influence Plaintiff's litigation decisions and interfere with Plaintiff's relationship with its counsel. *See* ECF Nos. [208] at 2; [218] at 3, 9–10.

Plaintiff also submitted evidence of social-media activity occurring after the filing of the Motion. *See* ECF Nos. [218] at 2–3; [219] at ¶¶7–11. Plaintiff identifies posts dated June 5, 9, 11, 12, and 18, 2026 that continued to reference Plaintiff's counsel, the litigation, or matters

15

associated with counsel.  *See* ECF Nos. [219] at ¶¶7–11; [219-4]–[219-8].  Plaintiff asserts that certain posts publicized security-related information concerning the preschool attended by counsel's children, including information about armed-intruder countermeasures.  *See* ECF Nos. [218] at 2; [218-8]; [219].  Plaintiff characterizes this post-motion conduct as retaliatory and as further evidence that Defendant had not ceased the conduct identified in the February 20 Order.  *See* ECF No. [218] at 2–3, 14–18.  Additionally, Plaintiff provides screen shots of numerous posts dated June 11 and 12, 2026, several of which state:

> The attorney suing Rabbi Shmuley over an antisemitic incident ALLEGEDLY:
>
> - Extortion
> - Intimidation
> - Witness Tampering
>
> Now reportedly referred to law enforcement and the FBI. Might be time to stop billing hours and start interviewing criminal defense lawyers. Developing . . ."

*See* ECF No. [219-4] at 2.  In another such post, Defendant similarly states: "The Attorneys Who Came after me to Silence Me Over an Antisemitic Attack May Have Allegedly Engaged in Attempted Extortion and Witness Tampering. We are turning this over to the police[.]"  *Id.*

Plaintiff's Supplemental Declaration also addresses whether Defendant removed the challenged posts.  *See* ECF No. [219] at ¶¶12–15.  Plaintiff states that, when the Motion for Sanctions was filed on May 29, 2026, the first, second, third, fourth, fifth, sixth, and eighth alleged violations of the February 20 Order remained publicly available, while the seventh had been removed.  *See id.* at ¶13.  Plaintiff further states that, as of June 24, 2026, the first six alleged violations remained publicly available, while the seventh and eighth had been removed.  *See id.* at ¶14.  As support for this contention, Plaintiff submits screenshots and metadata revealing that several posts remained online after the Motion for Sanctions was filed and through at least June 24, 2026. *See id.* at ¶¶14–15; ECF Nos. [219-9]; [219-10].

Plaintiff also argues that the continued availability of the posts undermines Defendant's claim that he would have promptly remediated the issue if Plaintiff had raised it earlier. *See* ECF No. [218] at 2–3, 9–10. Plaintiff further contends that the posts published after the Motion for Sanctions was filed undermine Defendant's contention that the earlier conduct was inadvertent, benign, or attributable solely to technological glitches. *See id.* at 2–3, 11–15. Finally, Plaintiff maintains that another monetary sanction would be inadequate because Defendant was already warned about the possibility of striking his pleadings, was already sanctioned for knowingly violating a pretrial order, and did not personally bear the financial effect of the $15,000.00 sanction. *See* ECF Nos. [121]; [130] at 14–17; [164]; [208] at 4–5, 11–12; [218] at 3, 15–18. Plaintiff therefore renews its request for dispositive sanctions or, alternatively, contempt proceedings and an award of fees. *See* ECF Nos. [208] at 21; [218] at 15–18.

On July 17, 2026, the Court granted Defendant leave to file a Sur-Reply addressing the new factual matters presented in Plaintiff's Reply and Supplemental Declaration. *See* ECF No. [225]. In the Sur-Reply, Defendant argues that the correspondence between counsel attached at ECF Nos. [218-2], [218-3], [219-1], and [219-2] has no material evidentiary or legal significance and does not alter Defendant's position that the social-media language in the February 20, 2026 Order was *dicta*. *See* ECF No. [226] at 2. Defendant also addresses Plaintiff's supplemental social-media exhibits individually. *See id.* at 2–5. As to the collection of posts offered to rebut Defendant's technological-error explanation, Defendant contends that none of Plaintiff's comparator posts contains the same combination of unusual timing, typographical errors, formatting anomalies, and duplication that characterized the May 24, 2026 posts. *See id.* at 2–3. Defendant therefore maintains that the May 24 posts were accidentally published drafts and relies

17

again on Defendant and Bell's Declarations submitted in support of that explanation.  *See id.* at 3; ECF Nos. [214-1]; [214-2]; [230].

Defendant further reargues that several of the post-Motion publications attached to Plaintiff's Reply and Supplemental Declaration do not identify Plaintiff, Plaintiff's counsel, or this litigation and therefore fall outside the language of the February 20 Order.  *See* ECF No. [226] at 3–4.  Defendant contends that the posts concerning two individuals, and a later meeting at a religious site must be considered in the context of what Defendant describes as harassment directed toward him by individuals associated with Plaintiff's counsel.  *See id.*  Defendant relies, in part, on his Supplemental Declaration dated July 21, 2026.  *See id.* at 3–4; ECF No. [230].

As to the posts involving security measures at a preschool attended by counsel's children, Defendant argues that the posts do not concern this case, Plaintiff, or Plaintiff's counsel and therefore cannot constitute violations of the February 20 Order.  *See* ECF No. [226] at 4.  Defendant also argues Plaintiff has not demonstrated that the challenged posts reached an appreciable audience, affected the prospective jury pool, or otherwise caused prejudice to the adjudicative process.  *See id.* at 2–3 & n.3.  Defendant additionally responds to Plaintiff's evidence that several challenged posts remained online after the Motion was filed by arguing that he offered to remove the posts during the pre-Motion conference and that Plaintiff declined that proposed remediation, choosing instead to file the Motion for Sanctions.  *See id.* at 4.  Defendant, therefore, contends that Plaintiff cannot rely on the posts' continued availability as evidence of defiance when Plaintiff chose not to accept Defendant's offer of immediate deletion.  *See id.*  Defendant concludes that Plaintiff has not established a violation of an enforceable order or a sufficient basis for sanctions and, therefore, requests that the Motion for Sanctions be denied.  *See* ECF No. [226]

18

at 5.  The Motion is now fully briefed and ripe for review.  *See* ECF Nos. [208]; [214]; [218]; [219]; [226]; [230].

## II.     LEGAL STANDARD

### A.  Sanctions Under Federal Rule of Civil Procedure 16(f)

Federal Rule of Civil Procedure 16 authorizes district courts to manage cases actively and to enter orders necessary to secure the "just, speedy, and inexpensive disposition" of civil actions. Fed. R. Civ. P. 16(c)(2)(P).   That authority would be ineffective without a corresponding mechanism to enforce the court's case-management directives.   Accordingly, Rule 16(f)(1) provides that, "[o]n motion or on its own," a court may issue "any just orders" if a party or its attorney: "(A) fails to appear at a scheduling or other pretrial conference; (B) is substantially unprepared to participate — or does not participate in good faith — in the conference; or (C) fails to obey a scheduling *or other pretrial order*."  Fed. R. Civ. P. 16(f)(1) (emphasis added).

