IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FONTAINEBLEAU FLORIDA HOTEL, LLC
d/b/a FONTAINEBLEAU MIAMI BEACH,

CASE NO. 1:25-cv-20251-JTK

Plaintiff,

v.

JACOB SHMUEL BOTACH a/k/a
"SHMULEY BOTEACH," and John Does 1-10,

Defendants.
_______________________________________/

**PLAINTIFF FONTAINEBLEAU FLORIDA HOTEL, LLC'S**
**SUPPLEMENTAL BRIEFING ON AI-DATA RELEVANCY**

**BURSTYN LAW PLLC**
Sean A. Burstyn, Esq.
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S700
Miami, FL 33131
Tel: (305) 204-9808

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*

## INTRODUCTION

The Court asked whether Botach's communications with AI platforms fall within the scope of "damages" discovery permitted by ECF No. 261, and specifically how those materials relate to malice and the statutory cap on punitive damages. Precedent from the United States Supreme Court and Eleventh Circuit, as well as Florida law, answers that question directly. Under Fla. Stat. § 768.73(1)(c), the cap on punitive damages lifts entirely where the fact finder determines that "the defendant had a specific intent to harm the claimant" at the time of the injury. As discussed below, legions of cases from trial courts to the Supreme Court hold that post-defamation conduct is probative of whether defamatory statements were made with intent to harm. Specific intent is therefore not background color to the damages trial or damages discovery. Discovery into Botach's intent to harm Plaintiff is damages discovery, and the AI materials are the most direct evidence of that intent. Botach did not merely publish an errant falsehood on a blog or make a heated statement in a debate. He methodically engineered his attacks—drafting, refining, and iterating for painful effect through the most potent technologies known to humankind. The prompts and chats are his mental state reduced to writing, and they are probative of damages.

That conclusion is well-established in this very case. When Botach moved to strike the Amended Complaint's allegations concerning his continued post-publication attacks on Plaintiff, its counsel, and others, the District Court denied the motion and held the "'inflammatory allegations' referenced in the Motion are probative of intentionality and malice." (ECF No. 59 at 2 (emphasis added).[1]) That ruling tracks nearly fifty years of settled law. In *Herbert v. Lando*, 441

---

[1] In the prior briefing, Plaintiff successfully argued that the First Amended Complaint's various allegations in addition to those identifying the defamatory publications, supported the FAC's allegation that "[Defendant] engaged in this conduct with specific intent to harm Plaintiff and did in fact harm Plaintiff. Thus Plaintiff will pursue through trial and appeal an award of uncapped punitive damages against Defendant Boteach." (ECF No. 28, Pl.'s Opp. to Mot. to Strike at 7-8.)

U.S. 153 (1979), the Supreme Court had occasion to review an order compelling discovery under Rule 26 in a defamation case involving punitive damages. The Court held that a defamation defendant's state of mind is a proper subject of discovery, *id.* at 170-176, and the Eleventh Circuit reaffirmed this year that "[t]he most important indicium of the reasonableness of a punitive damages award," which "is the degree of reprehensibility of the defendant's conduct." *Faulk v. Dimerco Express USA Corp.*, 172 F.4th 844, 862 (11th Cir. 2026). When evaluating punitive damages awards, the Supreme Court has "**instructed courts to determine the reprehensibility of a defendant by considering whether**," *inter alia*, "**the conduct involved repeated actions** or was an isolated incident; **and the harm was the result of intentional malice**, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (emphasis added).

In defamation cases in particular, "**[c]ourts have traditionally admitted any direct or indirect evidence relevant to the state of mind of the defendant and necessary to . . . enhance damages**." *Herbert v. Lando*, 441 U.S. 153, 165 (1979) (collecting sources). Punitive damages evidence in a defamation case encompasses far more than just a defendant's net worth, and ECF No. 261 permits discovery as to Plaintiff's "damages" without further limitation. In a case such as this one, damages discovery reaches evidence of the defendant's malice toward the plaintiff, which unquestionably exists in his AI accounts. Because the requested materials go to the very reprehensibility findings required by Supreme Court precedent and the intent finding that §

From the outset of this case, Plaintiff has tied Defendant's multi-front assault to its damages presentation.

