**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

FONTAINEBLEAU FLORIDA HOTEL, LLC
d/b/a FONTAINEBLEAU MIAMI BEACH,

Plaintiff,

v. Case No. 1:25-cv-20251-JTK

JACOB SHMUEL BOTACH
a/k/a "SHMULEY BOTEACH," et al.,

Defendants.
_________________________________/

**DEFENDANT JACOB SHMUEL BOTACH'S MOTION FOR RECONSIDERATION**

Defendant Rabbi Jacob Shmuel Botach, by and through undersigned counsel, respectfully moves this Court, pursuant to Federal Rule of Civil Procedure 54(b) and the Court's inherent authority, to reconsider and vacate: (1) the Court's September 17, 2026, Order on Report and Recommendation (ECF No. 261), which struck Defendant's Answer and Affirmative Defenses, dismissed his Counterclaim with prejudice, and entered default judgment against him as to liability (the "Sanctions Order"); and (2) the Court's speech restriction first entered as a paperless order on February 20, 2026 (Dkt. No. 125) and modified on September 18, 2026 (Dkt. No. 263) (the "Gag Order"). In the alternative, Defendant requests that the Court certify the controlling First Amendment question governing the Gag Order for interlocutory appeal under 28 U.S.C. § 1292(b). In support, Defendant states as follows.

## INTRODUCTION

This motion presents a narrow and unusual ground for reconsideration that arises from the sequence of the predecessor judge's orders. On February 20, 2026, the predecessor Judge entered a paperless order directing Defendant in one sentence to "cease such harassing conduct and social media references to Plaintiff and its counsel during the course of this litigation." (Dkt. No. 125.) That order made no factual findings of any kind. It merely stated that "the Court is deeply disturbed by Defendant's conduct, both in terms of its continued social media attacks aimed at Plaintiff and its counsel, as well as Defendant's attempt to effect service at an address he knew to belong to Mr. Soffer's child."

(Dkt. No. 125.) It undertook no First Amendment analysis, identified no risk to a fair trial, and considered no alternative to silencing Defendant.

On September 17, 2026, the predecessor judge imposed the most severe sanctions available — striking Defendant's pleadings, dismissing his Counterclaim, and entering default judgment on liability — as punishment for violating the February 20, 2026, order, which was devoid of any findings, while expressly reserving the question of the order's validity for "a forthcoming order." (Dkt. No. 261 at 23.) A day later, on September 18, 2026, the predecessor judge acknowledged that he "should have made explicit factual findings on the record before barring Defendant from referencing Plaintiff and its counsel on social media," supplied those findings for the first time, and narrowed the restriction only "going forward." (Dkt. No. 263 at 2, 7.)

The predecessor Judge thus recognized that the February 20, 2026, paperless order, as entered and as it stood throughout the entire period of the conduct for which Defendant was sanctioned, lacked the factual findings that the First Amendment requires before a court may restrain a litigant's extrajudicial speech. The drastic sanctions and default entered on September 17, 2026, rest entirely on that defective order. That concession did not exist when Defendant opposed sanctions; it is an intervening development, and this motion is the first opportunity to present it. The case has since been reassigned to a successor Judge, who may examine the sequence unencumbered by any prior commitment to it. Correcting that sequence is the very basis for reconsideration: this Court should reconsider and vacate the Sanctions Order and the resulting default, and reconsider and vacate the September 18, 2026, Gag Order. Imposing the most severe sanctions the law allows for violating a speech restraint the predecessor Judge has since conceded it should not have entered without findings is a clear error of law and works a manifest injustice.

## LEGAL STANDARD

The Sanctions Order and the Gag Order are interlocutory. A default judgment as to liability, with damages still to be tried, is a non-final order. *See Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1379 (11th Cir. 2024). Federal Rule of Civil Procedure 54(b) governs reconsideration of such orders, and "district courts retain plenary power to reconsider an interlocutory order before the entry of final judgment." *Id.* "A federal court's inherent authority to correct its own errors, so long as it possesses jurisdiction over the action, is firmly rooted in the common law," and "until final judgment, a district court may reconsider any portion of its decision and reopen any part of the case." *Id.* at 1380. The Eleventh Circuit explained that while district courts "enjoy plenary *power* to reconsider non-final rulings, they need not employ plenary

*review* when doing so." *Id.* at 1380. Rather, they "should hesitate before revisiting their earlier interlocutory order" because "important interests of finality, stability, and predictability" underlie "justifiable caution." *Id.* In exercising its sound judgment as to whether to grant reconsideration, a district court should use the law-of-the-case doctrine as a guide because the doctrine operates "with more or less force depending on the stage of litigation" and encourages courts to adhere to "the general point that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Id.* That is why it is not enough for a movant seeking reconsideration to "simply rehash[ ] arguments already considered and rejected." *Id.* at 1381. Ultimately, "[c]ommon sense, not a rigid set of rules, governs." *Id.* at 1380–81.

