# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CV-20251-KMM

FONTAINEBLEAU FLORIDA
HOTEL, LLC,

Miami, Florida

Plaintiff(s),

October 26, 2026

vs.

JACOB SHMUEL BOTACH, and
JOHN DOES 1-10,

Defendant(s). Pages 1 - 219

---

DISCOVERY HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE MARTY FULGUEIRA ELFENBEIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):

SEAN A. BURSTYN, ESQ.
1101 Brickell Avenue
Miami, FL 33131
305-204-9808
sean.burstyn@burstynlaw.com

ANDREI DAMBULEFF, ESQ.
214 Colonial Homes Drive
Atlanta, GA 30309
908-500-0831
andrei.dambuleff@burstynlaw.com

APPEARANCES (CONT'D)

FOR THE DEFENDANT(S): EDWARD NICKLAUS, ESQ.
P. BRANDON PERKINS, ESQ.
ROGER ROCHE, ESQ.
NICKLAUS & ASSOCIATES, P.A.
4651 Ponce De Leon Boulevard
Coral Gables, FL 33146
305-460-9888
edwardn@nicklauslaw.com
bperkins@nicklauslaw.com
rogerr@nicklaus.com

TRANSCRIBED BY: Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com

Thereupon,
the following proceedings were held:

THE DEPUTY CLERK: Calling case 25 Civil 20251, Judge Kuntz. Fontainebleau Florida Hotel, LLC v. Botach.

Counsels, please state your name for the record, beginning with the plaintiff.

MR. BURSTYN: Good afternoon, your Honor. Sean Burstyn for the plaintiff, and I'm joined by my colleague Andrè Dambuleff.

MR. DAMBULEFF: Good afternoon, your Honor.

THE COURT: Good afternoon to all of you.

MR. NICKLAUS: Good afternoon, your Honor. Edward Nicklaus on behalf of the defendant, along with my cocounsel Brandon Perkins and Roger Roche.

THE COURT: Good afternoon to all of you.

MR. NICKLAUS: Same firm, Judge.

THE COURT: All right. Well, we are here this afternoon on a discovery hearing that I had tentatively set for today in the event that the parties were not able to work out the matters involving some of this punitive damages discovery.

I received an email from Mr. Burstyn indicating that there was a request for this hearing to go forward today at 1 p.m.

I did see that there was material submitted over the weekend, at docket entry 296, with the notice of hearing, and

earlier today I did see that the defendant also filed a notice of filing note from doctor at docket entry 297, which I assume was filed in conjunction with today's discovery hearing as well. So I did take a look at that. All right.

MR. NICKLAUS: I'd like to address that first, if I may, your Honor.

THE COURT: OK. Go ahead, Mr. Nicklaus.

MR. NICKLAUS: I have told Mr. Burstyn, of course, earlier. As of about an hour ago I have strongly recommended to my client that he keep the 4th on for the deposition, and he has agreed. And I also spoke with his doctor. His doctor, I call him. This was all this morning after last night receiving a note from the doctor.

I talked to Mr. Burstyn about it. All that is off now. He is back on schedule, hell or high water.

THE COURT: OK. So November 4 he is going to be deposed.

MR. NICKLAUS: Yes, ma'am.

THE COURT: OK. All right. So I guess we don't have to discuss that any further.

So in that case let's go ahead and address the matters that are teed up for today at docket entry 296.

All right, Mr. Burstyn.

MR. BURSTYN: Yes, your Honor.

Good afternoon, your Honor. We've got a deposition in

one week. Everybody agrees, and you will hear today, even from the defendant, that documents need to be produced.

The problem with -- I have my punitive damages discovery box there of everything I've received. With the exception of two sheets of paper, it's empty. I've got nothing. I've got a W-2 showing that this man, with $25 million in homes, received $15,000 last year. That's the entirety of the documentary backup that I have for his punitive damages.

THE COURT: I don't think you needed to bring the box.

MR. BURSTYN: The box was there with some materials and we felt it was very important to convey, because I am at a loss. Do I clutch my pearls, do I get upset, or do I just say this is what I am conditioned to expect throughout this case.

I got a doctor's note on the car ride over here. Now he is going to be there. I actually don't think it is over. I think the defendant is, frankly, a dangler. He puts excuses out just in case.

He said he couldn't do October because he was going to be in Hawaii. He said that in a signed affidavit to your Honor, under penalty of perjury. Meanwhile, he was posting the entire time from New York, never in Hawaii, for the last month.

He is lying to the court, which he's done repeatedly. He is continuing to do that. I am going to show up at the deposition and he is maybe going to be there. I have no

confidence in that. If he is, it is going to be I don't remember because I had hand surgery three weeks ago.

They had our interrogatories in April, seven months ago. They were served with the requests for production --

THE COURT: My order requires that he be there November 4, does it not?

MR. BURSTYN: It does.

THE COURT: OK.

MR. BURSTYN: Yes.

THE COURT: I want to make sure. I was pretty sure that that was in the order that we had. OK.

MR. BURSTYN: It is reduced to writing.

We would ask that the court, if the court is willing, given in light of this morning's update and retraction, that it be made clear that if he fails to appear, he is at risk of sanctions, so that he doesn't come in and say he wasn't warned. But we defer to the court on how that is to be managed.

They are going to cite to your Honor two cases from their objections. One is *Lane*, which appears in our filed materials, *Lane Capital*.

*Lane Capital* is a case that required the production of tax returns and 30 other categories of discovery, including discovery of jointly-held assets.

They are going to cite another case, your Honor, *Stern*, which is in their objections, another case citing the

general rule that tax returns are discoverable.

In that particular case the court held, Under the circumstances of this case, tax returns would not be produced, because that particular defendant's wealth was in two categories. One was in stock and the other was in his collection of 800 cars. So for that reason, because neither asset would be shown on the tax returns, that particular defendant didn't have to show tax returns.

We have got half a dozen tax return cases.

We were told last week -- and I will narrow down to exactly what the issues are. I think I'm speaking in a high-level sense of the scope of issues.

We were told last week that we were going to get, last week, a statement by an accountant, who we don't know who he is or where he will show up, signing, this is the defendant's net worth, here it is.

We cited in our materials a case *Donahue*, which described it as "the height of naivete" to allow a defendant to state what his own net worth is.

Criminal defendants don't get to tell you how much in illegal contraband they had on them. Punitive damages defendants don't get to tell you what their net worth is and then I just have to accept it, particularly in a case such as this one.

As you know, we have basically nothing. You warned

them not to put any of us in this position. As a practical matter, as an officer of the court, I don't think there is anything that your Honor can order, unfortunately, that will remedy this because it is not going to happen. He is just not going to give us the documents.

On the AI issue -- and we can go one by one. I really don't think it matters, just in terms of saving time, because there is just not going to be any compliance.

He is publishing online open letters to Elon Musk and all the AI service providers, telling them, don't comply with the subpoenas. That's obstruction. He is getting in the way of everything.

We have gone through, in our meet and confer, the interrogatories, where he tells us --

THE COURT: Do you have those posts?

MR. BURSTYN: Yes. Yes.

THE COURT: I would like to see them.

MR. BURSTYN: OK.

THE COURT: Were those posts published after I issued my order last Wednesday night?

MR. BURSTYN: Yes. I think yesterday. I mean, there are posts about the court's corrupt order shouldn't be followed.

May I approach?

THE COURT: Yes.

(Pause)

MR. NICKLAUS: Is this the document dated October 14th?

MR. BURSTYN: It is October 14th.

MR. NICKLAUS: OK.

MR. BURSTYN: There is another October 16. There you go.

MR. NICKLAUS: Thank you.

MR. BURSTYN: Last time we were in front of your Honor I felt bad. We had noticed a late supplemental production because in the run-in to the hearing he continued posting.

Every time we get out of a meet and confer and our positions on the meet and confer are relayed to him, we see online that the evil Jewish lawyer who sold his soul for a bag of gold is asking for X, Y, Z during these meet and confers.

So we are constantly under attack.

I think the first page there are several, and there are more ongoing even over the weekend, where he posted about the Jewish lawyer who sold his soul, next to a video of his son, who is a soldier, asking his son if he can borrow his machine gun for the weekend.

In this October 14th post, which is like oftentimes -- I have never had to say such a thing. Normally that would be like a moment in a case, but here it is not.

In the October 14th post he says: Would you really

hand over users' private AI conversations to a billionaire litigant? Can you help me?

He goes on in these posts.

He is not going to comply.

What I can tell you --

THE COURT: This October 14th post is before my order.

MR. BURSTYN: There's more, your Honor. I can submit them. Just one moment.

(Pause)

MR. NICKLAUS: Yes, your Honor.

THE COURT: My order was issued last Wednesday.

MR. BURSTYN: October 21st.

THE COURT: OK. Thank you.

MR. BURSTYN: There are additional posts after the hearing but also after your Honor's order was entered. I don't have -- there are thousands of posts in this case.

Maybe you can try to pull some. He was posting over the weekend about this.

So he is not going to do it.

We asked opposing counsel, what are you going to produce. Even their own cases say he needs to produce documents. They don't know what they're going to produce.

There is no counter-submission, as your Honor knows, to our submission for this hearing today. There is no

affidavit explaining what the burden is of compliance with these subpoenas. All we have in the record is the document requests, the interrogatories, and, frankly, a wealth of case law showing that, in the context of punitive damages discovery, discovery is broad. These are permissible categories.

We have the affidavit of our expert explaining that these are the sorts of documents that he needs to rely on in order to make a complete and reliable net worth estimation.

If the court wants to go one by one, we can. Again --

THE COURT: I think we have to.

MR. BURSTYN: OK.

THE COURT: I think we can and we should, because I would like to also hear from Mr. Nicklaus or whoever is speaking on behalf of Rabbi Botach here today as to their respective positions on each one of these because I don't think that it is appropriate to make any kind of blanket determination when it comes to discovery. These are individualized requests that require individualized rulings.

MR. BURSTYN: OK. If I could read into the record and we could send it in.

This came in over the weekend, an October 24th, 11 p.m. post. Forgive me. I'm reading: Judge Marty Elfenbein's ruling has put every American's AI privacy at risk, etc., etc. How can Americans have constitutional rights when private AI conversations become targets of litigation.

He raises questions of judicial impropriety, etc., etc.

He is not going to comply with a process that he believes is corrupt. And none of this is his fault, of course. The continuing posts that we described obviously continue into the weekend.

We asked Mr. Nicklaus -- I will just say on the record, Mr. Nicklaus has been nothing but respectful, which has not been the case for everyone. I understand he has a job to do, but we asked him, what have you done in the three weeks since we were last here -- it's been three weeks this week -- to collect any AI posts, to start searching. The answer was nothing.

What have you done -- what implemented preservation methods have been completed. What have you done to avoid spoliation. The answer was, I don't know.

So this stuff is getting deleted.

We spoke to Anthropic, with the LOM known as Claude. They gave us a procedure.

Your Honor ordered us to meet and confer last week on a procedure for getting the AI data from the service providers. In a sentence, they basically said, just have him send an email from the email address that is associated with his account requesting the AI, all of his AI data with the different service providers, and then they would produce it to us. They

could produce it to counsel.

If they seriously have a privilege log to make, they can make a privilege log. It is not that difficult.

THE COURT: Are they not willing to produce it in response to a subpoena?

MR. BURSTYN: So we learned some interesting things through this process. I think it is all pretty intuitive. This is, obviously, new territory.

The Stored Communications Act provides additional rights of content hosters, like the AI service providers gmail, etc., with respect to subpoenas. They do not have to -- in fact, their position is they cannot respond under the Stored Communications Act --

THE COURT: Without a court order.

MR. BURSTYN: -- without a court order or consent.

If this court were to order them, the service providers, to produce the documents --

THE COURT: As opposed to an order overruling objections by the -- because that is essentially what my order did last week. I said, OK, for categories one, three, four, and seven, in part, I said the objection is overruled except for there is a potential that there is work product in there, which is why I wanted you all to talk about a procedure. Because if they produce the documents directly to you Mr. Burstyn, and they want to withhold anything that they think

Rabbi Botach prepared in anticipation of litigation, then I have concerns about that, right, which is why I want to be able to talk about, well, what is the best way to do it.

Wouldn't my order effectively already have overruled the relevance objections that Rabbi Botach had while preserving his work product objections?

Are you saying there would need to be another order under the Stored Communications Act to get Anthropic or Open AI to respond to the subpoenas?

MR. BURSTYN: Yes. There needs to be one more order, one more piece of an order, which is to actually compel the defendant, who is not willingly agreeing to make this request of the providers. He has to be ordered to make the request of them for all of the data, and then they will provide all of his account data to him and his counsel, and then they will do that review.

The service providers, most of whom are out in California, will take the position that they are not subject to personal jurisdiction. Then I have to go domesticate the subpoena there in California in order to have your Honor's order be effective as to them.

THE COURT: A federal subpoena with a federal order?

MR. BURSTYN: It is their position, and it is not going to get resolved by the discovery -- there are two paths. Your Honor can order them, in which case they will not comply.

They will say we have to domesticate the subpoena in, I think, the Central District of California in order for the order to be effective.

THE COURT: Oh, I see what you are saying, because under Rule 45 they're there. So you'd have to go to the Northern District of California and get the order from the Northern District of California or, alternatively, Northern District of California could just kick it over to me and then I could then enter an order. First you'd have to start there. I see what you are saying. OK.

MR. BURSTYN: Exactly.

THE COURT: I'm following.

MR. BURSTYN: Option two, which can be done in an instant, is simply to order the account holder to make a request of the service providers, and they will comply with that.

THE COURT: OK.

MR. BURSTYN: So we have in our materials basically a format. It is at Exhibit C-2, which is what he needs to do.

We would ask the court to order the defendant to just make a request for the account data and have the service providers provide it to his counsel.

What we think is very important to the plaintiff, and the plaintiff is entitled to it per the court's order last week, the AI service providers do maintain audit logs that show

user deletions of content. So we will be able to see what was deleted. And we're concerned --

THE COURT: That is category number seven.

MR. BURSTYN: Right. Right.

That is AI. We are prepared to go one through one on the RFPs, on the requests for production, if the court would like us to do that now.

THE COURT: Sure. Let me give Mr. Nicklaus a chance to respond to the kind of high-level stuff and then we can get into the nitty gritty of the individual requests.

MR. NICKLAUS: Thank you, your Honor.

First of all, I don't review logs. I don't review AI. I have thoroughly reviewed emails, and we have not had a lot of time to do everything that we needed to. Our client, number one, is in New Jersey. He's been flying back and forth, I guess, from Israel. What we need really is more time with respect to responding to this.

I did tell counsel that what we would produce would be consistent with the ruling, and most of our objections, I would indicate to you, are consistent with the Judge Dimitrouleas rulings in the *Stern v. O'Quinn* case. I told counsel that we would produce what that order required.

Overall, in that case the court ruled that financial statements must be produced. If they are profit-and-loss statements, they must be produced. Then if there are

underlying documents provided to the accountants, that material must be produced as well.

I told counsel this morning -- by the way, I know that his accountant, one of his accountants that he talked to -- he talked to two of them, Mr. Sachs and a Mr. Moche -- Moche had been in the Orient, apparently, and we just got produced to us this morning tax returns for two years from that gentleman, who says he's back going to Israel now.

We have had a logistics issue with regard to that. He was going to prepare -- and I told counsel we would provide him with a financial statement. I would say, by the way, we did provide specific answers to interrogatories that we were talking about earlier, that we had.

We had also agreed that we would produce anything in this order of Judge Dimitrouleas. Anything else, Judge, we take -- if you look at the requests for production, if you look at the interrogatories, if you look at the questions, they are absolutely burdensome. They are absolutely overwhelmingly confusing. Multiple questions in each one of the questions, which are almost impossible to deal with. But what we would do -- our objection is, to basically most of the discovery, is it is burdensome. It is broad. They are basically abusive.

If you look at them, we are talking about an individual. I don't care if he is a rabbi or whatever he is. He is being accused by this detailed discovery, that we

initially had due -- actually, it was originally due on the 22nd.

I know your Honor ordered on the 24th -- and I was in mediation this week in some other cases, by the way -- you ordered that certain of the requests with regard to interrogatories and items one, three, four, and seven are overruled, and that's fine. I have sent this order and I have sent every order in this case, including issues with regard to spoliation that he talks about, to Mr. Shmuely and advised him the consequences and advised him to preserve everything. I have no signals that he has not done that.

He did have surgery, according to his physician --

THE COURT: I saw that, on the 20th.

MR. NICKLAUS: By the way, you did overrule or you sustained the objections with regard to numbers two, five, six, and seven, in part.

THE COURT: Correct. Those are dead requests. So we don't even need to talk about those.

MR. NICKLAUS: The other thing you did order, with regard to the AI information in the subpoenas -- I have absolutely no knowledge of any communications or anything else from Mr. Shmuely directly to the deponents, the supposed deponents, or the people that respond to the subpoenas that he sent directly to them. I have no knowledge of that. I don't know if he did or not.

I mean, this material that we get presented with today, I don't have a chance to respond to because I never saw it, never heard about it, and never knew anything about it.

I will say this. He talks about blogs. Actually, blogs going back and forth in this case. But we have sent an additional request to produce to opposing counsel.

What that request to produce asked for was, first of all, all the video that the Fountainbleu had of this incident, and there is a lengthy video. Some of it has audio as well. All of it is relevant. All of it is most important, and most important exhibits in this case, because counsel alleges, and they allege that the offense in that place took part, was in part instigated by Mr. Shmuely. It was not. It was not instigated by Mr. Shmuely, and the video shows just the opposite of that.

THE COURT: Don't you guys have the video already?

MR. BURSTYN: We object. This isn't even before the court. They have video. Mr. Nicklaus just said we have video and audio. We don't.

MR. NICKLAUS: Well --

MR. BURSTYN: Mr. Nicklaus, respectfully, is 15th counsel for the defendant. The prior counsel, if we have to bring them back, they very comfortably reached an agreement with respect to the scope of video disclosures after their client was found leaking the video that we produced online.

THE COURT: I was going to say, I remember there was a motion that I ruled on involving sanctions where Mr. Shmuely ended up paying, I think, $15,000 in attorneys' fees because he had the video of the incident and he violated the protective order because he was posting it online.

MR. NICKLAUS: I know, but it was sealed, for some reason.

THE COURT: It wasn't under the confidentiality order, but no one's moved, no one's brought to me whether or not it should be properly under the confidentiality order or not.

There is a mechanism. If someone wants to challenge it -- I wrote about it in the order that I set -- if someone thinks that this was improperly designated as confidential, the order has a mechanism to bring it to my attention so I can decide whether it is confidential.

I remember writing on this like months ago. So I know that the video has been produced because it was posted to social media, and that was the whole reason why he was sanctioned because it violated the confidentiality order.

MR. NICKLAUS: Don't doubt it, your Honor, one bit. I hear a lot of things about it. It was sealed.

There is a confidentiality order, and upon reviewing this massive file, once we got into this case in August, there is a confidentiality order that I think would cover most of this stuff. So it's already been stipulated to. I think your

Honor signed it.

What we were running into with regard to this -- by the way, I also know your order requires me to confer with counsel about how to approach these deponents or these people that are supposed to be subpoenaed, the AI --

THE COURT: Right.

MR. NICKLAUS: -- AI group, I call them, on the last seven of requests for production items, that we were supposed to get together and communicate with those people on how to respond to the subpoenas.

I haven't had a chance to talk to Mr. Burstyn about that. I have absolutely -- I only have a few hands, and the time we have had to do this since your order has been very little. I'm always willing to do that. Like I said, we need more time to do it.

THE COURT: You might have to talk about it on the fly here in court because I need to give you all some guidance on how to go forward.

MR. NICKLAUS: Sure.

THE COURT: Because we only have until November 9th for everyone to get this done. So we are running up against a really tight time line.

MR. NICKLAUS: That is correct, your Honor.

I also might mention to you that counsel cited some cases to you. One of them was the *Stern* case, which we cited,

but the other one -- there are some footnotes to the *Stern* case that also say, if such discovery, nevertheless, the requests are overly broad or unduly burdensome on its face, and if you were to read each one of these requests for production, they are pretty burdensome when you look at them.

What the court said in the *Lane* case is that if it is cast in such broad language as to make arduous the task of deciding which of numerous documents may be conceivably or may conceivably fall within the scope that it is considered overbroad.

That is something that requires an affidavit, and, again, we did refer you to the affidavit that I filed with regard to Rabbi Shmuely before the last hearing.

Now, he does address the burdensome of the discovery in that affidavit. I won't go over it again with you.

If you look at each one of these requests, and if the court wants to go through each one of these -- I think we filed objections to most of them based upon the *Stern* case and the vagaries involved in them, but they are also cumulative. I mean, they ask for other detailed information, bank statements, deposit slips, everything under the sun that you could possibly think of. I don't know where they got these forms or whatever they are, but they are definitely abusive.

What I would refer the court to, though, in good faith -- it sounds like Rabbi Shmuely didn't do anything. He

did answer the interrogatories and he did provide financial net worth information with regard to No. 2, and these are part of the 11, I think, that were singled out at the last hearing. He did answer several other of these interrogatories. Some of them were none. He answered them and he signed the affidavit under oath, and it was provided to Mr. Burstyn.

So all of these --

THE COURT: We will go through each one of these one by one, like I told Mr. Burstyn, but I did want to give you a chance to give me kind of your big-picture position before we get into each one of these.

MR. NICKLAUS: Sure.

THE COURT: Let's dive in. Go ahead, Mr. Burstyn. Let me hear from you, one by one. As you address, let's say, for example, interrogatory No. 2, just as an example, then I will turn to Mr. Nicklaus and then I will rule on each one of these individually.

MR. NICKLAUS: Judge, I'd like to make one more announcement, though.

THE COURT: Sure. Go ahead.

MR. NICKLAUS: My client advised me -- and we had sent a request to produce to Mr. Burstyn just recently to update all of his discovery, pursuant to the rules, requiring him, from his initial disclosure, to provide us with other information.

If you read some of the requests for production, he

has information in the requests that talk about trust agreements and documents, etc., etc. So he obviously already has information which he has not produced to us.

Secondly, we asked for emails that Mr. Burstyn has communicated with people. We note that there was recently -- I think this weekend -- an email, a blog by the Mail Review, written by The Daily Mail, and the information comes, obviously, from the plaintiff. It was not from our client.

MR. BURSTYN: False statement. False statement by counsel. Go ahead.

MR. NICKLAUS: Well, I don't know if it is false or not.

MR. BURSTYN: Don't make it then.

MR. NICKLAUS: Obviously, it is as false as these other ones that we received. We don't have any identification on them either.

My client believes that Mr. Burstyn has been emailing Mr. Mail with regard to the history about the case and bringing the public up to case and publishing it himself.

So I don't know for sure where these emails are coming from. They are very hard to deal with. They come in over the weekend. They came over yesterday.

We're trying to get together with the accountants in this case -- we have two of them -- that have said they would provide net worth statements.

The reason we didn't produce -- I told Mr. Burstyn this morning. I just got the tax returns last night by email. I haven't had a chance to even look at them. I told him that I don't care, whatever we have, we'll give to you.

I'm trying to get my client to cooperate as much as possible.

Then I told him I would send you the tax returns. Well, I looked at the tax returns. I again called, after I spoke to Mr. Burstyn this morning, I called the client again. I finally got ahold of him again. I said, I'm going to produce the tax returns. He objects to producing them because they're joint returns, him and his wife. The accountant said to us that he would eventually try to have the statement of assets reported separately from him and his wife.

So we're trying to protect her, his rights, if there are any. I don't want to give up tax returns and be in violation of some sacred relationship that I may have with my client. If he wants me to object to them, I must do so in good faith.

I have them. I have two years' worth, but they are joint returns that I found out. So I told him --

THE COURT: All right. Let's deal with that when we get to that particular request for production regarding the tax returns and then we will talk about that and what, if anything, should be done in relation to Mrs. Botach -- is that her

name -- and then potentially as it relates to her individualized privacy and her financial information. So we will address that when we get to that particular request.

MR. NICKLAUS: Yes, your Honor.

THE COURT: All right. So let's go one by one.

Mr. Burstyn, where do you want to start?

MR. BURSTYN: If the court has -- do you have the interrogatories, your Honor?

THE COURT: I do.

MR. BURSTYN: I think we can start with the interrogatories. We will go through them one by one.

I do want to say at the outset, before we dive in, the interrogatories are the *Donahue* case that we cite. They are the concept of the defendant doesn't get to just pick what numbers he wants to put down in an affidavit, a financial statement, or even interrogatories. So these are not sufficient backup for the financials. Even putting that issue aside, they are incomplete.

Interrogatory No. 2, your Honor, asks him to state all of his sources of income. All of these, we recognize, were narrowed to a two-year look back at the last hearing.

I have no way of challenging whether he has other sources of income that are not disclosed here, but I can tell you two things.

Number one, he states that he has $554,000 of rental

income in his response to interrogatory No. 2, but he doesn't appear to show properties in response to the other interrogatories that would generate $554,000 of rental income for two years. That is over a quarter million dollars a year in rental income. Where is the property this is coming from? It is not disclosed.

THE COURT: OK. But wouldn't that be on a different interrogatory than No. 2?

MR. BURSTYN: It would, but I also just want to make one more observation.

If he is going to say this is complete, which I think is at his peril, if tax returns come in and show other income statements, the point of this exercise is I can't do anything to contest that because he gets the final say.

One more observation.

THE COURT: No, but if this is inaccurate, after he has additional documents, he can supplement or amend his answer to this interrogatory.

MR. BURSTYN: Yes. I don't know that we will characterize it as a supplement, but I understand that.

THE COURT: I mean, he would be required to under Rule 26(c). If you have anything in your discovery that is inaccurate, you have an obligation to supplement accordingly.

MR. BURSTYN: Yes. So if he says this is complete, then it's complete.

One other observation is, he is obviously referencing documents to come up with these figures down to the penny. We don't have them. So they exist. On the burden argument, we don't buy it. He looked at those documents.

So I think interrogatory No. 2, what we'd ask is simply that that remain open for us to revisit. So we can come back to that if we need to.

On interrogatory No. 4, we cited several cases.

THE COURT: Just so I'm clear, as of this moment you're not seeking any relief as to interrogatory No. 2, is that correct?

MR. BURSTYN: As to interrogatory No. 2, we do know that he failed to state the millions of dollars of trust income that he has received.

THE COURT: OK. So No. 2 is missing trust income?

MR. BURSTYN: Yes. That's what we know as we sit here.

THE COURT: What about 4, any other income component of this interrogatory?

MR. BURSTYN: Yes, your Honor.

THE COURT: OK.

MR. BURSTYN: He also stated that he has, in later interrogatories, an LLC called Hospitality House. It's possible that this business doesn't generate income. I don't know. We met and conferred on it and counsel wasn't aware

either.

