# EXHIBIT I

---

**From:** Sam Feldman <sam@feld.law>
**Sent:** Thursday, September 18, 2025 5:33:30 PM
**To:** Bimaya De Silva <Bimaya.DeSilva@burstynlaw.com>; Danielle <Danielle.Weisman@wilsonelser.com>; Benford, John Y. <John.Benford@wilsonelser.com>; Heitman, Alyssa J. <alyssa.heitman@wilsonelser.com>; Bertelsen, Jacqueline <jacqueline.bertelsen@wilsonelser.com>; Ezeta, Daniela <daniela.ezeta@wilsonelser.com>; Matthew Mainen <Matt@njaclaw.org>; Kristin <kristin.carlson774@gmail.com>
**Cc:** Sean Burstyn <sean.burstyn@burstynlaw.com>; Todd Friedman <todd@toddfriedmanpa.com>; Andrei Dambuleff <andrei.dambuleff@burstynlaw.com>; BurstynLaw Docketing <docketing@burstynlaw.com>; Mark Goldfeder <Mark@NJACLaw.org>
**Subject:** BOTEACH V. FONT -- DEMAND FOR $100 MILLION, ABANDONMENT OF ALL CLAIMS WITH PREJUDICE, AND A TELEVISED 30 MINUTE APOLOGY TO THE RABBI, FOR LIABILITY RELEASE

We demand you tender the sum of $100 million to us, and entirely yield otherwise, and very publicly and sincerely apologize to Rabbi Shmuley, all within the next 14 calendar days. We will do you an undeserved favor, true charity to an operation that is not doing anything good for humanity and plenty bad, for a global liability release. That is our proposal to resolve this lawsuit. I suggest you consider it *very* carefully. Because, if you turn it down, maybe the future will retroactively reveal our present generosity. I think the figure should be much higher. But, hey, who am I, right? I'm just a guy that knows when some bastion of Corporate America reallyyyyyyy shit the bed . . . . and opened all the way wide their corporate coffers for a huge ensemble of zeros behind a non-zero number to make their way to us, the good guys. I don't want to give any of you a heart attack, now, so I felt a stroke of mercy and decided to temper the tension a bit with the note below. But I still hope I get to file this demand. Enjoy.

* * *

Response to your service of this "written discovery": Thank you! For these great papers / writing. I don't want to leave you guys hanging for full time until our R&Os, so I wanted to leave you with some breadcrumbs to wet your beak, banter with you all a little bit, tease you a bit, friendly competition type chatter, on . . . hmmmm . . . could do any of the 3, so much to work with, but let's do RFAs. And I will give it to you in one, nice, neat, massive, justified, paragraph.