Rule 16(f) is not confined to violations of dates appearing in a scheduling order.  By its express terms, the Rule applies to the violation of a "scheduling or other pretrial order," and therefore reaches judicial directives entered to regulate the conduct of the parties and preserve the orderly administration of a case before trial.  Fed. R. Civ. P. 16(f)(1)(C).  Rule 16(f) supplies a broad case-management sanctions hook extending beyond purely scheduling orders to other pretrial directives.  *See Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985).  The Rule was designed to address conduct that "unreasonably delays or otherwise interferes with the expeditious management of trial preparation."  *Id.* at 1535; *see also United States v. Samaniego*, 345 F.3d 1280, 1284 (11th Cir. 2003) (recognizing the district court's discretion to determine whether a pattern of delay or deliberate refusal to comply with court "orders or directions" warrants sanctions).  The Rule's enforcement authority therefore extends to a party's disobedience of a

pretrial directive even when the prohibited conduct occurs outside the courtroom, provided that the directive governs the litigation or the parties' conduct during its pendency. *See* Fed. R. Civ. P. 16(f)(1)(C); *Goforth*, 766 F.2d at 1535; *Samaniego*, 345 F.3d at 1284.

The word chosen to express a judicial command does not determine whether the command is enforceable. A party may not disregard an authoritative direction merely because the court "directed," rather than "ordered," the party to comply. This is precisely why the Eleventh Circuit has expressly recognized that sanctions may be warranted where a party engages in a pattern of delay or a "deliberate refusal to comply with court orders *or directions*." *Samaniego*, 345 F.3d at 1284 (emphasis added). The relevant inquiry is, therefore, substantive: whether the court communicated an authoritative, sufficiently definite instruction concerning the party's conduct — not whether the instruction employed a particular talismanic verb. *See id.*; *Giovanno v. Fabec*, 804 F.3d 1361, 1365–66 (11th Cir. 2015).

Rule 16(f) does not condition the imposition of a sanction on a finding of subjective bad faith; a violation may be sanctionable when the party failed to comply with the pretrial order and the resulting sanction is just, even absent the heightened showing necessary to invoke the court's inherent authority. *See Giovanno*, 804 F.3d at 1366 n.5 (rejecting the contention that Rule 16(f) sanctions require "a finding of bad faith"). The absence of a universal bad-faith requirement does not mean that culpability is irrelevant.

Rule 16(f)(1) incorporates the sanctions identified in Rule 37(b)(2)(A)(ii)–(vii). *See* Fed. R. Civ. P. 16(f)(1). The available sanctions therefore include: prohibiting a disobedient party from supporting or opposing designated claims or defenses; striking pleadings in whole or in part; staying further proceedings; dismissing the action or proceeding in whole or in part; rendering a default judgment against the disobedient party; and treating the failure to obey as contempt of

20

court, except where the violated order directs a physical or mental examination.  *See* Fed. R. Civ. P. 16(f)(1); Fed. R. Civ. P. 37(b)(2)(A)(ii)–(vii).  The Rule thus expressly authorizes case-dispositive sanctions in sufficiently serious circumstances.

In addition to the sanctions available under Rule 37(b)(2)(A), Rule 16(f)(2) provides that, "[i]nstead of or in addition to any other sanction," the court "must order" the party, the party's attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of the noncompliance, unless the noncompliance was substantially justified or other circumstances would make an award unjust.  Fed. R. Civ. P. 16(f)(2).  Thus, once the court determines that Rule 16(f) was violated, a compensatory expense award is ordinarily mandatory unless the noncompliant party establishes substantial justification or circumstances rendering the award unjust.  *See id.*

Whether an order was sufficiently clear is central to determining if it was violated; sanctions for disobeying a judicial directive are appropriate only when the order communicated the required or prohibited conduct in specific and understandable terms.  *See Consumer Fin. Prot. Bureau v. Brown*, 69 F.4th 1321, 1330 (11th Cir. 2023); *In re Se. Banking Corp.*, 204 F.3d 1322, 1332 (11th Cir. 2000).  A party's disagreement with an order does not excuse noncompliance. Unless and until the order is modified, stayed, vacated, or reversed, the party must obey it.  *See Maness v. Meyers*, 419 U.S. 449, 459 (1975) ("[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.") (citation omitted).  A party may preserve an objection and seek reconsideration or appellate review, but it may not adopt self-help and unilaterally decide that a judicial direction is invalid, unnecessary, or inapplicable.  *See Maness*, 419 U.S. at 458-59.  That principle is particularly important where the order was intended to regulate conduct during an

active case, because belated review cannot fully restore the court's ability to manage proceedings that were disrupted while the order remained operative.  *See id.*

## B.  The Court's Inherent Authority

Federal courts also possess inherent powers that are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962). Those powers are indispensable to the judicial function and include the authority to control the proceedings before the court, enforce compliance with lawful orders, protect the integrity of the adjudicative process, and sanction conduct that abuses that process.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991).  The court's inherent authority is both broader and narrower than rule-based sanctioning mechanisms.  *See Chambers*, 501 U.S. at 47.  It is broader because it may reach conduct not captured by a particular procedural rule, including misconduct occurring outside the filing of a pleading or motion and conduct comprising a pattern that transcends any single rule violation.  *See Chambers*, 501 U.S. at 46–51.  It is narrower because, when used to punish a party or impose attorney's fees for litigation misconduct, its exercise generally requires a finding of "bad faith."  *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017); *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).  As such, "[t]he key to unlocking a court's inherent power is a finding of bad faith."  *Purchasing Power, LLC*, 851 F.3d at 1223.

Importantly, the relevant standard is "subjective bad faith," not mere negligence or recklessness.  *Id.*  The subjective bad-faith determination must be tied to specific conduct and supported by sufficiently detailed factual findings.  *See id.* at 1224–25.  The court should identify the conduct it finds sanctionable, explain why that conduct demonstrates subjective bad faith, and distinguish the sanctioned behavior from legitimate advocacy, factual disagreement, or an

unsuccessful but good-faith position. *See id.*; *In re Mroz*, 65 F.3d at 1575–76. A finding may rest on evidence that a party willfully disobeyed a court order, attempted to abuse the judicial process, harassed an opposing party or counsel to obtain litigation advantage, or engaged in conduct calculated to interfere with the court's ability to resolve the case fairly. *See Chambers*, 501 U.S. at 45; *Purchasing Power, LLC*, 851 F.3d at 1223; *In re Mroz*, 65 F.3d at 1575–76.