768.73(1)(c) requires,[2] and in light of the District Court's probity determination, the requested materials are discoverable.

## ARGUMENT

### I. Botach's AI Communications are Probative of Malice and Plaintiff's Theory of Damages.

Botach's counsel conceded Plaintiff's entitlement to punitive damages at the October 8th hearing, leaving open the remaining question of amount, which is a function of the reprehensibility of Botach's conduct. In the Seventh RFP, Plaintiff asks for evidence of that reprehensibility—his written words of spite and animus for Plaintiff and anyone involved in litigating its rights or adjudicating the law.

The AI prompts, outputs, revisions, and related communications bear on Botach's specific intent to harm the Hotel, which began, at the latest, in December 2024 and has continued through the present. At the punitive damages trial, Plaintiff will inform the jury that after the Fontainebleau declined to pay Botach $1 million, he launched a two-year campaign of retaliation. The AI Communications are the blueprint of that campaign. Plaintiff will argue that the persistence and duration of the campaign, coupled with the weaponization of AI, are collectively evidence of reprehensibility. While it is a novel form of evidence, Courts addressing party-generated AI communications have treated them as ordinary discoverable material. *See U.S. v. Heppner*, 820 F. Supp. 3d 292, 296 (S.D.N.Y. 2026). It is not privileged, it is relevant to damages, and it is

[2] As discussed in connection with the testimony of Plaintiff's damages expert, *infra*, Botach's AI Communications are also probative of Plaintiff's compensatory damages. His posts amplify the harm of (*i.e.*, damages from) his defamatory statements that Plaintiff is antisemitic and corrupt. His posts also exacerbate Plaintiff's damages for tortious interference with guests. To punish Plaintiff for requesting this discovery, Botach launched a weekend salvo of retaliatory posts urging guests to reconsider whether they feel safe at the Hotel because the Seventh RFP is a sign that Plaintiff monitors its guests' internet traffic on hotel-provided WiFi and urging AI businesses to shun Plaintiff's principal. Ex. 1, postdated October 11, 2026.

proportional. *See* Fed. R. Civ. P. 26(b)(1); *see also Conservation Law Found., Inc. v. Shell Oil Co.*, 2026 WL 2664341 (D. Conn. 2026) (compelling production of AI data).

As set forth in the Introduction, *supra*, the First Amended Complaint specifically references Botach's usage of AI as context of and support for his malicious campaign against the Hotel. (ECF No. 12 at ¶¶ 2, 10(e), 112.) Second, Botach filed a Motion to Strike certain allegations in the Amended Complaint, including references to AI, allegations that Botach continued his malicious behavior "for days and weeks on end," and an allegation that Botach meant harm against the Hotel's employees and "its outside legal counsel." (ECF No. 20 at 5-7.) The Court denied that Motion and found that the contested allegations were "probative of intentionality and malice." ECF No. 59. Botach's AI Communications are probative of his reprehensibility and therefore damages.

Third, Plaintiff's *damages* expert testified that Botach's extensive online activity constitutes a total "package," whereby his continued references to the Hotel, even if themselves not legally defamatory, nonetheless amplify Plaintiff's damages by echoing or drawing attention back to his defamatory statements. ECF No. 146-13 at 102:15-104:11 ("I'm looking at brand . . . damage and image damage," his "overall activity" including "a continual number of social media posts" "really reinforc[es] the concept that the Fontainebleau is a dangerous, anti-Semitic location"); *id.* at 115:2-117:17 ("he's just continuing to reinforce the statements that he's made at the onset of his, you know, attacks of the Fontainebleau"). Thus, Botach's continued attacks are relevant to compensatory damages in addition to punitive damages.