The court further clarified that if the movant can "meet a significantly higher showing for reconsideration — for example, the standards applicable to Rules 59(e) or 60(b), or the exceptions to the mandate rule — the district court should not hesitate to revisit its prior ruling." *Id.* at 1381. "But just because a movant fails to meet these higher standards does not mean that reconsideration cannot be had — the district court may still have room to conclude that reconsideration is appropriate." *Id.* "In short, district courts have discretion to revisit their prior interlocutory orders, considering both the weight of the moving party's arguments and the disruption that a change would cause in light of the time that has passed since the decision was initially made." *Id.*

Because this action has been reassigned, the motion is also governed by the Southern District of Florida's local rule addressing an application for the same relief before a successor judge. Under Local Rule 7.1(e), where a motion "has been made to any Judge" and "refused in whole or in part," and "a subsequent motion or application is made to a different District Judge . . . for the same relief in whole or in part, upon the same or any alleged different state of facts," the movant bears a "continuing duty" to present the successor Judge an affidavit setting forth the prior application, "what ruling was made thereon," and "what new or different facts and circumstances are claimed to exist which did not exist, or were not shown, upon the prior application." That rule governs the procedure for presenting the motion to the successor Judge; it does not raise the substantive bar, which remains Rule 54(b)'s plenary standard. Rabbi Botach satisfies Local Rule 7.1(e) through the accompanying affidavit, which discloses the prior rulings and identifies the

intervening developments — including the predecessor Judge's September 18, 2026 modification of the February 20, 2026, paperless Order—that bear on reconsideration.

**SUMMARY OF THE ARGUMENT**

This case is the posterchild for reconsideration. It satisfies Rule 54(b)'s plenary standard and, independently, the far more demanding Rule 59(e) and Rule 60(b) showing as well. The motion rests on a single, extraordinary sequence that no court should allow to stand. On September 17, 2026, the predecessor Judge imposed the most severe sanctions a court can impose — striking Defendant's Answer and Affirmative Defenses, entering default judgment against him on liability, and dismissing his Counterclaim with prejudice — based entirely Defendant's violation of the one-sentence February 20, 2026, paperless Order. (Dkt. No. 261 at 21–22; Dkt. No. 125.) The very next day, September 18, 2026, the predecessor Judge granted in part Defendant's motion to vacate that same order and acknowledged that "it should have made explicit factual findings on the record before" entering the speech restriction — the very findings the First Amendment demands before a court may restrain a litigant's extrajudicial speech. (Dkt. No. 263 at 2.) He supplied those findings for the first time and "partially narrow[ed]" the bar only "going forward." (Dkt. No. 263 at 2, 7.) The case is now before a successor Judge who entered none of these orders and may weigh them with fresh eyes.

Three features of that sequence make reconsideration of the Sanctions Order compelling. First, the sanctions rest on a predicate the issuing court has disavowed. Where a court imposes severe sanctions for violating an order, "the propriety of [the sanctions] order depends in large part on the propriety of the [predicate] order," and sanctions "will very often be sustained" only "when the infirmity of the violated order is not clear and the sanctions imposed are moderate." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 & n.34 (11th Cir. 1997); *accord Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1292, 1294 (11th Cir. 2005). This case is the inverse on both axes: the infirmity is not merely clear but conceded, and the sanctions are the most severe the law permits. The duty to obey an order while it is in force — the collateral-bar principle the predecessor Judge invoked — determined only that Defendant could be sanctioned in some measure; it does not compel this Court, on reconsideration, to leave case-ending sanctions in place on a restraint the issuing court has since repudiated. Second, those sanctions are disproportionate: no sanction directed at Defendant personally, and no measure targeted at the specific posts, was ever tried or shown to be futile, and the stricken defenses and dismissed

Counterclaim were never found to lack merit. (Dkt. No. 233 at 45 n.5.) Third, the case-ending finding of willful, deliberate violation turns in part on a contested credibility determination — whether the May 24, 2026 post was published intentionally — resolved against Defendant on a paper record, without the hearing that Eleventh Circuit decisions sustaining terminating sanctions have featured.

The Court should also reconsider and vacate the September 18, 2026, revised Gag Order. Even as narrowed, the order remains an unconstitutional prior restraint. It applies the least speech-protective standard — "reasonable likelihood" of prejudice — on a question the Eleventh Circuit has never resolved, and does so inconsistently, elsewhere invoking a "substantial likelihood." (Dkt. No. 263 at 2, 4.) Three of its four stated rationales target pressure on the adversary and offense to counsel rather than the fairness of the adjudication. Furthermore, the one rationale that sounds in trial fairness — a bare "risk[]" of "tainting the jury pool" — is the kind of conclusory prediction the First Amendment forbids as a basis for a prior restraint. (Dkt. No. 263 at 7.) The order was entered without narrow tailoring and without the consideration of less restrictive alternatives — searching voir dire, cautionary instructions, continuance, or venue — that a prior restraint requires. The predecessor judge expressly "moot[ed]" those arguments rather than analyze them. (Dkt. No. 263 at 7.)

In the alternative, the controlling First Amendment question warrants certification for interlocutory appeal under 28 U.S.C. § 1292(b). Which standard governs a restraint on a civil litigant's extrajudicial speech is a pure, controlling question of law on which the predecessor Judge himself acknowledged the Eleventh Circuit "has not specifically weighed in." (Dkt. No. 263 at 3.) Because the sanctions, the default, and the ensuing damages trial flow entirely from the challenged restraint, an immediate appeal would materially advance the ultimate termination of the litigation.