So we know that he's receiving trust income. We think he should be ordered to provide complete responses to interrogatory No. 2 so that if and when we find out that he was incompletely stating his income, the plaintiff has the benefit of operating under the effect of an order.

THE COURT: OK. So right now you think that interrogatory 1 is missing trust income as well as, to the extent that Hospitality House generates any income, that would be missing as well.

MR. BURSTYN: Yes, your Honor.

THE COURT: OK. All right. Let me turn to Mr. Nicklaus on those two matters.

MR. NICKLAUS: This is interrogatory No. 2 we're talking about?

THE COURT: No. 2. Yes.

MR. NICKLAUS: Judge, I don't know. This is his affidavit. I think we can set up straw men and accuse him of lying before he is deposed.

I told Mr. Burstyn, I said, you know you can ask him about these things and what he's talking about at deposition, if he wants to. I mean, I'm not sure that he is leaving anything out by omission. I have no idea. This is his affidavit.

THE COURT: I thought I read somewhere in the

materials for today that he gets like $2 million from his trust, 2 million plus.

MR. NICKLAUS: I will refer you to No. 28, the answer to No. 28 on the same set of interrogatories.

THE COURT: OK.

MR. NICKLAUS: His answer is that he received distributions from the estate during a two years established by the court distributions roughly totaled $2,272,955 and some change.

THE COURT: OK. So that is a form of income that he received?

MR. NICKLAUS: Yes. That's what he says.

THE COURT: OK. So in that case it does seem like that, technically, interrogatory No. 2, there is a component of income that is missing. It is stated elsewhere in 28 that 2 would require revision to add that as a source of income for the last two years.

OK. What about Hospitality House, do you know if that is generating any income, Mr. Nicklaus?

MR. NICKLAUS: I think he indicated that in one of the other answers to interrogatories, if I'm not mistaken. Let me see which one.

THE COURT: I see it identified on interrogatory No. 19.

Is that where you're thinking, Mr. Nicklaus?

MS. BERTELSEN: Yes. Hospitality House, he says that he -- let me see which one it was, Judge.

THE COURT: I see it referenced at the end of the answer to 19.

MR. NICKLAUS: His answer -- we have our objections, and then what he did answer we included there.

THE COURT: OK.

MR. NICKLAUS: I saw it a moment ago, Judge.

THE COURT: No. 19. Look at 19. I think it says: Defendant identifies Hospitality House, LLC, a limited liability company, in which he holds an ownership interest, and he then he gives a principal place of business for it.

So I guess the question is whether Hospitality House, LLC has generated any income that the defendant has received in the last two years and, if so, that would be appropriate to include in a supplemental answer to No. 2. OK.

MR. NICKLAUS: I think that's probably referred to in the answer to interrogatory No. 2.

MR. BURSTYN: It's not.

MR. NICKLAUS: Well, maybe not specifically.

MR. BURSTYN: Well --

MR. NICKLAUS: He says $554,059. He didn't say --

MR. BURSTYN: That is rental income.

MR. NICKLAUS: Well, value. Well, I suppose he could ask him about that in his deposition whether he received any

income from that.

THE COURT: Here's what we will do. I am going to require an amendment to No. 2 to the extent that Rabbi Shmuely has received any trust income in the last two years, which it looks like he has according to interrogatory No. 28. To the extent he's received any income from his interest in Hospitality House, then he will supplement and he will add those two figures to the extent that those are additional forms of income that were not included in No. 2. OK.

MR. NICKLAUS: All right.

THE COURT: What is next?

MR. BURSTYN: No. 4 seeks, essentially, all bank accounts.

What we're looking for is, the court in addressing the burden issue has limited this to two years. We'd like to see bank account statements. We don't even know what bank accounts, which banks he has bank accounts with, much less the balances.

We cite in our materials filed over the weekend several cases -- *Kaplan*, *Regions Bank*, and *Lane Capital* -- all of which required defendants facing punitive damages to produce their bank account statements.

It is not really that burdensome to go log onto your bank account. Pretty much everyone has had to do it at one point in their life.

If he wants to come in and say he has 200 bank accounts and it is burdensome, I think that ship has sailed. I think it is late to do that. He needs to go to his banks, log in, download the documents, and show us the statements. That's what the authorities show. Even *Stern* required --

THE COURT: Right now we are just talking about the interrogatories. So he just has to list --

MR. BURSTYN: He has to list them.

THE COURT: -- according to this list the bank accounts.

MR. BURSTYN: Yes.

If I may make a brief comment, your Honor. On this point about we can just ask him at his deposition, we did, and that is why we ended up here, because he said at his deposition he didn't have answers to these questions.

The idea that in realtime at his deposition he spontaneously remembered things that he can't remember on the take-home exam that is an interrogatory is, I think, not productive.

THE COURT: Right. I seem to recall he indicated that his wife was the master of their finances.

MR. BURSTYN: Yes.

THE COURT: He did not have that information at his disposal.

MR. BURSTYN: Yes, your Honor.

THE COURT: OK. Mr. Nicklaus, let me hear from you on the subject of the discoverability of bank account information for financial worth discovery.

MR. NICKLAUS: I rely on the *Stern v. O'Quinn* case, your Honor. It says, number one, bank accounts for two years, for instance, would not reflect "current net worth."

We are talking about net worth. We are not talking about whatever he had once upon a time. It is talking about current net worth. That is why we are consulting with the accountants to provide us with those statements.

He does not have a prepaid or prepared net worth statement. So one of the items in the *Stern* case just says it is not relevant because it doesn't establish, quote, net worth, it doesn't establish property, it doesn't establish assets, etc. All it shows is what is in a bank account. So it is really not relevant, and that's basically our --

THE COURT: Does *Stern* deal with the issue of bank accounts? Is that requested?

I'm searching for the word bank in *Stern* and I'm not seeing the word bank account statements.

MR. BURSTYN: *Stern* held that separately ordering bank account statements would be cumulative because the information was already in other discovery that had been produced.

On the question of current net worth and timing, that is just relitigating your Honor's ruling from three weeks ago.

Your Honor addressed that, narrowing the discovery to two years, based on the wealth of Southern District authority.

This is that is one corner case *Stern*, because the defendant in that case, his net worth was comprised of stock and 800 cars. So on those facts the court departed from the general rule.

The general rule is set forth in the authorities that we cite -- *Kaplan*, *Regions Bank*, and *Lane Capital* -- all of which require the production of bank accounts, bank account statements.

THE COURT: Give me just a second. I'm just looking at the *Stern* opinion.

(Pause)

THE COURT: Someone has their ringer on their phone.

MR. NICKLAUS: Your Honor, I might also mention the fact that he would have joint accounts with his wife. So that is another problem.

MR. BURSTYN: Sure. So on the question of joint accounts --

MR. NICKLAUS: That is why bank accounts are not relevant.

MR. BURSTYN: Well, bank accounts are unquestionably relevant.

We also refer to the affidavit of our accountant who says so, citing generally accepted accounting principles.

On the law we cite *Puga*, *Shores of Panama*, and *SE Property Holdings*, which are in our materials, all of which compel the production of accounts that were held in joint names because those do go to the defendant's net worth.

If they want to use the protective order to protect his wife's privacy interests, they are welcome to do so.

(Pause)

THE COURT: Does someone have the pin cite for the *Stern* case where they are talking about bank statements?

(Pause)

MR. NICKLAUS: Again, Judge, we rely upon our written objections as well.

THE COURT: Right, but where is the pin cite? Where is it that you're relying on the *Stern v. O'Quinn* case for this point?

The reason I'm saying that is, it seems to me on this point to be one of the only cases, it seems like there are -- there is a variety of authority on this issue. I want to see why it is that the *Stern* case, when Judge Rosenbaum -- I think this is Judge Rosenbaum's opinion, even though it is Judge Dimitrouleas' case -- why it is that she drew that conclusion which seems to be contrary to many other opinions here in this district. So I'd like to see the pin cite, but it is a particularly long opinion.

MR. BURSTYN: Yes. It is at Westlaw, page 6.

THE COURT: OK.

MR. BURSTYN: On the bottom of the right-hand column, her Honor stated that production of defendant's bank statements would be cumulative in light of the production already required by the court. That is our point, which is that the information in the bank statements was already included in documents that this defendant would have to produce.

Here -- I will pause for the court.

(Pause)

THE COURT: Perhaps it is possible that there is more than one opinion that Judge Rosenbaum issued in this case, and I'm looking at the -- someone gave me the Westlaw cite.

MR. BURSTYN: Yes, your Honor.

THE COURT: It dawned on me that perhaps she wrote more than one time on the case.

MR. BURSTYN: The Westlaw cite is 2008 WL 11401795.

If you control F, it would be cumulative.

THE COURT: That is the issue I was looking at. Unpublished decision. She wrote more than one decision in that case.

(Pause)

THE COURT: OK. I see. All right. So I do see in this particular case that rationale for requiring that the defendant produce bank statements whereas it would be cumulative in light of the production already required by the

court. In that particular case the court had had already required that defendant provide financial statements used by the accountants to compute the financial worth, and for that reason she did not require the separate production of the bank records.

OK. So --

MR. BURSTYN: If I may, your Honor.

THE COURT: Yes. Go ahead.

MR. BURSTYN: So in that case you obviously have a proper -- the court didn't just make that up. The court had reason to believe that the contents of the accountant's materials would include the bank account information.

Mr. Nicklaus has, in all candor, told you that he does not know what is going to be in this accountant's materials, plus the wealth of case law, plus common sense. I'm trying to figure out this gentleman's net worth. Seeing what is in his bank accounts would be helpful.

The reason your Honor went back two years, in line with all the other cases indicating a look-back theory of not just today's net worth is so that I could see if magically on the date of production he's dissipated all of his assets. So we believe he should be required to provide a complete answer to interrogatory No. 4.

THE COURT: All right. So, Mr. Nicklaus, now that I have the benefit of going and looking at the *O'Quinn* decision

that you cited to in your objections, let me go ahead and hear your position on that.

MR. NICKLAUS: The bank accounts?

THE COURT: Yes.

MR. NICKLAUS: Wife would be on these same accounts and they would have to separate the assets related to him or the funds related to him or his wife.

THE COURT: Isn't that going to be a matter for the forensic accountants to figure out when they do whatever it is that they are going to do in reviewing and computing financial worth, as opposed to it being a shield to discovery? Because the records can be protected under the confidentiality order in the case.

MR. NICKLAUS: I don't know what the accountant would do, your Honor, because I'm not an accountant, obviously.

I think that if the accountant used the bank accounts to establish assets, property owned, running income, etc., etc., they would be able to separate that and to provide us the information separately, and then that would be something that would be preventive, I believe, in causing a disclosure of the bank accounts with both entities involved in the joint account.

THE COURT: Well, I mean, this interrogatory is just asking for a list of all bank accounts. So I don't think it runs afoul of him being able to say I have these bank accounts and some of these are co-owned with my wife and some of these I

own on my own. I don't know. I don't know what the answer is.

I have no idea what this bank account situation is going to be, but I certainly think, in response to the answer to interrogatory, he can provide the basic information about what bank accounts he has, is it a savings account, is it a checking account, and is it his account only or is it a co-owned account. It is certainly within the realm of the types of disclosures that are provided in financial worth discovery based on several of the authorities that the plaintiff has presented.

I do see that in *Stern v. O'Quinn* Judge Rosenbaum declined to provide it, but only because she deemed it to be cumulative from other information that was going to be produced in conjunction with financial statements and the underlying documents from the financial statements that have been prepared by the accountants. So it is not that *O'Quinn* says this information is not discoverable or irrelevant; it was simply in that case cumulative.

So I do think it is appropriate for him to disclose this information. And then whether or not we will reach it at I guess another time, whether or not there is a situation that we need to deal with if his wife is also on the accounts.

The fact that he is disclosing that he is on an account doesn't impact his wife one way or another. Right now in this interrogatory we are not talking about him disclosing

the particulars, other than the fact that he has these accounts.

MR. NICKLAUS: Your Honor, do you mind if I sit?

THE COURT: Absolutely. You can stay seated.

MR. NICKLAUS: Thank you.

THE COURT: Absolutely. As long as you use the microphone, that is my only requirement, so we can hear you.

MR. NICKLAUS: I will.

THE COURT: OK. So that is interrogatory No. 4.

MR. BURSTYN: No. 4 does ask for the account balances and the identities of the owners, which is, if he is concerned about joint ownership, then he shouldn't have any objection to disclosing who the account owners are.

THE COURT: Right. So that will give him an opportunity to be able to parse out and say, I have this account with my wife or this is my account, just my account.

Like I said, if there is a situation where there is going to be an issue that we need to talk down the line about anything that is co-owned with the wife, we will reach that when we get there. But right now we don't even know the answer to that, and this interrogatory, I don't think, impedes on any privacy concerns she really has other than disclosing the fact that she may be a co-bank owner with her husband on some bank accounts.

MR. NICKLAUS: Your Honor, if you would assume that

the bank accounts were solely his and they had balances in them, they would obviously change from day to day today. It would not be current information. Therefore, I think the information in the bank accounts is basically cumulative.

If they were to say, OK, I'll produce one bank --

THE COURT: I don't know that's cumulative. You produced one piece of paper so far. How can you say it is cumulative when nothing's been produced so far? Cumulative of what?

MR. NICKLAUS: By nature bank accounts themselves, they are not reflective of property owned or anything else that would add to the, quote, net worth statement.

THE COURT: Well, it is going to say, as of the day he answered the interrogatory, how much money is in the accounts, right, and it is reflective -- this one in particular is reflective of what does he have today.

I don't know anything that could be more current about his financial picture than learning about how much money he has today, because this one is not asking him to give a historical, you know, what his monthly statement has been each month for the last 24 months or anything like that. This one says the balance in such account as of the date these interrogatories are answered.

I mean, it is literally him going into his bank account and going, OK, I have X number in my account today and

this is the name of my account and it is a checking account, for example, and here's how much is in it.

MR. NICKLAUS: I guess you are correct if it would assume a certain date.

THE COURT: It says as of the date he is answering these interrogatories.

MR. NICKLAUS: As opposed to going back two years and all bank account statements and all records --

THE COURT: Correct.

MR. NICKLAUS: -- and all deposits.

THE COURT: This one is just the balance in such account as of the date these interrogatories are answered. So it is for a finite, it is a one-day picture of what his current bank accounts look like. So it is pretty limited.

OK. So that takes care of No. 4.

MR. BURSTYN: Interrogatory No. 7, your Honor, essentially requests that he identify his retirement accounts, the account holder. When I say "his," all retirement accounts, essentially, for his benefit and their balances. It is not unlike the last one we just did. It is retirement accounts.

We cite *Cottone*, *Hoecker*, and *Lane Capital*, all of which require disclosures of this sort of information.

He says it is overbroad and disproportionate. If he has a 401K, he probably only has one. It is not burdensome.

I don't know that we need to re-- it is really the

same exact arguments we just heard.
THE COURT: OK. Just as it relates to retirement accounts.
MR. BURSTYN: Yes.
THE COURT: OK. Mr. Nicklaus.
MR. NICKLAUS: Cumulative, your Honor.
THE COURT: Cumulative of what?
MR. NICKLAUS: I would go along with the same thing. If that information is contained in bank accounts, that would change from time to time, and I'm not sure this says as of the date. It does say as of the date.
THE COURT: It does. It says the balance in accounts as of the date the interrogatories are answered.
MR. BURSTYN: At the very end.
MR. NICKLAUS: I still don't think it is definitive of net worth statements. It may be part of it.
We are going to provide -- counsel says he doesn't believe me, but I have been promised that the accountant would provide a financial net worth statement.
THE COURT: What does that mean?
MR. NICKLAUS: That means he is going to provide a statement as to exploring certain materials and documents which will be producible, along with the net worth statement, the net worth of this individual as of a certain date.
THE COURT: OK. But isn't that a situation where the

fox is guarding the henhouse here, in the sense that, right, this is like, well, I'm going to have my people prepare my financial worth statement and then I'm going to turn it over and I'm going to not let you test whether any of that information is accurate.

MR. NICKLAUS: So what everybody has to do is go out and hire a forensic accountant to come up with a financial net worth statement in this case?

These are answers to interrogatories by an individual, your Honor. They are not a corporation who has tons of accountants or anything else.

THE COURT: I get it. But, listen, I have zero accounting background and I would be able to log into my 401K and be able to type in a number. I know how to log into my accounts and log in. This is not something that requires a forensic accountant to do this. This requires anyone who has a computer. As long as they know their password and their user name, they can get this information.

That is all we are talking about right now. Right now we are talking about retirement accounts. Why would a retirement account not be indicative of net worth.

If this gentleman has $500,000, for example, in the retirement account, why would that not be a snapshot to show, of his financial worth, of what he has sitting there in a retirement account to show his financial picture and his

potential ability to, what he has in terms of punitive damages for a jury to consider?

MR. NICKLAUS: Probably cause he's not retired, Judge, obviously.

THE COURT: It doesn't mean the money is not accumulating and sitting there if he's been putting money away.

Maybe he doesn't have a retirement account. I assume he does because you object and you didn't say none for that one.

MR. NICKLAUS: I didn't answer these, Judge.

THE COURT: But you filed objections, right. I assume --

MR. NICKLAUS: I did.

THE COURT: -- you asked the question.

MR. NICKLAUS: I did file objections, you're right.

THE COURT: And you wouldn't have filed objections if the answer was none. I mean, for No. 5 you said none without objections.

MR. NICKLAUS: Well, I didn't answer that. That wasn't my answer. That was the client's answer. I didn't say it. I filed objections where I had legal objections, which I made, but I didn't answer No. 5.

THE COURT: OK. Sitting here today we don't even know if he has any retirement accounts? Are we possibly having an argument over absolutely nothing?

MR. NICKLAUS: I don't know, Judge. I look at the affidavit and that's what it says.

THE COURT: OK. So in the affidavit he suggested he has retirement accounts?

MR. NICKLAUS: I'm saying the affidavit is sitting there under oath and written by Mr. Shmuely.

THE COURT: OK. But does he reference his retirement accounts in the affidavit?

I mean, this is three weeks ago, folks. I had a full week of criminal duty since I last saw you guys and I had about eight other discovery hearings.

I didn't know we were going to talk about the affidavit today. So if you want to direct me to it, I'm happy to look at it again in the record.

MR. BURSTYN: It doesn't say anything in the affidavit about whether he has retirement accounts or not. There is nothing -- I don't know.

Respectfully, this is a waste of time because nobody knows if he has retirement accounts. He should just say so. If he does, write the number. Because that is what the law says. If not, say none.

THE COURT: All right. So, Mr. Nicklaus, you don't know the answer to this, and I am skimming through this affidavit. I am not seeing in the affidavit, unless I'm looking at the wrong affidavit of his, that he is discussing

what he does and does not have in terms of assets.

MR. BURSTYN: He doesn't. He just says it will take him ten years to finish the interrogatories. He phrases, a decade.

MR. NICKLAUS: I don't know the answer. My client answered it accordingly, I assume.

THE COURT: OK. I do think that this falls in the same category as bank accounts. I think information about what he currently has in his retirement accounts is probative of the issue of financial worth discovery, and so I am going to require an answer to interrogatory No. 7.

MR. BURSTYN: Interrogatory No. 10, your Honor, requests, more broadly, any other depositories, meaning any other accounts that hold his assets.

We know from his other interrogatory responses that he got $2 million from the trust account, and that had to be deposited somewhere. He says none, but he doesn't have any other accounts where his assets are held. It is just not possible, unless he was paid from the trust in barter or something.

THE COURT: Couldn't it have gone into his bank account which he is going to provide a better answer to No. 4?

MR. BURSTYN: We know, and there is this big mystery about how we know this. Before these interrogatories were served -- we developed more information over time -- before

these interrogatories were served, we knew from Mr. Nicklaus' cocounsel that he was suing because there were some trust accounts and there is a probate proceeding. So what this interrogatory is designed to capture, your Honor, is to the extent there is some dispute that money is sitting for him not in one of his accounts, this is just all accounts that could be holding money for him.

THE COURT: So it's a catchall.

MR. BURSTYN: It's a catchall because he may say those other ones are bank accounts but I have got the trust money somewhere else, which we think is important because, as you know from interrogatory No. 2, where we said show us your income, he didn't see fit to write I got trust income.

So it is a catchall, but we don't think a burdensome or cumulative one because he may interpret it differently.

THE COURT: OK. Mr. Nicklaus, are there any other accounts that were not disclosed in response to No. 10?

MR. NICKLAUS: I have no idea, Judge. All I can tell you is the client answered it this way.

He seems to have more information. I don't have any other information. That is one of our requests, that he update the information that he has. If he has something that can be interpreted differently, like he may be doing, I don't know because I don't know what he has, what he's referring to. All I can say is how my client answered that question. I didn't

answer it.

THE COURT: OK. I think what he is saying is to the extent that he's received other money, such as distributions from the trust account, what he's trying to make sure is that there is no gamesmanship in terms of, well, it is not technically a bank account, it is a different type of account and so, therefore, I didn't disclose that account that is holding, for example, distributions from the trust. So I think that is what he is getting at.

MR. NICKLAUS: I think he could cross-examine him at his deposition on that type of information, Judge.

MR. BURSTYN: No, I can't.

MR. NICKLAUS: These are interrogatories.

THE COURT: OK. For No. 10, to the extent that there are any other accounts that are not identified in response to Nos. 4, 5, and 7, then he will be required to identify those in response to No. 10. Obviously, if there are no other accounts, then his statement will stand.

To the extent -- because before he wasn't required to answer No. 4 or 7 because there were objections. So now he is going to have to fully answer. He already answered 5, but he will have to fully answer 4 and 7. And to the extent for No. 10 there is anything additional that hasn't been disclosed that is an account where it is a depository account, then he will be required to supplement and provide an answer to that.

MR. NICKLAUS: Update it. OK, Judge.

THE COURT: Update it. Exactly.

MR. BURSTYN: Interrogatory No. 19, your Honor, essentially asks that he identify any business entities in which he owns or has any interests and a description of what the business is.

He just wrote Hospitality House, LLC. We have no idea what it does or anything about it, including its account, any distributions he's received from it or what it does.

We also believe, based on his social media, that he owns an interest in an adult toy store. It's prominent.

THE COURT: I'm sorry. So for No. 19, as it relates to Hospitality House, LLC, you believe what is missing is the type of business which was requested in the interrogatory. Anything else?

MR. NICKLAUS: What's missing?

MR. BURSTYN: Meaning what the business is, a description of the business, what it is.

THE COURT: Right. I mean, you used the word, for a description of the type of business.

MR. BURSTYN: Yes.

THE COURT: So that is what I understood you believe is missing for Hospitality House.

Anything else?

MR. BURSTYN: The nature and extent of his interest.

He just says he holds an ownership interest. I don't know how much, how much he owns.

THE COURT: OK: All right. You were going to talk about a toy store, you said?

MR. BURSTYN: I think it is called Kosher Sex. I'm not sure.

THE COURT: Kosher what?

MR. BURSTYN: It is an online adult toy store.

THE COURT: Oh, OK. Kosher Sex. OK.

MR. BURSTYN: So I believe, based on his social media, that he owns it or he is an owner in it. It is not disclosed.

I don't know if there are a bunch of other businesses he owns or not, but that is one that we've seen online that should be disclosed, or he can say he has no interest in it, if that's true.

THE COURT: OK. Well, I don't think he has to prove a negative in his answer to the interrogatory. I think just if he owns an interest in that business, he would affirmatively have to state it. But I don't think he has to say and, by the way, there is this business I don't own an ownership interest in that. I don't think he has to go to those lengths.

MR. BURSTYN: Right. This is maybe for the benefit of Mr. Nicklaus. We don't want to be in a situation where we sit at his deposition and he remembers a bunch of entities that he is online posting about, like discounts and cross-marketing and

buy this, buy that, which we see all over his social media, and then he remembers at his deposition, oh, yeah, I own that too, and then we have to rewind next week back today because there is just not enough time.

So we would ask Mr. Nicklaus to work with his client to complete the information with respect to the Hospitality House and have a conversation with his client to be sure before the depo that there is nothing else missing. And we put out that one business that we think he owns an interest in.

MR. NICKLAUS: Your Honor, prior to answering that I would request specifically that counsel provide me with the information that he thinks he has or he is speculating about so my client can answer this updated under oath.

THE COURT: I mean, I think that is fair, Mr. Burstyn. If there are particular businesses, specific ones that you know of that you think were omitted, like you did with Kosher Sex, I think if there are any others, I think that would be helpful just to make sure that you have as complete of an answer as possible. If there are any others, if you can go ahead and give that to Mr. Nicklaus.

Are there any others that you think?

MR. BURSTYN: That is the one I can think of. It is a very famous part of his persona. So when we received the interrogatory responses last week, that is what we thought was missing. So that is the only one that comes to mind.

THE COURT: OK. All right. So in that case, any objection, Mr. Nicklaus, as it relates to Hospitality House?

There's two subcomponents of interrogatory 19 that are not responded to, the type of business and the nature and extent of Rabbi Shmuely's ownership interest in Hospitality House. Any objection to providing that supplement?

MR. NICKLAUS: Your Honor, if he provides me with the information that he is seeking, that's fine. I would submit that he could ask that on deposition as well to clarify it.

This goes along with a lot of speculation that counsel is making. At the last hearing he said that my client owned properties in Israel. My client says absolutely not. Now that is speculation. I hear that, I have been hearing it, in almost every question. You can't speculate as to what somebody said under oath. But I have no objection to asking the client if he can update it, as long as I get the information from Mr. Burstyn.

THE COURT: OK.

MR. NICKLAUS: The same with every other request.

THE COURT: So let's do this. So for Hospitality House, because the type of business and nature and extent of Rabbi Shmuely's ownership or control of Hospitality House is not yet provided, he will supplement and provide those two components of interrogatory No. 19.

In addition, to the extent that Rabbi Shmuely has any

ownership or controlling interest in the business called Kosher Sex, he will provide a supplement. If he doesn't have any additional ownership or any ownership interest in Kosher Sex, then there will be nothing to supplement in that regard.

MR. BURSTYN: Can we refer to it as an adult toy store in Israel or online? Because if I have the name wrong, I am certain I am going to get, no, I don't own a company called Kosher Sex and that is going to be the way it is worded.

THE COURT: OK. So an adult toy store in Israel?

MR. BURSTYN: In Israel or online. If that doesn't ring a bell -- he is going to know what that is or not.

THE COURT: All right. All right. In that case we will make it a little bit more broad. But to the extent he owns a controlling interest in an adult toy store in Israel or online, then he will provide those particulars; and if he doesn't, he doesn't, and there will be nothing additional to supplement.

OK. What else?

MR. BURSTYN: With respect to interrogatory No. 24, that is the tax returns, your Honor, which we're just getting back to the court. You have the case law on that. I don't know that we need to --

THE COURT: OK. Let me hear from Mr. Nicklaus on the tax returns.