Bad news (for you): Did you know Florida does not have a specific statute for civil extortion? Under the common law, a plaintiff must show the defendant made a threat to obtain a benefit such as money, property, etc. A plaintiff must show that threat was *wrongful*. The Florida courts define wrongful as predicated upon undue influence, pressure, coercion, intimidation, strong-arming, aggressive bullying. Additionally, wrongfulness cannot be kindred to colorable liability. Meaning, there could be no reasonable mind to determine the party being accused of "extortion" was, in fact, aggressively negotiating and advocating to try to receive some compensation pursuant to legit liability of, here, the hotel, to the accused, here, Rabbi Shmuley. Otherwise, we call this a . . . "litigation demand." :) Basically every other day, I write a short letter to the effect of: Hello. I represent Fibbin Goldfarb. You incurred liability to Fib by [recitation of actionable conduct]. We demand you pay us . . . 0.000001% of our conglomerates annual revenues. (Damn, that figure is oppressive; I mean there is virtually no option, that poor defendant must comply, right? Truly forced, no way out.) Those demand financial metrics. Which we fraudulently report to the market by several dynamics such as total absence of required internal controls over financial reporting. (Oofta, Messrs CEO and CFO, for those damn SOX certs allllll the way at the bottom in our Forms 10-Q and 10-K.) Otherwise, I am going to file a big scary lawsuit, aka, I am going to use our country's proper dispute resolution vehicle to vindicate my rights! I have lodged many SHARK-LIKE, rock-the-boat type, litigation demands . . . for . . . sums . . . over . . . $100mm. Do you think I get sued for extortion? Ever once? It's called: legit liability. Uh oh, don't let me one-up you: My forthcoming theory of YOUR CLIENT's extortion, which will have many happy equally strong certainly viable brother and sister claims arriving concurrently, will, respectfully, be much closer to the mark. . . . . Okay, fess up: Which first-year over there stuffed some botched prompt into Lexis Protégé, and put personal touches on to further screw up the already-incorrect output? And what partner overbilled to pretend to review it, and thus missed every single, did not correct any single, of the many aspects of and assumptions within your ridiculously wrong (in light of the law) conclusions? In the unlikely chance those over-billing partners actually did review the first-year's junk . . . . . . Wow. Those optics would be quite worse for y'all. Anyways, that undue influence must be so powerful, it virtually overcomes the plaintiff's free will. The Florida courts clearly differentiate between aggressive bargaining, negotiating, applying proper leverage to try to resolve a dispute, vindicate a right, or get back at someone for screwing them over -- all of which are *not* actionable -- and conduct sufficiently more egregious than those examples to rise to extortion. A plaintiff must show that, due to a reasonable fear of harm flowing from the defendant's "threat," that the plaintiff ultimately capitulated and complied with virtually all of the demands kindred to the threat, *i.e.*, paid the ransom, because, in light of the pressure applied by the defendant to the plaintiff, the plaintiff reasonably felt it had no other choice or way out. The plaintiff must establish all of a long list of very specific qualities about the threat. It must have been very detailed, coherent, pointed, targeted, terms of when, where, who, how it will go down and "be ugly" if the poor plaintiff