At the same time, a party's self-serving denial of improper intent does not foreclose a bad-faith finding. Intent ordinarily must be inferred from "wrongdoing in the context of the case," including the party's knowledge of the order, the clarity of the instruction, the temporal proximity between the instruction and the misconduct, the repetition of the conduct, the implausibility or inconsistency of the explanations offered, the party's response when the violation was identified, and whether the conduct continued after notice or after a sanctions motion was filed. *See Purchasing Power*, 851 F.3d at 1225; *see also Chambers*, 501 U.S. at 50 (reviewing sanctions "in the circumstances of this case"). The court may also consider statements by the party revealing the purpose or anticipated effect of the challenged conduct. *See id.*

The existence of an applicable Federal Rule of Civil Procedure does not eliminate the Court's inherent authority. *See Chambers*, 501 U.S. at 50. When misconduct is adequately addressed by a rule, the court ordinarily should consider the rule-based mechanism first; nevertheless, the court may invoke its inherent authority where the rule is not "up to the task," where the misconduct extends beyond the rule's precise reach, or where the totality of the conduct constitutes a broader abuse of the judicial process. *Id.* at 50. The two sources of authority may therefore operate concurrently, provided that the Court applies the distinct prerequisites governing each. *See id.*; *Peer v. Lewis*, 606 F.3d 1306, 1314–15 (11th Cir. 2010).

Because inherent powers are potent and not cabined by a detailed statutory scheme, they must be exercised with "restraint and discretion." *Chambers*, 501 U.S. at 44.  The sanction must respond to the identified misconduct, serve a legitimate judicial purpose, and be no more severe than reasonably necessary to address the abuse and protect the proceedings.  *See id.* at 44–45 ("Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. . . . [O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion."); *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993).

### C. Striking Pleadings, Dismissal, and Default Judgment

Striking a party's pleadings, dismissing claims with prejudice, or entering default judgment are considered severe sanctions available to the trial court.  *See Malautea*, 987 F.2d at 1542.  Such sanctions terminate a party's ability to obtain an adjudication on the merits and therefore must be reserved for serious misconduct.  *See id.*  Nevertheless, the preference for resolving cases on their merits does not confer a license to disobey court orders or abuse the judicial process.  *See id.* at 1544.  A party's claimed success on the merits does not immunize that party from sanctions for misconduct that independently warrants termination of its claims or defenses.  *See id.*

As stated above, the court may strike pleadings, dismiss claims, or enter default judgment when a party fails to obey a pretrial order under Rule 16(f), through its incorporation of Rule 37(b)(2)(A).  *See* Fed. R. Civ. P. 16(f)(1); Fed. R. Civ. P. 37(b)(2)(A)(iii), (v), (vi).  The Eleventh Circuit has similarly recognized that a district court may impose a default judgment under Rule 16(f) when a party deliberately refuses to comply with the court's pretrial instructions or directions. *Giovanno*, 804 F.3d at 1365; *Samaniego*, 345 F.3d at 1284.  The trial court's inherent authority

also encompasses dismissal or default judgment when a party's bad-faith misconduct threatens the integrity of the proceeding and lesser measures would be inadequate. *See Chambers*, 501 U.S. at 44–45; *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009).

Because of their severity, case-dispositive sanctions, such as dismissal of claims or counterclaims with prejudice, ordinarily have two requirements. *See Betty K Agencies, Ltd. v. M/V Monada*, 432 F.3d 1333, 1338–39 (11th Cir. 2005). *First*, a federal court must find willful disobedience of the court's order or directive. *See id.* A repeated failure to obey after notice, particularly following an explicit warning, may support a finding of willfulness. *See Malautea*, 987 F.2d at 1542–44; *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989). *Second*, the Court must find that lesser sanctions would not suffice to ensure compliance with the court's order. *See Malautea*, 987 F.2d at 1542; *Betty K Agencies, Ltd.*, 432 F.3d at 1338. With that said, the court need not mechanically impose every lesser sanction before selecting a dispositive one. *See Malautea*, 987 F.2d at 1544; *see also AM Grand Ct. Lakes LLC v. Rockhill Ins. Co.*, No. 18-CV-23576, 2019 WL 13216298, at *2 (S.D. Fla. June 12, 2019) ("A district court is not required to first impose lesser sanctions if the lesser sanctions would be ineffective."). But the record must demonstrate, and the Court should expressly explain, why lesser alternatives would be ineffective under the circumstances. *See Betty K Agencies*, 432 F.3d at 1339; *see also Mingo v. Sugar Cane Growers Co-op. of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989) ("[D]ismissal is warranted only upon a clear record of delay or willful contempt *and* a finding that lesser sanctions would not suffice. Although we occasionally have found implicit in an order the conclusion that lesser sanctions would not suffice, we have never suggested that the district court need not make that finding . . . .").

25

In assessing whether lesser sanctions would suffice, a prior ineffective sanction is especially probative because it supplies concrete evidence that repeating the same measure is unlikely to secure compliance. *See Laude v. Odyssey Healthcare, Inc.*, No. 05-CV-1142-ORL-22-DAB, 2006 WL 1169530, at *1 (M.D. Fla. May 2, 2006) (finding that "lesser sanctions will not suffice, as admonishments and monetary sanctions have proven ineffective"). The more serious sanction selected should also bear a reasonable relationship to the misconduct. *See Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1151–52 (11th Cir. 2006). The court must consider whether the sanction addresses the manner in which the misconduct affected the litigation and whether it is proportionate to the culpability found. *See id.* Of course, where both a party's claims and defenses are implicated, the court may tailor the sanction by striking particular defenses, dismissing specified claims, entering default judgment only as to liability, or preserving a later determination of damages. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii)–(vi). Entry of default judgment as to liability does not automatically establish the amount of unliquidated damages. *See Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). Following default judgment, the "well-pleaded factual allegations of fact" relating to liability are generally deemed admitted, but allegations concerning the amount of damages ordinarily require evidentiary support or further proceedings unless the amount is liquidated or capable of mathematical calculation. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015).

### D. Criminal and Civil Contempt

Criminal and civil contempt serve different purposes and require different procedural protections. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994). "Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois,* 391 U.S. 194, 201 (1968), and "criminal penalties may not be imposed on someone who has not been afforded the protections

that the Constitution requires of such criminal proceedings," *Hicks v. Feiock,* 485 U.S. 624, 632 (1988). *See Cooke v. United States,* 267 U.S. 517, 537 (1925) (explaining that in prosecution for criminal contempt, the accused has the right to know the charges, right to assistance of counsel, right to summary process, and right to present a defense); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 444 (1911) (clarifying that in criminal contempt proceedings, the defendant is presumed innocent, cannot be compelled to testify against him or herself, and must be proven guilty beyond a reasonable doubt). For instances of "serious" criminal contempt involving imprisonment of more than six months, these protections include the right to jury trial. *Bloom,* 391 U.S. at 199, *see also Taylor v. Hayes,* 418 U.S. 488, 495 (1974). "In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Bagwell*, 512 U.S. at 827. "Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.*

"[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved." *Id.* "Thus, a contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Id.* at 827 (internal quotation marks and citation omitted). "But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Id.* at 828. "[T]he stated purposes of a contempt sanction alone cannot be determinative." *Id.* "[W]hen a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order." *Hicks,* 485 U.S. at 635. "Most contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience." *Bagwell*, 512 U.S. at 828. "[C]onclusions about

27

the civil or criminal nature of a contempt sanction are properly drawn, not from the subjective intent . . . but from an examination of the character of the relief itself." *Id.* at 828 (internal quotation marks and citation omitted).