Fourth, as has been extensively briefed, Botach admitted under oath that his online posts are intentional and strategic. *See* ECF No. 261 at 13-19*; see also* ECF No. 155-3 at 398:15-22.

The AI Data will provide an unrivaled view into the mind of a defendant whose scienter is itself the measure of Plaintiff's damages.

## II. Appellate Courts Reviewing Punitive Damages Awards and Considering Remittitur Require Evidence of Reprehensibility.

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Faulk v. Dimerco Express USA Corp.*, 172 F.4th 844, 862 (determining the appropriateness of remittitur by examining the extent to which a plaintiff was able to show malice). In *Faulk*, a decision analyzing the parties' respective evidence of damages, the Eleventh Circuit recently affirmed an order denying a motion to remit a $3 million punitive damages award, leading its analysis with "[t]he most important indicium of the reasonableness of a punitive damages award," which "is the degree of reprehensibility of the defendant's conduct." *Id.* (considering evidence of defendant's knowledge of the wrongfulness of its conduct and "repeated warnings that [defendant's] plan was illegal"). On a damages review, the Eleventh Circuit will put Plaintiff to the task of mustering its evidence that "Botach intended to harm [Plaintiff]". *Id.* at 864. The Seventh RFP seeks the best evidence of that intent. The AI chats are a window into his workshop of online harassment. This information is exactly what the Eleventh Circuit and Florida law expect a jury to evaluate when concluding that Botach's "conduct was exceedingly reprehensible and warrants a significant punitive damages award." *Id.*

Where countless cases have held that broad scienter evidence is admissible (and required for punitive damages), it follows that such evidence is discoverable. *See*, *e.g.*, *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1476 (11th Cir. 1989) ("the totality of the circumstances in this case shows that [defendant] exhibited a course of conduct motivated by ill will"); *S. Bell Tel. & Tel. Co. v. Roper*, 482 So. 2d 538, 539 (Fla. 3d DCA 1986) (holding malice can be shown "by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are

inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive"); *Wade v. Wood*, 2024 WL 4253357, at *1 (N.D. Ga. 2024) (declining to preclude evidence of defendant's breach of a collateral contract as it could be evidence of his intent, "which goes to malice [] and punitive damages," "all live issues for trial").

"[T]he circumstances and the degree of wantonness or culpability" are factors to consider in determining whether punitive damages are appropriate, along with the "nature, extent, and enormity of the wrong and all of the circumstances in relation to the tort." *Bankers Multiple Line Ins. Co. v. Farish*, 464 So. 2d 530, 533 (Fla. 1985). In determining punitive damages, a jury can consider "the intent of the party committing [the conduct] and all circumstances attending the particular incident." *Rinaldi v. Aaron*, 314 So. 2d 762, 763 (Fla. 1975).

## III. Defamation Cases Involving Punitive Damages Routinely Admit Post-Publication Evidence of Intent.

To show malice, "***any competent evidence, either direct or circumstantial, can be resorted to***, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, ***subsequent statements of the defendant***, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights . . . ." *Herbert*, 441 U.S. 153, at n.12 (emphasis added) (citation omitted). "**[T]he trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer** . . . ." Rest. (Second) of Torts § 908 (2026) (emphasis added).

If Botach made nothing more than two defamatory statements then allowed the litigation to run its normal course, one can imagine a lower punitive damages award compared to how the record actually developed. That is the upshot of the legions of federal cases, from the Supreme

Court to the Eleventh Circuit and District Courts throughout America—the same actionable defamatory statement can fairly be punished differently depending on whether its publisher acted from momentary malice or, as here, the statements were simply parts of a sophisticated multi-year technology-enabled campaign. Repeated attacks, and even evidence of repeated violations of court orders (*e.g.,* the AI Data), are probative of the appropriate punitive damages award.[3]