This is not a rehash. The dispositive development — the predecessor Judge's day-after concession that the restraint lacked the required findings, and his narrowing of it — did not exist when Defendant opposed sanctions and could not have been raised earlier. Reconsideration is governed by Rule 54(b)'s plenary standard, under which the stricter Rule 59(e) and Rule 60(b) tests "do not apply" before final judgment. *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1379–80 (11th Cir. 2024). The motion satisfies that standard and even the heightened ones.

Leaving the most drastic sanctions the law allows in place, on a predicate the issuing court has repudiated, would be clear error and a manifest injustice.

## ARGUMENT

### I. The Sanctions Order Should Be Reconsidered and Vacated Because It Rests Entirely on a Paperless One-Sentence Gag Order the Predecessor Judge Has Conceded Was Entered Without the Findings the First Amendment Requires and the Revised Gag Order Is Prospective and Equally Deficient.

#### A. The Terminating Sanctions Rest on an Invalid Prior Restraint That Lacked Any Findings When the Sanctions Were Imposed.

The Sanctions Order rests entirely on Defendant's violations of the February 20, 2026, paperless gag order: the Court dismissed the Counterclaim, struck Defendant's pleadings, and entered default judgment "based on his repeated violations of the Subject Order." (Dkt. No. 263 at 2.) That predicate was a single-sentence directive buried into a paperless order denying continuance; it made no findings and undertook no First Amendment analysis. (Dkt. No. 125.) A judicial command restraining future speech is a prior restraint that bears "a well-established presumption against [its] constitutionality" and may stand only if narrowly drawn and the least restrictive means available. *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000); *accord The News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512–13 (11th Cir. 1991).

The February 20, 2026, paperless gag order is an unconstitutional prior restraint. A court order directing a litigant to stop speaking about his adversary is a prior restraint and even when imposed on a trial participant, such an order still exhibits "the characteristics of prior restraints" and faces "a well-established presumption against [its] constitutionality." *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000). The Eleventh Circuit subjects any such restraint to "a heavy presumption against [its] constitutionality." *The News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512 (11th Cir. 1991) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 570 (1976)); *accord In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018) (because a gag order is both a prior restraint and a content-based restriction, it "must survive strict scrutiny").

To overcome that presumption, Eleventh Circuit authority forbids entering a speech restraint on a conclusory record. In *United States v. Noriega*, the court held that "a conclusory representation that publicity might hamper a defendant's right to a fair trial is insufficient to overcome the protections of the First Amendment." 917 F.2d 1543, 1548 (11th Cir. 1990). The court must instead make "specific factual findings" that there is a substantial probability of

prejudice, that the restraint would prevent it, and that "reasonable alternatives . . . cannot adequately protect" the fair-trial right. *Id.* at 1549–50. Such a determination "cannot be conclusory, but must be stated definitively and explicitly based on the particular facts and circumstances," and the court "must delineate carefully its reasons" for the restraint. *Id.* at 1550; *see also Murphy-Brown*, 907 F.3d at 797–98 ("skimpy findings" are themselves a constitutional defect, because "without such findings, *de novo* review is difficult"). That is precisely why, when the Eleventh Circuit upheld the restrictive order in *Foxman*, it emphasized that the trial judge "conducted a full hearing before entering the restrictive order, and he concluded that there was no less restrictive means of safeguarding the defendants' Sixth Amendment rights." 939 F.2d at 1515.

Here, the predecessor Judge has already conceded that "it should have made explicit factual findings on the record before" entering the restriction. (Dkt. No. 263 at 2.) Nevertheless, the predecessor Judge still imposed the terminating sanctions based on the violation of the one-sentence directive entered without any factual findings. When a court imposes severe sanctions for a party's violation of an order, "the propriety of [the sanctions] order depends in large part on the propriety of the [predicate] order," and "an important factor is whether the entry of that order was itself an abuse of discretion." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997) (although *Chudasama* involved sanctions imposed under Rule 37(b) and here the predecessor Judge imposed the sanctions under Rule 16(f), the distinction makes no difference, because Rule 16(f)(1) incorporates the Rule 37(b)(2)(A) sanctions and the Report and Recommendation specifically recommended sanctions on exactly that basis, Dkt. No. 233 at 20, 45); *accord Cotton v. Massachusetts Mutual Life Insurance Co.*, 402 F.3d 1267, 1292 (11th Cir. 2005) (reaffirming that the propriety of Rule 37(b) sanctions "depends in large part on the propriety of the earlier" order, and that whether "the entry of that order was itself an abuse of discretion" is an important factor in reviewing severe sanctions).

The Eleventh Circuit has drawn the governing line precisely. Because "we expect litigants to obey all orders, even those they believe were improvidently entered, sanctions will very often be sustained, particularly when the infirmity of the violated order is not clear and the sanctions imposed are moderate." *Chudasama*, 123 F.3d at 1366 n.34; *accord Cotton*, 402 F.3d at 1292 (if "the infirmity of the violated order" is "clear," then "any significant sanctions ... were an abuse of discretion").

Here, the infirmity of the February 20, 2026, paperless order is not merely clear — it is conceded by the issuing court — and the sanctions are not moderate but the most severe a court can impose: striking Defendant's pleadings, dismissing his Counterclaim, and entering default judgment on liability. Under *Chudasama* and *Cotton*, sanctions of that severity resting on a predicate of that infirmity are an abuse of discretion. Because the sanction power is also limited by due process and a sanction must be "just," *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1151 (11th Cir. 2006), those sanctions cannot stand on a prior restraint the issuing court admitted it should not have entered without findings.