MR. NICKLAUS: I think I go with the same rationale in

the *Stern* case, your Honor, that they're not really relevant. Also, they are joint returns that he has with his wife. I think that needs to be separated. And it is not really reflective of net worth. I would go with the --

THE COURT: You didn't object to this one.

MR. NICKLAUS: Right. I would say that the court acknowledges that there are only -- they weren't required. They are not really relevant to a determination of the defendant's current net worth, that they relate to information predating this year, they are not necessarily current, and that the type of information contained in tax returns is not especially conducive to determining a defendant's net worth. Tax returns don't reveal assets, such as property --

THE COURT: Mr. Nicklaus, you didn't object to this one.

MR. NICKLAUS: I did.

THE COURT: No, you didn't. I'm looking at the response. You say: Defendant limits its response to the two-year period established by the court. That was already my ruling before we came in.

Defendant's federal income tax returns were prepared by Charles Moche, CPA, whom defendant believes maintains an office in Englewood, New Jersey. Defendant does not presently know Mr. Moche's complete business address. Defendant does not recall the precise taxable income reported for those years.

Defendant does not presently have copies of those returns.

MR. NICKLAUS: Your Honor, that was before we saw the returns were joint returns too, your Honor.

THE COURT: OK. But there is, the time to file objections already past. There were no objections.

So what is missing from this answer, Mr. Burstyn?

MR. BURSTYN: There's no tax returns. The objection was waived. Even if it wasn't waived, it would not be well founded given the case law.

There is a protective order they can avail themselves. We encourage them to avail themselves of it. There is no objection.

If they're giving them to us, they need to give them to us. They need to state the information here, and when we get to requests for production, they need to produce them. That's the law.

*Stern* says nothing different, except *Stern*, helpfully for the plaintiffs, specifically says, quote, tax returns are generally subject to production. It says under the facts of that case there were reasons not to. That is why it is a corner case in the body of law compelling tax returns, production of them, by defendants facing punitive damages.

There is no objection. The law is clear.

MR. NICKLAUS: I respectfully request these are answers to interrogatories and not a request for production,

Judge.

THE COURT: You're right. It is an answer to an interrogatory. But there are no objections either way.

I think what is missing here is -- you already provided the name and address and the person who prepared the return. So what is missing here is the amount of taxable income that was reported. And then the last part of this, whether or not he has a copy of such return, he says, defendant does not presently have copies of those returns.

So I think really what is missing here is what is the amount of taxable income that was reported for the years going back two years, so for 2024 and 2025.

MR. NICKLAUS: I just got copies of those yesterday by email from the accountant, who was in the Orient. I don't know why our client -- it asked for precise taxable income. I would think he meant precise related to not a joint ownership but his own, and that is why the tax return would not be relevant to his own specific income.

MR. BURSTYN: Judge, we are looking for the tax returns and the amounts on the tax returns.

THE COURT: So there was no objection lodged to relevance here for No. 24. You can't come up with the objections at the hearing. That ship has sailed.

So I think here what is missing is Rabbi Shmuely needs to provide the amount of taxable income that was reported in

the tax returns for 2024 and 2025.

OK. What is next?

MR. BURSTYN: Your Honor, when your Honor recaps the order on interrogatory No. 19 -- sorry. I just don't want to revisit it later -- the court stated that he was required to identify business entities in which he held a controlling interest. The interrogatory says, we have asked --

THE COURT: Any ownership interest or controlling interest.

MR. BURSTYN: Yes.

THE COURT: Yes, is what it is says.

MR. BURSTYN: We just want to clarify, I think on the record your Honor had read the controlling interest portion.

THE COURT: I meant to read both if I didn't.

MR. BURSTYN: Thank you.

THE COURT: I was intending to track the language in interrogatory No. 19.

MR. BURSTYN: Thank you.

We can go to interrogatory No. 28, I believe.

THE COURT: OK.

MR. BURSTYN: That is asking, essentially, for estate and trust income, as well as anticipated receipts.

As your Honor knows, the defendant's MO, reduced to writing -- we included a copy of his email -- is delay, delay, delay, delay. He put that in writing to us, actually. Told us

that that was his game plan here.

We know from Mr. Nicklaus' --

THE COURT: Wait. Where did he put that in writing?

MR. BURSTYN: Sure. So that is at Exhibit No. -- just one moment, please -- C-5.

He said that, he emailed me and my team saying that we're scumbags and delay, delay, delay, delay.

He's asking for more time to complete discovery.

THE COURT: Oh, I see it. It is docket entry 296-3, page 14.

MR. BURSTYN: Yes.

So what is happening, Judge, is he has staggard benefits from his family's trust. His father, to his credit, was a very, very wealthy man. The defendant has millions of dollars every X amount of time.

What is really happening in this case and why all of this is going on and why we are getting doctors' notes saying I can't be at my depo again is because we are in a race for my client to be able to get a judgment. We were supposed to have trial earlier this year and the defendant got out of that. He has his next distribution coming up on November 19th and more money coming in in 2027. He's filed the appeal.

The reason all of that is going on, we believe, is so that I can't get a judgment and I can't then be a judgment creditor.

I say this without prejudicing our rights. We are going to do what we can to stop the dissipation of assets. It is a lot more -- what he is trying to do is make sure that he gets the assets before we get a judgment and a jury verdict. That's why delay, delay, delay, delay. Four times.

These future inheritance expectations that he has -- one is just in November -- they should be identified because he knows he has money coming in, and I am not going to get a trial in November. We are going to be at a point where we are back here, just to forecast what we think is going to go on --

THE COURT: So wait. Your concern is, though, the distribution is coming on November 17, you said, but discovery closes on November 9. So you will already have -- your concern there is that you won't have the information -- your concern is the assets will be dissipated by the time you can go to trial and potentially get a judgment?

MR. BURSTYN: Yes. That is why he is saying that he wants his deposition -- that is why we believe he is trying to delay the case, so that he gets the assets before the Fountainbleu gets its judgment.

There is a strategic reason why he is coming up with these things, at great expense to him. Because it is one thing to get yelled at by a judge, in his mind. It is another thing to actually have assets when we come to collect. That is really what he is concerned about.

He is not concerned about what the court can do to him, which we will come back to in a different context, in a different time.

Without question, his future expected income, which is weeks out into the future, should be disclosed because it is going to be relevant. We are talking about current net worth. We don't have trial until next year. He is going to have to supplement all of these answers by the time we get to trial.

Interrogatory No. 28 is asking him, if you know that money is coming in, say so. And we know that he does.

Before Mr. Nicklaus repeats that he doesn't know where we get this information from, it is deja vu all over again. At the last hearing he was sitting next to Mr. Nicklaus, who we know has notified --

THE COURT: No, that is Mr. Nicklaus. He was sitting next to someone different.

MR. BURSTYN: Yes. He was sitting next to -- he is always sitting next to Mr. Nicklaus.

MR. NICKLAUS: This Mr. Nicklaus?

MR. BURSTYN: Yes, yes, yes. Who's on first.

MR. NICKLAUS: Present, your Honor.

MR. BURSTYN: He was sitting next to Mr. Krtausch, his for now cocounsel, who filed a complaint stating that the defendant expects to receive $2 million in November.

There's a lot of information of public record.

THE COURT: So you know that information based on that other lawsuit that Mr. Krtausch is pursuing unrelated to this.

MR. BURSTYN: Yes. It is in public filings.

There's since been -- there's more information. He publishes information. He has many other lawsuits. We will discuss the requests for production that we got on Friday that he's referring to and we will produce documents responsive thereto if it is timely. I don't think it is. That is not before the court. We will deal with that when the time comes.

To wrap up, his inheritance is, obviously, discoverable. He said so. He's produced some of the amounts of money he's inherited. His future expectations of income from the trust should also be disclosed because he is going to have to supplement anyway and identify this information.

THE COURT: OK. The reason for that is because it would be reflective of his current net worth as of the date of trial. You guys are set for trial, I think, in February. So if he receives a distribution next month, that would be close enough in time to trial that it would be relevant for the jury to be able to consider that.

MR. BURSTYN: Yes, and also if he is sitting here right now and he knows that in January or in March, before we will have collected, that there is -- the way the trust works, as far as we have seen in the public filings by his counsel in this case, there are certain date benchmarks by which he

receives certain amounts of money or assets. We don't have visibility into all of that. Some of it is publicly filed, some is not.

If he is sitting here and he knows in March, the day after trial, I'm expecting to get another $10 million from the trust, that's discoverable. It is probative and proportionate to the issues in the case. So there is no reason that he shouldn't be required to disclose that. That is interrogatory 28.

THE COURT: OK. Let me hear from you, Mr. Nicklaus, on that.

MR. NICKLAUS: Let me get this straight, your Honor. He has information that my client might have something other than his current net worth which he is being asked about here. Is he supposed to speculate with regard to what he might get in some litigation where he might get nothing? Is he going to disclose that? Is he making an argument to the court or the jury about why he is, quote, not disclosing some speculative piece of litigation?

THE COURT: I think -- I may have misunderstood -- is it that under his trust he is set to receive a certain distribution next month, not based on a future collectible mitigation that is unsettled at this point in time?

MR. BURSTYN: Yes. This is not some random case that we are asking do you think you're going to win. I mean, the

defendant, who figuratively is sitting right there, has a lawsuit in Miami-Dade County court --

MR. NICKLAUS: That is not me. I am not sitting here.

MR. BURSTYN: -- stating that he is unquestionably entitled to about $2 million on November 19th. If that is true, it is discoverable.

If he wants to talk about admissibility, that is not for right now. This is not me asking him if he thinks he is going to win a lawsuit.

THE COURT: OK. When you say that he's made those representations in a lawsuit that under his trust fund he is entitled to receive a certain distribution on a date certain --

MR. BURSTYN: Yes.

THE COURT: -- is that part of that lawsuit or it is just a representation that he made in that lawsuit?

MR. BURSTYN: No, no, it is the lawsuit. The lawsuit, as far as we -- I am not in it -- as far as we understand it, he is suing because he says he is entitled to amounts certain on certain dates, and we'd like him to disclose that because it is probative of his net worth.

THE COURT: He is fighting over his receipt of that amount? It is contested?

MR. BURSTYN: He is suing all his siblings. I don't know really --

THE COURT: So we don't know if he is going to receive

that distribution because it is contested?

MR. BURSTYN: No, but I would like to know what he says he expects to receive now, because it is not just him thinking or speculating that he is going to get it. He actually has counsel suing to receive it.

So if he is on the stand -- I don't know that he will be -- if he is on the stand or when the time comes for supplemental disclosures, I can say, hey, did you end up getting the things that you said you were going to get before our trial. Right now it is less clear.

Him stating that he believes he has a right to receive $2 million on November 19th, etc., is not a statement that I can go take to the jury and say he, in fact, received it.

I will go find out if he actually ultimately got it, but for purposes of discovery, I've got a defendant who between now and the date of trial is expecting to receive millions of dollars. The issue at trial is going to be -- at trial, after he expects to receive this money -- what is he worth. This is evidence of that.

THE COURT: Only if he receives it, though.

MR. BURSTYN: And then he --

THE COURT: Wouldn't it create a false picture for a jury to have that he has an expectation -- what if he's wrong? What if he loses in that other lawsuit and he never gets that distribution. Wouldn't you be creating a false picture for the

jury what his net worth is just because he anticipates that in litigation he is going to get a certain sum of money?

MR. BURSTYN: I'm not suggesting that I am going to go from this interrogatory to saying, ladies and gentlemen of the jury, remember that bank account that had 5 million, I also have an interrogatory response that says he thinks he is going to get 2 million and so he got the 2 million.

For purposes of discovery, it is relevant for my client to know what he expects to receive between now and trial. By the time of trial we'll get more information, but he knows more than I do about what he expects to receive before trial.

What I'm trying to say, on my point about this is not about admissibility, is by the time of trial he can come out and say I didn't actually end up getting that. I lost the case.

I'm not going to take the interrogatory responses about his expectations or his stated rights of future income and go show them to the jury and say, that's as good as cash, that's his net worth.

The point here, and what makes this, I think, a unique situation -- it is not a unique situation. These are the facts. By the time of trial, those contingencies will have either hit or they won't have.

The alternative, their approach, is don't make him say

what he is going to get in November, and then in this discovery period I'll have what he has today and then I will just show up blind at trial and have no idea what he got in between now and then.

So the better alternative, we're suggesting, is he should disclose what his stated rights are under the trust agreement, because he knows better than I do, and by the time of trial we can find out if he got it.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: Wow. Judge, he doesn't have it. It is not current. It is not in his hands. The only person that he could possibly ask whether he is going to have that as an asset is maybe the judge who might create summary judgment in that case, whenever that might be.

If he got it before trial, he would update, obviously. But he is not required to answer something that is speculative now.

He doesn't have it. It is not an asset. It is not an asset. It is highly questionable.

THE COURT: I agree with you. I think that at this point in time -- this isn't a receivable that he has on a spreadsheet that he knows that it just hasn't been paid out yet but it is for sure coming. This is litigation.

As we know, everyone sitting here -- we are all lawyers -- there is no certainty whatsoever about litigation.

This is not an asset at this point in time. He may be hopeful that he is going to get a distribution. That is why I was trying to understand exactly what the nature of this is.

Sitting here right now it is not, what you are going to get in litigation is not an asset. You are trying to compute what his financial worth is to give this information to your forensic accountants so they can come up with financial worth, and I don't see how the possibility that in litigation, at some point in the future, he may or may not get this distribution from his trust can be counted towards his financial worth, to be able to tell the jury whether or not what his financial worth is so that they can determine what appropriate punitive damages would be in the case.

Now with that said, under Rule 26(e), and I will put this into my order, he has an obligation to supplement this answer. So between now and trial, should there be a determination that he is legally entitled to a distribution from his trust, then he is going to be required, and that will be covered by my order, to supplement and provide that information prior to trial.

However, sitting here right now I am not going to make him guess and speculate as to something that may or may not be a possibility in the future.

He will certainly be required to supplement should there be any kind of a ruling or outcome in that case that

entitles him to distribution under the trust and, if so, he will have to provide the date in which that distribution is going to be made and the amount of that distribution. OK.

MR. BURSTYN: Thank you. Your Honor, interrogatory No. 30 catches pretty much everything that wasn't in the prior interrogatories. That is any other assets or property rights and the valuations of the assets, what he paid, etc.

He disclosed that he has a one-fifth interest in his late mother's home in Miami Beach and a one-fifth interest in a one-bedroom interest at Tower 41st Street, Miami Beach.

A couple of issues.

He also disclosed in discovery to us, in his initial disclosures, that an insurance policy showing his coverage amounts but also that he owns four homes totaling, I want to say, around $20 million in homes. It might be more than that. It stated the addresses. His Englewood home, I think, is valued at about $17 million. Manhattan condo, upstate New York house, another condo in Miami Beach.

We know, not because I have some voodoo source of information, we all should know that interrogatory No. 30 is woefully incomplete. It is incomplete by about $20 million. So that is not like an, oops, I forgot I have a $17 million house, which really permeates our concern about everything.

THE COURT: And that insurance policy is in his name?

MR. BURSTYN: Yes.

THE COURT: OK.

MR. BURSTYN: Yes. He is insured. It lists these homes.

What might be happening is he might be resorting to self-help here and in his mind saying, well, because my wife may own some of those assets, I don't have to disclose them. That is *Puga* and several other cases in our materials, and we have already dealt with this in the tax returns, that is not the law.

Then also, how am I supposed to value a one-bedroom unit at Tower 41. I don't even know which unit it is.

This is incomplete on its face, but it is also incomplete based on the other information that we have and that the defendant has produced.

Also, and we produced this a while ago in the case, we believe his father owns or owned several million dollars worth of property in Israel. We referenced this during our meet and confer on Thursday. He has emails that I, unfortunately, have been added, against my will, to a family email chain, where the family talks about everything, including --

THE COURT: A family email chain for Rabbi Shmuely's family?

MR. BURSTYN: Yes.

THE COURT: You've been added?

MR. BURSTYN: Yes. It is surreal. I produced it. It

shows a lot, including -- it is a very wealthy family, to their credit. Great for them. They are actively fighting over who is going to get this million dollar condo in Jerusalem.

Again, I also just want to push back. The idea that I have to do a sort of pre-call on these interrogatories and say, hey, before you tell me what you want me to know, let me tell you what I know, because I know what is going to happen. I know 50 percent of the available information, let's say, and then all I am going to get in these interrogatories is the 50 percent that I knew before, and then Sean's none the wiser. Mr. Burstyn's none the wiser. Whatever.

The defendant knows these interests. He knows what he owns. It is not here. It is off by over $20 million. He should go back to the drawing board and do this right.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: Sounds like more speculation to me. I don't know what he knows and whether those properties are owned by him alone or whether they are owned by his wife or whether they are jointly owned. I don't see anything.

You know, this is as speculative as it is that the Fountainbleu is going to get a big judgment against him in the first place.

THE COURT: Well, did you read the declaration of their forensic accountant that was filed with the materials for today's hearing at 296-3, in that on -- these are not numbered,

the affidavit. Let me see. It is page 5 of the affidavit.

They go through, the forensic accountant itemizes that there were four different pieces of real estate that were insured under Chubb Masterpiece Policy No. 13843710-05, and it itemizes a property in New Jersey, another in New York, another one in New York, and another one in Miami Beach, none of which are the two properties that are identified in response to interrogatory No. 30.

So the question is, why aren't these in response to interrogatory No. 30 if there is an insurance policy issued to him and to his wife identifying these four, unless he's since sold these properties and no longer has any kind of interest in these properties?

MR. BURSTYN: They are being listed, Judge.

MR. NICKLAUS: Excuse me. I'm sorry, counsel.

Insurance policy is not a title to ownership, number one. Number two, we don't know why the wife, if the wife had the insurance policy, why she had it or what type of policy --

THE COURT: It says it's issued to both of them.

MR. NICKLAUS: -- what type it is, what type of policy it is, and whether it reflects any value at all.

THE COURT: I mean, it does. It says, for the one in Englewood, New Jersey, it has a value of $16,950,000 in dwelling coverage and another $3.34 million in contents coverage.

MR. NICKLAUS: That's right. It is still not ownership, though. It is an insurance policy.

THE COURT: But the question is, state whether you own, have title to, possess, or have an interest in any asset or any property rights described in these interrogatories.

So my question is, have you made an inquiry with your client as to whether or not he has an ownership interest in any of these properties. Because if so, it would be appropriate to supplement if he does.

MR. NICKLAUS: Sure. I've asked him to answer these interrogatories and I asked him to fill out the affidavit, which he filled out. I didn't prepare it. He prepared it.

So the answer is my client knows what the questions were. Whether he owns the property now or whether he owns it later, I have no idea. All I can say is, have I consulted my client. Yes, I have.

THE COURT: Right. I think that if you were on the receiving end of interrogatory answers that you were challenging that you thought were incomplete, you'd be going back to counsel saying, you can't just necessarily take what your client says at face value. You, as the lawyer, need to push your client and say, hey, what about these other things; are you being complete in your answers.

You know that, Mr. Nicklaus. You can't just let your client tell you I don't have anything if there is a possibility

that you know that your client's withholding things.

MR. NICKLAUS: I'm supposed to know something about what's in New Jersey and do research to find out whether he really owns it or not. Counsel says he has information. Let him supply the information and update his discovery so that maybe my client can review it.

THE COURT: That is not how it works. If your client owns properties, how would he know of the possibility he owns properties. That strains credulity to make that argument here in court. How would you not know that you have a deed to a property, that you have an ownership interest in a property. How would you not know that when you went to a closing to sign documents to own or co-own a property. He would know that information.

MR. NICKLAUS: Your Honor, I don't think you're implying that somehow I accepted answers to my client's interrogatories willingly.

THE COURT: I'm asking you the questions because there is here an insurance policy and I have asked you, have you asked your client about this information because, perhaps, his answers to interrogatories need to be updated.

MR. NICKLAUS: Well, if they need to be updated, I'll ask him to update them, Judge.

THE COURT: All right. I am going to require a supplemental answer to interrogatory No. 30.

There are a few different things as it relates to the existing properties that have been identified. Specifically, as it relates to the property at 4443 Prairie Avenue, in Miami Beach, Florida, the information is incomplete as to -- the interrogatory asks for information such as the amount that he paid, if he paid anything. Perhaps if he inherited it, he paid nothing. The date and the manner in which he acquired the item. So if it was formerly his late mother's, perhaps, like I said before, it was an inheritance, but he would have to explain that, as well as the current value and amount of insurance.

With regard to the other property at Tower 41, the same information is missing. But, in addition, he needs to provide the actual street address. This does not provide a street address for Tower 41. So there is no way to identify, I don't know if this is a penthouse condo or if it is on the second floor. But certainly the value could change depending on the size of the condo and where it is located within that tower.

To the extent that Rabbi Shmuely owns or has an interest in any other real property, and as an example there are four properties here that he may or may not currently have an interest in, but I think the inquiry is necessary to verify does he have an interest in any of these four properties or any other properties around the globe.

Mr. Burstyn has suggested that there are properties that the family owns in Israel. So to the extent he has any other properties, he needs to disclose that information in response to interrogatory No. 30.

I do think that given some of this information that has been disclosed here in court, the specific inquiries need and should be made.

So that takes us to the answers to interrogatories.

MR. BURSTYN: The requests for production.

THE COURT: OK. Request for production No. 6, right?

MR. BURSTYN: Yes, your Honor. The sixth request for production, the first one, I think these arguments are mostly going to be coextensive with what we discussed with regard to the interrogatories.

The first request for production looks for various net worth documents, including his bank account statements.

We are not, frankly, given the context here, we are not seeking to compel them to produce documents related to his expenses. If he wants to do that, in theory it would help him. If he doesn't, we are not going to demand that he reduce his net worth. But these are the bank account statements, canceled checks, and retirement account statements.

We had suggested, regarding checks -- I don't want him to go look for every $72 check -- a materiality limit. None was forthcoming. We weren't able to reach any agreement.

THE COURT: Let me ask you this. You are going to see money in, money out on a bank account statement. Why do you need to also have him pull the checks?

Does it matter if 18 months ago he wrote a check for tuition for one of his children to go to college, for example, or he made a car payment? What does it matter? The point is money's out --

MR. BURSTYN: Yes.

THE COURT: -- so he doesn't have that money today, so it wouldn't bear on his financial worth today.

MR. BURSTYN: I don't think we are moving on that piece anymore. I agree with what your Honor is suggesting, if we get the complete bank account statements for the relevant time period, retirement account statements, etc. If there is an issue, we can come back. I don't think there would be with complete account statements.

When we say complete account statements, before we hear about overbreadth, if he's got one or two accounts, that's 24 PDFs. I think he can download them by the year, if he's using a traditional bank.

I don't think we need canceled checks. It's the account statements that would suffice.

THE COURT: So in response to request for production No. 1, because this has a lot of subcomponents, be specific.

You talked about bank statements, is what you are

seeking to compel. Any other subcategory here?

MR. BURSTYN: Yes, your Honor. Bank statements, retirement account statements.

THE COURT: OK.

MR. BURSTYN: We believe those for the last two years.

Also, to the extent he has any financial statements, like statements of personal net worth, we would expect that he produce those. We just don't know if they exist or not.

Also, we are seeking investment accounts. So that would be things like brokerage accounts showing stock holdings, and any deferred compensation accounts or agreements that he may have for any of his entities, of course.

THE COURT: OK. Mr. Nicklaus, so it sounds like, with regard to No. 4, they have narrowed it down to these categories -- bank statements, retirement account statements, investment account statements, deferred compensation accounts or agreements, and statements of personal net worth.

MR. NICKLAUS: I rely upon our written objection, your Honor. I think this is all disproportionate. It is an unrestricted collection of materials that really is disproportionate to what he is trying to seek, which is really net worth and financial net worth.

All of this has to do with striping him of everything he had his whole life unrestricted, and I object to it. It is abusive. It is cumulative, not proportionate, not germane,

really, to the main issue.

MR. BURSTYN: We stand on the same case law when we had this discussion regarding the interrogatories.

THE COURT: I am reading the objection. It's lengthy.

(Pause)

THE COURT: All right. Well, consistent with my ruling as it relates to the answers to interrogatories, I do think there are certain components here that are discoverable for the same reasons that we discussed when we were talking about the answers to interrogatories, Nos. 4, 7, and 10. That being, I think that the snapshot showing his monthly bank account statements, as well as retirement accounts and investment accounts, all of that goes to show or goes to paint the picture of what his financial worth is and what he has available to him, right.

If he has a million bucks sitting in a retirement account, that is relevant to what his current financial worth is. Same goes with his investment accounts and with regard to his bank statements going back for the two-year period.

What do you envision, Mr. Burstyn, when you say statements of personal net worth? What does that mean?

MR. BURSTYN: Some folks, particularly wealthy folks, track their net worth, track their financials on a regular basis. We were told that, even during this hearing, that his accountant was preparing a statement of his net worth.

In *Stern v. O'Quinn*, there was a discussion of some people just had that document.

So if he has any statements indicating his net worth, we would ask that those be produced, like personal financial statements. This is getting ahead to another request for production No. 3, where we asked for his loan application. Those sorts of documents are sometimes prepared as a standalone when you go to get a loan -- what are your assets and liabilities.

So to the extent he has any, those would be discoverable under the case law. If he doesn't, then he doesn't. I hope that description helps the court.

If his accountant or anyone else has ever written down in the last two years a figure for his net worth, we would like to see what that is.

THE COURT: I thought you were going to separately request that information with loan applications.

MR. BURSTYN: So I'm describing where I think he might use that. I don't know that it is -- in my experience, when I've had clients with a personal financial statement, it comes up when they go get loans, it comes up when they guarantee other people's loans, and the lender might say, what is your net worth, and they will have an accountant prepare a personal financial statement.

If he has one, we'd like it produced. I don't know

that he's ever done one. I don't know that he's ever created one. They didn't say it doesn't exist. So if it is exists -- in my personal experience, I've seen it come up with loan applications. Maybe he's had it come up in other contexts. I don't know. They don't say it doesn't exist.

THE COURT: Mr. Nicklaus, do you know if he has any personal net worth statements that have been prepared?

MR. NICKLAUS: No.

THE COURT: You don't know.

MR. NICKLAUS: I don't know.

THE COURT: OK. So I think it is important to make that inquiry as it relates to that category. Perhaps he doesn't have and no one's ever prepared in the last two years. It is only limited to the last two years. So if someone's prepared it in the last two years, then that would be subject to production. If no one's prepared a personal net worth statement in the last two years, then there is nothing to be produced in regard to that category.

OK. That is request for production No. 1.

MR. BURSTYN: Request No. 2, to save time, I would stand on the arguments we made with respect to the interrogatories. This calls for two years of past tax returns, including W-2s, 1099s, and K1s, the sort of backup that goes into tax returns, and we'd stand on the same case law that we argued earlier in the day.