does not meet all requirements tandem to the threat . . . all of which, again, must be very specific in several ways. Boils down to: If you don't complete all of [hyper specific detailed demands], *e.g.*, place exactly $50,000 in a briefcase and leave it by the mailbox at my grandma's house, before knocking on the door to tell her a package has arrived for her grandson, and deliver these Christmas cards I've made for her while you're on site, and grab some of her choc chip cookies to bring back to me, and keep your mouth shut for the rest of your life, and then send me $10,000 by wire to Account No. 69 on the first of each month into perpetuity . . . oh boy . . . I am going to [hyper specific detailed threats]. I'll let you use your own imagination to come up with an example of the latter set of requirements. But, again, based on what I've already told you, just know, it must make the plaintiff feel that they have NO CHOICE. Such that their decision whether to comply with the threat is illusory; they are forced one way. Illusory just like the grimy unconsummated proto "oral contract" your Goldfarb shamelessly begged through, saying your crap hotel would jump through a series of performative hoops including sensitivity retraining, ones without any credence for ensuring institutional memory of the techniques, information, whatever updates you guys did not make but should have, from personnel to personnel in your revolving-door security department, to ensure Jews could become safe again . . . conditions on which you never followed through. Conditions which quite conveniently did not touch on discussion of existing policies and procedures, and updates proven necessary by the incidents suffered by Rabbi Shmuley and many other Jews thanks to your shit hotel. Did you know going back like some 70 years, there was a whole ass fire in your building targeting Jews? And the circus of many further incidents of endangered Jews experienced by you and your weird Turnberry overlords and private equity daddies . . . ? Don't worry, we are "adding them to the chat" shortly. Time for one of those fat checks they are writing to end up in ourrrr pockets, not yours. Time for me to EXPOSE, EXPOSE, EXPOSE, Jeffrey Soffer. We recently learned some very interesting thingssss . . . . Hopefully, your insurance carriers will still cover some aspects of the catastrophe to unfold for your clients. But . . . . I have spent enough time wallowing through commercial insurance policies including D&Os with all sides . . . I look forward to reading every single word of every single policy related to every single one of the soon-to-be expanded ensemble of named defendants, but based on my past experience alone, I know they do tend to carve-out indemnification, advancement of expenses, coverage whatsoever, etc. for problematic ones like . . . crimes, intentional torts, certain securities claims. Scout's honor, I am going to "thread those needles" . . . and many more. Returning, that sentiment of "I have no choice so I must comply with the ransom terms" must be reasonable. Your client is a big stinky hotel network of . . . ? Rabbi Shmuley is an honorable man. You are talking about figures like $1,000,000 -- and doing so in ways that, per our ongoing factual investigation -- unfortunately seem at least partially patently false in a way you must either know or have failed to minimally investigate. Have you checked your parent's / affiliate's / individual location's net revenues at all recently? Are those figures, in light of $1,000,000, reconcilable to conclude poor little Fountain Blew had virtually no choice? You guys should have jumped with joy upon receipt of such an offer if it even did happen, which we have pretty tight reasons to doubt in light of your mosaic of credibility losses constantly manifesting here and elsewhere in case developments. You should have paid the $1,000,000 because you would have got away with a highway robbery . . . meaning securing liability release for claims that, I promise you, will result in MUCH HIGHER RECOVERIES. Whoever made that internal decision to say no, if that request even happened, which it probably didn't, and instead decided to wage a frivolous lawsuit and many other improper attempts at leverage versus an individual, in bad faith, in abuse of the court system, including the discovery process, a rabbi and his family, who, despite his international rock-star celebrity status, you did not protect with the additional security measures with which you routinely have accommodated other humans you must deem more important "celebrities," despite their virtual worthlessness or very low value in terms of meaningful conduct, purpose, rarely positive, presence in the world, if any? You did so to try to strong-arm him into silence? (Uh oh, to the person with whom the buck stopped, whoever pulled that trigger, and to the entity at which they work, I hope you have good malpractice insurance.) Silence about warning our fellow community members of the truth that they were not safe to patronize your overrated (meaning it is poorly rated but its rating should be even poorer), overpriced shitty hotel, where you use a lot of questionable tactics to try to juice your bottom-lines, *e.g.*, intentionally allow prostitutes to frequent the bar scene as we know from confidential witnesses, former employees, and public information that is abundant, and you do so knowingly. It was the hatred and violence of many people and groups over a very long history of exterminations and expulsions that basically, by natural selection, ensured it was only those Jews like us who are mindful to warn our fellow Jews of dangers known, and to listen to such warnings from our fellows, were those who survived. Do you know anything about the social dynamics of a meerkat community? I invite you to look into some of the peer-reviewed research / publications on topic of how meerkats arrived to engage in certain group-wide behaviors. I will give you one tidbit to wet your palate probably dry from that hotel's stale air: if the look-out meerkat on duty during a particular time is unfortunately subdued by a predator, it is almost certain all or close to all of the entire remaining group will perish shortly thereafter. Your own social page was the source of most of the bad publicity surrounding your despicable conduct; you were in control of keeping that up, which you chose to do. Yes . . . I am laughing at you too, not just Shmuley. I am laughing at you for that previous self-inflicted wound. And I am laughing at the amateur hour ongoing wherein somebody over there thinks that's an actionable statement about cancellations. By the way, have you seen your BBB ratings and complaints about obstacles to cancellations, your thefts in connection, and other slimy conduct? You are lodging this claim in response to a Rabbi's communication to our community of a despicable episode of antisemitism that happened, front-and-center, at your busy establishment. One of your workers fist-bumped the guy who berated Shmuley after that loser did so. By the way, these events transpired in your strange-smelling, public location, in presence of many witnesses and recorded in clips that do not even match up with your recitation of the dialogues from your "complaint." You did not intervene, stop the attacker, have minimally adequate security staff on standby in light of industry standards. By the way, Shmuley got attacked at your strangely-named establishment in similar fashion years ago such that you knew this breed of attack to not only be highly likely, but . . . see where I'm going? You disrupted the law enforcement investigation including by refusing to provide security tapes that

would have shown the attacker's face and allowed neutralization of the ongoing threat to Miami Beach's dense Jewish community. You did so during a time of statistically all-time-high and exponentially growing rates of antisemitism and violent hate crimes against Jews. Put differently, you went out of your way to do something very strange and tending to suggest guilty conscience, in order to ensure the ongoing threat to the safety of Jews was perpetuated. You appointed your head of security with first-hand factual knowledge as your 30b6 corporate rep and still had a little disaster today.