"The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command . . . ." *Id.* "Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies." *Id.* (citing *Shillitani v. United States,* 384 U.S. 364, 370, n.6 (1966) (upholding as civil "a determinate [2-year] sentence which includes a purge clause")). "In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *Id.* (internal quotation marks and citation omitted). "By contrast, a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a 'completed act of disobedience,' such that the contemnor cannot avoid or abbreviate the confinement through later compliance." *Id.* at 828-29 (quoting *Gompers,* 221 U.S., at 443). "When a contempt involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect." *Id.* at 829. "[T]he defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense." *Gompers,* 221 U.S., at 442.

"This dichotomy between coercive and punitive imprisonment has been extended to the fine context." *Bagwell*, 512 U.S. at 829. A contempt fine accordingly is considered civil and remedial if it either "coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." *United States v. Mine Workers,* 330 U.S. 258, 303–304 (1947). "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Bagwell*, 512 U.S. at 829 (citing *Penfield Co. of Cal. v. SEC,* 330 U.S. 585, 590 (1947)). "Thus, a flat, unconditional fine totaling even as little as $50

28

announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Id.* (internal quotation marks and citation omitted).

Because contempt carries consequences and procedural requirements distinct from ordinary Rule 16 sanctions, a court should distinguish carefully between using the underlying noncompliance as evidence supporting a Rule 16 or inherent-authority sanction and formally adjudicating the party in contempt. *See* Fed. R. Civ. P. 16(f)(1); *Bagwell*, 512 U.S. at 826. The court may conclude that misconduct warrants striking pleadings, default judgment, dismissal, or fees without necessarily commencing separate contempt proceedings.

## III.   DISCUSSION

### A.  The February 20 Order Was an Enforceable Court Order Under Rule 16(f)

Defendant's principal argument throughout his Response and Sur-Reply is not that he complied with the February 20 Order, but rather that the Order was not legally enforceable in the first instance. Defendant repeatedly contends that the District Court merely *directed* him to cease certain conduct, rather than *ordered* him to do so, and therefore argues that the February 20 Order cannot serve as the basis for sanctions under Rule 16(f). *See* ECF No. [214] at 8–11; ECF No. [226] at 2. Defendant further characterizes the District Court's language as nonbinding *dicta* because the Order principally resolved motions concerning discovery and scheduling rather than a formal motion for sanctions. *See id.* The Court rejects both arguments.

As stated above, Rule16(f)(1)(C) authorizes a district court to issue "any just orders" when a party "fails to obey a scheduling *or other pretrial order*." Fed. R. Civ. P. 16(f)(1)(C) (emphasis added). By its plain text, the Rule is not confined to violations of scheduling deadlines or directives issued during formal Rule 16 conferences. Rather, it broadly encompasses "other pretrial order[s]"

entered by the Court to regulate the conduct of the litigation and the parties appearing before it. *See Goforth*, 766 F.2d at 1535 (recognizing Rule 16's purpose of ensuring the orderly and expeditious disposition of cases). Indeed, the undersigned has previously recognized in this very litigation that Rule 16(f) serves as "a broad case-management sanctions hook extending beyond purely 'scheduling orders' to other pretrial directives." *Fontainebleau Fla. Hotel, LLC v. Jacob*, No. 25-CV-20251, 2026 WL 548040, at *3 (S.D. Fla. Feb. 27, 2026). In ordering sanctions for Defendant's violation of the Stipulated Protective Order, the undersigned concluded that Rule 16(f) reaches judicial orders governing the conduct of parties throughout the pretrial phase of litigation — not merely scheduling deadlines. *Id.*

The February 20 Order plainly falls within that category. The Order was entered while this action remained in active pretrial proceedings and resolved Defendant's Motion to Continue Trial, Motion to Reopen Discovery, and Motion for Extension of Time to Serve Third-Party Defendants. *See* ECF No. [125]. In resolving those motions, the District Court addressed Defendant's ongoing conduct during the litigation, expressed concern regarding Defendant's repeated social-media activity directed toward Plaintiff and Plaintiff's counsel, and issued a prospective command governing Defendant's conduct during the remainder of the litigation. *See id.* Accordingly, regardless of the procedural vehicle through which the Order was entered, the February 20 Order constitutes an "other pretrial order" within the meaning of Rule 16(f)(1)(C).

To further support his argument that he did not violate the February 20 Order, Defendant contends that the District Court merely *directed* him to cease certain conduct, rather than *ordered* him to do so, suggesting that the Court intentionally employed softer, precatory language that Defendant remained free to disregard. *See* ECF No. [214] at 8–10; ECF No. [226] at 2. That argument has no support in either legal authority or ordinary judicial practice.

30

Starting with the basics, Black's Law Dictionary defines an "Order" as "[a] command, *direction*, or instruction." Order, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). Likewise, Black's defines a "Judicial Order" as "[a] written *direction* or command delivered by a government official, esp. a court or judge." *Id.* (emphasis added). Defendant's attempt to distinguish the two concepts is therefore inconsistent with their ordinary legal meaning.

The Eleventh Circuit likewise has repeatedly used the terms interchangeably. In *In re MDL-1824 Tri-State Water Rights Litigation*, the Eleventh Circuit explained that an enforceable order is "a clearly defined and understandable *directive* by the court to act or to refrain from a particular action." 644 F.3d 1160, 1179 (11th Cir. 2011) (quoting *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005)) (emphasis added). The circuit court further observed that the district court's order "very clearly *directs* the parties to act, imposing a set of *directives* that, if disobeyed, could subject the parties to contempt proceedings." *Id.* at 1180 (emphasis added). Far from distinguishing between judicial "orders" and judicial "directives," the Eleventh Circuit used the terms interchangeably when describing the operative commands contained within a court order. Likewise, in *Lowe v. Delta Air Lines, Inc.*, the Eleventh Circuit explained that dismissal may be warranted where a litigant fails to comply with a lawful court order while simultaneously describing those same judicial commands as the district court's "directives." 730 F. App'x 724, 727–28 (11th Cir. 2018). Again, the Eleventh Circuit drew no distinction between an enforceable order and the directives contained within that order.

District courts within this Circuit likewise treat the terms as interchangeable. In *Bush v. Ocean Bistro, Inc.*, a court in this District explained that the plaintiff failed "to comply with the Court's directive — the Order to Show Cause," using the terms "directive" and "Order" interchangeably to describe the same judicial command. No. 11-CV-61561, 2011 WL 13319109,

31

at \*2 (S.D. Fla. Dec. 5, 2011), *report and recommendation adopted*, 2011 WL 13319149 (S.D. Fla. Dec. 28, 2011).  Similarly, in *James v. United States*, another district court warned the plaintiff that disagreement with the court's "directive" did not excuse compliance and, in the very next sentence, required compliance with the court's prior "Order."  No. CV421-167, 2024 WL 990021, at \*2 (S.D. Ga. Mar. 7, 2024).  These authorities confirm what is already evident from ordinary judicial practice: the operative command contained within a court order is frequently described as the court's "directive," yet remains fully enforceable as an order.