As noted, *supra*, Fla. Stat. § 768.73(1)(c) allows for uncapped punitive damages where a plaintiff can show the defendant had a specific intent to harm the plaintiff at the time of the injury and as noted in footnote 3 herein, it is well established that post-harm conduct is probative of defendant's state of mind at the time of injury. *Herbert* and *State Farm* require an assessment of state of mind regardless of any damages cap (*i.e.*, for the jury to set a punitive damages amount even within any cap). Moreover, Plaintiff's damages expert testified that Botach's continuing malicious posts reinforce and amplify the harm of his defamatory statements. (ECF No. 146-13 at 102:15-104:11.). In *Carroll v. Trump*, 2023 WL 4744176 (S.D.N.Y. July 25, 2023) (applying New York law), the defendant's post-December 2024 statements were "included as 'subsequent statements of the defendant,' which may be considered to establish that [defendant] made the [original defamatory] statements that always have been the subject of this action with the deliberate

[3] "Evidence of repetition . . . of offensive conduct after it initially occurred is indicative of malice or evil intent sufficient to support punitive damage." *Johns-Manville Sales Corp. v. Janssens*, 463 So. 2d 242, 256 (Fla. 1st DCA 1984). In defamation cases, "there's also no explicit bar against *post*-publication evidence . . . ." *Block v. Matesic*, 789 F. Supp. 3d 1131, 1166 (S.D. Fla. 2025). *See also Coomer v. The Am. Project, Inc.*, 2025 WL 1222527 at *3 (M.D. Fla. 2025) (rejecting the proposition "that post-publication information is never relevant in defamation cases"); *Gilmore v. Jones*, 2021 WL 68684 at *6 (W.D. Va. 2021) ("[M]aterials that post-date the publication . . . may be probative of actual malice."); *Aquavit Pharmacueticals, Inc. v. U-Bio Med, Inc.*, 2023 WL 2396511 at *15 (S.D.N.Y. 2023) (finding punitive damages appropriate when considering, *inter alia*, the defendant's repeated, contemptuous "violation[s] of the [c]ourt's injunctive orders").

intent to injure or out of hatred, ill will, or spite ('common law malice') in order for [plaintiff] to obtain punitive damages." *Id.* at *2.

"The introduction of the 'other writings,' to which [d]efendant reiterates his objections, was necessary and permissible for the purpose of attempting to prove malice on the part of the [d]efendant [and allow the jury to decide] whether [d]efendant was motivated by malice in making the statements that [p]laintiff alleged to be defamatory." *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1255 (M.D. Fla. 2007). Botach's AI Communications are akin to the "other writings" in *Clark*, which were not in themselves defamatory but nonetheless relevant to proving malice.

**IV. The Requested Discovery is Proportional to the Needs of the Case, Framed by the Pleadings, and Botach Already Agreed to Produce Communications Concerning the Hotel and this Litigation.**

To put proportionality in context, Plaintiff is seeking uncapped punitive damages against Botach—a very wealthy person and trust fund beneficiary, with homes or interests in homes all over the world. As explained in *Faulk*, the Eleventh Circuit has upheld punitive damages ratios of 9.2:1 relative to compensatory damages, depending on the degree of reprehensibility. *Faulk*, 172 F.4th at 864. (Here, that ratio would permit the Fontainebleau to obtain a damages award against Botach in excess of $20 million.) And for several reasons, he has no legitimate claim of burden. First, he has five attorneys plus professional staff representing him. Second, he is insured by Chubb not only for his fees in this case but also his sanctions liabilities, so the cost of compliance is free to him. Third, no burden objection should even be entertained. The labor of searching for and producing more discoverable content that Botach himself keeps creating is entirely self-inflicted. Moreover, the content should not have been created in the first place. (ECF No. 263, Order on Defendant's Mot. to Vacate at 7-8.) Against this backdrop, any burden of production is *de minimis,* and the AI platforms all permit user-friendly search term queries.