In adopting the sanctions, the predecessor Judge declined to consider the February 20, 2026, order's constitutionality, reasoning that the order's "validity" was "not relevant" because "parties are required to follow" a court order "until it is reversed or modified, even if they have proper grounds to object." (Dkt. No. 261 at 9 (citing *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386 (1980), and *In re Novak*, 932 F.2d 1397, 1400 (11th Cir. 1991)).) That principle — the collateral-bar rule — is sound, but it decides only one question, and not the question this motion raises.

The collateral-bar rule governs a *litigant's obligation*. It means that Defendant was not free to decide for himself that the February 20, 2026, order was invalid and ignore it; because the order was in force, his violations exposed him to *some* sanction. That is as far as the rule goes. It does not tell the Court *which* sanction is appropriate once a violation is established, and it does not say that the most severe sanction in the Court's arsenal may be imposed based on an order the issuing court has since admitted it should not have entered.

That second question — how severe a sanction a given violation will bear — is governed by a separate and fully compatible line of authority. *Chudasama* and *Cotton* hold that the propriety of a severe sanction "depends in large part on the propriety of the [predicate] order," and that such sanctions are ordinarily sustained only "when the infirmity of the violated order is not clear and the sanctions imposed are moderate." *Chudasama*, 123 F.3d at 1366 & n.34; *Cotton*, 402 F.3d at 1292. These cases do not excuse disobedience; the Eleventh Circuit announced the predicate-order inquiry while expressly assuming that "we expect litigants to obey all orders, even those they believe were improvidently entered." *Chudasama*, 123 F.3d at 1366 n.34. The two doctrines work together: a litigant must comply first and seek relief later, but a court deciding whether to end a case as a sanction must still weigh the validity of the order that was violated.

Here, that weighing cuts decisively against the sanctions imposed — the infirmity was conceded by the predecessor Judge and the sanctions are terminal.

The collateral-bar rule is also beside the point as to what the Court is now being asked to do. That rule restrains a *litigant* from engaging in self-help. It places no limit on the *Court's* own authority under Rule 54(b) to revisit and correct its interlocutory rulings before final judgment. Granting reconsideration would not reward Defendant for disobedience; it would be the Court's exercise of its own plenary power to ensure that the most drastic sanction the law allows does not rest on a prior restraint the issuing court conceded it should not have entered without findings. Leaving that sanction in place would be clear error under the stricter Rule 59(e) standard and, at a minimum, weighs decisively in favor of reconsideration under Rule 54(b).

Two further points confirm the disproportion. The predicate order barred two things — "harassing conduct" and, separately, all "social media references to Plaintiff and its counsel." (Dkt. No. 125.) The willfulness and severity analysis that produced the terminating sanction treated every "reference," however innocuous, as a sanctionable violation of the restraint the First Amendment condemns — inflating both the count of violations and the appearance of defiance on which the case-ending sanction was built. (Dkt. No. 233 at 34–41.) A sanction calibrated to an unconstitutional sweep cannot be sustained once that sweep is removed.

**B. The Terminating Sanctions Are Disproportionate and Available Lesser Sanctions Were Never Shown to Be Inadequate.**

Independent of the predicate's invalidity, striking pleadings, dismissal, and default judgment are "appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536 (11th Cir. 1993). Both the Report and Recommendation and the Order adopting it rested the terminating sanctions on a finding that lesser sanctions would not suffice. (Dkt. No. 233 at 43–45; Dkt. No. 261 at 17–19.) The record will not bear that finding. A terminating sanction is warranted only on "a clear record of delay or willful contempt *and* a finding that lesser sanctions would not suffice," and that finding "is essential." *Mingo v. Sugar Cane Growers Co-op. of Fla.*, 864 F.2d 101, 102 (11th Cir. 1989). The only lesser sanction ever imposed on Defendant was a $15,000 fee for a distinct violation — the Protective Order — and the record reflects that the fee was paid by Defendant's insurer rather than by Defendant personally. (Dkt. Nos. 130, 164; Dkt. No. 233 at 5.)

A sanction the litigant does not himself feel is no test for whether a penalty he would feel could secure compliance. No measures calibrated to the conduct at issue, e.g., a targeted order to remove specifically identified posts, a fee award keyed to Defendant personally and to proven violations, or a show-cause order directed to the extrajudicial speech, were ever attempted or shown to be futile.

The Report and Recommendation and the adopting Order also manufacture the predicate for severity by counting admonitions in unrelated orders. Both treat Defendant's history under orders addressed to other conduct — the February 10 warning concerning deposition attendance (Dkt. No. 121) and the Protective Order fee (Dkt. Nos. 130, 164) — as evidence of willfulness and of the futility of lesser measures. (Dkt. No. 233 at 42; Dkt. No. 261 at 15–17, 18.) That history proves the opposite. Each of those orders was cabined to its own subject, and each produced compliance: after the February 10 warning the deposition delays ceased, and after the Protective Order fee Defendant did not again violate that order. Compliance that follows a conduct-specific warning shows that lesser measures work on this Defendant; it does not show that only the termination, default sanctions can secure compliance with the February 20 Order.