We are probably going to hear burden and information about his spouse. Again we go to, if they are very concerned, they can go to *in camera* review with redactions or use the protective order.

His tax returns are discoverable. There isn't a case that holds that tax returns are not discoverable. There is *Stern* that said, under the facts of that case, they are not, but *Stern* acknowledged the general rule. This information is subject to discovery.

THE COURT: OK. Mr. Nicklaus.

MR. NICKLAUS: I rely on our written objections, your Honor. It is cumulative. It is not proportional. It is certainly abusive.

With regard to the plethora of information that he's been asking, there are 42 of these requests for production. There are so many subparts, your Honor, they are impossible to deal with. They are just so burdensome and abusive, it is insane.

I would respectfully tell the court that I think our objections are fair, I think they are reasonable, and I think we are being fair with regard to what we are willing to produce in this case.

I think what happens here is that -- I know Mr. Burstyn is very well versed in all the financial aspects that somebody could possibly have. He's asked about it. It

does not go to the germane issue in the case and what the net worth is. It is just overly, overly, overly excessive, and I rely upon our written objections.

THE COURT: We are only on the second request. We haven't gotten into, what is it at this point in time he's been required to provide in terms of documents. Bank records, retirement account records, and -- what did I say -- his investment account records, and to the extent he has a personal net worth statement. If he doesn't have one, there is nothing to produce there.

So what is it so far that's been abusive about this?

Perhaps down the line when we get to some of these other ones, but right now all he's been required to produce is three categories of documents, which he should have available online to be able to download and produce.

MR. NICKLAUS: We were just talking about tax returns here.

THE COURT: Which you told me that you already got copies from the accountant.

MR. NICKLAUS: I did. They are joint returns. I did.

THE COURT: Right. So I think -- listen, at this point anything that is being produced here that is of a financial nature he is going to be welcome to avail himself of the confidentiality order that is in the case to make sure that those documents can only be used for purposes and in the ways

that are allowed by the protective order.

I would have no issue with regard to any of these financial documents, which are highly-sensitive documents, to be governed by the terms of the protective order. I think that is a perfect use of the protective order in this case, including the protective order would encompass any documents that included records from a nonparty, which in this case would be his wife, so that she is protected to make sure that none of her financial information is disseminated in any way either.

I do think under the case law, there are many cases in the Southern District of Florida and within the Eleventh Circuit where the courts, having had the benefit to review these cases, where courts have ordered limited income tax returns going back to a two-year period for purposes of financial worth discovery.

Now as it relates to his wife, I think that that material will be governed, like I said before, by the protective order. To the extent there is anything that is specific to her income, it might be appropriate for redaction.

So, for example, if she has within their joint tax returns her own W-2s, for example, that is her income and her paystubs, if it happens to be part of her tax returns, then I don't see why the plaintiff should be privy to the numbers of how much W-2 income she specifically received from whatever employment she may have.

So I think there are situations here as it relates to her individualized information within her tax returns that would be appropriately subject to redaction. I think that should take care of any concerns that she would have about her own personal financial, plus it could be cloaked under the umbrella of the confidentiality order more broadly so the information can't be disseminated.

MR. NICKLAUS: Yes, and I did discuss that this morning with Mr. Burstyn and since then my client instructed me to object.

THE COURT: I understand. I understand your client has certain positions and you are advocating for your client's positions. I get it.

MR. NICKLAUS: I must do so.

THE COURT: Absolutely. OK.

What are we talking about next?

MR. BURSTYN: With request for production No. 3, your Honor, we can narrow that to really two things.

One is the assets and liabilities in this case of controlled entities, one of which is what he refers to as his nonprofit World Values Network, is one that comes to mind, and the other item in this request for production that is not duplicative of others would be loan and credit applications, where he goes and tells lenders of banks what he has, what he is worth, etc.

I recognize this request does ask for balance sheets and other net worth statements, but that is covered. So assets and liabilities of controlled entities and loan and credit applications is what we're looking for there.

His objection is along the lines of, or one of them, is that this could mix entities or assets that his wife has a part of or it could include some information referencing his wife. I think what your Honor just said a moment ago is as good for request for production No. 2 as it is for No. 3.

THE COURT: So you think there's certain entities that Rabbi Shmuely controls that his wife also has an interest in those entities?

MR. BURSTYN: They object on that basis. So I don't know. They have an objection that this might include the information of others. I think they are referencing his wife.

Let's play it out for a moment. If he owns an LLC that has $5 million in assets, that is not confidential information of his wife. He will say it's got net assets of 5 million. I own 10 percent. His interest is worth $500,000. If there is something very sensitive regarding his wife in there and they can defend that to the court, then we would urge counsel, and not the defendant, to be the one making those redactions. Otherwise, yes, they say there might be information of others in there and we can just deal with that the way we dealt with the other requests.

THE COURT: Where in the case that you provided me does this fall within the scope of financial worth discovery of another individual?

MR. BURSTYN: Well, *Lane Capital* is the main case we are relying on. The decision itself is fairly short, in that it compels --

THE COURT: Right. All 31 categories.

MR. BURSTYN: Correct. Then we pulled from Pacer, I think it would come up -- let me just see where it is stamped on the docket for your Honor.

(Pause)

MR. BURSTYN: I'm afraid I have a stamp on top of a stamp because we pulled it from Pacer.

THE COURT: I have the decision. I'm looking at it. I printed out all the cases.

MR. BURSTYN: 296-5 of our docket shows the motion to compel that was the request for production.

(Pause)

THE COURT: What requests would mirror your requests here?

MR. BURSTYN: So I think the main one -- there are several. Request No. 16, your Honor, at page 12 of the motion to compel, which copies the requests that were approved, asks for copies of all balance sheets and profit-and-loss statements with regard to any business enterprise in which the defendant

had an interest. That was granted.

That is the nature of information that we're seeking in request for production No. 3.

THE COURT: Here's my issue with the *Lane v. Capital Acquisitions* case, which I did rely on at our last hearing for purposes of establishing the temporal scope. However, Judge Seltzer in this opinion did not exactly provide any analysis on an individualized basis as to any one of these requests. He just issued a blanket order saying, for all 31 requests go back two years and I'm going to give you two years' worth of discovery.

So it is not particularly persuasive to me when there is no analysis for me to understand. I am not in Judge Seltzer's mind back in whatever year this was when he wrote this order to understand why it is that he drew these conclusions 21 years ago.

MR. BURSTYN: Sure. Two points there. Just on logic, if I am a business -- some folks are very stock rich. Some people are very cash rich. If I own a business, that's my source of wealth, and that business owns X percent of net equity and it would show partners' earnings, it would show distributions to him, it would show what the value of his interest is in that business. That's information the jury is going to want to know, right. If he owns -- I'm sure he doesn't.

Let's say I have a defendant who owns 10 percent of a billion dollar business. The idea that the jury is not going to be able to take a look at that to assess what his net worth is really cuts out what net worth literally is. Part of your net worth is the value of the business interests that you own.

So there isn't, I think, a universe where it doesn't make sense for him to be required to produce that information. It's what he owns.

THE COURT: What he owns or what the business owns? The business hasn't been sued here.

MR. BURSTYN: Right. So --

THE COURT: Here's my struggle, because you are going to get his K-1s in response to request for production No. 2. So you are going to get his distributions and know what it is that he is making from the business, any businesses, in terms of distributions through the K-1. But those are assets held by the business, not held by him. That is why it is an LLC.

LLC gives you benefits for liability, right. It shields you from liability. But those assets belong to the business. They don't belong to the members of the LLC. I think that was one of the entities we were talking about was an LLC.

MR. BURSTYN: So I think we have the arrows inverted here. I can't go from the LLC, generally speaking, I can't go from the LLC up to him, but I can go from him down to the LLC,

from a net worth standpoint.

A person is worth the value of all of their assets. He is going to show me in the interrogatories that he's got, let's say, 10 percent of Hospitality House. That is an asset, that 10 percent. That does nothing for the ladies and gentlemen of the jury to know he owns 10 percent of Hospitality House. What are they going to do with that.

My accountant needs to go in and say, I've looked at the balance sheet of Hospitality House and 10 percent of Hospitality -- the 10 percent this defendant owns is worth 10 percent of the net assets of Hospitality House.

So this isn't me going from the entity up, which I can't do because they'll say -- unless I overcome that. But that is not this case. This is, what do you own. And if he owns 10 percent of Apple stock -- and your Honor is allowing me to show what the math is, what his stock is worth. That is only because Apple stock is a public company so I don't need Apple's financials. In non-public entities the only way the jury can know what the value of that asset is, is if he shows me the balance sheet of the entities that he owns an interest in.

So it is something that we need access to; otherwise, in stating percentages of the shop in Israel and Hospitality House is probably going to be useless.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: Your Honor, first of all, the last paragraph there, we did object on the basis of indiscriminate treatment with respect to the financial affairs of others, separate entities, if he owns a part of an entity or whatever.

If it is an LLC, it might be related.

Thirdly, it is just not germane. It is not proportionate to this case. It is just not. I generally don't believe -- I don't think it relates to his net worth at all. I think it is cumulative also.

MR. BURSTYN: There is no other way to know -- we have all these cases allowing us to --

MR. NICKLAUS: We are doing a lot of creation here, a lot of creation of supposed net worth of a simple individual.

MR. BURSTYN: He is worth tens of millions of dollars, and some of that comes from the entities that he owns.

There's no way -- it's like giving me the address of a house but I can't say what it's worth. To give us the percentage of his ownership interest but not any way to value the interest in that business.

THE COURT: Other than *Lane v. Capital Acquisitions*, were there any other cases that supported your request, Mr. Burstyn?

MR. BURSTYN: Your Honor, I'm just taking a quick look so I can be sure.

(Pause)

MR. BURSTYN: As I sit here, and I don't want to take too much time, I'm not sure which of the other cases has this fact pattern. So I'll just sit on, rest on the affidavit of our expert describing these requests as being the requests he needs to perform a valuation, and also just point out that Judge Seltzer didn't say the only way to figure out -- the interest that he has, those are his assets. The question for the jury is not to tally up what his interests are and conclude that he owns X percent in a company. That is just completely limiting what the inquiry is for a net worth assessment.

For me to go to the next step, I have to know what the value is of that interest in dollars. The only way I can do it is to get the balance sheet of those entities. If he comes back and says these are big entities with 200 investors, let him come and say it. I don't think they are. But there is no punitive damages net worth inquiry on the value of his interests in different legal entities if I have no visibility into the financials of those legal entities.

THE COURT: And I hear your argument. My hesitation to allow this, which is why I'm asking for cases, because you gave me a lot of cases to read in a very short period of time, is that these are the financial records of a business who is not a defendant here. So this is why I'm asking if you have cases to support your perspective.

I hear your argument. I'm looking at your

parentheticals, and perhaps *Ramones v. AR Res.* is the one you're relying on. I'm just trying to look at the parentheticals you provided. I do want to be right on the law here, which is why I'm asking for any cases that deal specifically with this type of issue.

MR. BURSTYN: So I know that *Donahue* is one, but, yes, *Ramones* did compel production of profit-and-loss statements, balance sheets, etc., which is exactly what we're looking for here. Again, being there is no other way to determine what the value of those interests is.

Then in *Donahue* the court --

THE COURT: *Ramones*, for example, the defendant was the entity from which they were seeking the balance sheets. Here, our situation is a little bit different, right. For example -- what was the name of that LLC?

MR. BURSTYN: Hospitality House.

THE COURT: Hospitality House, just as an example, and I know you also said World Values Network earlier. They are not parties to this case.

What I am trying to understand is, and the defendant has lodged an objection here, that you've got financial records of these nonparties that are being asked to be produced in this case. I understand your reason as to why you want them, but I hesitate to, unless there is case law that is analogous to this situation, to consider ordering any of that information because

this isn't just Rabbi Shmuely's financial records. He is a party to this case. This is now a nonparty business.

MR. BURSTYN: So one point, your Honor, that we think is important with respect to request for production No. 3, this request, this is narrowed to controlled entities, entities that he controls. So these are his pocket businesses. These are not going to be businesses that he is some 1 percent investor in. So we believe we took that into account in the scope of the request for production.

THE COURT: What does that mean, businesses that he controls? He has 51 percent or more in the business?

MR. BURSTYN: Yes. It is a defined term. If that is not part of the definition, we would comfortably stipulate. Whatever he --

THE COURT: I don't have the definitions.

MR. BURSTYN: Just one moment. Sure.

(Pause)

THE COURT: By the way, even *Lane v. Capital Acquisitions*, that was them getting that financial information from a corporate defendant. It wasn't an individual who owned an interest in another company. So I don't think that that case is particularly on point either.

MR. BURSTYN: We view the task for punitive damages discovery in terms of assessing what the individual's net worth is as determining what are all the assets that he owns and then

valuing them. That's what net worth discovery is.

THE COURT: No, I understand that. They have an objection to there being entities that have nothing to do with this case where they would have to turn over their financial records, and that is my struggle. That is an objection that they have lodged.

So my question is, is there a case here in this packet that you have given me that is analogous here, where there is an individual person who was sued for punitive damages and they had to turn over financial records of entities in which they had an interest, right. It is not their records. It is other entities. That is the distinction that I am trying to draw.

The two cases that you directed me to, that is not the situation. The corporate entity was the defendant. So it was their own financial records, balance sheets, profit-and-loss statements, those kinds of things that are being turned over.

MR. BURSTYN: I have good nows. *Donahue*. Thank you, your Honor, for your patience. *Donahue* is the case that described it as being the height of naivete to allow a defendant to write up what the value of their assets was.

In *Donahue*, the defendant, an individual, offered to write up the value of his interests in partnerships, joint ventures, or sole proprietorships, any of them, in interrogatory responses.

That's the case where the court said, no, we're not

letting you just write up what the interests are worth; you have to provide the backup documents to avoid the fox being in charge of the henhouse.

So we do have a case on this. We also believe there's no way to reach a defendant's net worth without this, but *Donahue* is authority for exactly what we're looking for.

(Pause)

MR. BURSTYN: I'm not relitigating an issue, but that case, interestingly, said, with respect to business interests, because business interests aren't always liquid, said that the records could go back as many as five years, even for non-sole proprietorships, like partnerships, which necessarily involve other partners. There is Florida law exactly on this on all fours.

(Pause)

THE COURT: What *Donahue* says is that any interest in various business arrangements. That's his interest. Would his interest be answered when you get the answer to the interrogatory where he says, I have a certain percentage, and you're going to get his K-1s and his K-1s are going to show what his distributions are in his K-1. I think you also have to say what your interest is in the K-1. I think all that information is going to be there.

I'm looking at *Donahue* and even in *Donahue*, this Fourth DCA opinion discussing punitive damages, I don't see

that it is talking about specifically getting the financial records of a nonparty business as opposed to learning about the business interests that someone has in a business, which I think you are going to get in the interrogatories.

The objections in this one are sustained. I am really struggling to see why nonparties' business records, financial records should be produced when they are not a party to this case.

MR. BURSTYN: OK. Not to reargue, World Values Network, which we believe funds his lifestyle, we don't think distributes K-1s because it is a nonprofit. So I am obviously respectful of the court's ruling.

What *Donahue* is saying, in the second-to-last paragraph, is that the bank accounts, etc., are the information that are going to allow us to value the proprietorships, the businesses that he owns or has a controlling interest in.

The amended complaint, with all of its allegations deemed admitted, describes the World Values Network as basically his slush fund. That is where he told us to put the million dollars and then he'd go away. That is where the money is.

I will just add one more thing. There is no valid objection here. He produced a made-for-litigation Excel spreadsheet in this case listing donations received by the World Values Network. He already did this. The issue with

that is, of course, the *Donahue* problem. When *Donahue* says you can't just sign an affidavit, you can't just respond to interrogatories saying what your interests are, the whole point of *Donahue* is the party seeking the discovery gets to go further.

The further here, particularly with World Values Network -- I'm not an accountant. I don't think nonprofits deliver K-1s. The issue here is he's already produced the Excel spreadsheets. He just hasn't produced the backup. So we have no way of authenticating them. We have no way of knowing whether the information in there is true or not. So he doesn't have a valid objection on that.

The defendant himself, without being compelled to do so, produced spreadsheets showing the financials of that entity. So we believe, at least as to that one, especially with the allegations being deemed admitted in the complaint, the court's concern would not apply to World Values Network. He produced the documents. It is just not the backup.

THE COURT: Why did he produce the documents for World Values Network?

MR. BURSTYN: He produced the documents -- well, we had a request for production. Earlier in the case he -- we had cross-allegations about the role of World Values Network in this case. World Values Network still has a role in this case.

We think at that time, in his mind, he wanted to

produce it because he wanted to show, when he had a counterclaim, that the plaintiff caused World Values Network to suffer losses. So that is why he produced it.

There was a time he was comfortable producing it. Now that we're trying to get the information about World Values Network for our case, they're saying, no, we don't want to show you that.

It is a sword and shield problem. When it was good for him, the concern that the court is articulating about, oh, what about all these other people, that wasn't an issue. He gave us the names of donors, etc. Now that it is time for punitive damages, it is, dear Lord, I can't show this information. It is not a sound argument.

THE COURT: What is his ownership interest in World Values Network?

MR. BURSTYN: World Values Network, the admitted allegations in the complaint state, is his pocket nonprofit that serves himself and his interests. That is how he is constantly flying all over the world and we can never track him down.

Money to World Values Network, our expert will testify, inures to his benefit, because he doesn't respect the formalities required of a nonprofit. It is his entity. He will disclose it as an entity that he controls. He's already disclosed the income that he makes from World Values Network in

these interrogatories.

We would like to see what the account balances are of the World Values Network because we will argue, and if he has the right -- I don't know that he will -- to counter argue at trial, he can say, no, I don't have an economic interest in the World Values Network.

THE COURT: It is a damages trial. I am sure he will have the right to counter argue.

MR. BURSTYN: Well, we think in time he may be precluded from making various evidentiary submissions, including, as a consequence, of where this may all end up. We are not there yet, but that is why I make that comment.

THE COURT: Well, that will be for Judge Kuntz to decide and not for me.

MR. BURSTYN: He's produced the information that the court is expressing a privacy concern over. So we don't believe there is any merit to the privacy concern with respect to World Values Network.

With respect to the K-1 giving us some of this information, we don't say that exists with respect to the World Values Network.

THE COURT: OK. So your argument is the World Values Network is in a different position as to the other defendants because there is not going to be a K-1, they're not-for-profit, and he previously provided spreadsheets showing the financials

for World Values Network. Simply what he hasn't provided is the backup to that spreadsheet --

MR. BURSTYN: Yes.

THE COURT: -- that shows the financials of World Values Network?

MR. BURSTYN: Yes.

THE COURT: OK. Mr. Nicklaus, the argument is limited, as to request for production No. 3, only as to World Values Network and what the defendant's position is as to them, as to two matters. One, whether or not -- part of my ruling was he is going to get the information for these other entities through a K-1 and know what distributions he's receiving and what interest he has through the K-1, but Mr. Burstyn says that World Values Network won't fall into that category because it is a nonprofit and so there won't be a K-1.

Then, number two, that Rabbi Shmuely previously produced financial information for World Values Network and so here what they're seeking is the underlying information for the spreadsheets that they previously provided or that he previously produced in discovery.

So let me hear your response to those two points.

MR. NICKLAUS: I think he said he was an employee. It is a 501(c)(3). Whether it has any net worth or not, utilized for that purpose or not, I think he would just be entitled to show, perhaps, his income or whatever he received, perhaps, on

his K-1, but not the rest of the entity.

I don't know what -- he said he was an employee. So I don't know whether he has an ownership interest or what.

I would basically object for the other reasons, too. It is just really expansive. I have already stated my objection a number of times.

THE COURT: I know you have. Mr. Burstyn raised two other points which you have not had an opportunity to respond to. So I want to make sure I get your response.

The second one of his points is the fact that Rabbi Shmuely earlier in the case did turn over spreadsheets that had the financials for World Values Network. So his point is that he is using it as a sword and a shield right now.

When he had a claim in the case, he was providing the financial information for World Values Network, but now that it is time for punitive damages discovery, he doesn't want to turn over that information in the case as it relates to World Values Network. We are not talking about any other entities.

MR. NICKLAUS: He's already turned it over, I presume.

THE COURT: Apparently he's turned over a spreadsheet, but there is no backup information to support the spreadsheet. That is what Mr. Burstyn was saying.

His forensic accountant would not be able to see the basis for any of those numbers that are in the spreadsheet.

MR. NICKLAUS: I think the bottom line is that the

K-1s or whatever his paystubs would show for that would be the only relevant issue with regard to his, quote, net worth personally. I don't think --

THE COURT: Forgive me, folks. I have no accounting background whatsoever. Is there a K-1 that is issued for a nonprofit company?

MR. BURSTYN: I'm not going to play accountant. I'm not going to answer the question. I don't know. In my experience, K-1s show the partner of profit and losses of closely-held entities. I don't think that would exist with a 501(c)(3).

Our accountant plans to testify at trial that this 501(c)(3) inures to his benefit. Inurement is the IRS's phraseology for what happens when a 501(c)(3) is abused, and so the distinction collapses and the economics of the nonprofit end up being the economics of the individual principals because the cash of the nonprofit inures to the benefit of the individual.

I will also just point out, the World Values Network's registered address is Shmuely Botach's $17 million home in Englewood, New Jersey. One of these homes -- the upstate New York home, million dollar, three-car garage home, that he has in upstate New York during the pendency of this case -- was transferred from his own name to the name of the World Values Network. It is a personal home that he lives in in upstate New

York. It is a huge part of his net worth.

THE COURT: OK. Go ahead, Mr. Nicklaus. I know you were still making your argument. Go ahead.

MR. NICKLAUS: No, I was not. Sorry, Judge.

My understanding of the K-1 would reflect a partnership interest. If a 501(c)(3) is a nonprofit corporation, I don't think it would show that. I think he would be an employee and maybe have a W-2 or something like that. Talk about a -- it would just be an ownership. I am not an accountant either. I can't tell you for sure.

THE COURT: All right. Here's what I am going to do. As it relates to request for production No. 3, I am going to take this issue, World Values Network, under advisement.

To be candid, folks, I don't know a ton about how a 501(c)(3) reports income or value. I just want an opportunity to look at the law on it and get a better understanding.

I don't want to make an assumption, but other discovery is going to yield this information when, from an accounting reality, it will not. I just want to take some time later today to look at that and I will include a ruling on that issue as to World Values Network in the order.

As it relates to the other entities that are in a different posture, where the plaintiff will receive information about distributions and what Rabbi Shmuely's receiving through K-1s, the objections will be sustained.

Being that the World Values Network is under a different, is a 501(c)(3), I'll take that under advisement and I will issue a ruling on that when we issue the written order from today's hearing, after I get a chance to look at that and get a better understanding as to how that would work.

OK. What is next?

MR. BURSTYN: Thank you, your Honor.

Request for production No. 4 asks for documents sufficient to show any ownership interest he has in controlled entities.

This request doesn't implicate all the concerns we just discussed. So I think this will be a lot shorter.

What will he show us here? Operating accounts would show his ownership interest in entities. If he has a partnership agreement, those are his assets.

This is that *Donahue* problem of, I don't want an interrogatory that says he owns 2 percent of an entity. I want the partnership agreement or any other documents that would be sufficient to show what he owns, how much he owns, not all the personal information of other partners.

That is request for production No. 4.

THE COURT: OK. So in this case if there is some kind of -- essentially, you're looking for something like a partnership agreement? Is that what this is with regard to any entities in which he owns an interest?

MR. BURSTYN: Partnership agreements, operating agreements. Yes. The documents that show what his ownership --

THE COURT: What his percentage would be that would spell out that he is a 33 percent owner of an LLC --

MR. BURSTYN: Yes, your Honor.

THE COURT: -- for example.

OK. Mr. Nicklaus.

MR. NICKLAUS: Your Honor, the request is not specific enough. I think it is pretty vague. They're asking for documents which are sufficient to show. That asks for an evidentiary conclusion. Depending on what documents he's talking about, I think it's vague and ambiguous.

Besides that, I think on the other entity disclosures that we are dealing with here today probably take care of that. I think it is duplicitous as well.

THE COURT: OK. Let me ask you this. I can define, right, what types of documents would be included in request for production No. 4. So if I defined it, for example, if he has a partnership agreement or there is an operating agreement for any entity in which he has an interest that shows what his percentage of interest is, that would take care of that, clearing that up, would it not?

MR. NICKLAUS: It would not, respectfully, with respect to our objections about proportionality.

THE COURT: Right. I'm just saying --

MR. NICKLAUS: But yes. Yes.

THE COURT: -- right now with regard to any question about vagueness.

MR. NICKLAUS: You could do that. You could certainly do that, your Honor.

THE COURT: OK. So then the rest of your request or the rest of your objection has to do with proportionality?

MR. BURSTYN: Yes, and vagueness and ambiguity, etc., etc.

THE COURT: Right.

MR. NICKLAUS: It is really not relevant.

THE COURT: I can clarify the vagueness issue through my order.

MR. NICKLAUS: Yes.

THE COURT: I want to hear your other objection as to proportionality.

MR. NICKLAUS: Yes, ma'am.

THE COURT: OK.

MR. NICKLAUS: It is cumulative.

THE COURT: What would it be cumulative of if they're trying to get the documentation that shows what his percentage or interest would be?

MR. NICKLAUS: Well, the other entities that they ask the requests for, requests for admissions -- I'm sorry,

requests for production, all the other entities that he is relating ownership to.

THE COURT: Is there something that I have ordered so far where he would have already received this information that would make it cumulative?

I know there are going to be other requests. There are a lot of requests. It may be down the line. I am asking so far, based on what I have ordered, is there something where this would already be encompassed?

MR. NICKLAUS: I don't recall right now, your Honor. Sorry. I don't. Because it seems to be on and on and on and overburdensome.

THE COURT: Hold on. Let me see what I have ordered so far.

So far I have ordered bank statements, retirement and investment accounts. To the extent he has a personal net worth statement, I have required that, and his income tax returns.

Would any of those encompass any partnership agreement or operating agreement that would show the percentage of his interest in an entity? I don't think so.

OK. So as of right now, based on what I have ordered produced, I don't think this is cumulative. That doesn't mean down the line as we talk about other requests things may become cumulative. But as of right now I think I have already ordered about five categories of documents, and this would not be one

of them.

So I am going to fix the vagueness issue. To the extent that the defendant has any partnership agreements or operating agreements that show his percentage of interest in the last two years in any entity, then he would produce those. Obviously, if there is not an operating agreement or partnership agreement, then there will be nothing to produce as to that particular entity. But if one does exist that shows what his percentage is, that would be subject to request for production No. 4.

Go ahead.