PS! Here are some decent hits from my highlight reel. Please, I would be flattered for you to investigate the dockets closely and glean some of my work, and the lawyers and firms who tried to stop me, and what happened ultimately. I promise I did not waste the time to assemble this for your viewing. We are filing some big cases, conveniently was available for my copy-paste in an adequacy paragraph under Rule 23, that tricky class action one.

PS If you say know, I already have the PFS drafted to file. ;)

***In re Snap Incorporated Securities Litigation***, Case No. 2:17-cv-03679-SVW-AGR (C.D. Cal.) (Wilson, J.) (our small Kessler Topaz case team litigated aggressively against top-flight defense counsel to recover **$187,500,000** for class members who invested in Snap common stock during the class period from the March 2, 2017 initial public offering -- registration statement for which contained materially false and misleading statements downplaying competition from Instagram which mimicked Snap's signature "stories feature" -- through the corresponding corrective disclosures of August 10, 2017, which revealed the truth underlying Instagram's competitive threat causing Snap's share price to tank upon removal from the same of the fraud's artificial inflation); ***Baker v. SeaWorld Entertainment Incorporated***, Case No. 14-cv-02129 (S.D. Cal.) (Anello, J.) (recovered **$65,000,000** for investors defrauded by misrepresentations concerning the impact on park attendance of the notorious *Blackfish Documentary*); ***SEB Investment Management AB v. Endo International PLC, et al.***, Case No. 2:17-cv-3711 (E.D. Pa.) (Savage, J.) (recovered **$82,500,000** for defrauded investors); ***In re Advance Auto Parts Incorporated Securities Litigation***, Case No. 18-cv-00212-RTD-SRF (D. Del.) (Noreika, J.) (recovered **$49,250,000** for defrauded investors); ***In re Acuity Brands Incorporated Securities Litigation***, Case No. 1:18-cv-02140 (N.D. Ga.) (Cohen, J.) (recovered **$15,800,000** for defrauded investors); ***In re Adeptus Health Incorporated Securities Litigation***, Case No. 4:17-cv-0449-ALM (E.D. Tex.) (Mazzant III, J.) (recovered **$44,000,000** for defrauded investors); ***In re Under Armour Securities Litigation***, Case No. 1:17-cv-00388-RBD (D. Md.) (Bennett, J.) (recovered **$434,000,000** for defrauded investors); ***Dahhan v. OvaScience, Incorporated, et al.***, Case No. 1:17-cv-10511-IT (D. Mass.) (Talwani, J.) (recovered **$15,000,000** for defrauded investors); ***Flynn v. Exelon Corporation et al.***, Case No. 1:19-cv-08209 (N.D. Ill.) (Kendall, J.) (recovered **$173,000,000** for defrauded investors); ***Hudson v. GoHealth, Incorporated***, Case No. 1:20-cv-05593 (N.D. Ill.) (Daniel, J.) (recovered **$29,250,000** for defrauded investors); ***In re Cognizant Technology Solutions Corporation Securities Litigation***, Case No. 2:16-cv-06509-ES-CLW (D.N.J.) (Walls, J.) (recovered **$95,000,000** for defrauded investors); ***In re Valeant Pharmaceuticals International Incorporated Securities Litigation***, No. 3:15-cv-07658-MAS-LHG (D.N.J.) (Shipp, J.) (our small Robbins Geller case team battled uphill against top-flight defense counsel to recover **$1,200,000,000** for defrauded investors -- the largest pharmaceutical securities class action recovery of all time).

Samuel C. Feldman, Esq.

Feldman Law Firm PLLC

71 Northeast 27th Avenue

Pompano Beach, FL 33062

(954) 682-8590 / Phone

(954) 941-7003 / Fax

Sam@Feld.Law