Accordingly, the Court rejects Defendant's attempt to suggest that the language in the February 20 Order was meaningless and could be disregarded merely because it was framed as a directive as opposed to an order.  Let there be no doubt that the District Court entered a judicial order on its docket containing a mandatory directive governing Defendant's conduct during the pendency of this litigation.  The Court's decision to employ the verb "DIRECTS" rather than "ORDERS" did not diminish the mandatory nature of the command or convert an enforceable judicial order into a nonbinding suggestion.  *See Lowe*, 730 F. App'x at 727–28.  To conclude otherwise would permit litigants to disregard judicial commands based solely upon stylistic differences in drafting.  Neither Rule 16(f), the Eleventh Circuit, nor ordinary judicial practice supports such a result.

The Court likewise rejects Defendant's contention that the February 20 Order was too vague or indefinite to support sanctions.  The relevant language of the Order states:

> Finally, the Court is deeply disturbed by Defendant's conduct, both in terms of its continued social media attacks aimed at Plaintiff and its counsel, as well as Defendant's attempt to effect service at an address he knew to belong to Mr. Soffer's child.  The Court **DIRECTS** Defendant to cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation.

ECF No. [125] (emphasis added).

The plain language of the Order establishes two separate prohibitions joined by the conjunction "and." First, Defendant was directed to cease the "harassing conduct" discussed in the immediately preceding sentence — relevant here, the "continued social media attacks aimed at Plaintiff and its counsel." *Id.* Second, and independently, Defendant was directed to cease "social media references to Plaintiff and its counsel during the course of this litigation." *Id.* The grammatical structure of the sentence is significant. The Court prohibited two distinct categories of conduct: (1) harassing conduct and (2) social-media references to Plaintiff and its counsel during the litigation. The Court must give effect to every word of the Order rather than rewrite its language to include limitations that the District Court did not impose. *See In re Mouttet*, No. 13-CV-22222, 2020 WL 5993925, at *21 (S.D. Fla. Oct. 9, 2020) ("[I]t is not this Court's place to interpret the District Court's order to mean something other than what it says.").

Had the District Court intended to prohibit only harassing references, it easily could have said so. It did not. Instead, the Court broadly prohibited social-media references to Plaintiff and Plaintiff's counsel during the pendency of the litigation. *See* ECF No. [125]. The surrounding context confirms this reading. Immediately before issuing the directive, the District Court expressed that it was "deeply disturbed by Defendant's continued social media attacks aimed at Plaintiff and its counsel." *Id.* It then issued a prospective command requiring Defendant to cease both the harassing conduct and social-media references during the remainder of the litigation. Read in context, the Order sought to end Defendant's ongoing practice of using social media as a parallel forum through which to discuss Plaintiff, Plaintiff's counsel, and the pending litigation. Nothing in the language of the Order suggests that Defendant remained free to continue making

public references to Plaintiff or Plaintiff's counsel so long as he believed those references were not independently harassing. *Samaniego,* 345 F.3d at 1284.

Nor may Defendant unilaterally decide that the Court's command was overbroad, unnecessary, or legally incorrect. A party who disagrees with a judicial order must seek reconsideration, modification, or appellate review; he may not simply disregard the Court's directive while it remains in force. *See Maness*, 419 U.S. at 458. At all times relevant to the Motion for Sanctions, the February 20 Order remained valid, operative, and fully enforceable. Accordingly, the Court concludes that the February 20 Order constitutes an enforceable pretrial order under Rule 16(f), that its operative directive was mandatory rather than optional, and that it clearly prohibited Defendant from engaging in the conduct identified therein throughout the pendency of this litigation. The Court therefore turns to whether Defendant violated that Order.

**B. Defendant Repeatedly and Willfully Violated the February 20 Order Under Rule 16(f)**

Having concluded that the February 20 Order constitutes an enforceable pretrial order within the meaning of Rule 16(f), the Court next considers whether Defendant violated that Order. The Court concludes that he did, many times over.

**1. The February 26, 2026 Post**

In his February 26, 2026 video — posted just six days after the District Court entered the Order, Defendant published a video discussing litigation involving what he described as a "world-renowned establishment." *See* ECF No. [208] at 7–8. In the video, Defendant stated that he is involved in a significant legal dispute arising from an incident in which he claims he was threatened with murder and that the establishment blamed him for provoking the attack because he was visibly Jewish. *See id.* at 8. Defendant further explained that he initially sought only an apology and a commitment to improve security training to better protect Jewish guests but now

34

believes the opposing parties are attempting to "break" him through litigation. *Id.* Although Defendant referred to Plaintiff as a "world-renowned establishment" rather than using the Fontainebleau name, the post unmistakably referenced the hotel, the alleged incident, and the lawsuit arising from it. The District Court did not prohibit only references employing Plaintiff's precise corporate name; it prohibited "social media references to Plaintiff." ECF No. [125]. The February 26 publication plainly referenced Plaintiff and therefore violated the February 20 Order. *See Samaniego*, 345 F.3d at 1284.

### 2.  The March 10, 2026 Post

One day after his deposition, Defendant posted a video on social media while standing with the Fontainebleau Hotel visible in the background. *See* ECF No. [208] at 8–9. When a woman in the video stated that a visibly Jewish person would not be safe in London but that "it's completely different here," Defendant responded by directing her attention to "a place behind you," turning and pointing directly at the hotel, and stating, "that hotel — I'm not going to get into it — that would prove otherwise." *Id.* While continuing to identify the hotel, Defendant added that antisemitism "is here," and then turned and pointed at the hotel again, stating, "I know it's here because of what happened to me there and what's happened to me now because of what happened here." *Id.*

The March 10, 2026 video did not merely allude to an unidentified dispute or discuss antisemitism in the abstract. Defendant physically identified Plaintiff's hotel, referred to what had happened to him there, and linked that incident to what was happening to him "now" — an evident reference to the ongoing litigation. *See* ECF No. [208] at 8–9. The presence of broader commentary about antisemitism does not remove the post from the Order's scope. The District Court created no exception permitting references to Plaintiff when embedded within discussion of

political, religious, or social issues.  Because the March 10 video expressly and visually referred to Plaintiff during the pendency of the case, it violated the February 20 Order.  *See Samaniego*, 345 F.3d at 1284.