More still, his AI posts are framed by the pleadings. The very first substantive allegation of the First Amended Complaint accuses Botach of leading his "multi-week [now, multi-year] assault on the Fontainebleau Miami Beach, its personnel, and its representatives" with "AI videos . . . ." (ECF No. 12, FAC at ¶ 2; *see also id.* at ¶¶ 10(e), 112.) His posts are also relevant to Plaintiff's tortious-interference claim, which alleges that he "specifically urged the Hotel's guests to terminate their contractual relationships with Plaintiff." (ECF No. 12 ¶ 110).

Finally, any objection to the AI Communications is inconsistent with what Botach has already agreed to produce. At the outset of this case, Plaintiff requested, and Botach agreed to produce, his communications regarding the Hotel and this litigation. (ECF No. 65-2 (RFPs 7, 8, 11, and 13).) Indeed, Botach acknowledged (in writing) his ongoing obligation to supplement his productions even after the discovery cutoff. *See* Ex. 2.

## V. Botach Should be Ordered to Consent to the AI Subpoenas.

The scope of the subpoenas, and the probity of the information they seek, is substantively coextensive with the discussion above concerning the Seventh RFP. While the Court ordered supplemental briefing on whether the AI-related materials fall within the scope of authorized damages discovery, Plaintiff submits the following exhibits in relation to its concern that Botach may be spoliating evidence. *See* Exs. 3, 4, and 5. While Defendant's counsel has contacted Plaintiff's counsel on various topics, including through Friday, October 9, 2026, all of Plaintiff's written and telephonic requests for confirmation that Botach's AI Data has been stored have either been ignored or met with statements that counsel was unaware of preservation efforts.

As such, Plaintiff respectfully submits that Defendant should be ordered to cooperate with the subpoenas on AI service providers, including by providing his consent for the subpoenaed AI service providers to release responsive content and disclosing the account names (*i.e.*, usernames

or e-mail accounts) necessary for the service providers to identify accounts used by him or that are within his possession, custody, or control.

**VI. The AI Data is Not Privileged or Protected.**

Botach's counsel's suggestion at the October 8th hearing that the AI Communications may be subject to the attorney-client or marital privileges was unfounded, and we recognize the Court did not seek further briefing on those arguments. To the extent Botach maintains the objection, Plaintiff respectfully submits that purportedly privileged materials can be logged and submitted for *in camera* review. Finally, a non-lawyer's correspondence with a computer is not privileged, *U.S. v. Heppner*, 820 F. Supp. 3d 292, 296 (S.D.N.Y. 2026), and while a *pro se* individual may enjoy work-product protection from litigation strategy discussion with AI, *see Warner v. Gilbarco, Inc.*, 820 F. Supp. 3d 629, 633 (E.D. Mich. 2026), Botach is not *pro se* and his attack posts are both an invalid litigation strategy and unlawful (ECF No. 261).

**CONCLUSION**

Botach should be compelled to produce his AI Communications and comply with the AI service provider subpoenas (ECF No. 271-2 at Ex. B.5), and the Court should award any other relief it deems appropriate including attorneys' fees.

Dated: October 12, 2026
Miami, Florida

Respectfully submitted,

**BURSTYN LAW PLLC**

By: /s/ *Sean A. Burstyn*
Sean A. Burstyn, Esq.
Florida Bar No. 1028778
sean.burstyn@burstynlaw.com
1101 Brickell Avenue, Suite S-700
Miami, Florida 33131
Tel: (305) 204-9808

*Counsel for Plaintiff*
*Fontainebleau Florida Hotel, LLC*

**CERTIFICATE OF SERVICE**

I certify that on October 12, 2026, a true and correct copy of the foregoing was electronically filed on the CM/ECF system, which will serve it via electronic mail on all counsel of record.

By: */s/ Sean A. Burstyn*
Sean A. Burstyn, Esq.