A terminating sanction must also be "specifically related to the particular 'claim'" at issue and bear a reasonable relationship to the misconduct; the Eleventh Circuit vacated stricken defenses in *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137 (11th Cir. 2006) where the district court supplied no rationale tying the sanction to the abuse. Here, the sanction extinguishes Defendant's defenses and his counterclaim even though the R&R disclaimed any finding that they lack merit (Dkt. No. 233 at 45 n.5), and the adopting Order struck them wholesale and entered default on liability all the same (Dkt. No. 261 at 21–22). A sanction that eliminates concededly non-frivolous claims and defenses as punishment for out-of-court speech is not proportionate to the conduct it purports to address.

Nor was there any showing that the deterrent object of a monetary sanction had been exhausted. Both the Report and Recommendation and the adopting Order brushed aside the obvious intermediate measure—a monetary sanction payable by Defendant himself—by declaring the question irrelevant "regardless of who is paying." (Dkt. No. 233 at 44; Dkt. No. 261 at 19 n.4.) But the sole monetary sanction ever imposed, the $15,000 fee, was a stipulated award absorbed by Defendant's insurer, and the record contains nothing to suggest that a sanction Defendant would personally feel had been tried or shown to be futile. (Dkt. No. 261 at 19) A sanction an insurer

pays tests nothing about whether a penalty the litigant must bear personally would deter the litigant. And the premise for escalating past lesser measures is that no less drastic sanction would ensure compliance with the court's orders, such that imposing one first would be an ineffective "vain gesture." *Malautea*, 987 F.2d at 1542, 1544. Neither the Magistrate Judge nor the predecessor District Court Judge tried, or explained why they could not try, a sanction directed at Defendant personally, or other less restrictive sanctions, before imposing the terminating, default sanctions.

Finally, where the Eleventh Circuit has sustained terminating sanctions, the court developed the record through an evidentiary hearing before ending the case. *See, e.g.*, *Malautea*, 987 F.2d at 1543–44 (affirming a default-judgment sanction where, before striking the defendants' pleadings, the district court held a sanctions hearing allowing each side "one hour to present argument, live testimony, and documentary evidence relevant to the imposition of sanctions"); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (affirming the striking of the answer and counterclaims where the court "considered other lesser sanctions, and held a hearing with both parties to determine whether lesser sanctions would suffice"). A hearing is not invariably required where the record adequately supports the findings. But where, as here, a case-ending sanction turns on a contested determination of intent and credibility, due process and the sound exercise of discretion call for one.

Here, both the Magistrate Judge and the predecessor District Court Judge made their findings on a paper record, without a hearing, and resolved a contested question of intent—whether the May 24, 2026 post was published deliberately—against Defendant notwithstanding his and his assistant's declarations attributing the post to a technical error during a device migration — declarations uncontradicted by any competing declaration, which the Court nonetheless rejected as not credible without ever hearing the witnesses. The Court's alternative finding that Defendant's other posts established willfulness even setting the May 24 post aside does not cure the defect, because that finding counts as willful every "reference" to Plaintiff and so rises or falls with the validity of the references bar the First Amendment condemns. (Dkt. No. 214; Dkt. No. 261 at 13–14.) The gravity of a sanction that ends the case on the merits, resting on a disputed credibility finding, is precisely the circumstance in which the live, on-the-record process that preceded the sanctions in *Malautea*, 987 F.2d at 1543–44 (default entered only after an evidentiary hearing at which the defendants could present live testimony on the sanctions question), and *Eagle Hospital*,

561 F.3d at 1307 (answer and counterclaims struck only after a hearing on whether lesser sanctions would suffice), is required.

## II. The Court Should Reconsider and Vacate the Revised Gag Order Because, Even as Narrowed, It Remains an Unconstitutional Prior Restraint; Alternatively, the Court Should Certify the Controlling First Amendment Question for Appellate Review.

### A. The Revised Gag Order Applies the Wrong Standard and Was Entered Without the Narrow Tailoring and Consideration of Less Restrictive Alternatives a Prior Restraint Requires.

A gag order "challenged by the individual gagged" is a prior restraint that bears "a well-established presumption against [its] constitutionality" and may be sustained only if "narrowly drawn and ... the least restrictive means available." *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000); *accord Foxman*, 939 F.2d at 1512–13. The revised September 18, 2026, Gag Order fails on two independent grounds. First, it applies the least speech-protective standard and does so on an unsettled question. The order rests on a "reasonable likelihood of prejudicing the right to a fair trial," (Dkt. No. 263 at 2), which was adopted by the Fourth and Tenth Circuits. *See Brown*, 218 F.3d at 427 (explaining that "the Fourth and Tenth Circuits have concluded that gag orders imposed on any trial participant may be justified by a 'reasonable likelihood' that extrajudicial commentary will prejudice a fair trial and adopting the same standard without deciding whether it suffices) (citations omitted)). The Sixth, Seventh, and Ninth Circuits, however, have applied more demanding standards based on "clear and present danger." *Id.* The Fifth Circuit rejected the more stringent approach, reasoning that Supreme Court precedent distinguishes trial participants from the press, whose speech warrants greater protection. *Id.* It held that a "substantial likelihood" of prejudice suffices to restrict parties and their lawyers, while leaving unresolved whether the potentially less demanding "reasonable likelihood" standard would also suffice. *Id.* The Eleventh Circuit has never resolved the question. The order is also internally inconsistent, because it references a "substantial likelihood" of prejudice. (Dkt. No. 263 at 4.)