MR. BURSTYN: Request for production No. 5, your Honor, we maintain the request. Just to move things along, I think your Honor's reasoning on request for production No. 3 stands.

This is the tax returns and financial statements for any controlled entities. We would ask -- I think your Honor's same reasoning for World Values Networks applies here -- we would ask that your Honor take under advisement whether World Values Network should have to provide its income tax returns or financial statements.

Again, we got the natives. I have no idea what that information is based on.

THE COURT: When you say you got the natives, are you talking about that spreadsheet?

MR. BURSTYN: Pardon. Strike that, if you will, please. I have an Excel spreadsheet with a bunch of numbers in it without any idea of where it came from. That is what I am referring to as the natives.

THE COURT: OK.

MR. BURSTYN: No metadata, etc.

In the interim, I have checked and confirmed, nonprofits do not issue K-1s. So I just wanted to share that.

THE COURT: OK. All right. Mr. Nicklaus, for No. 5, it is very similar to the request for information in No. 3.

For No. 3 I have said that I am not going to require that these nonentities turn over their financial information, except for I have held in abeyance my ruling on World Values Network. I am inclined to be consistent as to request for production No. 5.

Did you have anything else you wanted me to consider on No. 5?

MR. NICKLAUS: No. I was going to suggest that, your Honor.

THE COURT: OK. So in that case the objections will be sustained as it relates to the other entities, and I will rule separately on World Values Network for request for production No. 5 when I rule on No. 3.

OK. Go ahead.

MR. BURSTYN: On request for production No. 6, this is

a request that covers trust instruments, amendments, restatements, schedules, etc., accountings that are in his possession, custody, or control. These would all bear on his net worth going back two years.

I will give you an example, your Honor. With respect to sub-trusts. He alleges in the complaint, that we referenced a few times, that there is a sub-trust of his father's master trust that has an account in his name that are tied up in the probate proceedings with cash in it. It exists. They said it exists.

If he has received from the trustees, this is your account, this is an account in your name, we're holding onto it, we haven't disbursed it yet because the time hasn't come, you haven't reached your 60th birthday, which is what the condition is, this request is -- that type of information is what this request seeks.

We believe it is discoverable. It would show what his interests are in the trust.

THE COURT: OK. Mr. Nicklaus, what is the position with producing documents that show his interest in his trust?

MR. NICKLAUS: Number one, I think it might be something he already has. It sounds like to me he already has a copy of it.

Number two, I think it discloses other interests of other entities that may be involved and may be privileged in

that regard.

I certainly would object to that. I don't believe -- whatever is in there may be speculative again, like we talked about earlier, something that may or may not be occurring yet or not in his possession because it may be under litigation. Our objections really are that it is not current situation. It is not something that shows his current net worth.

THE COURT: So here the request is for all trust instruments -- so the document creating the trust or any sub-trusts -- and then, separately, any accounting statements or schedules received from any trustee on any trustee's behalf.

MR. NICKLAUS: Your Honor, I guess if it applies to something that is not in litigation, that is something we don't know about, other than trusts, if there are any, that's fine, I suppose. Well, I don't have those. Unless it is privileged. I don't know that he is the trustee or controls the trustee.

THE COURT: So based on the way it is worded it is whether he has been a settler, beneficiary, distributee, trustee, co-trustee, or holder of a power appointment.

MR. NICKLAUS: Right.

MR. BURSTYN: There is case law on this, your Honor, and I mean, we do know, we do have this information that he is receiving a lot of money from his trust. I don't know that I have complete information.

*Hoecker* is the case that we cite in these materials

that specifically ordered the defendant to provide a list of any trusts which he was the beneficiary and monies currently held in any accounts, safe deposit boxes, etc.

THE COURT: Listen, I do think that this one is subject to his financial worth. Unlike before, you were asking him to speculate about some future distribution that is currently in litigation, as to whether or not he is ever going to receive that, I think that was different. I think to the extent that he has a trust or sub-trust, I think that the documentation showing information about that trust I do think is pertinent to financial worth.

The distinction that I drew earlier is the fact that that November 19th distribution is something that is apparently hotly contested and we have no idea whether he is going to get that distribution. But at least as of right now, historically the information about what trust he is in and what his rights are in the trust will be something that will be germane to what he currently has.

So I am going to allow the documents with regard to request for production No. 6.

Of course, this is limited to the two-year period I set earlier as it relates to any accounting statements, schedules, that kind of stuff, is only going to go back the last two years.

MR. BURSTYN: Your Honor, request for production No. 7

goes to documents that he would possess regarding his demands concerning the trust.

I think this one is, in all candor, similar to the concerns the court raised regarding litigation, but here's why we believe the request for production is different.

He has made demands of the trustee. I don't know that they will be admissible. I think they will be. But if he has made demands of the trustee saying, for example, you owe me that $4 million that is sitting there in Los Angeles in some building or (inaudible), that is going to help me cross-examine him or it is going to help me at the deposition get information about what these properties are.

The Israel properties are another perfect example. I know from this family group chat email chain that they put me in that he is -- how did I know that he had the Israeli property that wasn't disclosed in the interrogatories. It is exactly because of request for production No. 7. He has these demands on the trustees. Dad left us this property. I have one-fifth of it. When am I going to get it.

The one-fifth he has. I only know this, that some of these properties exist, because of the documents that would fall within request for production No. 7, which are his demands on the trustees.

So this is where the discoverable information about what assets the trust would have is helpful.

I will also point out, trusts can say things like, anything the settler has at the time of his or her death will go into the trust. If the trust is created, say, 20 years before the settler dies, the trust isn't going to list what all the assets are. You are only going to find out after the person dies what they had at the time of their death. And then in all of his emails, where he is saying this is what dad had, this is what dad left us, that's how I knew about the Israeli property. I suspect I will learn more through request for production No. 7.

THE COURT: I just required that they provide information about all accountings, statements, and schedules received from any trustee or on any trustee's behalf.

Aren't you going to get that information already through request for production No. 6?

MR. BURSTYN: I don't know what the accountings will show, what the bank accounts will show. So I'm not sure, for example, that an accounting of his sub-trust will show -- I just don't know if, for example, a one-fifth interest in an Israeli property or the condo in Tower 41 is going to come up in request No. 6. I don't know.

I do know if there are documents to request for production No. 7, they will be along the lines of what I have already seen, which is that property should be in the trust, I should be getting a piece of that, and then I can ask him at

his deposition where is it, what is the address of it, what can you tell me about it.

Another example, your Honor, I believe his mother was a jeweler who left him, he claims, a substantial amount of jewelry. There is no secret. I know this because he filed a public police report saying his siblings stole hundreds of thousands in jewelry from him. That is going to help me narrow things down and find what his assets are. They won't necessarily be in request for production No. 6.

These are the defendant's own statements of what his interests and assets are. We believe they are probative and discoverable.

THE COURT: But how is that different than previously with the interrogatory where you wanted information about his expectation of future -- he is litigating a future distribution? How is this different than that?

MR. BURSTYN: This is going to be his specific statements of assets that -- OK. In the litigation item, there was this contingency of will he win it or not. I understand the court's concern there.

With request for production No. 7, I'm not looking for demands that he might win or not. What we're looking for is things that he claims he is entitled to so that we can evaluate whether there is a valid claim to the asset there. They're the best statements or the best evidence of what assets he believes

are his or are, in fact, his.

The Israel property, there was no contention in the emails that we saw that that property was in fact one-fifth his. So you can imagine a world where within the scope of this are just kind of errant statements like, I should have 10 percent of the city of Los Angeles. I think Judge Kuntz on motions in limine will be able to resolve that. I am not going get to say he owns 10 percent of Los Angeles.

When he has detailed statements and emails with his siblings saying, I want this, this part belongs to me, those may be assets of his. It is probative of what he owns. It is his own statements as to what he owns. We should be allowed to discover that. We believe it is discoverable.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: He already answered it in question No. 28, where he describes the distributions that he received from the estate during the two-year period established by the court. That's what this asks for.

It also doesn't specifically describe what documents he is looking for. He just wants something that he may speculate about what it might show, etc., etc. It is a vague and ambiguous request.

He's already answered it in interrogatory No. 28.

MR. BURSTYN: That is why this is the --

MR. NICKLAUS: Now he wants documents sufficient to

show that, I suppose. It is just -- and I rely on the rest of our objections as well there, Judge.

MR. BURSTYN: Your Honor, our disagreement is narrower than I thought. This is asking for the backup of what he is going to swear to. It is the antidote to the fox in charge of the henhouse.

He is going to tell us what the trust holds for him. This is the backup. Show us the documents. Show us the receipts. If you have these emails saying that you own that car or you own that property, he can go -- at trial he is permitted to testify and say, no, I was lying. I don't actually have a one-fifth interest in that Israeli property, and the jury can evaluate his credibility at that time.

I'll say, but didn't you send your brother the email saying I do own one-fifth of that. Then at trial he would say, I'm just speculating; I didn't really mean that I owned it. This is, we believe, probative. I mean, the party admitted this.

THE COURT: But doesn't this go back to point earlier that if the siblings are disputing whether or not he has this, does he actually have it.

Look, I think historically the backup to how he got the answer to No. 28 of the $2 million, the $2.27 million in distributions from the trust, I think that is discoverable. I think you are entitled to see the backup as to how he computed

that number.

My question is, the demands for future -- the rest of this request for production, which is what he's demanded in the last two years, and if it is contested, then I don't know that he actually owns that, if his siblings, if four other siblings are saying that is not part of what you are entitled to under the trust.

MR. BURSTYN: They're not. They're not actually saying he's not entitled to it. They are just bickering about when it is going to be -- the email on the Israel property, the emails are, I want -- demands for more use of it; I want to be able to use it; why does this brother get to use it for Hanukkah when I don't. That is the nature -- that is why I wrote this request for production.

It is his demands about these properties. They are not actually disputes over whether he has an interest in them.

So I learn what he has an interest in when he talks about these properties and why am I not getting distribution checks, you are all thieves, you are stealing my distribution checks. What is the basis of his demand for the distribution checks? What is the basis for his demand that he is entitled to stay there over Hanukkah? The basis is the undisputed claim that he has a one-fifth interest in them.

OK. I am not in that email chain saying why don't I get to sleep at the house. Why not? Because I don't have an

122

underlying ownership in it.

So it is evidence of what he is entitled to when he goes out and makes these claims, that he wants certain fringe benefits related to the properties. That is what makes him different than me. I am not making those claims. Sean Burstyn isn't making those claims because Sean Burstyn doesn't have an interest in these properties. He does.

So the nature of the demands with respect to the properties that are held in trust is evidence of his ownership interest in them.

Again, if he wants to go tell the jury, yeah, in that email where I said, hey, my premise is I own one-fifth of it and what my demand is I want to be able to use it more, etc., he can go tell the jury I was making it up, I don't really own any interest in it.

THE COURT: So what you are contemplating is that he is going to have to search his emails and text messages with his siblings for every time he made a demand for the property in the trust?

MR. BURSTYN: There's not a lot. It is not hundreds of properties in the trust, as far as we are aware.

Here we are asking for documents sufficient to show his demands, but perhaps a limiter would be to the extent a demand identifies a property, he should have to produce that. This is how I learned of the information that he has interests

in.

Your Honor has also limited it back to two years. OK. If he has been complaining with his siblings about dad's apartment in Jerusalem for the last 15 years and he's fighting over that, we've cut it down to two years. Number one.

Number two, if he's complained about all the properties one time in the last two years, then give me the few emails on each property that show what he's demanding from the trust.

It is probative. We believe it is proportionate because it is how I know, what I said to your Honor earlier, that he's got this property in Israel worth millions of dollars. One email would do the trick and it would help me identify the assets.

THE COURT: OK. So you're not asking for all communications.

MR. BURSTYN: No.

THE COURT: Just one per any property that is subject to the trust.

MR. BURSTYN: Yes. At a minimum, we believe that would help us identify --

THE COURT: Because it says documents sufficient to show.

MR. BURSTYN: Right. Correct.

THE COURT: OK. So, Mr. Nicklaus, we will start with

the premise that the number that was computed in interrogatory No. 28, right, historically the distributions he's received in the last two years, I do think it is appropriate for the plaintiff to be able to see the documents that support how he obtained that number.

The question is, for the last two years, to the extent that Rabbi Shmuely has demanded from the siblings or demanded from the trust, really, in which he is a beneficiary use of any other assets in which he has an interest in the property, the discoverability of that in the last two years, but not all communications, right. Not all emails or text messages.

So, for example, if the property, part of the property includes this apartment in Jerusalem and he's been making demands, if there is one email among the text messages that shows that he's been telling his siblings, I want to use the apartment in Israel because it is part of the trust, what is your position on that?

MR. NICKLAUS: I'd like to know how he got on the group chat to begin with or get that information or see the information that relies upon his, or as a predicate to his statements to you.

MR. BURSTYN: I believe it was your client.

MR. NICKLAUS: Excuse me.

The other thing is, I thought you already ruled on this, basically. I guess we are re-forming all these requests

for production again to make them more specific again, to go back and ask him to respond more specifically to, as we outline it today, in a now request of some sort.

THE COURT: Well, I narrow requests all the time at discovery hearings. There is a whole negotiation. I do this at every discovery hearing.

MR. NICKLAUS: I understand.

THE COURT: So I basically ask, OK, documents sufficient to show, what is it to show -- right, this is a conversation you all could have had before you walked in here -- what is it specifically that you think is a document sufficient to show.

He is saying if there is a text message or there is an email from him to his siblings demanding use of a property that is subject to the trust, that is what he is looking for. So he can identify, is there anything else that is part of the trust that he doesn't know about.

MR. NICKLAUS: Well, he should ask that specific question. So I guess we will have to rely upon a request to provide more information somehow.

MR. BURSTYN: We met and conferred on Thursday and were not able to really have a discussion on any requests for production because I don't think counsel have had a discussion with his client about these requests for production.

MR. NICKLAUS: I was still in court.

THE COURT: So, Mr. Nicklaus, with regard to -- like I said, I am just narrowing this down in the last two years any communication. It just has to be one per property, to the extent that there are any properties he's demanded use in or which he's made a demand, right, where he has an interest in one of these properties. I don't know. Maybe there are none and maybe there's a handful of properties that are part of the trust, but that is the request here. That is how it's been narrowed down.

Any document that is going to show his interest in the property or a property that is part of the trust. So I think that it is pretty -- I don't know how many properties are in this trust.

Does anyone know how many properties are in this trust?

MR. BURSTYN: I don't know.

THE COURT: OK.

MR. NICKLAUS: No.

THE COURT: I guess the question has to be asked. It could just be the one, this Israel apartment, and we are talking about one email or one text message, to the extent it's even been sent in the last two years. It could be a few. I don't know. But it doesn't sound like it is a whole lot of real estate.

MR. BURSTYN: No. It is not like thousands of

properties or even hundreds of properties, as far as we can tell from the trustee information or the litigation. I don't think it will be a lot.

MR. NICKLAUS: If he has any documents, I ask as a predicate, in responding to it, that he provides those text messages to us.

THE COURT: Do you have any objection to providing them, Mr. Burstyn?

MR. BURSTYN: No.

THE COURT: I mean, we're just trying to advance the ball here and we're trying to make sure that you're getting information that you need. I think it will help out Mr. Nicklaus, too, to be able to go back to his client and say, hey, these are specifics, look for this type of information.

MR. BURSTYN: We will produce -- we have produced a lot -- we will produce tomorrow everything we have received on this that is informing this information.

We would also ask that the defendant take into account that the job is not to just tell us what we already seek, to do discovery by checking out what does plaintiff already know and then I'll go and show what I'm willing to say.

We will hand over everything we have got, but he knows more than we do.

THE COURT: I understand. I think it will make, perhaps, Mr. Nicklaus' job a little bit easier to be able to

sit down with his client and say, this is what the judge ordered, but also specifically these things have been specifically identified. I think that we are just trying to make sure that everyone gets the information as quickly as possible.

MR. BURSTYN: I will just point out very quickly, your Honor, at an earlier hearing -- not with Mr. Nicklaus -- there was this pass-the-buck issue, of which counsel knows what. The probate lawyers for him are the Offit Kurman firm. That is his same lawyers in this case. They are not in this room right now, but this idea that I am sitting on this basket of information, it is the same folks representing him -- they are even in those email chains. They are litigating that case -- are his counsel in this case Fountainebleau v. Botach.

THE COURT: OK. Well, there you go Mr. Nicklaus. That is going to be another good source of information for you all to be able to consult with because they will know the information too.

MR. NICKLAUS: Sorry, your Honor. Of course I'd like anything to make my job easier. That would be very nice in this case.

I will tell you, we just found out that those other lawyers have left their firm and they are going through the ethical requirements of disclosing who represents who with regard to their case repertoire. I understand. I have not

been able to talk to them, but I just found that out this weekend.

THE COURT: Are they going to be withdrawing from this case?

MR. NICKLAUS: They were lawyers in this case. I think it was Chris Colley.

MR. BURSTYN: Chris Cathey and Austin Krtausch.

MR. NICKLAUS: And the other gentleman. I don't know. They are out now. Apparently, they are not available. I don't know what their status is. They filed a notice of appearance and they have been appearing in this case all along. Long before we were in the case.

So I don't know. That is another tweak that came about here in the last couple of days.

THE COURT: Another twist.

MR. NICKLAUS: Yes. Right. Another hurdle to jump over, Judge.

THE COURT: All right. I was optimistic that that was going to be able to make everyone's life a little bit easier if the go-to people are cocounsel in the case. At least for the time being they are until such time as Judge Kuntz allows them to withdraw.

So in the meantime, you can avail yourself of their help because they are still counsel of record in this case until such time as Judge Kuntz says otherwise.

MR. BURSTYN: I will just also add, Scott Piekarsky of the firm --

MR. NICKLAUS: We are asking everybody for help, Judge. I mean, even plaintiff's counsel, all the documents he has. That is why we filed a subsequent request for production for all emails and things like that. He's been communicating with the other siblings and Rabbi Shmuely's family, etc., etc.

THE COURT: I get it. You're playing catchup. I get it.

MR. NICKLAUS: There's a lot of information that I know he has that leads us to believe that he already has it.

THE COURT: All right. Here is what I am going to do with request for production No. 7.

So with regard to the past two years, to the extent that there's any documents that are going to show the distributions or the payments that he's received, specifically, interrogatory No. 28 itemizes that he's received this $2.2 million from the trust in the last two years. There is obviously backup document that is going to be able to show how he computed those numbers. That will be subject to production.

To the extent that in the last two years Rabbi Shmuely has made any other demand for property in the trust -- this can be an email, a text message, anything of that nature -- that will be subject to -- that will be responsive to request for production No. 7.

Then Mr. Burstyn will turn over tomorrow any emails that he has that will assist in locating any such information.

Obviously, that will not be -- Rabbi Shmuely will still have an obligation if there is another property, for example, that is not the Israel property, that is subject to the trust and he's made a demand because he believes he has an interest in that property under the trust, then that is going to be on him to make sure that he looks to see if he has a text message or if he has an email or he's made such a demand.

Just one is all he needs to produce. He doesn't have to go through and scour and produce a million emails or text messages. Just one per any property that is part of the trust that he's demanded in the last two years.

OK. We are going to take like a five-minute break so everyone can have a comfort break and stretch. We've been going now for three plus hours.

MR. BURSTYN: Thank you.

THE COURT: I do want to get through everything today.

Go ahead, folks, take a five-minute break and we will come back.

MR. BURSTYN: Thank you, your Honor.

(Recess)

THE DEPUTY CLERK: All rise. This court is now back in session. The Honorable Marty Elfenbein preceding.

THE COURT: Please be seated.

All right. Let's go ahead and start back up again.

Mr. Burstyn, what is the next request for production?

MR. BURSTYN: Your Honor, request for production No. 8, your Honor. I believe, based on our past discussion, this can and will be narrowed.

Essentially what we're looking for, we've discussed income that he's generated. To the extent he is going to say income doesn't include things like gift or pledges, given the nature of the work that he does, we would like to receive documents showing gifts, grants, or pledges that he's received in the last two years.

We understand your Honor's ruling with respect to entities other than the World Values Network. This request No. 8 does include gifts, pledges, grants, etc., to the World Values Network. We would suggest that this falls within the scope of the other matter that your Honor is taking under advisement.

THE COURT: Is there like a threshold amount here? I mean, if someone is like, hey, here's a $25 gift card, is he supposed to be disclosing it in response to this?

MR. BURSTYN: Right. We met and conferred. We were not able to have, really, a productive discussion on it.

$5,000 is, I think, being generous. He might have -- I don't know the nature -- he might have 20 people who give a thousand a month or $5,000 a month. It is difficult because I

think it could add up significantly.

With respect to pledges, I would say pledges that total $5,000 or more is a reasonable cutoff, and the same with the individual gifts.

Again, in the abstract I don't think the defendant has informed his counsel about the nature of the pledges and the gifts and the income he receives. So we can't really offer more than what I have just described.

THE COURT: So here you're seeking donations or gifts, etc., not just given or received by Rabbi Shmuely, but also given by him.

Aren't you going to see that on his tax returns, any donations that he makes? He is going to presumably have a number for the writeoff.

MR. BURSTYN: Yes, and we will also add that that observation from your Honor is going to roll through several of the forthcoming requests.

We are not seeking to compel, seeking an order overruling his objections to producing information about any of his expenses. We are going to rely at trial on law that holds that a defendant who does not disclose what his expenses are in the discovery phase cannot show up at trial and say I have all these gifts that I've made. The answers -- or expenses that I have. So the answer to your Honor's question is yes, and we are not seeking to compel production of --

THE COURT: So you're only seeking to compel income, money coming in, not necessarily money going out.

MR. BURSTYN: If he is objecting, and he is repeatedly, he is not willing to show money coming out, then he will have to live with that at trial. Yes.

THE COURT: OK. So as it relates to request for production in that case, you are limiting it to things that are donations, gifts, grants, things like that, that are received by Rabbi Shmuely with the threshold of $5,000 or greater for the last two years?

MR. BURSTYN: Yes.

THE COURT: OK. Mr. Nicklaus.

MR. NICKLAUS: Yes, your Honor. With regard to any donations or gifts or grants, those will all come off of the gross income of whatever entity they're talking about to arrive at net income. That would depend on what net income the entity made, which would mean whatever is distributed to Mr. Shmuely would also be disclosed in his income statement, general income statement.

This objection should be sustained because it is irrelevant. It is also disproportionate to what donations you made. What he received from any entity is already covered in the other discovery.

THE COURT: So you're saying that any donations that he would have received -- so, for example, the $5,000

threshold. So he would have had to report that to the IRS anyway. So it is going to be reflected on his income tax returns?

MR. NICKLAUS: Of course.

MR. BURSTYN: If he did. He might not have, number one. Number two, pledges aren't --

THE COURT: I mean, you're required to, I think, anything over like $1800 or something like that in a gift per year is income that has to be reported to the IRS. I think there is a threshold like that.

MR. BURSTYN: I'm not entirely confident that everything that he is required to disclose to the IRS is disclosed to the IRS, number one.

Number two, this encompasses pledges, and pledges are not disclosed --

THE COURT: What is the basis for that statement? That is a big statement to say that someone's committing tax fraud.

MR. BURSTYN: Sure. So the allegations in the amended complaint -- I will tell you one. He sued us, right, with a personal complaint in his name -- not the World Values Network -- saying he was entitled to a million dollars compensation for whatever his counterclaim was, and that would have been income to him. If he prevailed in his lawsuit, he would have won.

Before the lawsuit, and this is in the amended complaint and deemed admitted, he was demanding that million dollars be paid to his nonprofit where it wouldn't be taxed as ordinary income. That is number one.

So the same million dollars that he says he was entitled to as compensation, he was previously asking us to put it in the name of a nonprofit where it wouldn't be taxed. That is tax fraud.

Number two, he traveled --

THE COURT: Wouldn't World Values Network have to pay taxes on that?

MR. BURSTYN: It is a nonprofit. No.

THE COURT: Nonprofits pay zero dollars in taxes? They don't file tax returns with the IRS?

MR. BURSTYN: They don't pay income tax.

THE COURT: Whatsoever?

MR. BURSTYN: There is an ordinary income tax and then there is a nonprofit tax rate. To the extent there is any tax payable by the nonprofit, the answer is no. Nonprofits don't pay income tax. He does. So that was tax fraud.

THE COURT: Is that true? Baptist Health is a nonprofit organization, for example. Are you telling me they don't pay any taxes to the IRS?

MR. BURSTYN: If Baptist Health's CEO is trying to get personal benefits for himself and he puts it into the Baptist

Health 501(c)(3) which then pays for his flights all over the world, that's inurement. That is tax fraud.

Again, I am not a tax accountant. I am not going to tell you that the World Values Network or nonprofits pay zero tax. I do know that nonprofits on the pledges that are made to them pay less in tax than individuals who make ordinary income. Number one.

Number two, what I also can represent to the court is when an individual generates income, like he was trying to seek through this lawsuit, he has to pay tax first and then he can pay for his flights and his travels all around the world. When the money goes in through his nonprofit, the nonprofit doesn't pay tax and then the expenses, all the flights he takes all around the world, those are expenses of an entity, so they are all writeoffs.

An individual doesn't get writeoffs, which is why he wanted the cash from my client to go to the nonprofit, which would have taken writeoffs for his personal benefit. So he had the same exact claim in the litigation in his own name and he was back-channeling to try to get us to put the money not in his name but into the name of a nonprofit. That is tax fraud 101.

I mean, I can go on. But the answer is that it was a tax evasion method. It is right in the complaint. It is, I think, well known with respect to this defendant. It is also

why one of the houses, one of the million dollars homes that started as his personal home in this case, throughout the course of the case, ended up being the nonprofit's home.

I don't know what else I can say, your Honor.

THE COURT: All right. So what you are saying is that when you get his tax returns, you're not going to see all donations made to World Values Network?

MR. BURSTYN: No. I wouldn't --

THE COURT: You would see any made directly to him or you're saying even those?

MR. BURSTYN: It is only if he reports them. If someone sends $10,000 to his personal account as a gift, the IRS doesn't go around looking -- if someone sends you $2,000 -- one sends to another person $2,000 on Venmo. If you don't report that to the IRS, the IRS doesn't know. It is just sitting there.

His pledges, his gifts, if he is not reporting it, the tax returns are not sufficient at all. We know from firsthand experience in dealing with him he was trying to get us to park the cash in names other than his own name as tax optimization, to put it diplomatically.

THE COURT: All right. Mr. Nicklaus, let me hear your response to that.

MR. NICKLAUS: Number one, it is not related to damages in this case. Number two, if the CEO of Baptist Health

Center didn't get a salary, I would be amazed.

The bottom line, that is not tax fraud. I think that is what he said.

With regard to donations, it comes off the net -- it makes the net. It doesn't have anything to do with the salaries or anything else. It doesn't have to do with anything except off the gross profit of any entity.