### 3. The March 11, 2026 Post

One day later, Defendant posted a second video on social media once again with the Fontainebleau Hotel visible in the background and stating: "I'm here in Miami Beach, where I had business with the Fontainebleau Hotel yesterday.  It's right behind us.  You guys all know the story of the Fontainebleau.  I'm not going to get into it.  Sad story." *See* ECF No. [208] at 9.  Defendant then added: "I had a tough day yesterday.  Legal issues.  I'm not going to get into them.  But I'm a Jew that's never going to cower or bend to antisemites or those that seek to protect antisemites." *Id.*

This video is particularly significant because it demonstrates Defendant's contemporaneous understanding of the District Court's directive.  Defendant began the video by stating that he was not going to discuss the case, yet immediately proceeded to discuss the incident underlying this litigation and his dispute with Plaintiff.  *See* ECF No. [208] at 9.  Defendant's disclaimer demonstrates that he understood judicial restrictions existed concerning his public commentary.  Nevertheless, he immediately proceeded to discuss the very dispute he purportedly would avoid.  Having acknowledged the Court's directive, Defendant was not free to decide unilaterally that continued discussion nevertheless complied with the Order.  *See Maness*, 419 U.S. at 458–59.  The March 11 publication therefore constitutes another violation of the February 20 Order.

### 4. The March 16, 2026 Post

Next, on March 16, 2026, Defendant posted a link to an article published on his Substack titled, "Fontainebleau 'Water Park' Will Destroy Miami Beach. Ron DeSantis Can Still Stop It." *See* ECF Nos. [208] at 9; [208-7]. Although the Court notes that, in its Reply, Plaintiff withdrew its argument that sanctions are warranted based on this social media post, the Court nonetheless concludes that this post also violated the February 20 Order. *See* ECF No. [218] at 10 n.7. Indeed, Defendant's post criticized one of Plaintiff's real estate projects, choosing to again reference Plaintiff on social media during the pendency of this litigation after the District Court expressly directed him not to do so. *See* ECF No. [208] at 9; ECF No. [208-7]. Defendant remained obligated to comply with that directive unless and until it was modified or vacated. *See Maness*, 419 U.S. at 458–59.

### 5. The March 24, 2026 Post

Eight days later, on March 24, 2026, Defendant posted another video on social media discussing a Broadway play about a wrongful conviction. *See* ECF Nos. [208] at 9–10; [208-8]. On this occasion, he stated: "Could you imagine that I'm in court, the victim of an antisemitic hate crime, being sued by people of overwhelming and endless financial power." *Id.* He then added "Is the American judicial system fair? We hope so. But is it really if you're a billionaire? If you're someone like me who's up against a billionaire? Is it fair?" *Id.* This video expressly described the central factual and procedural features of this action: Defendant's assertion that he was the victim of an antisemitic hate crime, the lawsuit brought against him, and his contention that he is litigating against persons of extraordinary financial means. *See* ECF No. [208] at 9. In context, the publication plainly referred to Plaintiff and this litigation even though Defendant omitted

Plaintiff's formal name.  Because Defendant again published content referring to Plaintiff during the course of this litigation, the March 24 publication violated the February 20 Order.

### 6.  The March 28, 2026 Post

Days later, on March 28, 2026, Defendant posted another video on social media — this time referring to Plaintiff by name.  This video depicts an individual approaching him on a street in New York City, yelling and using profane language toward him.  *See* ECF Nos. [208] at 10; [208-10].  During the encounter, Defendant stated, "This is what happened to me at the Fontainebleau Hotel.  I won't put up with it."  *Id.*  Defendant argues that the publication primarily concerned conduct by third parties, *see* ECF No. [214] at 15, but that characterization does not alter the Court's analysis.  While it may be true that Defendant's March 28, 2026 video discussed a separate confrontation, he compared it to the events occurring at Plaintiff's hotel and in doing so, Defendant voluntarily invoked Plaintiff and the underlying litigation as part of his public commentary.  *See* ECF No. [208] at 10; ECF No. [208-10].  Whether the principal focus of the video concerned another subject is immaterial.  Defendant continued making social-media references to Plaintiff despite the District Court's directive to cease doing so.  The March 28 publication therefore violated the February 20 Order.

### 7.  The May 24, 2026 Posts

The May 24, 2026 social media publications constitute perhaps the most egregious violations of the February 20 Order.  To recap, in one video, Defendant alleged that a member of his family was confronted and threatened in Jerusalem by an individual who invoked Plaintiff's counsel.  *See* ECF Nos. [208] at 10–11; [208-11].  Defendant specifically identified Plaintiff's counsel as the attorney representing the hotel in this action and asserted that this lawsuit was filed to "intimidate and silence him" after he publicly alleged that he had been threatened with murder

in an antisemitic attack. *Id.* Defendant further stated that it "remains unknown whether anyone connected to the ongoing litigation had prior knowledge of, encouraged, or otherwise played any role in the confrontation" and that he "has endured nearly two years of legal and public harassment by [Plaintiff's counsel] and the hotel in an effort to financially and personally destroy him after speaking out about the alleged antisemitic attack." *Id.* In the other May 24, 2026 post, Defendant referred to Plaintiff, Soffer, and Plaintiff's counsel, Burstyn, by name, and questioned whether Burstyn appeared in materials associated with Jeffrey Epstein. *See* ECF Nos. [208] at 11; [208-2]. The post also referenced Burstyn's representation of another client, questioned Burstyn's role in events preceding the death of Virginia Giuffre, criticized Burstyn's representation of Plaintiff, and concluded with an assertion concerning public distrust of attorneys, stating that Plaintiff's counsel "is the reason that 84% of Americans believe that attorneys are scumbags." *See* ECF No. [208-2].

These posts did not merely allude to Plaintiff — they expressly identified Plaintiff, Plaintiff's counsel, and the upcoming trial. They therefore violated both components of the District Court's directive. *See* ECF No. [125]. They constituted social-media references to Plaintiff and Plaintiff's counsel, and they also plainly continued the very social-media attacks that prompted the District Court's intervention. These publications therefore fall squarely within the conduct the District Court sought to halt and cannot reasonably be characterized as compliance with the February 20 Order. *See Brown*, 69 F.4th at 1329–30. Accordingly, the Court finds that the May 24 publications violated the February 20 Order.

**8. The May 28, 2026 Post**

The violations of the February 20 Order did not end there. On May 28, 2026, Defendant published two posts that stated: "June 29th Rabbi Shmuley's Trial Against 'that Hotel' in Miami

39

Begins.   He will absolutely defeat the antisemitism-deniers.   We need your support. Shmuley.com." *See* ECF Nos. [208] at 12; [208-12] at 2.   Defendant's May 28, 2026 posts identified the date of the upcoming trial, referred to Defendant's adversary as "that Hotel in Miami" and characterized the opposing side as "antisemitism-deniers." *Id.* The timing is also significant.   The May 28 posts appeared after counsel had specifically advised Defendant's attorneys that the prior publications violated the February 20 Order and immediately after the Parties conferred regarding a sanctions motion.   Although that chronology bears most directly on willfulness, discussed below, it also eliminates any plausible suggestion that Defendant lacked notice of Plaintiff's position or inadvertently failed to appreciate that continued social-media references were prohibited.   Rule 16(f) exists precisely to address a party's deliberate refusal to comply with pretrial orders governing the conduct of litigation. *See Samaniego*, 345 F.3d at 1284. The May 28 publications therefore violated the February 20 Order.