Second, the Court did not consider the less restrictive alternatives—searching voir dire, emphatic jury instructions, continuance, or venue measures—that a prior restraint requires. *Brown*, 218 F.3d at 431. It instead "moot[ed]" those arguments by "reshaping the order going forward" and declaring that "no less restrictive measure" would suffice. (Dkt. No. 263 at 7.) With

trial not imminent and jury selection not begun, that conclusory invocation of least-restrictive-means does not warrant a prior restraint, *id.*, and the order should be vacated.

The Fourth Circuit in *In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018) vacated a civil gag order materially like this one — a restraint on the parties, counsel, and potential witnesses in a series of nuisance suits — as "defective in multiple respects." *In re Murphy-Brown, LLC*, 907 F.3d 788, 792, 792 (4th Cir. 2018). Because gag orders are both prior restraints and content-based restrictions, the court applied strict scrutiny. "Strict scrutiny first requires that a gag order serve a 'compelling' public interest." *In re Murphy-Brown, LLC*, 907 F.3d at 797. "Our system of justice properly requires that civil litigants be assured the right to a fair trial." *Id.* (citation omitted). "Ensuring fair trial rights is a compelling interest, however, only when there is a 'reasonable likelihood' that a party would be denied a fair trial without the order under challenge." *Id.*

The *Murphy-Brown* court identified three failures of the restraint in that case that are equally fatal under the less demanding participant standard that the Fourth and the Tenth Circuits apply, which still requires specific findings, narrow tailoring, and the least restrictive means. *Brown*, 218 F.3d at 425. First, the restraint furthered no compelling interest on the record: the district court's reliance on a "significant increase in trial publicity" was "without adequate factual findings or development of a record," and "the fact of publicity is hardly dispositive" where the court can "guide a jury to an impartial verdict" through ordinary trial management. *Murphy-Brown*, 907 F.3d at 797–99. Here, the predecessor Judge did identify specific posts and give reasons for his order; but, as explained below, the reasons he gave do not establish that compelling, fair-trial interest. And unlike in *Murphy-Brown*, there has been no difficulty seating a jury at all, because trial is months away and voir dire has not begun.

Second, the order failed the least-restrictive-means review: *Murphy-Brown* faulted the trial court for "fail[ing] to explain if and why" voir dire, enlarged jury pools, cautionary instructions, venue changes, and (in rare cases) sequestration "had proven ineffective," emphasizing that voir dire "can serve in almost all cases as a reliable protection against juror bias." *Id.* at 799. Here, the predecessor Judge did not analyze those alternatives at all. In fact, he "moot[ed]" the question. (Dkt. No. 263 at 7.)

Third, the order was not narrowly tailored: *Murphy-Brown* condemned a restraint that "included no findings specific to the various individuals it restricted" and imposed "blanket

restrictions," holding that "[g]ag orders should be a last resort, not a first impulse" and that "skimpy findings" defeat meaningful review. *Id.* at 799–800. Here, the revised order's categorical bar on "social media references" that "could interfere with a fair trial" is the same species of blanket restriction. And *Murphy-Brown* specifically faulted applying such an order to social media, observing that the phrase "public communications media" gave "no hint of how it would apply to social media" — whether coverage turns on a post being public or private, or on an account's follower count. *Id.* at 800–01. The revised order, directed entirely at "social media," raises that identical ambiguity.

A review of the predecessor Judge's actual findings confirms the point. The predecessor Judge did not restrain speech in the abstract; he identified specific posts (e.g., Defendant's repeated efforts to associate Plaintiff's attorney with Jeffrey Epstein and with the suicide of one of Jeffrey Epstein's victims, Defendant's June 2026 posts accusing counsel of "extortion, intimidation, and witness tampering" and urging him to "stop billing hours," and Defendant's May 28, 2026, post announcing the start of his trial against the hotel and asking followers for their support) and gave four reasons for restraining them. (Dkt. No. 263 at 5–7.) But the reasons the Court gave describe the wrong kind of harm. Three of the four — that Defendant sought to "intimidate and harass Plaintiff into dropping its case," to "intimidate and harass Plaintiff's counsel into withdrawing," and to broadcast his posts as widely as possible — address pressure on the adversary and offense to counsel, not the fairness of the adjudication. (Dkt. No. 263 at 6–7.) A prior restraint on a litigant's speech may be deployed to protect the empaneling of an impartial jury; it may not be used to shield a party's resolve to keep litigating, or to spare counsel from insult.

Where courts have restrained a participant's harassment of an adversary, the restraint addressed genuine threats to the integrity of the proceeding — intimidation of witnesses that would "deter[], chill[], or alter[]" their testimony, or messages "designed to generate alarm and dread" that force trial personnel to divert resources to their own safety. *United States v. Trump*, 88 F.4th 990, 1013–14 (D.C. Cir. 2023); *see Lewis v. S.S. Baune*, 534 F.2d 1115, 1122 (5th Cir. 1976) (settlement obtained "through duress"). Nothing of that order is found here: the predecessor Judge identified no threat to any witness's testimony and no danger to the safety of counsel or the Court. Offense to counsel and pressure to settle, however disagreeable, are remedied by a damages action or a narrowly drawn contempt or harassment proceeding — not by a categorical prior restraint.