Counsel seems to be indicting in front of you and this court Mr. Shmuely for tax fraud. All of the sudden now he's got him for tax fraud, too. Everything that he is speculating about -- and this is purely speculation -- it is not germane to the issues. It is not germane to the issues of damages at all. Damages in a case, if they are recoverable, aren't taxable anyway.

THE COURT: So your position is this is cumulative of the tax returns because it is going to be in the tax returns?

MR. NICKLAUS: I don't know if it is going to be in his tax returns or not. I doubt if it has anything to do with his tax returns. I doubt there is anything, and I doubt if it is relevant to anything.

Even if it is in his tax returns --

THE COURT: Well, he's saying it's income.

MR. NICKLAUS: Well --

THE COURT: He is saying if someone is making pledges or making donations with the threshold that he's narrowed this

down to, $5,000 or more, he's saying that is taxable income.

MR. NICKLAUS: You mean if he receives money.

THE COURT: If he receives it, correct.

MR. NICKLAUS: Yes.

THE COURT: He is not seeking, if Rabbi Shmuely is making donations, he is not seeking that information. He is just seeking if Rabbi Shmuely is receiving.

MR. NICKLAUS: If he received income, it would be on his tax returns. Now you can't speculate, oh, it wouldn't be on his tax returns, we don't have his tax returns so, therefore, he is probably committing tax fraud.

MR. BURSTYN: That is not exactly what I just --

MR. NICKLAUS: That is really unfair. It is really not germane to the case. He is looking for ghosts that don't exist.

THE COURT: With regard to request for production No. 8, the motion to compel a better response is denied without prejudice because I think that this is cumulative of the information that should be reflected in his tax returns, and I have already ordered that he produce where he has to declare all of his income.

By the same token, even though you are not seeking to compel this, any charitable contributions that he makes should be also reflected on those tax returns.

Mr. Burstyn, if you stumble upon or come upon

information that is specific that suggests that he is misreporting his income, I will reconsider this request. But in a vacuum here, those are some really big allegations to make, to suggest that someone is committing tax fraud.

Without having any kind of tangible proof of that, I am not going to also order him to produce all the backup of his donations because I do think that it is cumulative to what I have already ordered him to produce. But I will reconsider it if you have evidence, hard evidence, to suggest that I should actually reconsider that point of view and make him produce it.

MR. BURSTYN: On the World Values Network, though, your Honor, your Honor has taken that issue under advisement. I don't need to prove tax fraud to show my argument that the receipts of the World Values Network -- well, it is cumulative if you are not going to give us the financials, the backup to that spreadsheet, right.

THE COURT: Yes. I have taken the matter of World Values Network under advisement.

So right now this ruling is specifically Rabbi Shmuely, because his personal tax returns should give you this information as to any income that he's received, which would include any gifts that are over whatever the IRS reporting threshold is for gifts should be included in his income.

The matter of World Values Network I am going to take separately under advisement because I am still trying to get a

berth understanding of exactly what information you are going to get as to this nonprofit and whether or not that would be cumulative to what I have already ordered to be produced, which we will take up and we will add to our order.

MR. BURSTYN: OK. Thank you, your Honor.

I think in the interest of time, request for production No. 9 is encompassed by other documents that have been compelled, including any demands he's made for -- this is a request for payments or distributions he anticipates receiving, any documents that show what he anticipates receiving.

I think across the trust account information, his demands for assets, that would be encompassed by 9. I want to be sensitive to the court's time.

THE COURT: OK. So let's go to, what is the next one?

MR. BURSTYN: Request No. 10, we are seeking only that he be required, with respect to this request for production, to produce documents showing his purchase or deeds to any real or personal property valued at $25,000 or more, and that's as to him individually.

Given the court's point about World Values Network, this would apply to the World Values Network as well.

So anything he bought for $25,000 or more or owns that is valued as $25,000 or more for the last two years.

THE COURT: It says valued at $25,000 or more

regardless of whether or not he has equity that is $25,000 or more.

So, for example, if he has a car that he's purchased in the last six months but he owes almost the entirety of the balance of the car, for example, would that be responsive to this?

MR. BURSTYN: I mean, yes. Your Honor, if he owns assets that are worth over $25,000 or more, it would be -- I understand the equity value point.

This is what I will say.

Going back to *Donahue*, he shouldn't be in charge of telling us -- he could easily go through and say yes for $25,000, but I have liabilities on the asset. So if he wants to show -- there is no way around this.

If the answer to your Honor's question is yes, that he has to show us assets even if there is a $25,000 in equity value, he shouldn't make that decision on his own in a vacuum where I can't contest it. So if he wants to say this is worth $25,000 but my equity is less, he needs to show what the liabilities are. Otherwise, how am I able to confront his determination that he's got a $200,000 Rolex but he has a bunch of debt on it. So that is just never going to appear in the production.

THE COURT: OK. I see.

All right. Mr. Nicklaus.

MR. NICKLAUS: How is it relevant as to what he paid for something, your Honor. It is not relevant. It is what the net worth is of that property today, currently, and within the last two years. It is not relevant to anything.

Also, he has him indicted again. Well, if he does this, if he does that. Those are all speculative questions.

THE COURT: I think you are on the same page because the request is for any property, real or personal, valued at $25,000 or more, right. So that is the worth of the property.

If it is $25,000 or more and he's got documents that show that he purchased it or sold it or deeded it in the last two years, then that would be -- it has to be worth $25,000 or more.

MR. NICKLAUS: What's $25,000? Why don't we just start at zero.

THE COURT: I think he is trying to reduce the burden, right.

MR. NICKLAUS: Well --

THE COURT: So obviously, if it's a bike and now that's worth 500 bucks, he's not asking for the receipt for the bike, but if it is like he's got a car, that would probably reach the threshold of 25,000. I think he's looking for big-ticket items here.

MR. NICKLAUS: It is still not relevant. It doesn't go to net worth at all, and I don't think it has to do anything

what he paid for something. I really don't.

THE COURT: But it is not what he paid. It is documents that are going to show -- I guess if you're showing the purchase, yes, or it could be a deed or it could be a mortgage to show that he has something that is valued at more than 25,000 currently, in the last two years.

MR. BURSTYN: Our position is net worth is a function of assets. There is no greater evidence of value of an asset than what you paid for it, these documents.

MR. NICKLAUS: It is just not proportional to the case, Judge. It is really burdensome. To disclose every mortgage he has within the last two years. Maybe he's paid off mortgages. Maybe he has new mortgages. It doesn't matter.

All this has to do with net worth and damages. It is not relevant to that. It is cumulative. It is absurd. It is absolutely --

THE COURT: What is it cumulative to? What have I required to be produced that bears on the value of any real or personal property that he owns?

MR. NICKLAUS: I think the answers to interrogatories he answered questions about what was the value of this, value of that. I think he possibly did.

He answered if he has tax returns. It shows what the net worth is. None of it really goes to net worth. It goes to what property he may have. Also, it doesn't relate to whether

it is jointly owned by him or jointly owned by somebody else or owned by some corporation or whatever. But it doesn't have anything to do with current net worth value. It is just, I think it is really abusive.

You take all these requests and put them together and what do you have? You have pure harassment, Judge, I believe. It is just my candid opinion, honestly. I don't mean any disrespect. It is just like, huh.

MR. BURSTYN: None of us have our cars on our tax returns.

MR. NICKLAUS: This is an individual that he says is a very wealthy guy. Well, maybe he is compared to somebody.

He's answered certain questions. All of these things are really abusive. I mean, sit back and figure out each one of these. It is overburdensome, time-consuming, unnecessary. I think he specified and argued about that basically in his affidavit as well, when he reviewed all this material.

I mean, if we were to go through each one of these requests for production and try to figure it out, it would probably take a lifetime.

THE COURT: I don't know about that.

MR. BURSTYN: Yes.

MR. NICKLAUS: Pretty close to it. You look at all this stuff. Even going back two years. Who has receipts for whatever you bought. Say you bought a watch or you bought a

car. I mean, who is going to keep all that information for more than two years. Probably not.

THE COURT: If he doesn't have it, you don't have to produce it. If he didn't keep the receipt and he bought a Rolex and he doesn't have the receipt, he doesn't have to produce the receipt. There is nothing to produce.

MR. NICKLAUS: I know, but we are running him around the barn three and four times in excessive discovery. That is so abusive, to figure out whether he did buy a watch or whether he bought a car. It is really not necessary. It is not relevant to determining net worth or damages.

MR. BURSTYN: If there is no argument --

MR. NICKLAUS: I am sitting here and looking at all these requests and all these numbers and all the detail. It will take any individual forever to answer all this stuff that he's asked here.

MR. BURSTYN: It will probably take about an hour for me to figure out how many $25,000 purchases I've made in the last two years.

If he is that wealthy that it takes him a lot of time to figure out how many $25,000 items he's purchased, it really proves my point that he is a very wealthy man. It is all probative.

I regret setting the $25,000 figure as high as we did. It inures to his benefit. These aren't arguments.

(Pause)

THE COURT: Mr. Burstyn, I'm looking at the *Stern v. O'Quinn* case. In that case there was a similar request to the one that you have here.

In that case the court found that plaintiff is not entitled to information regarding individual items of personal property, including the date of purchase and purchase price of those items. This minutia does not necessarily aid plaintiff in obtaining the "big picture" with respect to defendant's net worth. It only burdens defendants with the task of sorting through countless items and receipts. Instead, the court finds and directs the defendants to produce copies of appraisals, of insurance policies, and all personal property will yield the relevant information sought without unduly burdening defendants.

Is there going to be a later request here where you're going to seek insurance appraisals and any insurance properties or policies on any real or personal property?

MR. BURSTYN: We are coming to insurance coverage. If I heard your Honor quoting the case, if I heard it correctly, there was an inventory of personal property, but maybe you could --

THE COURT: I don't know that I said the word inventory.

MR. BURSTYN: I'm not sure if I heard that right or

not.

THE COURT: They were seeking information regarding individual items of personal property. Maybe what you heard was individual instead of inventory.

MR. BURSTYN: Yes.

THE COURT: So my question for you is, are you going to -- am I going to see a request in a few minutes that is going to seek now the appraisals for the insurance policies on any real or personal property?

MR. BURSTYN: You are, your Honor, although I don't know -- he could have a $200,000 painting that is not insured. I don't know. And this defendant has the burden of showing, without quoting other cases for the burden in those other cases, of showing why he cannot come up with a list of his assets that are worth $25,000 or more.

THE COURT: Because it gets to the point where I need to make proportionality determinations, and I have been giving you a lot of discovery on financial worth, but I'm looking and there's still another 20 requests. If you are going to talk to me about seeking 20 other categories of documents, you are going to have to be a lot more selective, Mr. Burstyn, because it starts to get to the point where this is not going to be proportional, your request.

So I'm asking you --

MR. BURSTYN: Yes.

THE COURT: -- are you going to ask in a few minutes to then turn around and ask to produce appraisals and insurance policies, because if you are, I am going to think different on this request for production.

MR. BURSTYN: I am. I understand the court's point.

I just want to make very clear to the court, I tried to meet and confer and was told that the defendant hadn't shed any light to his counsel on this and that counsel was in a mediation and hadn't been prepared for the meet and confer and I got absolutely nothing. So I share the court's sentiment. I wish I didn't have to ask for these things, but I got nothing.

So we can go to 11.

I didn't want to be here. I understand the court's concern.

Eleven is deeds to real property. That's discoverable. I don't think we need to spend a lot of time on it. I can, if the court would like me to.

THE COURT: OK. With regard to deeds to personal property, what is the position?

MR. BURSTYN: To real property?

THE COURT: To real property, right. The deed to the home.

MR. NICKLAUS: Yes. Sure. If he had insurance policies that comply with the *O'Quinn* case, *Stern v. O'Quinn* case, I think that is discoverable.

THE COURT: Right. But we are talking about No. 11 right now. Right now 11 is just the deed to any real property that he owns.

Presumably, as of right now, he's only disclosed these two properties.

MR. NICKLAUS: Oh, we are talking about 11.

THE COURT: We are talking about 11.

So as of right now he said two properties. Perhaps there's more, that we are going to talk about a handful worth of deeds that are all a matter of public record.

MR. NICKLAUS: Well, if he had deeds, etc., how is it relevant to show the deeds as long as he admits under oath that he owns properties, etc. You want to show the deeds to every piece of property that he has. Maybe it is jointly owned. Maybe it is not owned. Maybe it is owned in trust or maybe it is not his. Maybe it is speculative.

You want deeds to real property.

THE COURT: That is what No. 11 is.

MR. NICKLAUS: I don't think it's --

THE COURT: It is deeds to real property and, in theory, we should be talking about like a handful of deeds. It is not a big lift.

MR. NICKLAUS: Deeds don't necessarily show the value of property.

THE COURT: No, but they show assets.

MR. NICKLAUS: Well, they show assets, but they don't show the value of the property, which is what we are after, current net value.

I don't think it is relevant. I think it is cumbersome as well, and I don't know how long it would take someone to find all their deeds. I know I couldn't find my if I looked for them and I don't have that many.

THE COURT: They are posted online. What do you mean? You can get them at the Clerk's office online. It takes a minute. You punch in your name.

You've never looked up the deed to your house? You punch in your name and you can see the deed to your house.

MR. NICKLAUS: Well, if it is recoverable by public record, then why can't counsel get it himself?

MR. BURSTYN: Because there are thousands of counties throughout America and I can't search for all of them. I mean, this is --

THE COURT: And also you can't shift the burden in that way. It is a Rule 34 request. There is plenty of case law that says you can't turn around and say just because it is publicly available, you go search for it. There is a ton of case law on that.

MR. NICKLAUS: Well, we are going to or have given him the identity of the properties that they own, and I think they are requiring us to give more details with regard to those. If

we give that to him, then he could go search for the deeds if he really wants them.

I don't think it is fair, Judge. Really, this is really burdensome. I mean, look at the rest of these. We have 42 to go through. We haven't finished yet.

THE COURT: I hope we are not going to talk about all 42.

MR. BURSTYN: We're not.

MR. NICKLAUS: Counsel talks about meeting and conferring. I called him, and we had time to do it, and we did meet and confer and he had all of our objections written and he never mentioned one of them.

MR. BURSTYN: I want to talk -- OK.

THE COURT: All right. Let's be productive here because we are here and it's already 5 p.m.

OK. I think the deeds are pertinent to show assets, and assets is one of the key things in determining financial worth for them to be able to determine what does he own, and real property is the biggest asset or one of the biggest assets that one can have. So I do think it is germane to the issue of financial worth.

I don't think that it takes a particularly long time. Either you have your deed and you have a copy of it at home and if you don't, it is available online. This information, literally you go to the Clerk's Office for your county where

your property is recorded and you get a copy of your deed, especially if you have a mortgage. It is going to be on there because the bank is going to be filing a copy of the deed as a matter of public record.

So I don't think this is a particularly burdensome thing to produce. As of right now he's disclosed he has two properties. We are talking about two deeds. Perhaps there are a few more properties when he amends. So we are really talking about something in the order of five deeds. It is not a big lift. So I am going to require that production. OK.

MR. BURSTYN: In refreshing these, we can skip 12 because we are getting the securities accounts.

Request 13, we've basically hit on that and why it is relevant. This is the insurance policies.

So personal property or other properties other -- excuse me. Insurance covering personal properties or other properties would, of course, again identify properties he owns.

I don't know, your Honor, whether his life insurance policy, if he has one, would cover his assets. I know that it would cover his income. That would be a probative statement of what he generates and it would allow us to test the accuracy of things like his tax returns.

THE COURT: Does it matter if it is whole or term policy?

MR. BURSTYN: I think -- well, whole is very

important. A term policy, because whole one generates an equity interest in the whole.

THE COURT: Right.

MR. BURSTYN: If he has -- I don't know which one he has. If he has term policy, I suppose that wouldn't generate an equity value. I hope he never needs to use it.

MR. NICKLAUS: Are we talking about life insurance?

THE COURT: Yes.

MR. BURSTYN: Yes. Request 13.

THE COURT: That is why I'm asking the distinction between whole and term because, it would seem to me, that if he's got a term policy, I don't know how that goes to his net worth. If he's got a whole policy, then it may go to net worth. That is why I'm asking what he is seeking there.

MR. BURSTYN: By age 60 he would have built, presumably, an equity interest and that could be for many people hundreds of thousands of dollars.

THE COURT: OK. So you're seeking any whole life policies that he has, and what else in 13?

MR. BURSTYN: Policies covering personal properties.

With respect to whole life, there is universal, there is XYZ. So I would frame this as any life insurance policies in which he has an equity interest or that are an asset and life insurance policy -- and insurance policies for personal property.

MR. NICKLAUS: Your Honor, is counsel saying that if he recovers in this case he would require counsel to cash in his whole life policies?

MR. BURSTYN: Yes.

THE COURT: You're saying to cash in -- I guess you're saying from a collection standpoint?

MR. BURSTYN: Yes.

THE COURT: I don't know. This is a collection question.

MR. NICKLAUS: That is a little abusive, I believe.

THE COURT: I think a collection question is a totally separate area of law, right, as to whether or not that's collectible. I don't know the answer to that, whether or not that is collectible.

I think right now, he's -- we are not here to discuss collectibility. You can only get that once you have a judgment. The question is, is this financial worth discovery that the jury should hear about that informs what his financial worth is for purposes of punitive damages.

MR. NICKLAUS: I think his beneficiaries would be interested in that, Judge.

THE COURT: Well, what is your position as to whether or not that is any equity interest he may have in a whole life policy, whether or not that is informative of what his financial worth is?

MR. NICKLAUS: It is contingent, number one, on his turning in the policy. Number two, it is not relevant at all. Three, it is not something that is reasonably calculated to lead to any relevant evidence in this case as far as net worth is concerned. I mean, he is not going to cash in his life insurance policy. It is not reasonable. It is not reasonable to expect that. It really is oppressive.

I cited that to begin with, with almost all these requests, if you take them together. Now you're talking about, oh, yes, produce all your whole life policies because you may have to cash those in. I don't see that happening, Judge.

THE COURT: What about with regards to the personal property?

So earlier I asked Mr. Burstyn, when we were talking about request for production No. 10, and I said to him, based on the very case that you have been directing me to, which is *Stern v. O'Quinn*, that any insurance policies on personal property are discoverable. What is your position on insurance policies on any personal property?

MR. NICKLAUS: Well, personal properties, as I understand it -- what if he owns an automobile or two that is in excess of $25,000. Most of them are. Most of them aren't. Supposing he buys one. He has a policy with regard to automobile insurance. That's basically liability insurance.

If he has property insurance, he'd have to have a

crash, or if he had the kind of coverage under automobile liability policy, he'd have to have a crash or something that would devalue the vehicle and it would only be insurable for property damage, but that is all speculative.

MR. BURSTYN: That is not the purpose for which -- I think the court understands. The coverage is --

MR. NICKLAUS: It is all speculative and contingent upon some other event. It is not net worth.

THE COURT: It is going to show appraised value and value of it.

The very case that you keep on citing to the whole hearing, *Stern v. O'Quinn*, says exactly that. It says: The court finds and direct the defendants to produce copies of appraisals and insurance policies, and all personal property will yield the relevant information sought without unduly burdening defendants.

MR. NICKLAUS: He has a Chubb liability policy, too, for this case.

THE COURT: OK.

MR. NICKLAUS: Does he have to disclose that too? Probably already has. I don't know. My prior counsel may have done that.

MR. BURSTYN: He's disclosed his defamation insurance coverage, yes.

THE COURT: Yes. I imagine under Rule 26 initial

disclosures that would have already been disclosed in this case.

So, Mr. Nicklaus, what is your position on that, on personal property? I think what Mr. Burstyn is getting at is appraised value. He is trying to find out what is the value of the personal property that Rabbi Shmuely owns.

MR. NICKLAUS: It is not germane. It is not proportional. Number two, it is not related to net worth. I don't think he could bankrupt somebody by --

THE COURT: The case that you cited me to, all hearing you have been telling me about *Stern v. O'Quinn*, and now you're saying don't follow *Stern v. O'Quinn*?

MR. NICKLAUS: I don't think with regard to personal property, Judge. I said real estate property, fine.

No, I am not saying that. I am saying *Stern v. O'Quinn* is there.

THE COURT: OK.

MR. NICKLAUS: But if he has insurance policies related to personal property in excess of $25,000, how is that really related to net worth in this case that he currently has?

THE COURT: Because he is trying to find out the value of his assets.

I am going to put this back on you, Mr. Nicklaus, because either Rabbi Shmuely is going to turn over the receipts for purchases over $25,000 or if he's got insurance policies on

personal property -- these are going to show appraised value -- he is going to have to turn over one or the other. I thought I already made that pretty clear when I told Mr. Burstyn pick and choose, I'm not going to give you both.

MR. NICKLAUS: OK, Judge.

THE COURT: So what is your perspective? Because I am not going to give both.

The whole point is, he is trying to bring out what is the value of the assets. He doesn't need to find out the value of the assets in three different ways. He just needs to find out one.

MR. NICKLAUS: Well, without waiving my objection, your Honor, I'll take the personal property.

THE COURT: Right. But are you taking the receipts or are you taking the insurance policy? Because Mr. Burstyn, I think --

MR. NICKLAUS: Insurance policy. Insurance policy.

THE COURT: OK. So I am going to require that -- let me turn back to Mr. Burstyn on the thing about the whole life insurance.

So explain to me -- we are not here to discuss collectibility. We are here to discuss discoverability for financial worth. So explain to me how it is that -- I get personal property, getting insurance information that should have appraisal information in there and that is going to give

you value of personal property.

Explain to me how a whole life policy that he may have an interest in, how that goes towards his financial worth.

MR. BURSTYN: Our accountant expert -- this isn't all coming from me. I am not an accountant. Our accounting expert, we had a discussion with him. What he told us is that at some point, and this is familiar to me and perhaps others, his whole life policy at some point delivers an equity value. You get a statement. It is as good as cash. It is an account sitting there. It is invested cash. You can use that cash to satisfy your debts. Forget collectibility on that point. If you have an account or your benefit that you can choose to cover your expenses, it is an asset that goes towards your net worth.

When my expert pulls that screen down and says, this is the list of assets, the equity value in any life insurance policy is going to be on that list. They can argue at that point it shouldn't be, but we are going to present that to the jury. It is evidence of his net worth because it is an asset.

THE COURT: Are you seeking a copy of the life insurance policy itself or information that is going to inform you as to the value of the whole life policy, if there is a whole life policy, in which he has an equity interest?

MR. BURSTYN: So we believe that -- what we want to know is the value. This is calling for the policy. The policy

itself will have a schedule of distributions and contributions. If in all the accounts that he is going to produce he doesn't show us the account or if at his deposition he says he didn't actually make the contributions, nothing happens to an insured other than the loss of coverage if they don't make the distributions, he can go say that. If he has a policy that says we'll cover you for $5 million and you have to put up $100,000 a year, we'd like to see that before his deposition and then I'll say, hey, did you make these payments, because I am going to get a ledger from all these account statements and I'd like to tee up what all the assets are.

If I don't have that whole life insurance policy and I go to his deposition and say, hey, do you have a life insurance policy that you have any equity interest in or that you put any cash towards, he is going to say, I don't know, ask my wife Debbie. That is going to be three days --

THE COURT: Where is the request where you're going to get the ledger?

MR. BURSTYN: The life insurance policy, a whole life insurance policy itself, if he gives us the full packet, is going to show what the insured's premium contribution requirements are in order to maintain the policy.

So it will show me every six months you have to put $50,000 toward the policy, and then at his deposition I will be able to say, did you do this, or I will be able to actually

match -- I am going to get his bank statements. The premiums will look like expenses, 50,000 out, 50,000 out. But if the $50,000 -- I'm just using that number for argument sake -- but if the $50,000 out to insurance is to term, then your Honor is going to say that is not equity interest he has.

If I have a whole life insurance policy, I will be able to say, oh, that $50,000 out of your cash account is actually contributing towards your equity interest in a whole life policy. This helps me show that what would look like expenses on a bank account are not expenses. It is building equity value in an account. I can't do that without the policy.

THE COURT: OK. What I was trying to understand is if there was a separate request in which you were actually going to ask for statements, for example, from a life insurance policy that are going to show equity interest.

MR. BURSTYN: No. I think that the bank account payment income and expenses is how I get there. So no, I don't think there is a request here for the actual insurance account, if there is one.

THE COURT: OK. That is why I want to make sure in five minutes we are not going to be talking about now I want the statements from the life insurance policy.

MR. NICKLAUS: Your Honor.

THE COURT: Go ahead.

MR. NICKLAUS: Does Rabbi Shmuely get a discount for all the premiums he paid for that policy since its inception? Once he gets the (inaudible) value.

THE COURT: What do you mean does he get a discount?

MR. NICKLAUS: I mean all the premiums that he paid for a real life policy.

THE COURT: I see what you are saying, going into --

MR. NICKLAUS: It is an investment. You get a deduction for all the premiums you paid over the years for the cash value, and certainly the cash value is not as much as the face value of the policy when you pass away.

THE COURT: Well, I would imagine that is going to be a question for the forensic accountant, right, when he determines whatever the value is of this whole life policy.

MR. NICKLAUS: Sure. Is he going to get a discount for all the premiums he paid? Come on. Judge, that is really not proportional to the claim either, I don't believe. But that is my position.

THE COURT: Do we even know if he has a whole life policy or are we having an exercise here in -- are we going through this to later find out he had no whole life policy?

MR. NICKLAUS: I don't know, Judge, if he has.

THE COURT: I know. It would be nice if those questions were asked before objections were lodged, right, so that way we don't spend 20 minutes talking about something to

later just find out that the answer might just be none.

MR. NICKLAUS: I guess I'll ask.

THE COURT: All right. The requirement will be if in the last two years he has a life insurance -- it has to be a whole life insurance policy in which he has an equity interest, and to the extent he has any insurance on personal property in the last two years, that will be what he will be required to produce. The purpose being to show the value that he has in either the personal property that is insured and/or the life insurance policy.

MR. BURSTYN: More good news. To the extent we identify requests that are coextensive with documents that have already been ordered to be produced, I will skip over them. For example, with request No. 14, it adds something we haven't discussed before, which is accounts titled Certificate of Deposit Accounts.

Those are bank accounts. Your Honor has ordered him to produce bank accounts. I just don't want a situation here where I am skipping over request 14 and I get back, oh, I do have certificate of deposit accounts but you skipped 14.

With the economic reality that certificate of deposit accounts are bank accounts, we can skip 14 because those are within the scope of the bank account request for production.

THE COURT: OK. With request No. 1, I think it was.

MR. BURSTYN: Yes.

THE COURT: All right. Go ahead.

MR. BURSTYN: Request for production No. 15 is simply judgments that he holds, like litigation judgments, for example. Again, I don't know from our call whether there are any. Probably not a lot if there are.