**9.   The June 11 and 12, 2026 Posts**

Even after the Motion for Sanctions was filed, Defendant continued to defy the February 20 Order with additional social media posts referring to Plaintiff's counsel, Burstyn.   One such post stated: "The attorney suing Rabbi Shmuley over an antisemitic incident ALLEGEDLY: - Extortion  - Intimidation - Witness Tampering Now reportedly referred to law enforcement and the FBI. Might be time to stop billing hours and start interviewing criminal defense lawyers. Developing . . ." *See* ECF No. [219-4] at 2.   And in another similar post, Defendant stated: "The Attorneys Who Came after me to Silence Me Over an Antisemitic Attack May Have Allegedly Engaged in Attempted Extortion and Witness Tampering. We are turning this over to the police[.]" *Id.*

CASE NO. 25-CV-20251-MOORE/Elfenbein

By referring to "the attorney suing [him] over an antisemitic incident," Defendant is referring to Burstyn. This is precisely the sort of social media posts that "deeply disturbed" the District Court, leading it to enter the February 20 Order and directing Defendant to stop making any references to Plaintiff's counsel. *See* ECF No. [125]. Yet, Defendant did so again and does not deny that these posts refer to Burstyn. To the contrary, in his Sur-Reply and his Supplemental Declaration, Defendant admits that these posts relate to Burstyn's purported harassment of two of Defendant's friends. *See* ECF No. [226] at 3; [230] at 1-2. The Court therefore concludes that the June 11 and 12 posts also violated the February 20 Order.

### C. Appropriate Sanctions

The Court must next determine whether the severe sanctions Plaintiff requests are just and proportionate. *See* Fed. R. Civ. P. 16(f)(1); Fed. R. Civ. P. 37(b)(2)(A); *Malautea*, 987 F.2d at 1542. Plaintiff asks the Court to strike Defendant's affirmative defenses, enter default judgment on Plaintiff's claims, dismiss Defendant's Counterclaim with prejudice, award reasonable attorney's fees, and institute civil or criminal contempt proceedings. *See* ECF No. [208] at 5, 21. Striking pleadings, dismissal, and default judgment are appropriate only when (1) misconduct is willful and (2) lesser sanctions would not suffice. *See Malautea*, 987 F.2d at 1542; *Betty K Agencies*, 432 F.3d at 1337–39. Both requirements are satisfied here.

### 1. Willful Misconduct

The totality of the record demonstrates that Defendant willfully chose to disregard a clear judicial command. It is undisputed that Defendant knew of the District Court's February 20 Order. *See* ECF No. [125]. Nevertheless, Defendant continued making prohibited social-media references over approximately three months. *See* ECF No. [208] 7–12. The violations were not confined to a single publication or a single day. Instead, Defendant repeatedly returned to social

41

media to discuss Plaintiff, Plaintiff's counsel, and the pending litigation. That pattern is inconsistent with negligence or misunderstanding. *See Malautea*, 987 F.2d at 1542–44; *Moon*, 863 F.2d at 837. Defendant argues that the May 24, 2026 post in which he attempts to link Plaintiff's counsel to the Epstein files was a mere technological glitch and was inadvertently posted. Even if the Court accepted that explanation, Defendant still intentionally published numerous other videos and posts on social media that refer to Plaintiff and Plaintiff's counsel following the entry of the February 20 Order, following the meet and confer on the Motion for Sanctions, and even during the briefing period on the Motion for Sanctions.

Further, Defendant knew the significance of an order, the requirement that he comply with an order, even if he disagreed with it, and the consequences for failing to follow an order. Not only has Defendant already been sanctioned for violating an order of this Court, but Defendant was also warned about the potential for graver consequences if he violates any other orders. *See* ECF No. [130]. Indeed, on February 27, 2026, the undersigned "admonish[ed] Defendant in the clearest terms," explaining that an Order of this Court "is not optional" and "is not subject to Defendant's personal assessment of whether its terms are fair." *Id.* at 15. Adding to those remarks, the undersigned explained, in the context of its Protective Order, that Defendant cannot simply disregard the orders of this Court and "take matters into his own hands." *Id.* To impart the gravity of the situation, the undersigned then warned Defendant "that any future violation of the Protective Order will be treated with the utmost seriousness" and that she would not hesitate to recommend any of the sanctions available under Rule 37(b)(2)(A)(i)-(vi) "if the circumstances warrant them." *Id.* Thus, when Defendant elected to continue making prohibited social-media references, he did so with the knowledge that the Court had previously found him to have violated a judicial directive and knowing that more severe consequences would follow for future violations. That history

42

further undermines any suggestion that the present violations resulted from inadvertence or misunderstanding. *See Malautea*, 987 F.2d at 1542–44 (reasoning that a repeated failure to obey after notice, particularly following an explicit warning, may support a finding of willfulness).

Defendant's conduct here since the entry of the February 20 Order was not mere negligence and was not a mere misunderstanding of the Order.[3] His conduct was a willful and blatant disregard of the February 20 Order.[4] Defendant's publications demonstrate that he consciously chose to continue engaging in conduct knowing the District Court had expressly prohibited such conduct and after warnings about the perils of violating Court orders.

## 2. Lesser Sanctions Would Not Suffice

Turning to the issue of whether lesser sanctions would suffice, the record contains multiple warnings of escalating specificity. The District Court first warned Defendant on February 10, 2026 that continued misconduct could result in striking Defendant's pleadings. *See* ECF No. [121]. Then, on February 20, 2026, the District Court directed Defendant to cease social-media attacks and references to Plaintiff and its counsel. *See* ECF No. [125]. Less than one week later,

---

[3] In his Response, Defendant argues the Motion for Sanctions should be denied because Plaintiff unduly delayed in bringing the posts to defense counsel's attention. *See* ECF No. [214] at 12. The Court must determine whether Defendant violated the February 20 Order. Regardless of whether Plaintiff brought this issue to defense counsel's attention earlier, it would not alter the violative nature of the posts. It may, however, be relevant on the issue of willfulness. Even if so, the Court finds it highly unlikely that earlier notice would have altered Defendant's course of action given that Defendant continued to violate the February 20 Order with his May 28, 2026 posts (published *after* the meet and confer on the Motion for Sanctions) and his June 11 and 12, 2026 posts (published *during* the briefing period on the Motion for Sanctions). Thus, even when Defendant was made aware of this issue and about the potential for sanctions, he remained undeterred.

[4] In his Declaration, Defendant also attempts to explain the rationale for one of his posts, stating that he was simply reporting what happened to him and why he continues to experience antisemitism worldwide. *See* ECF No. [214-1] at ¶27. Defendant further explains that he is "one of the world's most recognizable public figures, fighting antisemitism and defending Israel" and he seeks to "publicize those who engage in despicable antisemitic crimes." *See* ECF No. [214-1] at ¶¶35, 39. While the Court does not question whether Defendant is an advocate against antisemitism, Defendant's desire to further that message does not give him a license to disregard the Court's Order.

the undersigned warned Defendant that Court Orders are not optional, that Defendant could not take matters into his own hands, and that future violations would be treated with the utmost seriousness, including the potential for Rule 37(b)(2)(A) sanctions. *See* ECF No. [130] at 15–17. Those warnings did not produce compliance. Another admonition would repeat a measure the record has already shown to be ineffective with Defendant. *See Chambers*, 501 U.S. at 44–45.