However inflammatory or defamatory the identified posts, the remedy for defamatory or harassing speech is a damages action or a narrowly drawn harassment or contempt proceeding aimed at the specific conduct — not a categorical prior restraint sweeping in every "reference" to Plaintiff and its counsel. The lone reason that sounds in trial fairness — that Defendant "risks tainting the jury pool" (Dkt. No. 263 at 7) — is stated as a bare risk, not a finding of a substantial likelihood that an impartial jury could not be seated. That is not enough. "[A] conclusory representation that publicity might hamper a [party's] right to a fair trial is insufficient to overcome the protections of the First Amendment." *United States v. Noriega*, 917 F.2d 1543, 1548 (11th Cir. 1990). And "the fact of publicity is hardly dispositive" where, as here, voir dire and instructions can "guide a jury to an impartial verdict," especially with trial still months away. *Murphy-Brown*, 907 F.3d at 798–99.

Nor does the breadth of Defendant's following supply the missing predicate. The predecessor Judge leaned on the size and reach of Defendant's audience, and the Report and Recommendation noted that his public Instagram account "had more than 90,000 followers." (Dkt. No. 233 at 3.) But reach is not prejudice. As the court in *Murphy-Brown* put it, quoting the Supreme Court, "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." 907 F.3d at 798. This case will be tried in the Southern District of Florida, a large and diverse metropolitan venire in which the premise that twelve impartial jurors cannot be seated is difficult to sustain. *Skilling v. United States*, 561 U.S. 358, 382 (2010). A larger audience may mean more people see Defendant's posts, but it does not show that publicity "would so distort the views of potential jurors" that an impartial jury could not be empaneled (a showing the predecessor Judge never made), and the precise risk that voir dire and cautionary instructions exist to manage. *Murphy-Brown*, 907 F.3d at 798–99.

Decisions that have upheld participant gag orders confirm the deficiency of the predecessor Judge's September 18, 2026, Gag Order, because each rested on process and tailoring that order lacks. In *Brown*, the Fifth Circuit affirmed a restraint only after the district court "made specific findings about the conduct of the parties" — three related, intensely publicized trials, an unsequestered jury already impaneled, and parties who had released wiretap recordings and announced their intent to "try this case in the press." 218 F.3d at 428–29. The order survived as narrow precisely because it "did not impose a 'no comment' rule," but left the parties free to assert innocence, describe the general nature of the case, and discuss matters of public record. *Id.* at 429–

30. And *Brown* applied the "substantial likelihood" standard, pointedly declining to adopt the "reasonable likelihood" test the predecessor Judge invoked here. *Id.* at 427. Likewise, in *Foxman*, the restrictive order was entered only after the trial judge "conducted a full hearing," "concluded that there was no less restrictive means of safeguarding the defendants' Sixth Amendment rights," and secured the agreement of all counsel. 939 F.2d at 1515–16. The revised order has none of these features: no hearing, no finding that the identified posts created a substantial likelihood that an impartial jury could not be seated, no record of *Brown*-type media manipulation, no imminent or multi-trial jury-taint problem, and no comment-sparing tailoring — only a categorical ban under the more lenient standard *Brown* refused to endorse.

The civil posture compounds the problem rather than excusing it. Gag orders in civil cases are "quite rare (there being no Sixth Amendment right at issue)," even as the First Amendment interests in an open civil proceeding remain "no less salient." *Murphy-Brown*, 907 F.3d at 796. Because materially similar restraints have been vacated for the very defects this order exhibits, and because the orders that survived did so only on findings, hearings, and tailoring absent here, the revised order should be vacated.

### C. At a minimum, the Court should hold an evidentiary hearing before sustaining any restraint.

Where courts have sustained restrictions on trial participants, they did so on a developed record: in *Foxman*, the judge "conducted a full hearing before entering the restrictive order" and found no less restrictive means. 939 F.2d at 1515–16. The terminating-sanctions cases are the same. *Malautea*, 987 F.2d at 1544; *Eagle Hosp.*, 561 F.3d at 1307 & n.6. Here, the Court resolved contested questions of intent and the meaning of ambiguous posts—including the May 24 duplicate post, as to which Defendant submitted unrebutted declarations—on a paper record. (Dkt. No. 214.) Although a hearing is not invariably required where the record adequately supports the findings, *In re Russell*, 726 F.2d 1007, 1010–11 (4th Cir. 1984), the disputed intent and credibility determinations here cannot be made without one.

## III. In the alternative, the Court should certify the controlling First Amendment question for interlocutory appeal.

If the Court declines to vacate the September 17, 2026, sanctions order, and / or the revised September 18, 2026, Gag Order, it should certify the following controlling First Amendment question under 28 U.S.C. § 1292(b) for immediate appeal:

> Whether the restriction on Defendant's extrajudicial social-media speech — first imposed by the February 20, 2026, paperless Order (ECF No. 125), which directed Defendant to cease social media references to Plaintiff and its counsel during the course of this litigation — is a prior restraint consistent with the First Amendment such that it may serve as the predicate for the sanctions imposed in the Court's September 17, 2026 Order (ECF No. 261) striking Defendant's Answer and Affirmative Defenses, dismissing his Counterclaim with prejudice, and entering default judgment as to liability, including (a) whether the standard governing a restraint on a civil litigant's extrajudicial speech is "reasonable likelihood" of prejudice, "substantial likelihood of material prejudice," or "clear and present danger"; and (b) whether the restriction, as entered and as narrowed, satisfies that standard and the requirements of specific on-the-record findings, narrow tailoring, and consideration of less restrictive alternatives.