THE COURT: I thought you weren't trying to go after him on liabilities.

MR. BURSTYN: No, no, no. This is judgments that he holds.

THE COURT: Oh, in his favor. Not against him but in his favor.

MR. BURSTYN: Yes.

THE COURT: Where he is the creditor?

MR. BURSTYN: Yes.

THE COURT: OK.

MR. NICKLAUS: Past two years?

THE COURT: Past two years.

MR. BURSTYN: For most people the answer is none.

MR. NICKLAUS: I would say it's public record.

THE COURT: The issue is, you know, he's going to know, right, be the only person who knows if he got sued in, I don't know, in Nevada, for example, whether or not there is going to be a judgment out there for him and entered in the last two years.

So what is your position, Mr. Nicklaus, other than

public record?

MR. NICKLAUS: I just don't think it is proportional, Judge. It will be reflected, however, in a financial statement, which we are working on. I mean the accountant is supposedly working on.

The original value, face value of the judgment doesn't necessarily evaluate the whole asset as to what it is. Nevertheless, we can disclose those.

THE COURT: All right. If Rabbi Shmuely has had any judgments entered in his favor in the last two years, then he would have to turn over those judgments.

MR. BURSTYN: More welcome news.

MR. NICKLAUS: How about if we just give him the citation of where it is located instead of asking Mr. Shmuely to call the clerk and ask the clerk to send it to us and everything else. That could take forever.

THE COURT: I imagine if he is a judgment creditor, he probably has a copy of the judgment, right.

Wouldn't he want to be collecting on a judgment if he has one in his favor?

MR. NICKLAUS: I would imagine he would, but that is only my imagination, too, Judge. I don't know the answer to that. It's a good guess.

THE COURT: Listen, I think that it's -- I would have to imagine that if he has a judgment that he is trying to

collect on that he is going to have a copy of that judgment, that it wouldn't be terribly difficult for him to be able to produce that.

He may not have any judgments at all in his favor in the last two years. We may be talking about nothing.

MR. NICKLAUS: We may be speculating, your Honor. That is true.

THE COURT: All right, Mr. Burstyn.

MR. BURSTYN: More good news. We can skip 16, 17, 18.

I am hopeful if he owns an aircraft, he will tell me that at his deposition. So in the interest of time, we will skip 19.

THE COURT: OK.

MR. BURSTYN: 20 concerns safe deposit boxes, your Honor. It is access logs and the inventories of anything that is held in a safe deposit box or vault.

As noted earlier in the hearing, his family, in addition to being in the real estate business, was in also the jewelry business. There is a reason behind this. It is not looking for things we don't expect to see.

If he has any assets in any safe deposit box or vault, we would like those assets identified, as well as the access log, so we can know what was put in or taken out. He might not have any. We don't know. We weren't told.

MR. NICKLAUS: He might not have the Hope Diamond in

his safe deposit box, your Honor.

MR. BURSTYN: If he does have something in his safe deposit box, it is going to be worth something leaving it in a safe deposit box. There might be nothing. I don't know. We think he should have to produce the contents of safe deposit boxes.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: Yes, your Honor.

THE COURT: What is your position on any statements or access logs from safety deposit box that he may have?

MR. NICKLAUS: I think it is not proportionate to the claim, but we will disclose it if there is any.

THE COURT: OK. All right. So in that case --

MR. NICKLAUS: I won't disclose it. My client will.

THE COURT: Understood. Yes.

To the extent that there are any, he has any statements in the last two years or access logs for the safety deposit boxes, to the extent he has a safety deposit box, then that would be subject to production.

As to the contents of that safety deposit box, I would say if he's got, not the Hope Diamond but some other fine piece of jewelry worth a lot of money, that information might bear on financial worth.

MR. BURSTYN: On request No. 21, that will be covered by insurance policies listing any personal property. So we can

skip 21.

THE COURT: OK.

MR. BURSTYN: On 22, this is a request for any foreign accounts that he owns or has an interest in.

Again, I don't know. I know that he's overseas a lot. His family has assets overseas. So this would be, essentially, in line with your Honor's prior order with respect to bank accounts.

THE COURT: Isn't this going to fall within the scope of request No. 1?

MR. BURSTYN: It is.

THE COURT: It is not limited to domestic accounts.

MR. BURSTYN: Correct. With that understanding we can skip 22.

23 -- I'm trying to be a good sport here -- we can skip, although I think we will get that elsewhere.

24 we can skip.

MR. NICKLAUS: Which one are we on now?

MR. BURSTYN: We are on request 25. I am just taking a moment. OK. We can skip 25.

Request 26, your Honor, is where we introduce -- and we are getting into skip territory, as the court can see, fortunately. This is where we introduce cryptocurrency-related assets. Some people have a lot. Some people have none. This would cover any cryptocurrency accounts.

I don't want to be in a situation where he understood bank accounts to be Bank of America and Chase. So if he owns any cryptocurrency, we are asking him to --

THE COURT: 26 is tied to this November distribution.

MR. BURSTYN: It is my apologies. We can skip 26.

THE COURT: OK.

MR. BURSTYN: I meant to go to 27.

MR. NICKLAUS: You are on 26 now?

MR. BURSTYN: We are off 26. We are on 27.

MR. NICKLAUS: On 27.

THE COURT: We are making lots of progress.

MR. BURSTYN: Yes.

Request 26 --

THE COURT: 27.

MR. BURSTYN: Request 27 -- thank you -- again, with the understanding to Mr. Nicklaus that any productions with respect to accounts would encompass cryptocurrencies, I don't know that we need to argue over 27.

If there is a dispute from the defendant's side as to whether cryptocurrencies are covered in what's already been ordered, then we would stand on request for production No. 27.

So perhaps the defendant can tell us, defendant's counsel can tell us.

THE COURT: All right. Mr. Nicklaus, with regard to request for production No. 1, I required that he provided the

categories where bank accounts -- so bank statements and statements for retirement accounts and investment accounts.

So the question is for Mr. Burstyn. 27 is specific to cryptocurrency accounts, whether or not that would be subsumed by request for production No. 1?

MR. NICKLAUS: I think so.

THE COURT: OK. So with that understanding, in that case to the extent that cryptocurrency accounts will be subsumed within bank accounts or other investment accounts, that would already be encompassed by the order on request for production No. 1.

So we can move on from 27.

MR. BURSTYN: Request 28 we can skip, your Honor.

Request 29 we are concerned about dissipation of assets. Request 29, we know that he is expecting, he claims to be entitled to receive $2 million from an account in the same, through the trust.

Request No. 29 is asking if there are any communications where he has tried to move those assets, the $2 million distribution, into anyone else's name.

We would take the position at trial that if he tried to move assets out of his name, went through a fraudulent transfer, that those would still be considered by the jury as assets of his.

For example, if there is an email from him to the

trustee or someone else saying put that 2 million in one of my children's names, our argument at trial is going to be, to the jury, count those millions of dollars as part of his net worth.

If he is very concerned about this request for production, then it validates our concern. If he is not trying to move the assets out of his name or dissipate assets, then there will be nothing.

THE COURT: So in request for production No. 29 you are seeking what kind of documents?

MR. BURSTYN: I would expect to see emails, number one. I would expect to see emails between himself and the trustees in which he asks the trustees to, colloquially, park assets in names other than his.

I am not sure what else would exist on that. I could imagine correspondence with his accountants or others, but there could be privilege issues there.

THE COURT: OK. So for request No. 29 you are contemplating that this would be emails between Rabbi Shmuely and any trustees regarding changing any ownership in any assets.

MR. BURSTYN: Changing where any trust assets are to be distributed. It is like out of his name, for example.

To put more color on it, let's say the trust provides for him to receive X millions of dollars every so many years. An email that would be responsive to this request would be an

email to the trustee saying, instead of sending that to me as the beneficiary, can you send it to my cousin. That would be within the scope of this request.

THE COURT: All right. Mr. Nicklaus, let me hear from you.

MR. NICKLAUS: I think you covered that before, Judge. It is like a, what is that, a contingent ruling, something he might expect in the future. I don't know. In other words, it is still speculative.

I think it is probably not anything he has that goes to current, and it involves litigation, I would imagine, if that is what he is talking about.

THE COURT: I think he is talking about something different. He is talking about asset dissipation or the potential for asset dissipation --

MR. NICKLAUS: Correct.

THE COURT: -- if Rabbi Shmuely, in order to protect assets, asks that the assets be parked in someone else's name or be distributed under someone else's name.

So to the extent that there would be any emails, for example, from Rabbi Shmuely going to the trustee asking for an asset in the trust to be distributed to someone else that would otherwise belong to him, that is the kind of emails that this is seeking or documents it is seeking.

MR. NICKLAUS: Like a contingent diversion, something

174

like that. So I might contingently get it. If I do get it, I'm going to send it to somebody else and something like that. Is that what he's talking about?

I think it is speculative. I really do. It is not related to his current net worth anyway if it involves something that he is involved in, particularly litigation, which we have already spelled out that he is involved with.

THE COURT: Let me ask you this, Mr. Burstyn. Do you have any -- and I say this because I remember at the last hearing that we had Mr. Nicklaus presented me with a case. I'm trying to remember if it was *Stern v. O'Quinn* or a different one. It might have been *Stern v. O'Quinn*, but I would doublecheck.

I remember specifically the issue of dissipation of assets was raised in that case, and ultimately that evidence wasn't provided because it was speculation as to whether or not the assets were actually being dissipated, as opposed to there being some kind of concrete evidence that there was dissipation of assets.

So my question for you, at this point, at this juncture right now, do you have any evidence that Rabbi Shmuely is, in fact, dissipating any assets that this would be cause for a real concern at this point to engage in that sort of discovery, as opposed to just you're assuming, you know, he is preparing or bracing for the worst?

MR. BURSTYN: Yes. The number one move if you are dissipating assets is, to borrow the defendant's words, delay, delay, delay, delay, delay, number one.

A defendant who is trying to delay my client's ability to become a judgment creditor, when he knows in the period of delay he will be receiving millions of dollars, is a defendant who is trying to obstruct our judgment. He is not saying delay in the abstract. He is saying delay this case.

Specific evidence of dissipation of assets --

THE COURT: You're saying in that email. It's so cryptic what he is saying. I interpreted it and I thought he was saying delay, delay, delay meaning the deposition. This comes immediately after he is talking about the deposition --

MR. BURSTYN: No.

THE COURT: -- whether or not he wants you to take the deposition as opposed to, I think, Mr. Friedman taking the deposition. He says, why not Zoom, and he goes delay, delay, delay, delay, delay, delay.

MR. BURSTYN: Yes. That was not to delay the deposition. We were actually getting deposition dates from them when that went on.

Right after we got that email, we got outreach from his counsel asking for us to continue the trial and then pending mediation. They did seek an extension of the discovery cutoff for months into the end of the year, which would have

necessitated a continuance of trial.

They didn't move for a continuance of trial, to the best of my recollection, but right after we got that email, the conversation was, hey, how about we try to settle this and go to mediation and push off the trial. Right when their client -- and I wasn't shocked to receive that email. I just got an email from their client.

THE COURT: I mean, the email literally says, the last line is: What happened to the motion for settlement?

MR. BURSTYN: Right, which is --

MR. NICKLAUS: Judge, just for the record, we never asked for an extension of the trial date. All we did was ask for a third mediation, which is pending.

THE COURT: That would be an extension of discovery. Someone asked for an extension a little bit to extend the discovery because Judge Kuntz, I think, gave like an extra ten days.

MR. NICKLAUS: We are going to ask for that today with a little bit more time to respond to some of these.

MR. BURSTYN: We don't think -- we will deal with that if it is raised.

The defendant had reached out to us, defendant's counsel had reached out to us to discuss a continuance so that the parties could mediate their dispute when he raised the delay issue.

As far as concrete evidence of dissipation of assets, you have heard today on the question of entities that he has an interest in nothing more than anything that is in World Values Network's entity, that should not be discovery. Plaintiff should not be permitted to see anything that is in World Values.

Lo and behold, as I noted earlier, a multimillion dollar home went from being in his personal name during the pendency of this lawsuit into World Values Network. That is a private home that he has out in the country, where he and his kids hang out and they have a multicar garage and all that.

Now in discovery they're saying, don't let him look at what is at the World Values Network. That is dissipation of assets.

I will tell you one more thing. His $5.7 million Manhattan three-bedroom condo, right in the middle of the city, is now listed for sale. That is dissipation of assets.

I have ample evidence that whatever net worth figure I am going to be able to come up with is going to be obstructed by him attempting to move these assets into places where I can't see them, and that's what pushing it into World Values Network does and then arguing that we shouldn't be allowed to explore what is there, when the assets of World Values Network, before they were in that entity, were in his name. He is listing condos for sale.

The other point we wanted to raise was, with respect to dissipation of assets, on delay, is simply frustrating the timing by which we can be a judgment creditor. If we were a judgment creditor when trial was originally scheduled, before he was skipping out on his deposition the first time around, he wouldn't be able to do any of this.

Finally, on the past two-year look back. He's been ordered today to let us know of any assets from the trust that have been distributed to him. If nine months ago there was a million dollars that was supposed to go to him but he had it parked in the name of his daughter, for example, he's not going to disclose that. He is going to say it didn't come to me.

I'd like to go back two years and say, how did it turn out that your father's trust didn't distribute that money to you. That is exactly what request for production 29 calls for.

When we find, and we think we will because I have shown you listings, I have shown you property, millions of dollars have come out of his name during the pendency of this case, when we find that millions of dollars from the trust account have gone to other people's names, and that is why they weren't within the scope of discovery as to him, we will pierce through that and we will show the jury those assets are sitting there for his benefit and they should be counted as part of his network.

THE COURT: All right. Mr. Nicklaus, do you want to

respond?

MR. NICKLAUS: No, I don't.

THE COURT: OK. All right. So based on the proffer of information that Mr. Burstyn has provided with the change in ownership during the pendency of this lawsuit of one particular asset, that being the home, the fact that another property that he owns, the proffered information that he has it listed, I do think that there is enough here beyond just sheer speculation as to whether or not, whether purposeful or not purposeful, but that the assets are changing or have changed during the course of this litigation, where I think it does make it fair to determine if there is any email communications that indicate that in the last two years Rabbi Shmuely has requested to change the ownership, custody, location, beneficiary of where an asset that would otherwise have been payable to him or owned by him to be distributed elsewhere.

OK. What else?

MR. BURSTYN: We can skip 30. It is covered.

31 as well.

32 we can skip.

33 we can skip. There is a continuing obligation to produce account statements from trustees.

With respect to request for production 34, we can skip that, understanding that there is a Truist Bank account for his benefit, and the court has ordered all bank account statements

for his benefit to be produced.

THE COURT: I think that is covered by request for production No. 1.

MR. BURSTYN: Yes.

We can skip 35.

Your Honor, request 36, there is a part of it that is different than what we have discussed substantively a moment ago, which is any request by him to postpone or withhold trust distributions.

The prior request that we discussed it was found I think discoverable any communications he has to change who the beneficiary is. If he has discussions with the trustees to postpone any trust distributions or withhold any trust distributions to him so they don't hit his net worth, we would argue, of course, that would be discoverable.

I think it is very likely, given what we have seen, that he is constantly requesting the funds now and before trial, the answer here is probably that none exist. But if he is trying to push off cash distributions, perhaps, to find time to plan around an eventual judgment in this case, that would be discoverable because our accountant will testify that his net worth is X and him telling the trustees to go park assets down the line for him and not give them to him now by the time of trial should be counted as part of his net worth.

Finally, this is basically the flip side of everything

we were discussing before about speculative future disbursements to him. The court limited how discoverable those requests were. Can you imagine now with this request if he could make all future disbursements speculative by telling the trustees, hey, don't give it to me until next year.

That is why we stand on that portion of request 36 that calls for any postponement or withholding of trust distributions to him.

THE COURT: OK. Response, Mr. Nicklaus.

MR. NICKLAUS: Yes. It's in litigation, your Honor. I think your Honor ruled on what is going on in litigation. I think counsel has any communications related to that. I think one might be privileged. I think it is just up in the air, speculative anyway, if it is a request. It may be a request, but it doesn't have any materiality to it because it is contingent. Whatever it is, if it is something pending, it is contingent, and it really is being litigated.

So that is our objection. I think it is probably not relevant to current net worth.

THE COURT: Mr. Burstyn, let me ask. First of all, who is Bar-Kochba Botach and Benjamin Kiss?

MR. BURSTYN: Bar-Kochba is one of the defendant's brothers. Benjamin Kiss, I believe, is one of the attorneys involved. These are names that come up in email threads and in the litigation as well.

There are three siblings -- five siblings of this generation. Three are trustees. Bar-Kochba and this defendant are not trustees.

What we have seen in the communications is that all five of the siblings discuss sort of how to divvy up the trust assets. I believe Mr. Kiss is an attorney involved, but I am not certain who he represents.

THE COURT: So your request here is between the defendant and someone we don't know who it is?

MR. BURSTYN: I don't know what his role is. We have seen him in the correspondence over where the assets go, but I don't -- I mean, I don't know what his role is. We have just seen him in correspondence over the assets.

I think the court -- I understand the court's concern -- I think could limit it to the beneficiaries of the trust, which is the trustee. It is three individuals, Bar-Kochba, and the defendant.

THE COURT: So Mr. Nicklaus has argued that this is, because they are in litigation over these future distributions in the trust, that this is all speculative.

But your position here, I am trying to understand, is more, for this request, that this is more like the dissipation of assets situation where he's basically, if any such documents even exist, if this ever occurred, this would be more akin to him saying, OK, I am going to forego getting any distributions

until some date in the future so don't make me any distributions?

MR. BURSTYN: Until after trial. They signaled very clearly their trial strategy is going to be the millions of dollars sitting in trust accounts in his name should not be counted as part of his net worth.

What this request says is if he has communications where he is deliberately putting distributions that he is entitled to into this postponed future distribution territory, he is going to tell the jury don't count that.

I am going to say the only reason he is telling you not to count it and the only reason it is in the future is because he made it go into the future to defraud my client out of a fair picture of his net worth.

THE COURT: But I'm confused about the litigation involving the trust.

MR. BURSTYN: Mr. Nicklaus said today he wasn't even familiar with it. So it's been used a lot in reference logs. It has nothing to do with my argument at all.

There's litigation between the siblings where this defendant alleges they have wasted some of the money, some of the disbursements didn't come out on time. The litigation is not in the complaint about who is entitled to what. They are all entitled to their one-fifth share. They are bickering over where's mom's jewelry, not are we entitled to the jewelry.

They are bickering over, why hasn't it been sold yet, not are we entitled to the paintings or whatever it is.

So that litigation has nothing to do with this request, which is if he is going to argue at trial my current net worth doesn't include trust interests that I am entitled to, I'd like to be able to tell the jury that some of those trust interests haven't hit his personal account yet because he told the trustees to hold the money in the trust, i.e., until trial is over. It is the same as the dissipation argument.

THE COURT: OK. I think that, to the extent that any such communications would actually exist between the defendant and any of the beneficiaries -- is it with the trustee or with the beneficiaries of the trust?

MR. BURSTYN: The beneficiaries of the trust is the five siblings, three of whom are trustees. Collectively they can decide.

THE COURT: But that is not what you requested here. You requested communications between you and any trustee about Kochba Botach or Benjamin Kiss.

MR. BURSTYN: And in there you, trustees, and Bar-Kochba are the beneficiaries.

I can't, in candor, substantiate, address the court's concern about Benjamin Kiss. So I'm cutting that out. It's typical language --

THE COURT: I see what you are saying. You're saying

there are five trustees. Excuse me. There's three trustees that are three of the siblings and then the two nontrustees are Bar-Kochba Botach and the defendant.

MR. BURSTYN: Yes.

THE COURT: So that is how you get to all five siblings.

MR. BURSTYN: Yes.

THE COURT: I understand. I'm following now.

OK. All right. I do think that to the extent that there could be, that any email communications exist where if the defendant were saying, hey, I know I'm entitled to this distribution going forward but don't pay it to me until April of 2027, I think that is really relevant to financial worth, if that existed, from a dissipation-of-assets perspective.

To the extent there are any such email communications between the defendant and maybe any of the siblings, because you have got the three who are trustees and then the one other who is not a trustee, in the last -- and this would be limited to the last two years, then that would be discoverable.

MR. BURSTYN: We can skip --

MR. NICKLAUS: Your Honor, if counsel has any documentation or emails in that regard to help us identify a response to this, I would appreciate receiving it and updating his discovery, like he's supposed to do.

THE COURT: I think he said earlier in the hearing he

was going to make sure that any emails that he had he was going to provide them to you tomorrow so that you could go ahead and cross-reference anything, if that helps isolate or identify anything.

MR. NICKLAUS: That's fine.

MR. BURSTYN: Yes.

MR. NICKLAUS: Thank you, Judge.

MR. BURSTYN: Request 37 deals with parking distressed assets in different people's names. We covered that. We can skip it.

Request 38 we can skip.

Request 39, I will take the burden of pulling records from the litigation.

Just a moment, please.

(Pause)

MR. BURSTYN: Request 40, your Honor, calls for settlement proposals with his siblings. Those are the beneficiaries.

MR. NICKLAUS: I'm sorry. What number are you on?

THE COURT: No. 40.

MR. BURSTYN: Request 40, yes.

It calls for term sheets or settlement proposals amongst the siblings by which they will provide the trust assets.

Without that information I can only assume that

everyone's getting an equal one-fifth of the trust assets your Honor has ordered them to identify in the prior request for production. If there is somehow a settlement where people get different assets, we will need to know that.

I think this could be narrowed. I don't need to see settlement proposals if they are not consummated.

I did leave this request pending because if a settlement is reached by the time of trial and they divide assets in a way that is different than what the trust documents show and it is not one-fifth of everything across the board, but they just barter amongst themselves, that would obviously be evidence of what they have agreed to be the different division of assets.

THE COURT: So if I am understanding, for request No. 40, in the event that the siblings negotiate a different distribution of the trust assets, what is in the trust documents, that is what this is seeking if there is a settlement and they reduce that to writing where they distribute the assets differently?

MR. BURSTYN: Yes, your Honor.

THE COURT: OK. So Mr. Nicklaus.

MR. NICKLAUS: Sounds pretty speculative.

THE COURT: So basically they're saying if something turns out to be different than what is in the trust documents and they negotiate something differently via settlement, then

only if the settlement is consummated and it is agreed to, he would seek that settlement document.

MR. NICKLAUS: Sounds a little speculative to me, your Honor. I think it speculates on certain events happening, happening, happening. It really doesn't have to do with the current situation, is what we are after here.

Respectfully, I think it is just speculation and we're tilting at windmills here, things that may or may not happen. I don't think it is relevant at this point.

THE COURT: Let me ask you this. What if they do enter into some kind of settlement in the future, do you agree that they may be required to supplement if they do modify the trust?

Because at the end of the day, right, everyone wants to know, well, what is his financial worth at trial, and if they agree to settlement, where they determine that the assets from the trust are going to be distributed a slightly different way, you would have to produce that, no, if they have it?

MR. NICKLAUS: Again, it is speculative. We would have to update any discovery.

THE COURT: Right.

MR. NICKLAUS: We are required to do if that happened.

Again, it is if, and it is just very -- I mean, how do you get a handle on that. I don't know how you do it. It could be anything, actually, and it has to do with settling

that hasn't happened yet. So it is a contingency situation that really is speculative, I think.

MR. BURSTYN: Your Honor.

THE COURT: Go ahead.

MR. BURSTYN: I think I just need it pending. An order overruling the objection would be, if we were to have it our way, would be to the extent they settle or vary the allocation of assets from what the trust document provides, that document that varies from the trust document has to be produced.

THE COURT: Yes. I think it seems like we are all on the same page. Right now it seems like there is nothing to produce in response to No. 40. It is only if this contingency materializes, and if so, then there will be a duty to supplement anyway.

At the end of the day, right, if the trust's assets are reallocated differently, then that is fair for everyone to know. How are the trust assets allocated if it is different than in the trust documents.

All of the sudden if Rabbi Shmuely has a smaller percentage, doesn't have a fifth anymore and has a smaller percentage, I'm sure that he is going to want that to be known, or vice versa. If somehow he negotiates with a sibling and gets a greater percentage, then I think that would be fair for the plaintiff to know.

The ruling with regard to request for production No. 40 will be, to the extent of between now and trial if there is a settlement that is agreed upon among the siblings regarding the assets in the trust or distribution of the assets in the trust, then at such time that settlement, that is reduced to writing, a settlement agreement will be produced.

Obviously, if there is no such settlement, then this will never materialize and there won't be anything that has to be produced.

MR. BURSTYN: I have really good news, which is subject to a wrap-up discussion on AI, we only have one left here.

THE COURT: Wonderful. Which number?

MR. BURSTYN: So we are skipping 41, 42, and 43.

THE COURT: OK.

MR. BURSTYN: Request 44 is a bit different. If we go back to the AI data framework on reprehensibility and our expert's assessment, which is based on impressions and how much reaction this defendant got from his public posts, he's been posting online stating -- this is request 44, so the record is clear. He has been posting online talking about how he is getting thousands of messages of support and outreach all over the world about how horrible plaintiff is.

That is all part of our expert's model. Our expert's model looks at the negative impressions that were received

regarding the hotel.

To the extent that he's been receiving those negative messages in emails or direct messages, which he's been recently posting about, that is probative of our damages, the negative impression that he's created of the Fountainbleu.

THE COURT: Your expert is testifying on the negative impressions. Does that also fall as far as compensatory damages side of the case?

MR. BURSTYN: Yes.

THE COURT: It is not just that -- because I know you mentioned before reprehensibility, but that seems to me that it falls more on the side of fixing the Fountainbleu's image after all this has happened, right?

MR. BURSTYN: Right.

THE COURT: OK.

MR. BURSTYN: You're right, your Honor. Our expert on this point will be testifying -- I don't want to say with prejudice to what he may testify to punitive damages. I don't want to get ahead of myself. But as for compensatory damages, a case like this is all about the public impressions, and to the extent he has materials that he says he's receiving, tons of messages about the Fountainbleu Hotel, that goes straight to what our damages model calls for.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: I would assume their expert has already

disclosed his or her opinions one way or another.

THE COURT: I think they were deposed. I read some deposition testimony with the notice of hearing today.

MR. NICKLAUS: I think there was some subsequent motions. We were not involved in the case at that time, Judge.

THE COURT: Understood.

MR. NICKLAUS: We had --

THE COURT: This is almost a year ago.

MR. NICKLAUS: It sounds a little bit like work product to me. This kind of information looks like --

THE COURT: Well, it is communications from third parties, he's saying, right. So if the public is sending him a communication where they're saying like we hate Fountainbleu, we can't believe they did this to you kind of a thing, those are the type of communications that he's seeking, right, from people who are interacting with his posts.