Further, the Court previously imposed a sanction in the form of a $15,000.00 fee award based on Defendant's knowing violation of the Protective Order. *See* ECF Nos. [130]; [164]. The violations of the February 20 Order followed that ruling and the accompanying admonition. Thus, regardless of who ultimately funded the payment, the prior monetary sanction did not deter Defendant from again disregarding a pretrial directive. *See* ECF No. [125]. What matters is the undisputed practical result: the Court imposed a substantial monetary sanction for knowingly violating a pretrial order, and Defendant thereafter committed additional knowing violations. *See* ECF No. [208-2]–[208-12]. Thus, another award of attorney's fees as a sanction for these escalating violations would not have a deterrent effect.

The question then is whether the more drastic sanctions that Plaintiff requested (striking of pleadings and entry of default judgment) bear a reasonable and proportionate relationship to Defendant's misconduct. *See Serra Chevrolet, Inc*, 446 F.3d at 1151–52. At his deposition, Defendant admitted under oath that his social-media publications were intended to cause Plaintiff and Plaintiff's counsel to reconsider their conduct and litigation strategy. *See* ECF No. [155-33] at 398:15–22. Consistent with that testimony, Defendant's May 24 and May 28 posts publicly accused Plaintiff of attempting to destroy him through this litigation, attacked Plaintiff and Plaintiff's counsel personally notwithstanding the Court's directive prohibiting such conduct, and attempted to rally public opinion by requesting "your support" in his trial "Against 'that Hotel' in

Miami" where he will "absolutely defeat the antisemitism-deniers." *See* ECF Nos. [208-2], [208-12]. Defendant therefore used repeated violations of the Court's Order as an extrajudicial litigation tactic designed to influence whether, and under what conditions, Plaintiff continued to prosecute its claims against him. That objective directly implicates the integrity of the judicial process. *See Chambers*, 501 U.S. at 44–46; *Malautea*, 987 F.2d at 1542–44; *Eagle Hospital*, 561 F.3d at 1306–08. The pattern of Defendant's repeated, willful violations of the February 20 Order when coupled with his stated intention behind his social-media posts and his history of sanctions and admonitions demonstrate that lesser sanctions will not suffice.

Accordingly, the undersigned concludes that striking Defendant's Answer and Affirmative Defenses, dismissing his Counterclaim with prejudice, and entering default judgment as to liability on Plaintiff's well-pleaded claims constitute appropriately tailored remedies that address the institutional harm caused by Defendant's abuse of the judicial process.[5] *See* Fed. R. Civ. P. 37(b)(2)(A)(iii), (v), (vi); *Serra Chevrolet*, 446 F.3d at 1151–52. With that said, the recommendation of entry of default judgment would not, by itself, establish the amount of Plaintiff's damages. *See Anheuser Busch, Inc.*, 317 F.3d at 1266; *Surtain*, 789 F.3d at 1245. Plaintiff would remain obligated to establish any unliquidated damages through appropriate evidence and further proceedings and Defendant would be able to defend against such damages claims.

---

[5] This recommendation is not based upon any determination that Defendant's affirmative defenses or Counterclaim lack substantive merit. Rather, it is based upon Defendant's willful violation of this Court's Order, his deliberate use of those violations as a litigation tactic, and the demonstrated inadequacy of lesser sanctions to secure compliance or preserve the integrity of these proceedings. *See Chambers*, 501 U.S. at 44–46; *Malautea*, 987 F.2d at 1542–44; *Eagle Hospital*, 561 F.3d at 1306–08.

**D.  Plaintiff is Entitled to Reasonable Fees and Expenses**

Rule 16(f)(2) provides that, in addition to any other sanction, the Court must order the noncompliant party, counsel, or both to pay the reasonable expenses incurred because of the noncompliance unless the failure was substantially justified or other circumstances make an award unjust.  *See* Fed. R. Civ. P. 16(f)(2); *see also Yaffa v. Weidner*, 717 F. App'x 878, 884 (11th Cir. 2017) ("Rule 16(f), the sanctions rule at issue here, also requires that a district court assess reasonable expenses and attorney's fees arising from any noncompliance with Rule 16's requirements for pretrial conference.").  Defendant's violations were not substantially justified. His disagreement with the February 20 Order did not authorize self-help, and his technological explanation does not account for the full course of conduct.  *See* ECF Nos. [214] at 8–18; [214-1]; [214-2].  Plaintiff incurred expenses litigating the Motion for Sanctions.  Those expenses were caused by Defendant's noncompliance with the Court's Order.  *See* Fed. R. Civ. P. 16(f)(2).  As a result, the Court finds it appropriate to award Plaintiff its reasonable attorney's fees and expenses incurred as a result of litigating the Motion for Sanctions.  The amount should be determined through a separate fee submission with Plaintiff bearing the burden to establish the reasonableness of its counsel's hourly rate along with the reasonableness of the requested fees.

**E.  Separate Civil or Criminal Contempt Proceedings Are Not Necessary on the Present Record**

Plaintiff also requests that Defendant be ordered to show cause why he should not be held in civil or criminal contempt.  *See* ECF No. [208] at 16–21.  Because Defendant's conduct satisfies the predicates for sanctions under Rule 16(f), the undersigned does not find it necessary to invoke Court's inherent authority or initiate separate contempt proceedings at this time.  Should Defendant engage in additional conduct violating an operative court order or should circumstances otherwise warrant further relief, Plaintiff may seek such relief as appropriate at that time.

CASE NO. 25-CV-20251-MOORE/Elfenbein

IV.      **CONCLUSION**

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Sanctions, **ECF No. [208]**, be **GRANTED in part** and **DENIED in part** as follows:

1. The Motion for Sanctions be **GRANTED** to the extent Plaintiff seeks sanctions under Federal Rule of Civil Procedure 16(f), and **DENIED** to the extent Plaintiff requests that the Court invoke its inherent authority or initiate separate civil or criminal contempt proceedings;

2. Defendant's Answer and Affirmative Defenses, **ECF No. [69]**, be **STRICKEN**;

3. Default Judgment be **ENTERED** against Defendant as to liability on Plaintiff's First Amended Complaint, **ECF No. [12]**;

4. Defendant's Counterclaim, **ECF No. [40]**, be **DISMISSED WITH PREJUDICE**; and

5. Plaintiff be **AWARDED** its reasonable attorney's fees and expenses incurred in litigating the Motion for Sanctions in an amount to be determined by the Court upon appropriate motion.

Pursuant to Local Magistrate Rule 4(b), the Parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable K. Michael Moore, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

47

**DONE and ORDERED** in Chambers in Miami, Florida on July 29, 2026.

_____

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record