Certification requires a controlling question of law, a substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation. *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1256–59 (11th Cir. 2004). That standard is met here. Regarding the first prong, this question presents a pure, controlling issue of law as to which there is substantial ground for difference of opinion — neither the Supreme Court nor the Eleventh Circuit has resolved which standard governs a restraint on a civil litigant's extrajudicial speech. The predecessor judge acknowledged as much: in his September 18, 2026, Gag Order, he observed that "the Eleventh Circuit has not specifically weighed in on how to balance these rights," and it selected the "reasonable likelihood" standard only after noting the recognized split among the circuits. (Dkt. No. 263 at 3.) A court's own recognition that the controlling standard is unsettled is itself strong evidence of substantial ground for difference of opinion, and it confirms that this is not a case of merely applying settled law to particular facts.

The second prong is also met. The February 20, 2026, paperless gag order is the sole predicate for the sanctions. The predecessor Judge struck Defendant's Answer and Affirmative Defenses, dismissed his Counterclaim with prejudice, and entered default judgment on liability for one reason: his social-media posts violated the February 20, 2026, paperless Order. (Dkt. No. 261 at 6–7, 21–22; Dkt. No. 233 at 29–45.) The only thing left — the February 2027 damages trial — flows from that default.

If the February 20, 2026, paperless order is deemed an unconstitutional prior restraint, that conclusion does more than vindicate a speech right — it removes the predicate on which the sanctions depend. Under *Chudasama* and *Cotton*, the propriety of case-ending sanctions "depends in large part on the propriety of the [predicate] order," so an appellate holding that the

restraint was invalid would require the sanctions to be revisited. The revised September 18, 2026, Gag Order cannot retroactively validate sanctions imposed before it was entered, and it too violates the First Amendment. Reversal of the Gag Order (as entered on February 20, 2026, and as revised on September 18, 2026) would therefore unsettle the sanctions, the default, and any ensuing damages judgment. This is not the ordinary case in which reversing one interlocutory ruling "would do too little" to advance termination. *McFarlin*, 381 F.3d at 1259. The challenged restraint is the sole engine of a default that has already disposed of the entire merits of the case, leaving only damages. Deciding the question now — rather than after a damages trial that a later reversal would require to be redone — "avoids the waste of a party going through a . . . procedure that it already knows it will lose." *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1358–60 (11th Cir. 2008).

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court reconsider and vacate the September 17, 2026, Sanctions Order and the resulting default; vacate the revised September 18, 2026 Gag Order; or, in the alternative, certify the controlling First Amendment question governing the Gag Order for interlocutory appeal under 28 U.S.C. § 1292(b); together with such further relief as the Court deems just and proper.

Respectfully submitted,

**NICKLAUS, NICKLAUS & ASSOCIATES, P.A.**
*Attorneys for Defendant*
4651 Ponce de Leon Blvd., Suite 200
Coral Gables, Florida 33146
Telephone: 305-460-9888
Facsimile: 305-460-9889
edwardn@nicklauslaw.com
bperkins@nicklauslaw.com

By: */s/ Edward R. Nicklaus*
**EDWARD R. NICKLAUS, ESQ.**
Florida Bar No.: 138399
**P. BRANDON PERKINS, ESQ.**
Florida Bar No.: 568635

## LOCAL RULE 7.1(a)(3) CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a)(3), undersigned counsel certifies that Defendant made reasonable efforts to confer with Plaintiff in a good-faith effort to resolve the issues presented in this motion. On October 16, 2026, Defendant's office emailed the proposed motion to Plaintiff's counsel, Sean Burstyn, and requested his availability to confer. Following Mr. Burstyn's email on October 19, 2026, Defendant's counsel, Brandon Perkins, responded offering to discuss the relief requested in the motion. At 12:56 p.m., Defendant's office telephoned Mr. Burstyn's office to arrange conferral and was advised by his assistant that Plaintiff opposed the motion. Plaintiff's counsel, Andrei Dambuleff, subsequently confirmed that opposition by email. Plaintiff opposes the motion.

By: */s/ Edward R. Nicklaus*
**EDWARD R. NICKLAUS, ESQ.**
Florida Bar No.: 138399
**P. BRANDON PERKINS, ESQ.**
Florida Bar No.: 568635

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 19, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve a copy on all counsel of record.

**NICKLAUS, NICKLAUS & ASSOCIATES, P.A.**
*Attorneys for Defendant*
4651 Ponce de Leon Blvd., Suite 200
Coral Gables, Florida 33146
Telephone: 305-460-9888
Facsimile: 305-460-9889
edwardn@nicklauslaw.com
bperkins@nicklauslaw.com

By: */s/ Edward R. Nicklaus*
**EDWARD R. NICKLAUS, ESQ.**
Florida Bar No.: 138399
**P. BRANDON PERKINS, ESQ.**
Florida Bar No.: 568635