MR. NICKLAUS: I know, but somebody could go out now and say, OK, you send a couple of federal emails and then we produce them to Mr. Burstyn, it sounds a little up in the air. It doesn't sound like it is anything that is relevant at all to net worth.

THE COURT: No, no, not net worth. Now we are talking about compensatory damages. We shifted gears.

MR. NICKLAUS: Yes.

THE COURT: So he is seeking this as part of his

compensatory damages model here, where he's got this expert who is going to talk about the negative social media impressions that have been made by these posts, right. What are the remedial efforts that Fountainbleu has to do now to restore their image in the public.

He is saying that these communications bear on that shift in their image publicly. If people had been supporting what Rabbi Shmuely says in terms of it impacting Fountainbleu's image, they want to know what is the consuming public saying about this and what messages has he been receiving.

MR. NICKLAUS: As I understand, that was already covered in their expert's deposition. I don't know. Their expert's deposition. I can't tell you for sure.

I guess if there were massive or one or two emails sent to Mr. Shmuely supporting him --

THE COURT: It might be in his private messages on social media, right. If he is posting somewhere on his social media and people are DM'ing him, supporting his message or whatever it is and saying, you know, we think Fountainbleu is a bunch of bad people, those are the types of things that he is trying to get.

MR. NICKLAUS: I suppose. I don't think it is relevant. I think plaintiff -- I guess we could confine it to social media that was in control of or communicated with by Mr. Shmuely or Rabbi Shmuely as opposed to some social media

that he didn't have.

THE COURT: Yes. It is all communications he has received concerning the Fountainbleu Hotel.

MR. NICKLAUS: OK.

MR. BURSTYN: That would include email, text messages.

THE COURT: I gave you an example of social media because we have seen he is a prolific poster on social media, but, right, it is whatever messages he's receiving from the public about the Fountainbleu that pertain to the Fountainbleu's hotel image.

Is there any objection to producing that?

MR. NICKLAUS: No. If we have them, I guess we will produce them.

THE COURT: OK. In that case, in response to request for production No. 44, Rabbi Shmuely will produce any communications he received regarding the Fountainbleu Hotel, including messages that are bearing on the Fountainbleu Hotel's image specifically. OK.

MR. NICKLAUS: Keep in mind, your Honor, that the counsel here at this table did not search and look for evidence on social media. They don't have social media accounts. If we do it, it comes from our client, not us.

MR. BURSTYN: If I could address that. They have to. This has been an issue in the case.

All of the posts that we find, he's under a continuing

obligation to produce his communications regarding the hotel. That is the requests for production going back to day one, including today.

I just want to go on the record on that. It has been extraordinarily burdensome for my team and myself to have to go find all of this content. The burden is a burden that he bears because he keeps doing it, after he's been told in very clear terms to stop. They have to keep producing this.

He's creating this content. If they don't want the burden, he has to stop.

There have been massive gaps in discovery in this case, and it's because exactly what your Honor just heard, which is that -- and I recognize that it is difficult, but the difficulty is his burden to bear. It is not just Mr. Nicklaus. It is from inception. His counsel has just constantly said, oh, that is on social media, I don't do that.

This is a social media attack case. If they are not doing it, then they are not doing discovery.

THE COURT: I mean, to say that that would be the equivalent of, I'm not going to, on an ESI production, I'm not going to do ESI searches through my client's email, that would not be something that would be acceptable, right.

As attorneys you have to go through whatever is in your client's possession, custody, or control that has been court ordered that is responsive. You have an obligation to go

through and provide that.

So I mean, to that point, the social media, counsel is as responsible as their client to make sure their client is providing fulsome productions of whatever it is in social media accounts. It is a form by which he is choosing to communicate with the public and he is making the information discoverable by putting it out there and having these communications out there in the public.

So I will say, I think that it is the obligation -- it is not limited to Rabbi Shmuely. It also falls on counsel to make sure Rabbi Shmuely is providing a fulsome production when it comes to his social media. OK.

MR. NICKLAUS: Counsel, I'd like to -- your Honor, sorry, I would like one other point to be made before.

All of this subsequent social media stuff going back and forth or wherever it is going, flying all over the place, I don't know if it is possible to capture all that. I think we will need to go back and look at what existed at the time of the complaint with respect to the allegations in the complaint, and the things happening subsequent to it aren't really related.

MR. BURSTYN: We spent a lot of time working very hard on that, and the court did too, rejecting that argument.

THE COURT: It is an ongoing issue. Their reputation and the damage to their reputation didn't end the day that the

complaint was filed. It's been an ongoing matter.

That is one of the reasons why I required that as it relates to his AI posts, right. It wasn't limited to the date the complaint was filed. He wants to see -- if he is going to continue creating the social media posts, he has to realize that that continues to create a burden on him because there is more discoverable information that he continues to create in the case.

There is only so much -- I understand that you have told him and that you told me the last time you were here, Mr. Nicklaus, that you told him to stop, but if he chooses to keep on going and producing more content, there is only so much anyone can do. He has to keep on producing it.

MR. NICKLAUS: There is only so much counsel can do too, your Honor.

THE COURT: I understand. I understand.

MR. NICKLAUS: I think maybe we would all be better off without social media these days sometimes.

THE COURT: I tend to agree with you. Yes. I think social media does create a lot of problems for many reasons.

OK. Let's talk about any other issues that we need to talk about at today's hearing. It is already 6:00.

MR. BURSTYN: Thank you so much, your Honor.

I hope we can, given the court's order on this, very quickly dispense with the seventh request for production, which

relates to certain AI communications as well as the related subpoenas.

THE COURT: All right.

MR. BURSTYN: He has a bunch of AI-generated posts. No AI posts exists without chats and prompts and discussions.

We gave counsel the courtesy in our letter last week of sending over a link, to ask the AI service providers to just give you a download of your entire account. The fact that this is AI doesn't make it really any different than a search for Fountainbleu, go through his posts, produce the relevant posts to us.

We met and conferred and asked when we would get this information. Your Honor cautioned everybody three weeks ago, don't wait for my order because it could be adverse to the defendant and he could have to produce stuff, so get working on it.

I suspect we are going to hear today, your Honor, that there have been no efforts to start collecting and reviewing this information at all. And then when we get to the very last part of this hearing soon what we are going to hear is, well, Judge, we need more time, we can't get it all done now, at which point I will argue these requests for production have been outstanding for over a month. That is a problem of their own making.

So he should be required -- he's been required to

produce these documents. I think the issue is simply when. We propose two days from now, which we think is generous because they should have been collected already, and they were already ordered produced.

With respect to the subpoenas, we believe the court needs only enter an order telling him to email the service providers from the email accounts he uses, he used to make the accounts, asking them to give over all his data. Once the service providers give over all of his data, counsel can review it all and then produce it as they would anything else.

*Laswell*, which we cite in our materials, collects many cases. This is not the first case to have to deal with this, requiring defendants to collect these documents and ordering defendants to consent to the release of such information.

Those are requests for production 1, 3, 4, and 7 in the seventh set of requests for production.

THE COURT: All right. So Mr. Nicklaus, with regard to the seventh request for production -- I noted the timing was unfortunate that I got you all the order after you had already served the responses to the seventh request for production later that evening. Unfortunately, I was out with the flue for several days last week.

So aspirationally I was hoping to get you all that order no Monday, but I was not able to. So I wasn't able to get it to you all until Wednesday night.

So I know that you all have lodged objections. You didn't know what the ruling was going to be at that time. But since then I have ruled and I have determined that requests 1, 3, 4, and part of 7 are within the scope of the discovery that Judge Kuntz/Judge Moore have allowed in this case.

It is damages discovery. Preserving the ability to lodge any objections to anything that may be work product if that was done with the purpose that it was done, the primary purpose that it was done in anticipation of litigation.

So let me hear from you all. We are only going to talk about 1, 3, 4, and 7, in part, consistent with my ruling.

MR. NICKLAUS: Your Honor -- I'm sorry. Go ahead.

MR. PERKINS: Brandon Perkins. I am going to take this aspect of it.

THE COURT: All right. Go ahead.

MR. PERKINS: Your order, obviously, just came in, and you indicated you had the flue between the time it came in and today. I promise you the most I have been in one place is sitting in this courtroom, and I have not had a chance to go through line by line all of our options.

We will be exploring what options we have, including with appellate counsel. I say that just to throw it out there. I don't want to agree to any deadlines that we are going to do this, we are going to do that, and then somebody say, oh, waiver.

This has been like drinking out of a firehose since we've gotten here. We have done everything we possibly can to make it easier for Mr. Burstyn to comply with the court's orders and to deal with, let's just say, a client that we have to deal with. OK.

So when we look at the specific request for production No. 7 that they ask for and what you are requiring us to produce with AI, we don't want to agree that we are going to write a letter to the AI providers and agree to that, like waive rights. It is what it is, your Honor.

I realize Mr. Burstyn would like us to say, oh, we'll just type into Chat, Chat, give us all the chats we've requested before. But unless your Honor orders us to do something like that, we are going to stick with the objections that we made and we are going to talk with our appellate counsel as far as what options we have after your order came out.

MR. BURSTYN: There is no, unless you think an order --

THE COURT: Hold on. The objections to relevance have been overruled.

MR. PERKINS: I understand. I understand.

THE COURT: And your client, regardless of whether or not -- we will deal with the subpoenas. That's a different issue because that is requesting information from a nonparty.

Your client should have possession, custody, and control over those chats, which means that your client is under an obligation to produce those.

MR. PERKINS: And what we are saying is, if you are ordering us to produce those, we will take your order and we will tell our client to do it.

I think you understand the position we are in. We will do the best we can. OK. But I just don't want to sit here and waive arguments before we have had a chance to go through your order from the 26th, because between the time you entered your order --

THE COURT: The 21st. Today is the 26th.

MR. PERKINS: -- from the time you entered your order, I have had zero time. We have also dealt with sickness in my family, all the way up to today. It's been very expedited.

So when counsel gets up and say, oh, they've had these a month, for one, it is only a month and, for two, we really haven't. All I've heard today is counsel will give his argument, he will then give our argument, he will then tear down our argument, not taking into account that we have only been here, at least on this, a month. We are still in it. You are expediting all of this for us. We are doing the best we can.

THE COURT: Well, the thing is we are not in a typical situation here, right. Discovery was only opened for 30 days

and then you all filed a motion and Judge Kuntz gave, I believe, an extra week or ten days.

Ordinarily I am happy to give people more time. I don't like putting attorneys in a time crunch. I understand this is not your only case, and I understand that you all came into this case and you had to dive right in to catching up on everything that's happened, plus doing a ton of work, all on a very expedited basis. I don't take that away at all. But we have a timetable here that Judge Kuntz has set, which I think is November 9th, by which all of this stuff has to get done.

Unless you are intending to go back to Judge Kuntz and ask for more time, I am limited by Judge Kuntz's order. I can't give you all more time. I can only work with the timetable that Judge Kuntz has given us.

So if you all want to go back to Judge Kuntz and see if he'll give more time, I will leave that up to you all. Right now that is what I've got to work with. I don't have anything else to work with.

Let's talk about, and I have and I understand if you all are in the process of consulting appellate counsel and you all want to appeal my ruling to Judge Kuntz. That will be up to you all to do that. You have 14 days from the date in which I issue my order to file any appeal of discovery ruling, and that is certainly something that is within your power if you choose to do that.

In the meantime, the discovery rulings stand and so I need to give you all deadlines so we can get everything done by November 9th.

MR. PERKINS: Right. My point is, I didn't want to get up here and say, OK, let's do this, let's agree, and then appellate counsel says, OK, I'm ready, here it is, and then we go and Mr. Burstyn says, well, no, now you've waived because, remember, you were there in front of the magistrate and you said X, Y, and Z and now you're taking a different position.

So I just want to make it very clear, we haven't made a decision yet on taking the appeal under the rule to Judge Kuntz. We probably are going to do that. But yes, let's discuss dates so we can be on the same page if that doesn't happen, and we probably will request more time.

If Judge Kuntz gives us more time, we can come back and ask for altered dates.

THE COURT: Certainly if Judge Kuntz gives you all more time, then you can come back to me and I can give you all relief, right. I can give you more time to take the deposition, I can give you more time to produce the documents. Right now I don't have that, and I don't know what Judge Kuntz will do with your motion.

So November 9 is our deadline. But we have got the plaintiff's deposition, which everyone has agreed for it to take place on November 4.

MR. BURSTYN: Defendants, yes.

THE COURT: I'm sorry. The defendant's deposition.

MR. BURSTYN: For the record, I don't --

THE COURT: Yes. Thank you. It's 6:00. It's been a long afternoon.

MR. BURSTYN: Thank you, Judge.

THE COURT: All right. Mr. Perkins, lets me hear from you in terms of timing, because if this deposition is set on November 4, which is what day next week, next Wednesday, that really is, I mean, we are just, this is nine days away, nine calendar days away.

So let me hear from you in terms of timing.

MR. PERKINS: We would like as much time as possible, with the understanding that we are probably going to pursue our options with Judge Kuntz on your ruling.

Ideally, we'd like the whole deposition moved back to December. We don't even want to get there because, like you said, we are all constrained by that ruling.

If your Honor could recommend to Judge Kuntz that he push it back, maybe that would help us when we file a motion if we're both saying the same thing. Perhaps Mr. Bernstein would agree that everything should be pushed back and then we could all approach Judge Kuntz to see if we can get relief.

THE COURT: So I do want to just -- it's Burstyn, not Bernstein.

MR. PERKINS: I'm sorry, your Honor. I am from Fort Myers and we know Smith and Jones.

MR. BURSTYN: That was well played, let me just go on the record.

THE COURT: All right. So I can't give you a deposition date in December. Right now November 9 is the latest.

I don't know if you all want to have a conversation, and perhaps you need to make a phone call to your client to see if you all want to change the November 4 date. I know we started the hearing where Mr. Nicklaus said November 4 is the day.

Do you all want to revisit whether November 4 is the day?

MR. NICKLAUS: No, your Honor, we don't. We want that taking place. We want that deposition taking place. Believe me, I had a lot of blood drawn off my desk in order to get that done this morning.

THE COURT: OK. So November 4 is the day.

MR. NICKLAUS: That's it.

THE COURT: OK. All right.

MR. NICKLAUS: As far as I'm concerned it is.

THE COURT: All right. I am just trying to work with you all to try to give you more time for document production.

MR. NICKLAUS: My client says he will go with it as

well.

THE COURT: OK. So in that case I could give you all a week and then that gives Mr. Burstyn two business days to review the documents to prepare for the deposition. That gives you all a week to be able to compel everything.

Does that work for everyone?

MR. BURSTYN: It does not. It gives us one business day because we are going to get it 10 p.m. Monday night.

THE COURT: I can give a time. I can say by 10 a.m., and that gives you the entire business day, minus one hour. They might have legal -- if their legal system needs time to upload things, I want to give them time to do that.

MR. BURSTYN: It is financials. I have an expert who needs to look through it. I need to prepare.

I just want to point out the defendant has done nothing to comply with discovery.

We respectfully think it is unfair to my client and my colleagues to get dump with this because he is just starting now, on Monday. We asked in our proposed order for a shorter period of time. Your Honor told them that they were going to get very little time after this to get things done and to get started before.

They are coming to you saying they didn't do what you told them to do. And delivering this to us Monday, with a day and a half to sort through a bunch of financials, a bunch of

emails puts the prejudice of that delay onto my client, where we don't think it should sit.

I understand a few days isn't realistic, but the difference between Thursday so that my colleagues can have time to go through it, our expert can go through it, would be helpful, particularly where we have a short amount of time during the deposition to go through what might be a lot.

I am going to be, if I get these documents on Monday, not before the weekend, I am going to be looking at things for the first time at the deposition, because there is no way we are going to finish the review.

The alternative would be to put the prejudice of defendant clearly doing nothing to provide us with discovery onto my team. I am not trying to be unreasonable. They were warned not to do this and shouldn't have basically every yard up until the deposition to get things together.

THE COURT: All right. Mr. Nicklaus.

MR. NICKLAUS: Yes, your Honor.

THE COURT: I saw you stand up. Go ahead.

MR. NICKLAUS: To say counsel hasn't done anything is a pretty good stretch. We have been working on this case to catch up ever since we received it.

The discovery that we went through, the 47 requests for production, were not due originally until the 22nd, and then the seven subsequent requests for production were not due

until the 25th. I mean the 22nd and the 25th.

So we are not too far behind what the original rules were, but we have provided this information to our client as much as possible. We have gone as far as we can to try to make sure that we communicate with him. Not all at one time or on a one-week basis. It is almost everyday trying to get this stuff done. As I said, he is not the easiest client to get along with, but I can tell you we have been working on this as diligently as possible. We are going to do what we can possibly do. Of course we don't want to waive any objections our client may have as well.

I am prepared to do anything else. I have other cases as well. I have mediation. Last week I was in mediations when you entered your order. That is one of the reasons I didn't get to see it. I was in another mediation in another case all day.

THE COURT: That is probably because I entered it at 8:00 at night. That is probably why you didn't see it.

MR. NICKLAUS: Yes. I usually don't go home until about 9:00. I'm pretty well with you on that.

Listen -- and Mr. Perkins is the same way. He's been all over the country in the last couple of days.

Like I said, we are going to do our best. I asked counsel to be reasonable, and of course he'd like to keep his thumb on Mr. Shmuely. I can understand that. I think we are

going to try, as counsel, to do the best we can do.

THE COURT: Well, what is the deadline that you are asking me to set? The best I can do is not something I am going to put into the order.

MR. NICKLAUS: I think you could -- well, let's see. We have a trial date the 22nd of February. We have a pretrial conference scheduled for a certain time. I would ask for a little bit more time, particularly up through December.

THE COURT: No, no, no. Judge Kuntz said November 9 is the deadline, folks. I can't go past November 9, and you want to keep the deposition on November 4. Mr. Burstyn can't take this deposition without the documents. So we have to proceed in an orderly fashion here.

MR. NICKLAUS: Listen, I don't want to cancel the deposition. I want to get that over with.

I don't know whether I am going to be able to get all the documents to him or not. That is a tall order.

MR. BURSTYN: One of the --

THE COURT: Listen, three weeks ago you all were here and I read him the transcript. I remember saying it, and I'm pretty sure I put it into my order to not wait.

We had agreed at the last hearing. You said to me I agree that everything that is in *Stern v. O'Quinn* for a two-year period is discoverable.

Today Mr. Burstyn showed me a box. It was an empty

box. It had one piece of paper in it. It was very dramatic. That is all you produced.

So what happened in the last three weeks? You told me it is *Stern v. O'Quinn*. You were going to produce those documents, no objection, for a two-year period, and I said don't delay, produce those before we have the next hearing.

MR. NICKLAUS: I, in good faith, told you the truth at that time, Judge. I haven't been able to get the documents. That's all. I am just telling you.

Look, I would suggest, you could recommend to Judge Kuntz that we have a little more extension of time.

THE COURT: It is not my job to advocate for the parties.

MR. NICKLAUS: I know that.

THE COURT: You are fine lawyers and you all can advocate for yourselves.

MR. NICKLAUS: OK. All right.

MR. BURSTYN: One side here is going to be up late. It is either my team next week before the depo, having, frankly, done nothing wrong, or it will be the defendant.

I just want to point out, we had asked for responses and objections to come in earlier than they were ordered at the last hearing. The court went with their proposal to get responses and objections last week on the basis of the defendant's sworn affidavit saying he was going to be in Hawaii

for the month of October. That is why your Honor accommodated them and gave them a later time on the responses and objections, at the risk of being --

THE COURT: I do remember that.

MR. BURSTYN: I would just like to report, to the best of our knowledge in all these posts that he was never in Hawaii.

THE COURT: All right.

MR. BURSTYN: This should come in on Thursday.

THE COURT: Here is the deadline. The deadline is midnight on Friday. That will give the plaintiffs through the weekend and all day Monday and all day Tuesday to be able to review the documents to be prepared for the deposition on Wednesday, November 4.

That gives the defendant all week to compile documents and information that he already knew some of this he was going to have to produce. So he was already on notice, and he even agreed that he was going to have to produce, and then some of it is extra stuff that I required that he produce today. He should have already gotten a head start. I told him to get a head start on this stuff because there was going to be discovery that was going to be subject to production, that everyone agreed was going to be subject to production.

So that gives them four business days to compile it and put it together and have it delivered to plaintiffs by

midnight. I am giving you as much time as I can this week, folks, in order to put it together.

The plaintiffs do have the ability, the right to be able to prepare for the deposition, and if they are going to choose to work on the weekends, they have the weekend to do it. But at a minimum, they are going to have two business days to be able to do it, as well next week to prepare.

I think it is the only fair way that I can give you all as much time as possible to produce the documents and give the plaintiffs enough time to be able to prepare for this deposition that everyone wants to go forward on November 4. So here's where we are in the deadlines.

OK. What else?

MR. BURSTYN: I just want to state on the record --

MR. NICKLAUS: The deadline for Mr. Burstyn to supply us with the documents we requested as well?

MR. BURSTYN: It's not --

THE COURT: First, he indicated that he will be supplementing and providing those emails tomorrow. He indicated that on the record.

MR. NICKLAUS: That's fine.

MR. BURSTYN: Just so we're clear, I think Mr. Nicklaus is referring to responses and objections that were served -- we will produce certain trust-related documents we received tomorrow.

THE COURT: You mean all these emails that you're copied on and things like that?

MR. BURSTYN: Yes.

THE COURT: OK.

MR. BURSTYN: To the extent Mr. Nicklaus is referring to a request for production that his office served us on Friday, that is not before the court. We haven't even responded or objected. So we are not producing anything responsive to those requests. I just want to be clear for the record.

THE COURT: I don't know what that request is.

Mr. Nicklaus, are you asking for a date certain for you to receive all these trust documents, these emails in which they are copied where Mr. Burstyn has these tidbits of information about, like, the Israel property and other things we have talked about during today's hearing? Is that what you are referring to?

MR. NICKLAUS: Yes.

THE COURT: OK. He says he will get that all to you by tomorrow.

MR. NICKLAUS: And then --

THE COURT: Into the microphone. Into the microphone.

MR. NICKLAUS: We have sent a --

THE COURT: Into the microphone. If not, your voice is not going to be captured on the record.

MR. NICKLAUS: Sorry.

THE COURT: That is OK.

MR. NICKLAUS: We submitted a separate request for production. It was a one-page item that had a list of things as well.

THE COURT: OK. Are you asking for some relief with regard to that?

MR. NICKLAUS: I'm asking the time to be shortened on that, because the rules require 30 days. We sent a request for production and just respond to it, is all he can do.

THE COURT: So you're seeking for an expedited deadline, like Mr. Burstyn did last time when he was before me with regard to the discovery?

MR. NICKLAUS: Correct.

THE COURT: OK.

MR. BURSTYN: I noticed that issue. This was just served Friday. It is coming up now. I emailed the court on Friday with issues and identified them.

This is being identified for the first time. I haven't even gone through these requests for production. He described some of them as relating to our surveillance footage. It is not even damages discovery. It is their client is retaliating with a strike back, a use of our request for production back on them about the surveillance footage and stuff that has nothing to do with the scope of discovery.

It is not a noticed issue. If he wants to notice it --

THE COURT: But you all want to come back here? I mean, it seems to me like you all have more important things to do in the case, like working on the discovery production. You want me to give you another hearing day to come back?

MR. BURSTYN: I don't know what he -- do you know how many requests there are?

MR. NICKLAUS: 16. They're simple ones.

MR. BURSTYN: When would you like responses and objections?

MR. NICKLAUS: Friday's fine.

MR. BURSTYN: OK. You will have them on Friday.

THE COURT: OK.

MR. NICKLAUS: Thank you.

MR. BURSTYN: I might be about to get fired by my colleague.

(Pause)

MR. BURSTYN: Pardon. Your Honor, the local rules prohibit requests for production that are served prior to the deadline, prior to the response deadline. So --

THE COURT: You mean where the responses would not be due until after the discovery deadline?

MR. BURSTYN: Yes.

THE COURT: If you recall when you propounded your

requests for production, you were in the exact same boat and here we are and I expedited the responses. What is good for the goose is good for the gander.

MR. BURSTYN: I understand. I just wanted to point out that we are going to be doing this as per the court's order and we are not waiving the argument that these requests are untimely. That is all I want to say on the record.

THE COURT: Right now I am not ruling on objections at all. I don't even know what these requests for production say.

So certainly you will be free to raise whatever objections. I don't know if they fall within the scope of damages discovery or not. I have no idea.

MR. BURSTYN: I understand. I understand.

I just want to point out that we are being ordered to produce, to expedite our responses and objections by Friday of this week, which we will do. The Fountainebleau is not waiving its argument that the requests are untimely, as well as any other arguments.

Finally, there's been a pretty clear signal that we are not going to get the documents that the court's going to order today even by Friday because of allusions to an appeal. We would like to go on the record and state --

THE COURT: I don't think the appeal -- I think the appeal was maybe only to the AI documents.

Let me be very clear. Whatever you appeal, that is

the only thing that tolls the discovery responses. Everything else, unless you are appealing it to Judge Kuntz, will be in plaintiff's counsel's hand by midnight on Friday.

The only way discovery will be tolled is because an appeal is filed. Because otherwise, it will be a violation of my court order. So let me make that real clear, that those are the rules under which we are operating.

Everything will be in plaintiff's counsel's hand that has not been appealed by midnight on Friday. If nothing is appealed, then everything will be in his hands by midnight on Friday.

MR. BURSTYN: If they choose not to give us documents before the deposition and we take the deposition, it is the plaintiff's position that is without prejudice to another subsequent deposition when they actually do give us the documents. Because right now they are setting us up where we are not going to get the complete set of documents that's being ordered to be produced and then we are going to have no time to work that out before the deposition. So that is plaintiff's position.

THE COURT: All right. I hear your position, but as of right now I am going forward assuming that the documents are going to be produced on Friday and this deposition is going to go off without a hitch on Wednesday of next week.

MR. BURSTYN: God bless this court. Thank you for all

the time, everybody's time. This has been quite a marathon. Thank you.

THE COURT: All right. Is there anything further we need to discuss?

Mr. Nicklaus, anything further on behalf of the defendant this afternoon?

MR. NICKLAUS: Not today, Judge.

THE COURT: All right. Not today. All right, folks.

We will issue an order that we will endeavor as quickly as possible to get you all, all the rulings from today so that you all can continue working. But don't wait on my order to be working on these things.

OK. We will try to get it to you hopefully by the end of the day tomorrow. OK. Yes.

MR. NICKLAUS: I appreciate your time. Thank you, Judge.

MR. BURSTYN: Thank you for the time, your Honor.

THE COURT: All right. Thanks, folks.

(Adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription to the best of my ability of the digital audio recording in the above-entitled matter.

October 29, 2026 s/ Joanne Mancari

Joanne Mancari, RPR, CRR, CSR
Court Reporter
jemancari@gmail.com